UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MELINDA WILSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-73 |
| | ) | |
| AMERICAN POSTAL WORKERS | ) | |
| UNION, DELAWARE AREA LOCAL, | ) | |
| AFL-CIO; and UNITED STATES POSTAL | ) | |
| SERVICE, an independent establishment of | ) | |
| the Executive Branch of the Government | ) | |
| of the United States of America | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## Table of Contents

Transcript of Melinda G. Wilson with attached exhibits ....................... A-000001

Transcript of Steven Collins with attached exhibits .......................... A-000091

Transcript of Carla Van Istendal with attached exhibits ...................... A-000109

Transcript of Andrew Keen with attached exhibits ........................... A-000130

Transcript of Linda Drummer with attached exhibits .......................... A-000146

Declaration of Steven Collins with attached exhibits ......................... A-000155

**W&F**

**WILCOX & FETZER LTD.**

## In the Matter Of:

# Wilson

## v.

# American Postal Workers Union

### C.A. # 05-073 JJF

---

### Transcript of:

### Melinda G. Wilson

### October 7, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-000001

Wilson                                    v.                American Postal Workers Union
Melinda G. Wilson              C.A. # 05-073 JJF                    October 7, 2005
Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 3 of 43

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MELINDA WILSON,                          )
                                         )
            Plaintiff,                   )
                                         )
v.                                       ) Civil Action No.
                                         ) 05-073 JJF
AMERICAN POSTAL WORKERS UNION,           )
Delaware Area Local AFL-CIO, and         )
UNITED STATES POSTAL SERVICE, an         )
independent establishment of the         )
Executive Branch of the Government       )
of the United States of America,         )
                                         )
            Defendants.                  )

          Deposition of MELINDA G. WILSON taken
pursuant to notice at the offices of the United States
Attorney, 1007 Orange Street, Suite 700, Wilmington,
Delaware, beginning at 9:10 a.m. on Friday, October 7,
2005, before Ann M. Calligan, Registered Merit
Reporter and Notary Public.

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Page 2

APPEARANCES:
    JOSEPH M. BERNSTEIN, Esquire
      800 North King Street - Suite 302
      Wilmington, Delaware  19801
      on behalf of the Plaintiff;

    PETER J. LEFF, Esquire
    JOSEPHINE A. ESCALANTE, Esquire
    O'DONNELL, SCHWARTZ & ANDERSON, P.C.
      1300 L Street, NW - Suite 1200
      Washington, D.C.  20005-4126
      on behalf of Defendant American Postal
      Workers Union;

    PATRICIA C. HANNIGAN, Esquire
    Assistant United States Attorney
      The Nemours Building
      1007 Orange Street - Suite 700
      Post Office 2046
      Wilmington, Delaware  19899-2046
      on behalf of Defendant United States
      Postal Services.

ALSO PRESENT:

    STEVEN COLLINS

    ANDREW KEEN

Page 3

1         MELINDA G. WILSON,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5         EXAMINATION
6 BY MR. LEFF:
7   Q.  Good morning, Ms. Wilson.  My name is Peter
8 Leff.  I'm the attorney for the Wilmington Delaware
9 Area Local of the American Postal Workers Union
10 AFL-CIO.
11      As a preliminary matter, will you please
12 state and spell your name for the record?
13   **A.  Melinda, middle initial G, Wilson.  Spelling,**
14 **M-e-l-i-n-d-a, G, middle initial, Wilson, W-i-l-s-o-n.**
15   Q.  What is your address, ma'am?
16   **A.  28 Ashley, A-s-h-l-e-y, Drive, New Castle,**
17 **Delaware, 019720.**
18   Q.  Have you ever had your deposition taken before?
19   **A.  No.**
20   Q.  Let me explain a little bit about it.  You were
21 here yesterday, but I'm going to ask you a series of
22 questions about the lawsuit that you're bringing
23 against the Union and the United States Postal
24 Service.  If at any time you don't understand a

Page 4

1 question, do you agree that you will let me know that
2 you don't understand it and I will reask it and
3 rephrase it until you do understand?  Do you agree?
4   **A.  Yes.**
5   Q.  And you understand that you've just been put
6 under oath, which means you will answer truthfully to
7 the best of your ability.  Do you understand that?
8   **A.  Yes.**
9   Q.  And is it fair for me to assume that, if you
10 answer a question, you understood it and you answered
11 it to the best of your ability?
12   **A.  Yes.**
13   Q.  And I see we are already off to a good start
14 that you are verbalizing your responses.  It's very
15 important to do that.  The court reporter has a very
16 difficult time picking up head nods, head shakes.  So
17 it's important to state your answer.  The court
18 reporter has a difficult time picking up mm-hmms and
19 uh-huhs.  It's hard to distinguish them.  So yeses and
20 nos work much better.
21      The other important thing for the court
22 reporter's benefit is it's very difficult if we talk
23 over each other.  She has a hard time picking up who's
24 saying what.  So if you let me finish my questions, I

Page 5

1 will let you finish your answer.  If at any time I
2 don't let you finish your answer, please let me know
3 and I'll certainly do that.  If at any time you need a
4 break, rest room, otherwise, please let me know.  We
5 are not here to keep you under any harsh conditions.
6      I think that's all the preliminary
7 matters.  Unless you have any questions about how we
8 are going to proceed, I will move on.
9   **A.  No questions.**
10   Q.  Okay.  Thank you.
11      Ms. Wilson, when were you hired by the
12 United States Postal Service?  What was your date of
13 hire?
14   **A.  April 25th, 1985.**
15   Q.  Were you hired as part time, flexible?
16   **A.  Yes.**
17   Q.  Were you hired into the clerk craft?
18   **A.  Yes.**
19   Q.  And from what position were you hired into?
20   **A.  LSM operator.**
21   Q.  And am I correct that the LSM is a letter
22 sorting machine?
23   **A.  Correct.**
24   Q.  And did you join the Union?

2 (Pages 2 to 5)

**Page 6**

1    A.  Yes.
2    Q.  And do you recall when you joined the Union?
3    A.  As soon as they came in to meet me as a PTF,
4    immediately.
5    Q.  That was the American Postal Workers Union, is
6    that correct?
7    A.  Yes.
8    Q.  And did you hold any other positions other than
9    an LSM operator?
10   A.  Yes.
11   Q.  Approximately how long did you hold the LSM
12   operator position?
13   A.  From 1985 until 1992.
14   Q.  And at any time during that period did you
15   become either a part-time regular or a full-time
16   regular employee?
17   A.  Yes.
18   Q.  And which one did you become?
19   A.  I became a full-time regular employee.
20   Q.  Approximately when did you become a full-time
21   regular employee?
22   A.  Approximately November 1986.
23   Q.  And at what station were you working at as an
24   LSM operator?

**Page 7**

1    A.  The Wilmington, Delaware, P&DC.
2    Q.  And for clarity on the record, due to the fact
3    that the Postal Service has a language all of its own,
4    does P&DC stand for processing and distribution
5    center?
6    A.  Yes.
7    Q.  And there are several hundred employees that
8    work at the P&DC, is that correct?
9    A.  Yes.
10   Q.  It's a large facility.
11      In 1992 what position did you move in to in
12   the Postal Service?
13   A.  I was in limited-duty status position as a
14   manual letter sorter.
15   Q.  And can you explain to the best of your ability
16   your understanding of what a limited-duty position is?
17   A.  Yes.  A limited-duty position is a position
18   that the Postal Service sort of makes for an employee
19   who's had an on-the-job injury where they accommodate
20   them for their eight hours of work because of an
21   injury sustained on the job.
22   Q.  So I assume by the fact that you moved into a
23   limited-duty position you sustained an injury on the
24   job?

**Page 8**

1    A.  Correct.
2    Q.  Can you tell me about that injury, please?
3    A.  Yes.  I had ganglion cysts, or I had developed
4    ganglion cysts on both my left and right wrists from
5    repetitive usage of both wrists due to the sorting of
6    the LSM machine that I was currently working on at
7    that time.
8    Q.  Now, is this different from carpal tunnel
9    syndrome, if you know?
10   A.  Yes.
11   Q.  Nevertheless, you put in for an injury on the
12   job, and it was approved at some time?
13   A.  Yes.
14   Q.  From what time period did you serve as a manual
15   letter sorter?
16   A.  I -- from 1992, November approximately up until
17   June of 2002 when I -- up until about June 2002.
18      MS. HANNIGAN:  I'm sorry.  I didn't hear
19   that.
20      THE WITNESS:  Up until about June 2002.
21      (Discussion off the record.)
22   BY MR. LEFF:
23   Q.  During this time period were you working eight
24   hours a day?

**Page 9**

1    A.  Yes.  Or more.
2    Q.  To what position did you move in June 2002?
3    A.  Flat sorter clerk.
4    Q.  And is a flat sorter another machine?
5    A.  Yes.
6    Q.  And at this time period in June 2002, were you
7    still on limited duty or did you move off limited
8    duty?
9    A.  I moved off.
10   Q.  And from what time period did you act as a flat
11   sorter clerk?
12   A.  From June 2002 until October 2002.
13   Q.  And where did you move in October 2002?
14   A.  Back to a manual letter sorting.
15   Q.  And is that the result of another on-the-job
16   injury or recurrence of your previous on the job --
17   A.  A recurrence of previous injuries.
18   Q.  And you resubmitted for limited duty, and it
19   was approved, is that correct?
20   A.  Yes.
21   Q.  For what time period did you serve that second
22   stint as manual letter sorter, sorting clerk?
23   A.  From October 2002 until I was -- until
24   February -- what is it?  March 10, 2003.

3 (Pages 6 to 9)

Wilson
Melinda G. Wilson
v.
C.A. # 05-073 JJF
American Postal Workers Union
October 7, 2005
Case 1:05-cv-00073-JJF        Document 34-2        Filed 02/23/2006        Page 6 of 43

Page 10

1  Q. What happened on March 10, 2003?
2  A. I was called into the office by Carla
3  Van Istendal and asked about my outside employment and
4  afterwards asked to leave the building on March 10.
5  Q. Now, I just want to make sure the year is
6  correct. Is that March 10, 2003, or March 10, 2004?
7  I'm not here to trick you.
8  A. Right.
9  Q. Your notice of removal states March 24, 2004.
10 Did this occur a year before or --
11 A. No. No. I'm sorry. I'm sorry. It is 2004.
12 Q. At any point did you act as a 204-B supervisor?
13 A. Yes.
14 Q. And can you tell me approximately -- well,
15 first, let me back up. What is your understanding of
16 what an 204-B supervisor is?
17 A. It's a supervisor, acting supervisor where
18 you're like training to become one.
19 Q. And did you go into the 204-B supervisor
20 training program or were you just appointed acting
21 204-B supervisor?
22 A. Just appointed.
23 Q. Now, is it your understanding that, while you
24 are a 204-B supervisor, you have all of the duties and

Page 11

1  functions of a regular full-time supervisor?
2  A. That's correct, yes.
3  Q. Can you tell me approximately what time period
4  you were a 204-B supervisor?
5  A. Not exactly sure on the dates. I might get
6  these years mixed up. But I believe it was in
7  November 2002 up until approximately June of 2003.
8  Q. And was that the only time period that you were
9  204-B supervisor?
10 A. Yes.
11 Q. Now, were you a 204-B supervisor continuously
12 during that period or did you move up and back between
13 the craft, the bargaining unit, and the supervisory
14 position?
15 A. I was a 204-B the entire time.
16 Q. I want to move into union activity. Had you
17 ever held an elected position with the Wilmington,
18 Delaware, area local?
19 A. No.
20 Q. Were you a steward for the Union?
21 A. Yes.
22 Q. And do you recall approximately what time
23 period you were a steward for the Union?
24 A. I believe it was in June of 2003 or May. I'm

Page 12

1  sorry. May 2003 until -- wait a minute. I got to get
2  these dates right because -- when did I leave? 2004.
3  Okay. Yeah. About May 2003 up until the time I left
4  the Postal Service in 2004.
5  Q. In March of 2004?
6  A. Yes.
7  Q. Were you appointed to that position?
8  A. Yes.
9  Q. Do you recall who appointed you to be a
10 steward?
11 A. Steve Collins.
12 Q. And Steve Collins was the president of the
13 Wilmington, Delaware, area local at the time, is that
14 your understanding?
15 A. Yes.
16 Q. Did you go through any steward's training that
17 you recall?
18 A. Not particularly, no.
19 Q. When you were a 204-B supervisor, did you
20 recommend removal of any employees?
21 A. No.
22 Q. When you were a steward for the Union, did you
23 file any grievances over any removals?
24 A. No.

Page 13

1  Q. Approximately how many grievances did you file
2  when you were a steward?
3  A. Approximately six or seven.
4  Q. Do you recall, were they all contract
5  interpretation grievances, or were there any
6  discipline grievances in there?
7  A. I believe that they were mainly contract
8  issues.
9  Q. I don't recall exactly the Postal Service
10 terminology, but were you in a certain section or
11 cluster throughout your time period at the Postal
12 Service?
13 A. I really don't know what you mean.
14 Q. Okay. Fair enough. I can't recall how they
15 delineate different groups of people, but it's not
16 that important.
17     You're familiar that a collective
18 bargaining agreement governed the terms and conditions
19 of employment for employees who were in the clerk
20 craft of the Postal Service?
21 A. Yes.
22 Q. Did you review the collective bargaining
23 agreement when you were a steward with the Union?
24 A. Not in its entirety, no.

4 (Pages 10 to 13)

Page 14

1    Q.  I want to turn your attention to the
2  disciplinary interview that was held on March 10,
3  2004. Do you recall that.
4    **A.  Yes, I do.**
5    Q.  How did that come about, were you called off
6  the workman floor, telephoned at home? Tell me about
7  that.
8    **A.  I was called off the floor.**
9    Q.  And when you got to the room where the
10  interview was going to take place, who do you recall
11  being there?
12    **A.  Linda Drummer.**
13    Q.  Who is Linda Drummer?
14    **A.  Linda Drummer at that time was my immediate**
15  **supervisor.**
16    Q.  Who else?
17    **A.  Carla Van Istendal, who is the manager of that**
18  **tour.**
19    Q.  Okay.  And who else?
20    **A.  My representative, Pat McLaughlin.**
21    Q.  Now, did you ask for him or was he just there?
22    **A.  He was just there.**
23    Q.  Do you know how he got there?
24    **A.  No, I don't.**

Page 15

1    Q.  He was another union steward, is that correct?
2    **A.  Yes.**
3    Q.  Did you speak to him before the interview
4  started?
5    **A.  No.**
6    Q.  You were removed from the Postal Service, is
7  that correct?
8    **A.  Yes.**
9    Q.  When did you first learn that you were being --
10  let me ask it this way, how did you learn that you
11  were being removed from the Postal Service?
12    **A.  When I received the letter.**
13    Q.  When you received the notice of removal letter?
14    **A.  Yes.**
15    Q.  So no one told you before that that you were
16  actually being removed, is that correct?
17    **A.  That is correct.**
18         MR. LEFF:  Can we make this exhibit 1,
19  please?
20         (Wilson Deposition Exhibit 1 was marked
21  for identification.)
22  BY MR. LEFF:
23    Q.  Please take a look at that document,
24  Ms. Wilson, and when you are done, please look up.

Page 16

1    **A.  Okay.**
2    Q.  The document that's been handed to you,
3  Ms. Wilson, designated exhibit 1, can you please tell
4  me your understanding of what that document is?
5    **A.  This is a notice of removal.**
6    Q.  And is this the notice of removal that you
7  received indicating to you that you had been removed
8  from the Postal Service?
9    **A.  I believe this is the one.**
10    Q.  Now, the date on it is March 24th, 2004.  To
11  your recollection, you did not receive that on March
12  24, 2004, is that correct?
13    **A.  No.  That's correct.**
14    Q.  Do you recall when you first received this
15  document?
16    **A.  I believe that I first received the document by**
17  **regular mail on approximately the 30th or the 31st of**
18  **March.**
19    Q.  Now, I want to make sure the record is clear on
20  this. Is March 30th or 31st of March when you opened
21  up a first class envelope and read the notice of
22  removal?
23    **A.  Yes.**
24    Q.  Now, at some point you also received the letter

Page 17

1  by certified mail, is that correct?
2    **A.  Yes.**
3    Q.  Do you recall on what date that you received it
4  by certified mail?
5    **A.  Yes.  I received it on April 6, 2004.**
6    Q.  Do you recall when you first received the
7  notice that there was a certified mail letter
8  containing the notice of removal delivered to you?
9    **A.  Can you be --**
10    Q.  Let me ask you this.  Okay.
11         When you picked up the certified mail
12  letter, was that delivered to your home or did you go
13  to the Postal Service and pick it up?
14    **A.  I went to the Postal Service to pick it up.**
15    Q.  You were notified that a certified letter was
16  waiting for you at the Postal Service, is that
17  correct?
18    **A.  Yes.**
19    Q.  Do you recall when you first received that
20  notice?
21    **A.  I received the notice the same day I picked the**
22  **letter up out of the first class mail on the 31st or**
23  **the 30th. It was on a weekend.**
24    Q.  Okay.  Do you recall why, or was there any

5 (Pages 14 to 17)

Page 18

1 particular reason you waited six or seven days to pick
2 up the certified?
3   A. It was the week -- I believe the week -- I know
4 was over -- I was separated from my husband and didn't
5 have a car and wasn't staying near my house. So I
6 didn't even bother to come back to the post office
7 until that time so I could get a ride.
8   Q. Did you know at the time that you had received
9 the regular first class mail letter and the notice of
10 the certified letter that the certified letter was the
11 same thing as the regular mail letter?
12   A. Yes.
13   Q. How did you know that?
14   A. It's common knowledge, usually -- being a union
15 representative, I know that they usually send stuff
16 regular mail and certified mail when it's that
17 important. It's usually the same duplicate thing and
18 it's the same that's given on the mailroom floor. You
19 get two.
20   Q. Did you believe that the decision to remove you
21 was in violation of the collective bargaining
22 agreement?
23   A. Yes.
24   Q. Did you make a decision that you wanted a

Page 19

1 grievance filed over the decision to remove you from
2 the Postal Service?
3   A. Yes.
4   Q. Did you inform the Union that you wanted a
5 grievance filed?
6   A. Yes.
7   Q. How did you inform the Union that you wanted a
8 grievance filed?
9   A. On April 6, the same day I went to the post
10 office and picked up the letter, I put a call in to
11 Steve Collins who was at the union office at the time
12 and advised me to come in right away on that day to
13 begin the process of the grievance. So I met him at
14 the union office on April 6. And he started the
15 step 1 process of getting my statement for the
16 grievance to be filed.
17   Q. At the time were you aware that, under the
18 collective bargaining agreement, you had 14 days --
19 well, let me ask it this way. What is your
20 understanding of the date that the grievance needed to
21 be filed at that time?
22   A. At that time 14 days after you become aware of
23 some type of disciplinary action being filed against
24 you.

Page 20

1   Q. So is it accurate to say that at that time you
2 were under the belief that the grievance needed to be
3 filed by April 14 or 15th, depending on when you
4 picked up the first class mail letter, or did you
5 believe that it had to be filed within 14 days of you
6 picking up the certified mail letter?
7   A. I believe it needed to be filed 14 days after
8 my receipt of the certified letter.
9   Q. So you received the certified letter on April
10 6, 2004, correct?
11   A. Yes.
12   Q. So just to make sure I understand it, you
13 believe that the grievance had to be filed 14 days
14 after that date, which would have been April 20th,
15 2004, is that correct?
16   A. That's what I believed at the time, yes.
17   Q. Why did you believe that the grievance didn't
18 need to be filed within 14 days of your receipt of
19 first class mail letter on or about March 30th or
20 31st, 2004?
21   A. I didn't believe that because there was no
22 guarantee on the fact that I could have picked the
23 letter up the day that they put it in there and also,
24 usually when you're given a letter of removal or

Page 21

1 something like that on the floor, you actually have to
2 sign for it. And looking at the collective bargaining
3 agreement, it says, your receipt of the letter. So me
4 seeing receipt, in my mind, you actually have to have
5 a piece of paper saying, hey, got it on that day. So
6 that's why.
7   Q. So I just want to make sure I understand your
8 answer. Your belief is that, upon receipt of the
9 first class, there's no proof as to what date you
10 receive it. So your belief was that, only when there
11 was proof that you received it, either by signing for
12 it upon hand delivered, signing an express mail,
13 signing a certified, signing a registered mail, that
14 would be the date that could be proven that you
15 actually have received it, is that fair?
16   A. That is fair.
17   Q. Is there any reason that you did not inform the
18 Union that you had received a notice of removal by
19 regular mail before you received the certified letter
20 on April 6?
21   A. I believe that I did note -- well, attempt to
22 notify by leaving a message at the union office, but
23 if I'm not mistaken, during the time -- the end of
24 that month -- that was the weekend, I believe, if I'm

6 (Pages 18 to 21)

Page 22

1    not mistaken, and as soon as I could get in touch with
2    Steve at the union office was when I did on April --
3    it could have been before that, but he might have been
4    just available on April 6 or that Monday, I believe.
5    That was a Monday. And so as soon as I was able to
6    get in touch with him for him to advise me on what to
7    do next is as soon as I could.
8    Q.  Is it accurate that you did not talk to the
9    Union about your receipt of a notice of removal until
10   April 6?
11   A.  I believe that I tried leaving a message, but
12   the office was closed or no one was there, I believe.
13   Q.  Did you leave a message or just try to call
14   them?
15   A.  I don't recall really, but if I called, I
16   probably did leave a message. I'm not exactly sure.
17   But this was important, so I'm sure that I would have
18   left a message.
19   Q.  Now, when you did speak to Steve Collins on
20   April 6, he wanted to meet with you immediately that
21   day, correct?
22   A.  Yes.
23           MR. LEFF: Would you mark this the next
24   exhibit, please.

Page 23

1           (Wilson Deposition Exhibit 2 was marked
2    for identification.)
3    BY MR. LEFF:
4    Q.  Ms. Wilson, please look at a document that has
5    been marked as exhibit 2, and when you are done,
6    please look up.
7    A.  Okay.
8    Q.  Can you tell me what exhibit 2 is, your
9    understanding?
10   A.  To my understanding, this is the statement that
11   I had written when I went to see Steve Collins on
12   April 6 after picking up the certified letter from the
13   Postal Service regarding my removal.
14   Q.  Ms. Wilson, did you write this statement out
15   before you got to the office to meet with Steve
16   Collins, or did you write it out while you were
17   meeting with him?
18   A.  While I was meeting with him.
19   Q.  And did Mr. Collins ask you to write out the
20   statement or was this something you offered to do?
21   A.  This is common practice in the first step of
22   filing a grievance is to write your statement.
23   Q.  Okay. I want to turn your attention to the
24   first paragraph. It states, "I, Melinda Wilson, am

Page 24

1    grieving the fact that I was issued a letter of
2    removal dated March 24th, 2004, that I received on
3    April 6, 2004. The removal is for the charge of
4    improper conduct."
5           Do you recall, is that what you wrote in
6    this statement?
7    A.  Everything here I wrote, yes.
8    Q.  Can you tell me, is there anywhere in this
9    statement where you wrote that you had received the
10   notice of removal on March 30th or 31st?
11   A.  I don't believe it says that in here any where.
12   Q.  Do you recall telling Steve Collins when you
13   met with him that you received the notice of removal
14   on March 30 or 31?
15   A.  I don't recall telling him one way or the
16   other.
17   Q.  Tell me about that meeting, that first meeting
18   with Steve Collins. What do you recall occurring?
19   A.  The first thing I recall was him pulling out
20   the step 1 forms, getting my, you know, address and
21   pay location and things of that nature and asking me
22   to write the statement as he was filling out the
23   preliminary step 1 forms.
24   Q.  Did you review the forms that Steve filled out?

Page 25

1    A.  Yes, I did.
2    Q.  Were you satisfied with that?
3    A.  Yes.
4    Q.  Did you file an EEO complaint against the
5    Postal Service over your removal?
6    A.  Yes.
7    Q.  Did the Union help secure an attorney for you
8    to do that?
9    A.  Yes.
10          MR. LEFF: Would you mark this the next
11   exhibit, please.
12          (Wilson Deposition Exhibit 3 was marked
13   for identification.)
14   BY MR. LEFF:
15   Q.  Ms. Wilson, can you tell me what your
16   understanding of the document that's been handed to
17   you that is marked exhibit number 3, what that is?
18   A.  Yes. This is the pre-complaint counseling form
19   sent out to me from the EEO office.
20   Q.  And is this something that you filled out, at
21   least the first few pages?
22   A.  Yes.
23   Q.  Turning your attention to section C of page 1,
24   am I correct in stating that you wrote that "on March

7 (Pages 22 to 25)

Wilson
Melinda G. Wilson

v.

C.A. # 05-073 JJF

American Postal Workers Union
October 7, 2005

Case 1:05-cv-00073-JJF     Document 34-2     Filed 02/23/2006     Page 10 of 43

Page 26

1 31st, 2004, I received a letter of removal issued by
2 Linda Drummer and concurred with by Carla
3 Van Istendal"?
4   A.  Yes.
5   Q.  And am I correct in saying that that's the date
6 you received the first class mail letter and not the
7 certified letter?
8   A.  Yes.
9   Q.  Turning your attention to exhibit 2 in
10 comparison to exhibit 3, is there any particular
11 reason you informed the Union of the date you received
12 the certified letter but the EEO of the date you
13 received the regular mail letter?
14   A.  The only reason being at the time that I called
15 to get this pre-complaint counseling form sent out to
16 me, I had a thousand things running and going on in my
17 mind that I wanted to file EEO complaints about, and I
18 had filed three or four on this date, March 31st. I
19 believe I had gotten the letter regular mail and
20 jumped right on the phone to EEO and started, you
21 know, to get that complaint process going. And like I
22 said, I believe it was the -- those dates for some
23 reason in my mind, I'm believing, are near the
24 weekend, and if I called the Union, I didn't get an

Page 27

1 answer or I left a message. And when I got to Steve
2 or when I finally got in touch with Steve on the 6th
3 and he informed me to come right away, in my mind it
4 went back to I received it when I signed for it.
5   Q.  Now, you filled this out on April 10, 2004, is
6 that correct?
7   A.  Yes.
8   Q.  Turning to exhibit number 2, if you wrote a
9 statement to the Union that you received the notice of
10 removal on April 6, 2004, in your opinion, was the
11 Union wrong to believe that they had until April 20th,
12 2004, to file the grievance?
13   A.  I believe that the Union was wrong, yes,
14 because of being as though I was speaking with the
15 president, and this instance, he should have known the
16 rule book or the rules governing a grievance and its
17 timely filing, no matter what the situation or
18 circumstance. So in going there on the 6th, Steve
19 Collins told me himself that, no, your receipt of the
20 letter is the date you signed for it. Therefore, your
21 statement is -- you know, that is what you can say.
22        So, in writing in the statement, pretty
23 much I was following what he told me was the proper
24 thing to do. You received it when you signed for it.

Page 28

1   And I'm sitting right there in the office after
2 leaving the Postal Service, and that's what he said,
3 and that's what I wrote.
4   Q.  So I want to make sure I understand you.
5 You're saying that Steve Collins told you that the
6 date that the time limits for filing a grievance begin
7 the day that you receive the notice of removal,
8 correct?
9   A.  That I signed for it. Receiving meaning a
10 certified receipt of some sort or the fact that I got
11 it by signing something.
12   Q.  So Steve Collins told you that the date that
13 you signed for a notice of removal is the day that
14 starts the running of the 14-day time limit?
15   A.  Yes.
16   Q.  He told you that before or after you wrote the
17 statement to your recollection?
18   A.  Before.
19   Q.  So based on what he stated to you, you wrote
20 that you received the notice of removal on April 6,
21 2004, and you were relying on his statement the day
22 that you signed for it is the day that starts the time
23 limits, is that correct?
24   A.  Correct.

Page 29

1   Q.  I may have asked you this, but just to make
2 sure, at any time do you recall telling Steve Collins
3 that you received the notice of removal also by first
4 class mail?
5   A.  I don't recall telling him that offhand, but I
6 do believe that I left a message during the time of --
7 that time before the 6th, and in letting him know
8 that. But he may have been out of town. It was
9 something going on to where he wasn't in the office
10 until that Monday or whatever day the 6th was. He
11 wasn't there. So I believe that I left a message on
12 his cell phone and/or the office phone.
13   Q.  At any time did you follow up with Steve
14 Collins or the Union with respect to whether they had
15 filed the grievance?
16   A.  No. I was just waiting for something from him.
17      MR. LEFF:  Mark this exhibit 4, please.
18      (Wilson Deposition Exhibit 4 was marked
19 for identification.)
20 BY MR. LEFF:
21   Q.  Ms. Wilson, are you aware that an employee who
22 has been wronged can file a step 1 grievance on his or
23 her own without the help of the Union?
24   A.  No. I'm not aware of that.

8 (Pages 26 to 29)


A-000009

Page 30

1    Q.  I want to turn your attention to article 15,
2  section 2, step 1 of the collective bargaining
3  agreement.  Had you read the grievance and arbitration
4  procedure before?
5    A.  Yes.  I had read it before.
6    Q.  And were you familiar with section 2, step 1-A
7  that says, "Any employee who feels aggrieved must
8  discuss the grievance with the employee's immediate
9  supervisor within 14 days of the date on which the
10  employer or Union first learned or may reasonably have
11  been expected to learn of its cause."
12    A.  Yes.
13    Q.  But you're telling me you didn't know that an
14  employee can initiate the grievance procedure by
15  talking to his supervisor at step 1?
16    A.  Correct.
17    Q.  Were you aware that Steve Collins requested
18  numerous categories of information from the Postal
19  Service with respect to the grievance over your
20  removal?
21    A.  No.  I just would assume that he would because
22  I come to him to file the grievance.  So it's part of
23  it.
24           MR. LEFF:  Make this exhibit 5 please.

Page 31

1           (Wilson Deposition Exhibit 5 was marked
2    for identification.)
3  BY MR. LEFF:
4    Q.  Do you know what's been marked exhibit 5, what
5  that document is?
6    A.  This is a step 2 grievance appeal form or
7  step 1 meeting form, both combined.
8    Q.  With respect to the grievance over your
9  removal, have you seen this document before?
10    A.  I've seen it only after requesting it after my
11  removal when gathering documents for this.
12    Q.  So after the arbitration decision?
13    A.  Exactly.
14    Q.  With respect to the grievance, do you know when
15  the Postal Service raised the issue that the grievance
16  was untimely?
17    A.  I became aware that they raised that point on
18  the day of the arbitration.
19    Q.  Okay.
20    A.  Or the day before the arbitration in meeting
21  with Steve, he told me.
22    Q.  That's when you became aware?
23    A.  That's when I became aware.
24    Q.  Do you know at what step the Postal Service

Page 32

1  raised it?
2    A.  No, I do not.
3    Q.  After your initial meeting with Steve Collins
4  on April 6, when did you next meet with the Union with
5  respect to the grievance?
6    A.  I don't believe I met with the Union any more
7  until the day before the arbitration.
8    Q.  And did you have any phone conversations with
9  Steve Collins or the Union?
10    A.  I don't recall having any phone conversations
11  with Steve.
12    Q.  How did the meeting before the -- let me move
13  back a step.
14           Did you receive a letter or a phone call
15  that the arbitration had been set?
16    A.  I believe I received both.  I believe.  I'm not
17  really sure that I received a letter as well as a
18  telephone call from Steve.  I believe.
19    Q.  And did you receive a phone call at some point
20  from Steve Collins asking you to come in to prep for
21  the arbitration?
22    A.  Yes.
23    Q.  What happened at that arbitration prep session?
24    A.  Well, the first thing that happened was Steve

Page 33

1  informed me that they are raising the timeliness
2  issue, Melinda, and I didn't, of course, know what
3  that was.  Then he went on to explain to me about mail
4  slotting and things of that nature and the fact that
5  the step 1 wasn't filed on time.  And I had never
6  heard of it until that day.
7    Q.  Did he talk to you about a strategy as to how
8  he thought that the Union could defeat the postal
9  services timeliness argument?
10    A.  Yes.
11    Q.  Do you recall what you talked about with
12  respect to that?
13    A.  I believe that the -- basically talked about
14  what he had told me about previously when I met with
15  him on April 6, and that is the fact that the time I
16  received the letter was April 6.  So he was going to
17  fight going in that direction.
18    Q.  Do you recall, did you talk to him at all about
19  the fact that at that time you were having some
20  marital problems.  As a result of that, you weren't
21  going to your mailbox regularly?
22    A.  Yes.
23    Q.  Tell me about that.  What was your
24  understanding of why he asked you about that or you

9 (Pages 30 to 33)

Wilson
Melinda G. Wilson
v.
C.A. # 05-073 JJF
American Postal Workers Union
October 7, 2005
Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 12 of 43

Page 34

1  were discussing that?
2  **A. I don't really recall why we were discussing**
3  **that, but I know that, just like I talked about**
4  **earlier, I was having problems at that time and hadn't**
5  **been to the mailbox in a while. So I really don't**
6  **know why he and I would have been discussing it.**
7  Q. During that pre-arb preparation session, did
8  you also discuss the merits of the case, the merits of
9  just cause?
10  **A. Yes.**
11  Q. Did you and Mr. Collins review a number of
12  documents during that session?
13  **A. Yes, I believe so.**
14  Q. Such as your clock ring time records, and do
15  you recall?
16  **A. We may have. We may have reviewed several**
17  **things. I'm not exactly sure what they were at this**
18  **time.**
19  Q. Do you recall, did Mr. Collins talk to you at
20  all about the questions he would ask and the questions
21  that the Postal Service advocate might ask?
22  **A. Yes.**
23  Q. Do you recall approximately how long you met
24  with Mr. Collins during that session?

Page 35

1  **A. Approximately an hour.**
2  Q. The next day was the arbitration hearing, is
3  that correct?
4  **A. Yes.**
5  Q. And Steve Collins acted as your advocate, is
6  that correct?
7  **A. Yes.**
8  Q. And you were present during the arbitration
9  hearing?
10  **A. Yes.**
11  Q. Do you recall, did the Postal Service call
12  witnesses?
13  **A. Yes, they did.**
14  Q. Do you recall that Steve Collins cross-examined
15  those witnesses?
16  **A. Yes, he did.**
17  Q. Did Mr. Collins call you as a witness?
18  **A. Yes.**
19  Q. And did he ask you questions that, in your
20  mind, both went to trying to defeat the Postal
21  Services timeliness defense and going to the just
22  cause merits of the case?
23  **A. Yes.**
24  Q. Do you recall Mr. Collins presenting exhibits

Page 36

1  during the hearing?
2  **A. Yes.**
3  Q. Do you recall Mr. Collins objecting to exhibits
4  that the Postal Service was trying to introduce?
5  **A. Yes.**
6  Q. In your opinion, based on the arbitration
7  hearing, did you believe that Mr. Collins was trying
8  to prevail on your behalf on the grievance on both the
9  timeliness defense and on the just cause merits?
10  **A. Well, we never ever got a chance to discuss the**
11  **just cause merits because this was -- they decided to**
12  **break the case up, and first part of the case would**
13  **be -- I don't know the terminology that Steve used,**
14  **but all they were going to be doing was doing the**
15  **first part, which was the timeliness issue. And if it**
16  **wasn't done timely from the arbitrator's point of**
17  **view, the merits would never have been discussed. We**
18  **never got to the merits. The first part of the**
19  **arbitration was just discussing the timeliness issue.**
20  Q. Do you recall, did the arbitrator make a
21  decision to bifurcate the case?
22  **A. That's the term they used.**
23  Q. Was it the arbitrator who made the decision
24  that you recall?

Page 37

1  **A. I believe it was collectively done between**
2  **Steve, the labor relations, and the arbitrator.**
3  Q. So the only issue addressed was whether or not
4  the grievance was timely, is that correct?
5  **A. That's what I believe.**
6  Q. In your opinion, was Steve Collins trying to
7  prevail on your behalf on that issue?
8  **A. Yes.**
9  **(Wilson Deposition Exhibit 6 was marked**
10  **for identification.)**
11  THE WITNESS: Okay.
12  BY MR. LEFF:
13  Q. Ms. Wilson, what is your understanding of what
14  exhibit 6 is?
15  **A. This is the award that was sent back by the**
16  **arbitrator from the -- or his decision from our**
17  **arbitration of the grievance filed for my removal.**
18  Q. So this is the arbitrator's decision denying
19  the grievance on the basis that it was untimely filed?
20  **A. Correct.**
21  Q. Turning your attention to page 7 of that first
22  part where it says procedural arbitrability, it says,
23  "Specifically the Union argued that the tolling of the
24  time period for initiating the grievance commenced on

10 (Pages 34 to 37)

Page 38

1 April 6, 2004, the date on which the grievant
2 reasonably would have been expected to learn of the
3 issuance of the contested removal."
4         Do you recall that that was the argument
5 that the Union put forth?
6    A.  Yes.
7    Q.  I want to turn your attention back to exhibit
8 number 3, the EEO pre-complaint.  Prior to the
9 arbitration hearing, did you provide the Union with a
10 copy of what has been marked exhibit 3, the EEO
11 pre-complaint?
12    A.  I don't know.
13    Q.  Turning your attention back to exhibit
14 number 6, in, I guess, the last full paragraph that
15 begins "conversely" --
16    A.  Still on page 7?
17    Q.  I'm sorry.  Page 9.  Last full paragraph that
18 begins "conversely."
19    A.  Mm-hmm.
20    Q.  It says, "Conversely, the documentary evidence
21 established that the first class mailing was delivered
22 to the grievant's residence address of record on March
23 30, 2004.  The arbitrator further determines that the
24 preponderance of documentary evidence and credible

Page 39

1 testimony established that the grievant actually
2 received the notice of removal contained in the first
3 class mailing on or before March 31st, 2004."
4         During the arbitration hearing did you
5 testify that you had received the notice of removal by
6 first class mail on March 30th or 31st?
7    A.  I don't think I did.
8    Q.  Do you recall if you were asked that question?
9    A.  Yes.  I recall that I was asked that question.
10    Q.  Is there any particular reason that you did not
11 testify that you received the notice of removal on
12 March 30th or 31st by first class mail?
13    A.  No.
14    Q.  Did you testify during the arbitration hearing
15 that the first time you had received the notice of
16 removal is when you signed for the certified letter on
17 April 6?
18    A.  I believe that is what I said at the
19 arbitration.
20    Q.  Was that honest?
21    A.  No.
22    Q.  Is there any particular reason why you weren't
23 being honest in that testimony?
24    A.  Well, I was under the impression that

Page 40

1 April 6 -- every time I would ask Steve, or just
2 knowing in my mind from reading in the collective
3 bargaining agreement, received, to me, just went back
4 to when I actually signed for it because there was no
5 real way to know that I actually picked it up out of
6 the mailbox on any given day.  In my mind, April 6,
7 the day I signed for it was the date I received the
8 letter.  That's why I testified to that fact.
9    Q.  Is it correct that, during the arbitration
10 hearing, you did not, or that the Union did not, argue
11 that, yes, you picked it up on March 30 or 31st, but
12 because you didn't sign for it until the 6th, that's
13 when the time limit started?  That was not the
14 argument that the Union put forth, is that correct?
15    A.  I don't believe that's the argument they put
16 forth, no.
17    Q.  And in fact, is it correct you're not exactly
18 sure whether or not you ever notified the Union that
19 you picked up the first class mail letter on March 30
20 or 31?
21    A.  I'm almost certain that I spoke with Steve
22 and/or left a message because I recalled Steve saying,
23 Well, we have 14 days.  Just being careful, you have
24 14 days.  So you need to go ahead and sign for the

Page 41

1 letter.  You need to go and get it and sign for it
2 because you have 14 days.  And you don't want to mess
3 up because I've had a case where somebody didn't pick
4 up their stuff and they still went through.  So pick
5 the letter up.
6         So, yes, I did tell him that I got the
7 letter -- but on the -- by phone.
8    Q.  So you actually had a telephone conversation
9 with Steve Collins before April 6?
10    A.  Yes.  Now it's coming back do me, yes.
11    Q.  And do you recall the date that you had this
12 conversation?
13    A.  Cannot recall the date.
14    Q.  So during this telephone conversation, you told
15 Steve Collins that you received a letter by first
16 class on March 30th or 31st?
17    A.  Yes.  Mm-hmm.
18    Q.  But you told him you not received the certified
19 letter yet?
20    A.  I hadn't -- yeah.  Had a pink slip in my box.
21 I let him know I had a pink slip.
22    Q.  Do you recall whether you called Steve Collins
23 at the union office or on his cell phone?
24    A.  Probably both.

11 (Pages 38 to 41)

Page 42

1   Q.  So you placed two phone calls to Steve Collins?
2   A.  I'm not exactly sure if I placed two phone
3   calls. I'm not exactly sure I dialed the union office
4   and actually got -- spoke with him or actually dialed
5   his cell phone and spoke with him. Whichever one that
6   I did dial at the time, I spoke with him.
7   Q.  Was this your first attempt to contact him or
8   were there other messages that you left before?
9   A.  Not sure.
10  Q.  Do you recall whether it was the date you
11  received the first class mail or was it --
12  A.  I believe -- I believe it was a day or two
13  afterwards because my recollection -- I'm not really
14  sure. It could have been the same day. Could have
15  been. But I think it was closer to the weekend, and I
16  couldn't get him, or Steve was away. But I did speak
17  with him soon after getting the first class letter.
18  Q.  So let me make sure I understand what you're
19  saying that Steve Collins told -- your understanding
20  of what Steve Collins told you. Steve Collins at one
21  point told you that the time limits for filing the
22  grievance start on the date that you signed for the
23  certified letter, correct?
24  A.  Yes.

Page 43

1   Q.  But you also testified that Steve Collins told
2   you that the time limits can begin if you don't pick
3   up the certified letter?
4   A.  Yes.
5   Q.  And did Steve Collins explain to you what date
6   or when the time limits begin if you don't pick up the
7   certified letter?
8   A.  No, I didn't. He just said, don't take any
9   chances because he had a case similar and person lost
10  because of time. But he didn't tell me anything
11  specific, just go get the letter.
12  Q.  So Steve Collins told you that another
13  grievance he pursued he lost on a timeliness issue
14  because the person never picked up the certified
15  letter, is that correct?
16  A.  No. That's not correct. He didn't tell me
17  that he specifically lost the case or that he was, you
18  know, on the case, but he said he had known that to
19  happen to someone else.
20  Q.  So just want to make sure I understand the
21  testimony. Steve Collins told you that he knew of a
22  case where someone lost on a timeliness issue because
23  they never picked up the certified letter?
24  A.  Yes.

Page 44

1   Q.  Based on that statement, were you worried that
2   the time limits might have begun before April 6
3   because a week had already passed since you got the
4   notice.
5   A.  No.
6   Q.  Why not?
7   A.  Because it was still well within 14 days of me
8   getting the notice. April 6 was still way before
9   me -- 14 days?
10  Q.  Is it fair to say that you believe that, as
11  long as you pick up the certified letter within a
12  14-day period, the time limits would begin on the date
13  you signed for that?
14  A.  Ask that again, please.
15  Q.  You testified that I believe -- correct me if
16  I'm wrong -- that, even though Steve Collins had told
17  you that the time limits could start before you pick
18  up the certified letter if you don't pick it up in a
19  timely manner, that, because you pick it up in the
20  14-day period, that you didn't have to worry about the
21  time limits starting before you signed for it.
22  A.  I wasn't so sure of that. After he made the
23  statement to me, I wasn't so sure. So all I knew was
24  immediately get it there the same day I spoke with him

Page 45

1   and get it to him the same day because I knew we still
2   had plenty of time because it was April 6. The letter
3   was dated -- I mean I got it on the 31st or somewhere
4   round about. And it was only six days that I had it.
5   So I knew I still had eight days at least for him to
6   start step 1.
7   Q.  So you weren't so sure if the time limit had
8   started before April 6 or not?
9   A.  No.
10  Q.  But at the very least, you had eight days until
11  the 14th?
12  A.  Yes.
13  Q.  Going back to exhibit 2, the statement you
14  wrote out, if you were not sure that the time limits
15  may have started before April 6th of 2004, why did you
16  state on your statement that that's the date that you
17  received it without any indication that you were
18  concerned that the time limits might have begun
19  before?
20  A.  Because, on April 6, Steve and I had discussed
21  that. That is when you did actually receive it.
22  That's when you have receipt of the letter, and that's
23  what it says in the collective bargaining agreement.
24  Receipt of. Receipt of meaning that I signed for it

12 (Pages 42 to 45)

Page 46

1 in some type of way. And so that is where my mind
2 was. And in putting the 31st on the paper and still
3 getting to the office on the 6th, it was still only
4 six days after I was reasonably made aware of the
5 letter removal. Still, if you were to use the 31st as
6 a first day, I still had ample time to have the step 1
7 done which is why I was there on the 6th.
8    Q.   Did you inform Mr. Collins that you believe
9 that the grievance had to be filed within eight days?
10   A.   I didn't inform him of anything because he's
11 the union president, and I know he should know.
12   Q.   Turning your attention back to exhibit 3, the
13 information for the pre-complaint counseling form, the
14 EEO complaint form. Do you recall, did the Postal
15 Service introduce this as an exhibit during the
16 arbitration hearing?
17   A.   I don't remember.
18        MR. BERNSTEIN:  Make this exhibit 7,
19 please.
20        (Wilson Deposition Exhibit 7 was marked
21 for identification.)
22 BY MR. LEFF:
23   Q.   Ms. Wilson, what I've handed you, exhibit 7,
24 purports to be a series of certified mailers that

Page 47

1 purport to be attempts to deliver mail to your
2 residence in 1996, 1997. The question I have is, do
3 you recall the Postal Service introducing this as an
4 exhibit during the arbitration hearing?
5    A.   I don't recall.
6    Q.   Ms. Wilson, had Steve Collins represented you
7 in other grievances you filed.
8    A.   Yes. I believe so.
9    Q.   Do you have any problems with the way he
10 represented you in any of those other grievances?
11   A.   No.
12        MR. BERNSTEIN:
13        MR. LEFF:  Let me introduce this exhibit.
14 Mark this 8.
15        (Wilson Deposition Exhibit 8 was marked
16 for identification.)
17        THE WITNESS:  Okay.
18 BY MR. LEFF:
19   Q.   Ms. Wilson, is it accurate to say that what I
20 handed you as Exhibit 8 are a series of grievance
21 documents and settlements pertaining to grievances
22 that were filed either on your behalf or impacted you
23 as part of the class action grievance?
24   A.   Yes.

Page 48

1    Q.   And with respect to any of these grievances, do
2 you have any complaints with respect to how the Union
3 represented you?
4    A.   No.
5    Q.   I want to turn your attention to a letter that
6 I believe you wrote in here. I don't know exactly
7 what page it is, but it looks like grievance
8 16-22-303, dated 12/29/03 at 1:56 p.m.
9    A.   Mm-hmm. Yes.
10   Q.   Is this something that you wrote out for this
11 grievance?
12   A.   Yes.
13   Q.   If you recall, did you write this out before
14 the step 1 was -- let me ask you this. Did you write
15 this before you met with the Union or during your
16 meeting with the Union?
17   A.   I wrote this out on 12/29/03. What it looks
18 like.
19   Q.   Let me ask you. You may not remember, but do
20 you remember, did you write this out in the presence
21 of a union official or did you write this out before
22 and hand this to a union official?
23   A.   No. I handed out during the presence.
24   Q.   The first sentence says, "On December 23rd,

Page 49

1 2003, I, Melinda G. Wilson, was called into the MDO
2 office to see Carla Van Istendal."
3        Do you recall that on December 23rd, 2003,
4 you were called in to the MDO's office?
5    A.   It should be been December 24th.
6    Q.   Do you recall why you wrote December 23rd?
7    A.   Just got mixed up on the date.
8    Q.   With respect to your understanding that Steve
9 Collins had a belief that the time limits started
10 running on the date that you signed for the certified
11 letter, it's your understanding that Mr. Collins's
12 belief was incorrect, is that right?
13   A.   Yes.
14   Q.   That actually the time limit should have begun
15 to run on the date that you received that first class
16 letter on March 30th or 31st, is that correct?
17   A.   That's what I was told afterwards.
18   Q.   Do you have any knowledge that Mr. Collins's
19 belief or telling you that it begins on the date on
20 April 6, instead of March 30th or 31st, was something
21 that Mr. Collins did purposefully or with bad intent
22 or wanted the grievance not to be timely filed?
23   A.   I have no idea.
24   Q.   It's possible that he just made a mistake?

13 (Pages 46 to 49)

Page 50

1  A. Of course, it is.
2       MR. LEFF: Make this 9, please.
3       (Wilson Deposition Exhibit 9 was marked
4  for identification.)
5       THE WITNESS: Okay.
6  BY MR. LEFF:
7  Q. Do you know what exhibit 9 is?
8  A. This looks like a decision without a hearing
9  for a sexual harassment case that I filed.
10 Q. And have you seen this document before today?
11 A. I believe I have, yes.
12 Q. Do you understand that your EEO case was denied
13 by the administrative judge?
14 A. Yes.
15 Q. I want to turn to the damages you're claiming.
16 When you were terminated from the Postal Service, do
17 you recall what level and grade you were at?
18 A. Yes. Level 5, step O.
19 Q. Do you recall what your salary was at that
20 time?
21 A. I think it was approximately 46, 47,000.
22 Q. And do you recall approximately how many
23 overtime hours you worked in a year?
24 A. No. I can't approximate.

Page 51

1  Q. Do you recall what your health plan benefit
2  was?
3  A. I don't recall.
4  Q. Do you know which health plan you went through?
5  A. Blue Cross.
6  Q. And did you have single coverage?
7  A. My husband has the coverage.
8  Q. And did you continue to be covered under that
9  Blue Cross after you were removed from the Postal
10 Service?
11 A. Yes.
12 Q. Were you in the FERS or CSRS retirement plan?
13 A. Yes.
14 Q. Do you recall which one?
15 A. FERS.
16 Q. Do you recall what your retirement benefit was
17 at that time?
18 A. No.
19 Q. Am I missing any benefits you were receiving
20 from the Postal Service that did not continue after
21 you were terminated?
22 A. No.
23      MR. LEFF: Make this number 10.
24      (Wilson Deposition Exhibit 10 was marked

Page 52

1  for identification.)
2       THE WITNESS: Okay.
3  BY MR. LEFF:
4  Q. Before I continue on with damages, do you have
5  any reason to believe, or knowledge, that Steve
6  Collins of the Union would have not wanted you to
7  prevail on the grievance or anything of that nature?
8  A. I don't know.
9  Q. You don't have any?
10 A. I don't have any -- no knowledge.
11 Q. Turning your attention to exhibit 10, which
12 purports to be your answers to the Union's
13 interrogatories, do you know what this document is?
14 A. Yes.
15 Q. Is this something that you helped prepare?
16 A. Yes.
17 Q. And on the last page, is that a copy of your
18 signature swearing that these are true and correct to
19 the best of your knowledge?
20 A. Yes.
21 Q. I see in response to question number 13, you
22 received unemployment compensation from April 2004
23 through September 2004 at the rate of 290 per week, is
24 that correct?

Page 53

1  A. Yes.
2  Q. You didn't receive any unemployment outside of
3  that?
4  A. No. Unemployment outside of that?
5  Q. Yes.
6  A. No.
7  Q. You worked at Macy's from February 2004 to
8  April 2004 as a part-time clerk?
9  A. Yes.
10 Q. Do you recall how many hours a week you worked
11 approximately?
12 A. About 12.
13 Q. 12?
14 A. Approximately.
15 Q. You were paid 7.50 an hour with no benefits?
16 A. $7 I think.
17 Q. Seven?
18 A. Maybe 7 or 7.50.
19 Q. From March 2004 until July 2004 you worked at
20 Advanced Staffing?
21 A. Yes.
22 Q. Approximately how many hours a week did you
23 work for that?
24 A. Probably about -- I was only part time. I'm

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477
A-000015

Wilson
Melinda G. Wilson
v.
American Postal Workers Union
C.A. # 05-073 JJF
October 7, 2005

Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 17 of 43

Page 54

1  trying to think. Probably about 16 hours or so a
2  week. 16 to 20 a week.
3  Q.  Did it vary week to week?
4  A.  Yeah. It was just part-time stuff, yeah.
5  Q.  You were paid $11 an hour with no benefits?
6  A.  Right.
7  Q.  From March 2004 to April 2004 you worked at
8  Caldwell Staffing?
9  A.  Yes.
10  Q.  What did you work for them a few weeks?
11  A.  Just a few weeks.
12  Q.  Do you recall how many hours a week you worked
13  for them?
14  A.  About between 25 and 30.
15  Q.  And you were paid $9 an hour, no fringe
16  benefits?
17  A.  Correct.
18  Q.  You worked for Kelly Services from June 2004 to
19  November 2004?
20  A.  Yes.
21  Q.  Approximately how many hours a week?
22  A.  40.
23  Q.  You were paid $11 per hour?
24  A.  That's correct.

Page 55

1  Q.  Did you work any overtime for them?
2  A.  No.
3  Q.  You went to work for United Parcel Service in
4  November 2004?
5  A.  Yes.
6  Q.  And you continue to work for them today?
7  A.  Yes.
8  Q.  Have you had any other employment from November
9  2004 to the present?
10  A.  No.
11  Q.  You started as a customer service
12  representative at $14 per hour?
13  A.  Yes.
14  Q.  With a full benefit package?
15  A.  Yes.
16  Q.  Is that a position covered by the Teamster's
17  collective bargaining agreement?
18  A.  No.
19  Q.  Is it covered by a collective bargaining
20  agreement at all?
21  A.  No.
22  Q.  Have you held any other positions at UPS other
23  than customer service rep?
24  A.  Yes.

Page 56

1  Q.  Tell me about the next position you had?
2  A.  Next position is the current position I'm in,
3  and that's supervisor of accounts receivable.
4  Q.  And when did you receive that position?
5  A.  Last week.
6  Q.  Congratulations.
7  A.  Thank you very much.
8  Q.  Now, while you were holding the customer
9  service representative position, did your salary go
10  up?
11  A.  No.
12  Q.  And do you have a higher salary as a supervisor
13  of accounts receivable?
14  A.  Yes.
15  Q.  What is the salary?
16  A.  38.
17  Q.  38,000?
18  A.  Yes.
19  Q.  And did your benefits change any?
20  A.  No.
21  Q.  And other than the jobs we talked about and
22  unemployment compensation, have you received any other
23  income after the time that you were terminated from
24  the Postal Service?

Page 57

1  A.  No.
2      MR. LEFF: Mark this the next exhibit,
3  please.
4      (Wilson Deposition Exhibit 11 was marked
5  for identification.)
6  BY MR. LEFF:
7  Q.  Ms. Wilson, take some time. Look through
8  exhibit 11. When you're comfortable with the
9  document, please look up.
10  A.  Okay.
11  Q.  This purports to be Plaintiff's Response to the
12  Union Defendant's First Set of Request For Production
13  of Documents. Are you familiar with this document?
14  A.  Yes.
15  Q.  Did you help prepare it?
16  A.  Yes.
17  Q.  Specifically I want to turn to the attachments.
18  I guess the first one is P-27. It's right after the
19  signature block.
20  A.  Right.
21  Q.  This is a copy of your UPS pay stub dated
22  January 21st, 2005?
23  A.  Yes.
24  Q.  Just want to make sure, are these federal

15 (Pages 54 to 57)

Wilson
Melinda G. Wilson
v.
C.A. # 05-073 JJF
American Postal Workers Union
October 7, 2005

Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 18 of 43

Page 58

1  and/or are they federal and state tax forms, do you
2  recall?
3    A.  Probably just federal.  Whoops.  Looks like --
4  looks like just federal.  Wait a minute.  Yeah.  Just
5  federal.
6    Q.  And to your knowledge, are these your complete
7  tax returns, federal tax return information for 2002,
8  2003, 2004?
9    A.  Yes, to my knowledge.
10    MR. BERNSTEIN:  If I could interject
11  something a couple weeks ago, while I was out of the
12  office, Ms. Wilson provided me with some additional
13  tax documents.  I just haven't had a chance to look at
14  them.  But at the lunch break I can go get them.
15    THE WITNESS:  I think it was 2004.
16    MR. LEFF:  They are tax documents?
17    THE WITNESS:  It looks like 2004 was
18  missing.
19    MR. BERNSTEIN:  That may be what they
20  were.
21    MR. LEFF:  We'll just agree we can
22  supplement the record with the tax records.  That's
23  all right.  No need to get them.
24    (Wilson Deposition Exhibit 12 was marked

Page 59

1  for identification.)
2    THE WITNESS:  Okay.
3  BY MR. LEFF:
4    Q.  I've handed Ms. Wilson a document.  Purports to
5  be the complaint in Wilson versus American Postal
6  Workers Union, Delaware Area Local, AFL-CIO, and
7  United States Postal Service.
8    Ms. Wilson, are you familiar with this
9  document?
10    A.  Yes.
11    Q.  Is this the complaint in your lawsuit against
12  the Union and Postal Service?
13    A.  Yes.
14    Q.  Did you review this document or help prepare it
15  before it was submitted?
16    A.  Yes.
17    Q.  And the claims that you bring against the Union
18  and Postal Service are contained in this document?
19    A.  Yes.
20    MR. LEFF:  Can you give me five minutes to
21  talk to my client and I may be done?
22    (Recess taken.)
23  BY MR. LEFF:
24    Q.  Ms. Wilson, a few more questions.  Do you

Page 60

1  recall, did the Postal Service contest your
2  unemployment?
3    A.  Yes, they did.
4    Q.  And did you have a hearing over that?
5    A.  Yes.
6    Q.  And did Steve Collins represent you at that
7  hearing?
8    A.  Yes.
9    Q.  And do you recall when that hearing was, what
10  month?
11    A.  No.
12    Q.  Was it in the summer of 2004?
13    A.  Yes.
14    Q.  And it was after you filed the grievance,
15  right?
16    A.  I think -- I believe -- I think so.
17    Q.  You prevailed at that hearing, right?
18    A.  Yes.
19    Q.  Did you have an EEO fact-finding session or
20  hearing?
21    A.  Yes.
22    Q.  Do you recall approximately when that was?
23    A.  February of 2004 I believe.
24    Q.  So that was before the arbitration hearing, is

Page 61

1  that correct?
2    A.  Oh, yes.
3    Q.  But February 2004, so that was actually before
4  you were removed from the post service?
5    A.  Yes.
6    Q.  And did you have a representative at that?
7    A.  Yes.
8    Q.  And who was your representative?
9    A.  Steve.
10    Q.  Steve?
11    A.  Steve Collins.
12    Q.  Was that for the EEO case for the decision
13  marked exhibit -- I don't remember.
14    A.  Number 9.
15    Q.  Was that for that case, or was that for a
16  different case, or were they consolidated?
17    A.  I think it was for this particular case.
18    Q.  The arbitration hearing was on October 7, 2004.
19  Does that ring a bell?
20    A.  Not particularly.
21    Q.  But you had an arbitration hearing?
22    A.  Yes.
23    Q.  Do you recall, were you put under oath when you
24  testified?

16 (Pages 58 to 61)

Page 62

1    A. Yes.
2    Q. And you were asked to tell the truth and you
3  swore to tell the truth?
4    A. Yes.
5         MR. LEFF: I have no further questions.
6  Thank you very much, ma'am.
7              EXAMINATION
8  BY MS. HANNIGAN:
9    Q. Ms. Wilson, good morning. I think it's still
10  morning. As I told you, my name is Pat Hannigan. I'm
11  with the U.S. Attorney's office, and I represent the
12  Postal Service in the lawsuit you filed.
13        I'm going to ask you some follow-up
14  questions. I'm not going to plow the same ground that
15  you've just been over I hope.
16        To start with, you sat through the
17  testimony yesterday of three employees of the Postal
18  Service, right?
19    A. Yes.
20    Q. And you heard one of them -- I think it was
21  Carla Van Istendal -- say that you made the comment to
22  her once, "I'm never going back to my regular job."
23  Do you recall saying that to her?
24    A. No.

Page 63

1    Q. The testimony yesterday also addressed, and
2  you've spoken this morning of March 10, 2004,
3  day-in-court proceeding. Do you recall that?
4    A. Yes.
5    Q. Do you recall that the day before that on March
6  9th that you told your supervisor, Linda Drummer, that
7  you had to leave suddenly because you had gotten a
8  call that your car had been fixed and you had to go
9  get it?
10    A. I don't recall that. I don't know. I'm not
11  sure.
12    Q. Do you recall her telling you, "You can't leave
13  right now because at eleven o'clock I intend to have
14  you in my office for a day in court"? Do you recall
15  that?
16    A. No. No, I don't.
17    Q. Do you recall them changing the leave slip to
18  say that you needed FMLA leave on that day?
19    A. No. I don't recall that.
20    Q. Did someone tell you that day that there was
21  going to be a day in court at eleven o'clock on
22  March 9?
23    A. I don't recall. No.
24    Q. You don't remember anything about that

Page 64

1  incident?
2    A. No.
3    Q. I'd like to have some exhibits marked. I'm
4  going to show you several similar documents and ask
5  you the same questions about them. Okay?
6    A. Okay.
7         MS. HANNIGAN: Could we mark these in
8  order, please?
9         (Wilson Deposition Exhibits 13 through 18
10  were marked for identification.)
11  BY MS. HANNIGAN:
12    Q. Ms. Wilson, I'm going to hand you what has been
13  marked Wilson exhibit 13 and ask you just to identify
14  that for us first.
15    A. This is a 3971 form, request for notification
16  of absence.
17    Q. Could we call that your request for sick leave?
18    A. Family medical leave.
19    Q. Okay. And is that your signature?
20    A. Yes, it is.
21    Q. And you prepared that document?
22    A. Yes, I did.
23    Q. Were you paid by the Postal Service for those
24  hours reflected on that?

Page 65

1    A. I'm not certain. I'd have to actually see my
2  check stub to know whether or not I was paid.
3    Q. Do you have any reason to think you were not?
4    A. Sometimes, if I don't have enough sick leave,
5  it may not. You know, it may go into leave without
6  pay. But normally I check off sick if I have sick or
7  think that I have sick, and if I don't, they'll just
8  charge it to leave without pay. So I usually check
9  sick so that they can take that type of leave so I can
10  get paid.
11    Q. But is it your best understanding that you were
12  paid for those hours?
13    A. It is my best understanding.
14    Q. Wilson 14, if you could go through the same
15  exercise. Is that your signature?
16    A. Yes, it is.
17    Q. And is that a request that you submitted to the
18  Postal Service for FMLA leave?
19    A. Yes, it is.
20    Q. And to the best of your knowledge, were you
21  paid for that time?
22    A. I believe so.
23    Q. Wilson 15, can you tell us what's on that
24  document?

17 (Pages 62 to 65)

Wilson                    v.              American Postal Workers Union
Melinda G. Wilson        C.A. # 05-073 JJF        October 7, 2005
Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 20 of 43

Page 66

1  A. On this document is a half-hour request for
2  sick FMLA that I signed for.
3  Q. What's the date of that?
4  A. The date is -- is that 12/17 or 12/12?
5  12/12. One says 12/12, and this says
6  12/17. So you have two different ones.
7  Q. Just so the record is clear, there are two
8  different leave slips on the same piece of paper?
9  A. Yes.
10  Q. And again, both of them bear your signature?
11  A. Yes.
12  Q. And to the best of your knowledge, were you
13  paid by the Postal Service for the time taken off on
14  those slips?
15  A. To the best of my knowledge, yes.
16  Q. And Wilson 16, is that your signature?
17  A. Yes.
18  Q. And what is the date of that leave slip?
19  A. The date is 12/18/03.
20  Q. And once again, to the best of your knowledge,
21  were you paid for the sick leave that you requested on
22  that form?
23  A. I believe I was.
24  Q. Wilson 17, is that your signature?

Page 67

1  A. Yes.
2  Q. Can you tell us the date, please?
3  A. That is 12/19.
4  Q. And to the best of your knowledge, were you
5  paid by the Postal Service for the time that you took
6  off as FMLA time reflected there?
7  A. Yes.
8  Q. And finally, Wilson 18, is that your signature?
9  A. Oh, yes. I'm sorry, but I'm still looking at
10  this other exhibit because I'm looking down at the
11  date of 2/13 as my signature, and up there is 12/19,
12  so...
13  Q. Take your time. If you have any --
14  A. I'm wondering if this is -- why would I have
15  signed it on 2/13 unless I put it in in advance? I
16  don't know why that date is there.
17  Q. You're referring to Wilson 17?
18  A. Aha, I see why the date is there. I must have
19  gotten the, all back at the same time. Yes. This is
20  dated 12/20/2003, and it is my signature.
21  Q. To the best of your knowledge, again, were you
22  paid by the Postal Service for the sick leave
23  reflected on that one?
24  A. Yes.

Page 68

1  Q. Do you have any records showing the hours that
2  you worked and the dates that you worked at Boscov's?
3  A. Do I have any records?
4  Q. Yes.
5  A. Probably within some of the paperwork that I've
6  gotten since this case has began, but nothing I could
7  just put my hands on right now or nothing that I have
8  personally of my own.
9  Q. Do you have any documentation of hours and
10  dates you worked at Boscov's that you provided to your
11  attorney?
12  A. No.
13  MS. HANNIGAN: I have several related
14  pieces of paper. My suggestion is that we mark them
15  as a single exhibit, and that's how I'm going to
16  start. If for some reason, you don't want it done
17  that way, we'll take them apart.
18  MR. BERNSTEIN: Do they have Bates stamp
19  page numbers on them?
20  MS. HANNIGAN: They do. They do.
21  MR. BERNSTEIN: We can do that.
22  (Wilson Deposition Exhibit 19 was marked
23  for identification.)
24

Page 69

1  BY MS. HANNIGAN:
2  Q. Ms. Wilson, I'm going to put what's been marked
3  Wilson 19 in front of you. I'm going to represent to
4  you that I think that every piece of paper in here is
5  associated with and was provided by your physician,
6  Dr. Ivins, but I would like you to take a look through
7  this and tell me if that was your understanding as
8  well and then we'll go through them one at a time.
9  Does it appear to you as though each of
10  those documents is something provided to the Postal
11  Service by you or by Dr. Ivins in connection with your
12  medical condition?
13  A. Yes.
14  Q. The documents that Dr. Ivins prepared, filling
15  in the forms, signing, did he do that at your request?
16  A. Yes.
17  Q. And the information that he provided that then
18  went to the Postal Service, was that based upon what
19  you told him?
20  A. Yes. And plus the job description that I would
21  take to him.
22  Q. Now, is it correct that, as a result of the
23  information provided at your request by Dr. Ivins that
24  the Postal Service, in fact, accommodated you in

18 (Pages 66 to 69)

Page 70

1  several ways?
2  **A. That is correct.**
3  Q.  And one of those accommodations was that you
4  were not required to stand during your work hours?
5  **A. Yes.**
6  Q.  And one of them was that you were not required
7  to lift more than ten pounds?
8  **A. Yes.**
9  Q.  One was that you were not required to do
10  anything that involved repetitive motion?
11  **A. Yes.**
12  Q.  And one was that you were permitted to work
13  only the day shift?
14  **A. Yes.**
15  Q.  If I could have that back, please.
16        MS. HANNIGAN:  If we could mark this one,
17  please.
18        (Wilson Deposition Exhibit 20 was marked
19  for identification.)
20  BY MS. HANNIGAN:
21  Q.  Again, Ms. Wilson, I'm going to put in front of
22  you what's been marked Wilson 20, and I'll represent
23  to you that I believe that these four pages are all
24  related to your employment at Boscov's, but would you

Page 71

1  look through them and tell me if you agree.
2  **A. Yes.**
3  Q.  The page that is on the top of that exhibit,
4  whose handwriting does that reflect?
5  **A. Mine.**
6  Q.  And in the middle of the page where it says,
7  "Type of schedule.  I am available to work on the
8  following days and times."  Do you see where I'm
9  reading?
10  **A. Yes, I do.  I do.**
11  Q.  Type of schedule.
12  **A. Yes.**
13  Q.  And can you tell me what's written in there on
14  the "from" and "to" on the days of week under that?
15  **A. From Monday through Friday after three-thirty,**
16  **from three-thirty to close.**
17  Q.  And what time does Boscov's close?
18  **A. 9:00 o'clock.**
19  Q.  And that is your handwriting there?
20  **A. I don't believe that those are -- that's mine.**
21  **Well, it looks different, but I can't remember if I**
22  **actually put those times in there or not.**
23  Q.  Do you recall what you told someone else who
24  might have been filling out the form about your

Page 72

1  availability?
2  **A. I know that I told them that I got off my job**
3  **at three-thirty, my normal job, is what I told them,**
4  **that I got off at three-thirty.**
5  Q.  If you look at the third page of that exhibit,
6  Bates number 341 at the bottom.  Do you see where
7  there's handwriting showing times you are available to
8  work?
9  **A. Yes.**
10  Q.  And again, is that your handwriting?
11  **A. No.**
12  Q.  Is that your signature?
13  **A. That is my signature.**
14  Q.  So after this form was filled out, did you have
15  an opportunity to review and sign it?
16  **A. Yes.**
17  Q.  And is it correct that, on Tuesday through
18  Saturday, you indicated that you were available to
19  work from four o'clock to close?
20  **A. Yes.**
21  Q.  It looks as though something else was written
22  there first and then 40 was written over it, do you
23  know what was written there first?
24  **A. No, I don't.  It looks like it could have been**

Page 73

1  **three-thirty, the same as on the other sheet.**
2  Q.  Were you concerned when you told Boscov's that
3  you could work from three-thirty or four to close that
4  that was inconsistent with Dr. Ivins's statement that
5  you needed day work only?
6  **A. No, because that day work request was back in**
7  **2000 or 2002, and I was no longer under, having had**
8  **the workday shift.  That documentation was from like**
9  **2000 or 2002.  I was no longer under those**
10  **restrictions of day shift only.**
11  Q.  When did Dr. Ivins lift that restriction?
12  **A. I'm not sure when he actually lifted it.**
13  Q.  Did you ever tell the Postal Service that you
14  were no longer under that restriction?
15  **A. No, I didn't.**
16  Q.  Now, if you look at page 2 of exhibit 20, you
17  see two-thirds of the way down maybe, it says,
18  "Physical Demands/Working Conditions"?
19  **A. Yes.**
20  Q.  And do you see, it says, "Standing, stooping,
21  bending, reaching, climbing, twisting/turning,
22  lifting/carrying (up to 50 pounds)."  Do you see where
23  I'm reading?
24  **A. Yes, I do.**

19 (Pages 70 to 73)

Wilson
Melinda G. Wilson
V.
C.A. # 05-073 JJE
American Postal Workers Union
October 7, 2005
Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 22 of 43

Page 74

1  Q.  Were you concerned that those job requirements
2  would take you beyond the medical restrictions that
3  you were on?
4  A.  No.
5  Q.  Why not?
6  A.  Because I had spoken with the employer prior to
7  that and explained to them what I did at the post
8  office and what my restrictions were.  And before
9  hiring me, her -- Brenda -- whoever my supervisor --
10  Brenda Parker.  We talked about what my restrictions
11  were at the post office, and she explained to me that
12  I never have to do anything outside of my restrictions
13  which is one of the reasons why I took the job.
14  Q.  Did you provide any documentation to Boscov's
15  about the medical restrictions?
16  A.  No, I didn't.  I just told them by word of
17  mouth.
18  Q.  Do you have any documentation that was provided
19  to you by Boscov's saying, "Even though your job
20  description calls for this, we are never going to
21  require you to do that"?
22  A.  No.  Just from my immediate supervisor only.
23  Q.  The immediate supervisor, was she part of your
24  interviewing process?

Page 75

1  A.  Yes.
2  Q.  And you say her name was Brenda Parker?
3  A.  Brenda Parker.
4  Q.  And when was it, as you recall, that you told
5  her what your medical restrictions were?
6  A.  Immediately upon being hired or before being
7  hired.
8  Q.  During the application process?
9  A.  Once that I got called.
10  Q.  Tell me how that application process went.
11  A.  The application process, I just went in one
12  night and filled the application out.  Upon being
13  called in in October, I explained to them, you know
14  that I worked at the post office and what my duties
15  were and that I was on light duty or limited duty
16  there and what actually would I be doing in the job
17  that they were going to assign me to.  And at which
18  time they told me I would be a cashier on the women's
19  department.  I told them what I could and could not
20  do, and they told me that I wouldn't be required.
21  Q.  You say, them, you told them.  Was there
22  somebody --
23  A.  Yes.  Dan Carty.  And I'm mistaken too because
24  Brenda Parker was on vacation at the time of my hire.

Page 76

1  She came back like a week after I started.  But he,
2  Dan Carty, must have, in turn, told her because she
3  came to me as soon as she came back, and I told her
4  then what I could and could not do.  And she told me,
5  no problem.
6  Q.  So let me make sure I understand.  You filled
7  out an application and went home.  They called you a
8  few weeks later.  They, Dan Carty?
9  A.  No.  Someone in the human resources.  I don't
10  know.  I don't specifically know who it was.
11  Q.  Called a few weeks later.  Said, come on in.
12  A.  Yes.
13  Q.  Did you have a conversation with that person on
14  the phone about your restrictions?
15  A.  No.
16  Q.  You went in to Boscov's.  Who did you meet with
17  there?
18  A.  I believe it was manager Dan Carty and Pamela
19  somebody.  I'm not sure if the -- but those were the
20  two managers there.  I'm not sure if it was either/or
21  or both of those.  I'm not sure.
22  Q.  And the first time that you went in following
23  the phone call saying, "Come on in, we've got a job
24  for you," on that first occasion, did you tell them

Page 77

1  about your medical restrictions?
2  A.  No, I did not.
3  Q.  When did you?
4  A.  When they offered me the position.
5  Q.  When was that?
6  A.  The day that they called me in for the
7  interview.  Couple of weeks or three weeks or --
8  October, beginning of October.  I'm not sure what the
9  exact date was.
10  Q.  And when you went in for that initial interview
11  after the phone call, that was the interview with Dan
12  Carty and Pamela somebody?
13  A.  Yes.
14  Q.  And did you at that time, the time of that
15  interview tell them about your medical restrictions?
16  A.  No.
17  Q.  Why not?
18  A.  Well, because they told me I was going to be a
19  cashier on a sales room floor.  I didn't believe that
20  the restrictions that I had were going to be
21  interfering with what I had to do as far as being a
22  cashier on the sales floor.  So I didn't think it was
23  that important.
24  Q.  Had you seen this documentation of the

Wilson
Melinda G. Wilson

American Postal Workers Union
October 7, 2005

v.

C.A. # 05-073 JJF

Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 23 of 43

Page 78

1 requirements of the job at that time?
2   **A. Yes, I had.**
3   Q. And did it occur to you that it requires
4 lifting, carrying up to 50 pounds, whereas you were
5 under restriction not to carry more than ten pounds?
6   **A. Yes.**
7   Q. It didn't occur to you to tell them that?
8   **A. It didn't occur to me until I actually got**
9 **hired and I got on the floor and asked them about --**
10 **asked my supervisor Brenda about that. She basically**
11 **laughed because the department I'm working in, this is**
12 **standard stuff that's on the thing, and you don't have**
13 **to worry about that. And are you under restrictions**
14 **for the post office? What are they? I verbally told**
15 **her what they were. And she said, "No problem. We**
16 **won't have you do any of that." So they never did.**
17   Q. Did you mention the fact that your restrictions
18 at the Postal Service required you to sit in a chair
19 with arm rests?
20   **A. No, I didn't.**
21   Q. Now, in fact, your employment at Boscov's
22 required you to stand throughout your shift, isn't
23 that correct?
24   **A. Yes.**

Page 79

1   Q. So it's fair to say that that requirement went
2 beyond the restrictions that you had told the Postal
3 Service you were under?
4   **A. Yes.**
5   Q. And in fact, you worked in the evening hours at
6 Boscov's, right?
7   **A. Yes.**
8   Q. And it's fair to say, isn't it, that that went
9 beyond the restrictions you had told the Postal
10 Service that you were under, that you had to work a
11 day shift permanently?
12   **A. No.**
13   Q. No?
14   **A. No, because the last permanent day shift change**
15 **I had was, I think, in 2002. And after which, 2002, I**
16 **actually bid on a job, and my hours were seven to**
17 **three-thirty. So, therefore, my doctor or anyone**
18 **didn't put time restrictions on any of my**
19 **documentation any more because my actual job at the**
20 **Postal Service was seven to three-thirty. So he no**
21 **longer even included time with any of the**
22 **documentation he submitted.**
23   Q. I'm going to show you in Wilson 19, it's the
24 12th page. And I'm sorry. The Bates number didn't

Page 80

1 copy. It looks like it should be 1112. 1110. I
2 think you testified earlier that this was information
3 provided by Dr. Ivins at your request to the Postal
4 Service?
5   **A. Yes.**
6   Q. It notes the date of examination, December 3rd,
7 2002?
8   **A. Yes.**
9   Q. So presumably this documentation was provided
10 after that date, isn't that fair to say?
11   **A. After?**
12   Q. After the date of the exam?
13   **A. Oh, yeah.**
14   Q. Sorry. That was so obvious a question it
15 confused you.
16     And I note over here in handwritten
17 notation, it says, "Start time no later than 8:30 a.m.
18 due to meds." Do you see that?
19   **A. Yes.**
20   Q. And was that information that was provided by
21 Dr. Ivins to the Postal Service in December of 2002?
22   **A. Yes.**
23   Q. And I think you testified earlier that you
24 never went back to the Postal Service and said, "I no

Page 81

1 longer have that restriction"?
2   **A. Right.**
3     MR. BERNSTEIN: When you refer to that
4 restriction, there's a whole bunch of restrictions on
5 this page.
6     MS. HANNIGAN: The restriction on not
7 working other than the day shift, working daytime
8 hours.
9 BY MS. HANNIGAN:
10   Q. A couple of questions about your earlier
11 testimony. You were shown what was marked Wilson 9,
12 which is the EEO decision?
13   **A. Yes.**
14   Q. It's this documentation.
15   **A. Mm-hmm.**
16   Q. And I notice that on page 6 of that, the judge
17 deciding the EEO claim wrote -- let me show you where
18 I'm looking. Page 6.
19   **A. Okay.**
20   Q. "Claimant admitted that she had outside
21 employment at Boscov's department store but denied it
22 required her to work outside her medical
23 restrictions." Did you deny that when you testified
24 at the EEO hearing?

21 (Pages 78 to 81)

Wilson
Melinda G. Wilson

v.

American Postal Workers Union
C.A. # 05-073-JJF
October 7, 2005

Page 82

1    A. Yes. I probably did.
2    Q. What was the basis of that denial?
3    A. The basis was the fact that I was being accused
4    basically by Carla of standing and I couldn't stand at
5    the post office. So, in fact, my doctor wrote a
6    letter or a note to Carla or the Postal Service
7    explaining that the reason that he would put sitting
8    instead of standing as a restriction in my limited
9    duty assignment because of the jobs that were offered
10   at the post office for me. And he explain that in a
11   letter he had written that the only reason he did put
12   down the no standing was because every position that
13   he had documentation for required heavy lifting and
14   pulling, and the only thing that I could possibly do
15   with the restrictions that I had would be in a manual
16   sorting letter case to rest my arms.
17   Q. What information did Dr. Ivins have about what
18   other jobs might be available to him?
19   A. I would take to the doctor when I went a job
20   description of what I actually did, were given to me
21   by my supervisor, what the job entails, and then he
22   would also ask me what positions were available for me
23   to do.
24   Q. So the information Dr. Ivins had about what

Page 83

1    other possible positions within the entire postal
2    operation might have been available to you, that
3    information was provided by you to him?
4    A. Yes.
5    Q. If you could pull up Wilson 3. It's one of the
6    early ones from this morning. You were asked earlier
7    about the date that is on that, and sort of just below
8    the middle of the page where your handwriting starts,
9    there's March 31 --
10   A. Yes.
11   Q. -- '04 written in. It looks to me as though
12   there was something else written there first, and
13   then, in your handwriting, something is written over
14   that. Do you know what was there first?
15   A. I believe that it may have been -- I really
16   don't know what it was.
17   Q. Don't guess, but if you recall what you did,
18   okay.
19   A. No.
20        MS. HANNIGAN: All right. Thank you. I
21   have no further questions, Ms. Wilson.
22        MR. BERNSTEIN: I have no questions.
23   We'll read and sign.
24        (Deposition ended at approximately

Page 84

1    11:25 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 85

1              INDEX TO TESTIMONY
2
3    MELINDA G. WILSON                      PAGE
4       Examination by Mr. Leff              3
5       Examination by Ms. Hannigan         62
6
7                   -----
8              INDEX TO EXHIBITS
9
     WILSON DEPOSITION EXHIBIT NO.          PAGE
10
     1  Notice of removal dated March 24, 2004   15
11
     2  Two-page handwritten document
12      dated 4/6/04               23
13   3  Information for pre-complaint counseling  25
14   4  Two-page excerpt of Collective Bargaining
        Agreement              29
15
     5  Step 2 Grievance Appeal Form        31
16
     6  Arbitration Award Summary,
17      Case No. C00C-1C-D 04114132       37
18   7  Three-page document, certified mail
        return receipts           46
19
     8  Step 2 Grievance Appeal Form        47
20
     9  Document Bates stamped MW 0008 through
21      0023                 50
22   10 Plaintiff's Answers to Union Defendant's
        First Set of Interrogatories       51
23
     11 Plaintiff's Response to Union Defendant's
24      First Set of Requests for Production of

22 (Pages 82 to 85)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

A-000023

Wilson
Melinda G. Wilson

American Postal Workers Union

v.

C.A. # 05-073 JJF

October 7, 2005

Case 1:05-cv-00073-JJF    Document 34-2    Filed 02/23/2006    Page 25 of 43

Page 86

1          INDEX TO EXHIBITS  Cont'd
2
3      WILSON DEPOSITION EXHIBIT NO.          PAGE
4      12  Complaint, Melinda Wilson v. American
           Postal Workers Union, Delaware Area
5          Local, AFL-CIO, and United States Postal
           Service                          58
6
       13  Request for Notification of Absence
7          11/5/03                          64
8      14  Request for Notification of Absence
           12/5/03                          64
9
       15  Request for Notification of Absence
10         12/12/03                         64
11     16  Request for Notification of Absence
           12/18/03                         64
12
       17  Request for Notification of Absence
13         12/19/03                         64
14     18  Request for Notification of Absence
           12/20/03                         64
15
       19  Certification by Employee's Health Care
16         Provider for Employee's Serious Illness
           FMLA                             68
17
       20  Application for Employment, Boscov's    70
18
19
20
21
22
23
24

Page 88

State of Delaware  )
                   )
New Castle County  )

CERTIFICATE OF REPORTER

        I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 7th day of October, 2005,
the deponent herein, MELINDA G. WILSON, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.
        I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                    Ann M. Calligan, RMR
                    (Certification No. 186-RPR)
                    (Expires January 31, 2008)

Page 87


REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

UNITED STATES
POSTAL SERVICE

COPY

Date:        March 24, 2004

Subject:     Notice of Removal

To:          Melinda Wilson
             28 Ashley Drive                    FTR Clerk
             New Castle DE 19720-3962           DE P&DC

Certified    7003 1010 0001 1223 5956
+ 1 copy via first class mail

You are hereby notified that you will be removed from the Postal Service no sooner than thirty (30) days from your receipt of this notice. The reasons for this action are:

**CHARGE:    Improper Conduct**

An investigation into your conduct reveals that while employed by the US Postal Service, you were also working a second job at the Boscov's department store. A review of your work hours and your leave requests indicates the following:

On 11/5/03 you reported to work for the Postal Service at 6:59am. You completed a PS Form 3971 for paid sick leave and left work at 1:02pm. You also indicated on the leave slip that you requested the leave be coded as leave under the Family and Medical Leave Act (FMLA). That same day, you worked at Boscov's department store from 4:59pm to 9:51pm. When questioned about this date, you replied that you could not recall the reason you left on sick leave, and you could not recall if you worked at Boscov's that day.

On 12/5/03 you called at 6:09 am and reported that you would be unable to report for duty at the Postal Service due to illness and requested paid sick leave. You requested the leave be coded as leave under the Family and Medical Leave Act (FMLA). That same day, you worked at Boscov's from 5:56pm to 10:05pm. When questioned about this date, you replied that you could not recall the reason why you could not report for duty at the Postal Service, and you could not recall if you worked at Boscov's that day.

On 12/12/03 you left work at the Postal Service at 3pm and completed a PS From 3971 requesting paid sick leave. You requested the leave be coded as leave under the Family and Medical Leave Act (FMLA). That same day, you worked at Boscov's from 3:18pm to 8:58pm. When questioned about this date, you replied that you could not recall the reason why you left on sick leave at 3pm, and you could not recall if you worked at Boscov's that day.

A-000025

DEPOSITION
EXHIBIT
Wilson 1
CR 10-7-05

COPY

- 2 -

On 12/18/03 you called at 6:05am and reported that you would be unable to report for duty at the Postal Service due to illness and requested paid sick leave. You requested the leave be coded as leave under the Family and Medical Leave Act (FMLA). That same day, you worked at Boscov's from 4:24pm to 10:02pm. When questioned about this date, you replied that you could not recall the reason why you could not report for duty at the Postal Service, and you could not recall if you worked at Boscov's that day.

On 12/19/03 you called at 7:21am and reported that you would be unable to report for duty at the Postal Service due to illness and requested paid sick leave. You requested the leave be coded as leave under the Family and Medical Leave Act (FMLA). That same day, you worked at Boscov's from 4:42pm to 10:27pm. When questioned about this date, you replied that you could not recall the reason why you could not report for duty at the Postal Service, and you could not recall if you worked at Boscov's that day.

On 12/20/03 you called at 6:20am and reported that you would be unable to report for duty at the Postal Service due to illness and requested paid sick leave. You requested the leave be coded as leave under the Family and Medical Leave Act (FMLA). That same day, you worked at Boscov's from 4:24pm to 11:39pm. When questioned about this date, you replied that you could not recall the reason why you could not report for duty at the Postal Service, and you could not recall if you worked at Boscov's that day.

When you were questioned as to why you took sick leave at the Postal Service on the same days that you were working at Boscov's, you replied that you could not recall.

The Employee and Labor Relations Manual (ELM) states:

*513.312 Restriction An employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority (see 661, Code of Ethical Conduct).*

*661.42 Conflicts of Interest — Employment An employee may not engage in outside employment or other outside activity that is not compatible with the full and proper discharge of the duties and responsibilities of Postal Service employment. No employee will engage in outside employment which impairs mental or physical ability to perform Postal Service duties and responsibilities acceptably.*

*666.2 Behavior and Personal Habits Employees are expected to conduct themselves during and outside of working hours in a manner which reflects favorably upon the Postal Service. Although it is not the policy of the Postal Service to interfere with the private lives of employees, it does require that postal personnel be honest, reliable, trustworthy, courteous, and of good character and reputation. Employees are expected to maintain satisfactory*

A-000026

- 3 -

*personal habits so as not to be obnoxious or offensive to other persons or to create unpleasant working conditions.*

Your actions have violated these provisions of the ELM.

You have the right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of this notice.

If this action is reversed or modified on appeal, back pay may be allowed unless the appropriate award or decision specifies otherwise, only if you have made reasonable efforts to obtain alternate employment during the potential back pay period. The documentation which you must maintain and present to support a back pay claim is described in Part 436 of the Employee and Labor Relations Manual.


Linda Drummer
Supervisor, Distribution Operations

Carla Van Istendal
Manager, Distribution Operations
(Concurring official)


Attachments (ELM 436)
SF 8


cc:    OPF
       Labor Relations
       File


A- 000027

EXHIBIT

I, Melinda Watson, am grieving the fact that I was issued a letter of removal dated March 24, 2004 that I received on April of 2004. The Removal is for the charge of Improper Conduct.

First of all I didn't know having a second job was improper conduct because I know several employees as well as managers who have second jobs. I am being disciplined for taking FMLA which I am approved for and the dates mentioned in the removal; I received approved 3971's from my supervisor for all these dates.

Further more, my Supervisor Linda Drummer, never had a discussion with me that I might be violating any contractual rules. She had the opportunity to discuss whatever she wanted with me but she never did. My supervisor knew of my employment in December, yet she never discussed this with me. This punishment is punitive rather than corrective and I want to be made whole with all back pay and benefits. Also has an attendance check been given to every employee who has a second job while employed also at the Postal Service?

As for the DIC given to me on March 10, 2004, I felt that it was very unfair. Why was Carla VanEldene there writing down questions for my Supervisor Linda Drummer to ask me? Shop steward Pat McLaugh

A-000028

P-4

who my representative and will testify to this.
I did not know what the DIC was really about.
I was asked about specific dates in which I had
called out FMLA and I told Linda that I could not
recall these dates. If she had given me copies of my
3971's it would have helped me recall the absences.
I suffer from chronic asthma and this is
documented in the FMLA director's office. On the
dates in question I was suffering from attacks
quite regularly and needed treatments and meds. I
took my treatments and felt better in the evenings
therefore I went to work at Boscov's.
On 12/2/03, when I left at 3pm, and I was feeling
sick and went home to get my medication and
I got it and went to work at Boscov's at 3:18 but
still I had to leave early that day because I was
still suffering asthmatic symptoms. I left at 8:58pm.

Mostly this punishment is too severe when all Linda
Drummer had to do in December of 2003 was call me in
and discuss my employment or absences with me.
She never let me know that there was a problem and
she could have.

CL 4-7-04
Wilson Melinda

A-000029

U.S. Postal Service
**Information for Pre-Complaint Counseling**

| Certified Mail No. 7001 2510 0003 0238 | Date Mailed 04/07/2004 | or Hand Delivered on |
| By *(Initials)* MAZ | Case No. | |

On   **March 31, 2004**   you requested an appointment with a Dispute Resolution Specialist.
*(Month, Day, Year)*

**Important: Please read.** You should complete this form and return it to the EEO office *within10 calendar days* of receipt. This is the only notification that you will receive regarding the necessity for you to complete this form.

## A. Requester Information

| Name *(Last, First, MI)* WILSON, MELINDA G. | Social Security No. 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 | Home Telephone No. (302) 395-4854 |
|---|---|---|

Your Mailing Address
**28 ASHLEY DRIVE, NEW CASTLE DE 19720-3962**

| Name of Postal Facility Where You Work Wilmington DELAWARE PLDC | Office Telephone No. 302 323-2281 |
|---|---|

| Address of Postal Facility 147 Quigley BLVD | Email Address* M |
|---|---|

**Employment Status** *(Check One)*

| ☐ Applicant | ☐ Casual | ☐ TE | ☒ Career | Position Title FSM Clerk | Grade Level 5 |
|---|---|---|---|---|---|

| Pay Location 215 | Tour 2 | Duty Hours 7 - 3:30 pm | Off Days *(If Tour I, Show Nights Off)* Sun / Mon | Time in Current Position 2 Years ___ Months |
|---|---|---|---|---|

| Your Supervisor's Name Linda Drummer | Supervisor's Title SDO | Supervisor's Telephone No. (302) 323 2281 |
|---|---|---|

*Providing this information will authorize the U.S. Postal Service to send you important documents electronically.

## B. Discrimination Factors

Prohibited discrimination includes actions taken based on your *Race, Color, Religion, Sex, Age (40+), National Origin, Physical and/or Mental Disability, or in Retaliation (actions based on your participation in prior EEO activity).* These categories are referred to on this form as factors.
What factor(s) of Discrimination are you alleging? (Please be specific, i.e., Race-African American, Sex-Female).

Retaliation

*For Retaliation Allegations Only.* If you are alleging retaliation discrimination, provide the date(s) and specifics of the EEO activity that you feel caused you to be retaliated against.

1. On 12-24-03 , I engaged in EEO activity. Case No.: 1C-081-0019-04
   *(Month, Day, Year)*

2. On _____ , I engaged in EEO activity. Case No.: _____
   *(Month, Day, Year)*

## C. Description of Incident/Action

Please use the space below to briefly describe the incident or action that prompted you to seek EEO counseling at this time.

On **March 31** , 20 04
  *(Month, Day)*   *(Year)*

I received a letter of Removal issued by Linda Drummer and concurred with by Carla Van Istendal. The Charge is "Improper Conduct" First of all, Ms Van Istendal is the concurring official to the discipline and she also was a part of the Day in Court(s) given on March 10, 2004 with both Linda Drummer + Carla Van Istendal present. These charges are outrageous. I called out FMLA and it was approved. Now 3 & 4 Months after the fact, they remove me. Many Postal Employee have outside employment and their attendance Records were not scrutinized to the postal attendance records and they were not removed. This is retaliation + harassment on the part of the Postal Service because of my Previous Complaints.

DEPOSITION EXHIBIT
Wilson 3
a 10-7-05
FINAL Bayone, N.J.

PS Form 2564-A, March 2001 (Page 1 of 3)

A-000030

Explain why, based on the factors you cited in Section B, you believe that you were treated differently than other employees or applicants in similar situations

1. Anthony Greiner
(Name of Employee)
Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)
White-male has outside employment and uses

was treated differently than I when: he calls out FMLA and go to his other job. Was his attendance records seized and he ~~removed from~~ Was not removed from the postal service

2. Maryann Campbell
(Name of Employee)
Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)
Black-Female - Manager (SDO) Tour 2

was treated differently than I when: She had outside employment and called out on leave and went to her other jobs. She was not Fired.

3. Curtis Phillips
(Name of Employee)
Factor(s) that describe the employee, i.e., sex (male), National Origin (Hispanic)
Black-Male

was treated differently than I when: he had outside employment and called out, yet went to his other job He was not removed from the Postal Service

4. Oliver Wallace - Black Male - SDO Tour 3
He has outside employment and is sick often and his attendance records are current.

List the name(s) of the official(s) who took the action that prompted you to seek counseling at this time.

1a. Name Linda Drummer
b. Title SDO Tour 2
c. Office Wilm DE P&DC
d. Grade Level

2a. Name Carla Van Istendal
b. Title MDO Tour 2
c. Office Wilm DE P&DC
d. Grade Level

Retaliation Allegations Only: Was/were the official(s) listed in Section D above aware of your prior EEO activity?
☐ No  ☒ Yes  If yes, explain how the official(s) became aware: Carla was aware on 12/24/05 when I made the call from her office in her presence and ☒ in the presence of Shop Steward Kim Turkin. Carla is Linda Drummers Supervisor SO I'm sure she informed my supervisor Linda Drummer.

What are you seeking as a resolution to your pre-complaint? $300,000.00 in damages. To be made whole as a Postal Employee with all Back-Pay and benefits and the harassment to ~~stop~~ immediately.

On the incident that prompted you to seek EEO counseling, have you:

1. Filed a grievance on the same issue?  ☐ No  ☒ Yes  If yes, April 16 (Date)  (Current Step)

2. Filed a MSPB appeal on this issue?  ☒ No  ☐ Yes  If yes, _____ (Date Appeal Filed)

A-000031

## H. Anonymity

You have the right to remain anonymous during the pre-complaint process.

Do you desire anonymity? [X] No    [ ] Yes

## I. Representation

You have the right to retain representation of your choice. *(check one)*

[ ] I waive the right to representation at this time.    [X] I authorize the person listed below to represent me.

| | |
|---|---|
| Name of Representative<br>*Charles Szymanski* | Representative's Title<br>*Attorney* |
| Organization<br>*Law Offices* | Telephone Number<br>*(215) 875-3100*    Email Address• |

Mailing Address *(Street or P.P. Box, City, State and Zip +4)*
*121 South Broad St    11th Floor    Philadelphia, PA 19107-4545*

• Providing this information will authorize the U.S. Postal Service to send your representative important documents electronically.

## J. Documentation

Please attach any documentation you wish to submit to support your allegation(s). Include a copy of any written action(s) that caused you to seek counseling at this time.

Note: If you are alleging mental and/or physical disability, it is important for you to submit medical documentation of your disability during the pre-complaint process.

## K. Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

## L. Authorization

I am aware that the claim(s) contained herein shall by-pass the pre-complaint process *if* like or related to a formal complaint that I have already filed, or *if* the claim(s) constitutes a spin-off complaint. (A spin-off complaint contests the manner in which a previously filed complaint is being processed.) In completing this PS Form 2564-A, *Information for Pre-complaint Counseling*, I recognize that the Manager, Dispute Resolution will review the claim(s) contained herein and determine how they shall be processed. I will be notified, in writing, if the Manager determines that my claim(s) shall be processed as amendments or appendages to a formal complaint that I have already filed.

Please print your name here
*Melinda G. Wilson*

Your Signature
*Melinda G. Wilson*

Date signed
*4/10/04*

Please return this form to:

MANAGER EEO DISPUTE RESOLUTION
U S POSTAL SERVICE
P O BOX 9001
BELLMAWR NJ 08099-9411

A-000032

RECEIVED

APR [ ] [ ] PM

NJ/FB EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT

U.S. Postal Service
**Agreement to Participate in REDRESS™,
an Alternative Dispute Resolution Process**

| Case No. |
| --- |

| Date Initiated |
| --- |
| MARCH 31, 2004 |

I, __MELINDA G. WILSON__, have been advised that, in accordance with 29 C.F.R. §1614.105(f), I have the option of participating in mediation instead of the counseling process. The EEO complaints processing office has given me information about the mediation procedure, and I voluntarily agree to participate in REDRESS™ mediation during the pre-complaint processing period. I am aware that REDRESS™ mediation sessions are confidential, and that resolutions reached during the procedure are handled in the same manner as are resolutions reached during the counseling process. In signing this agreement, I acknowledge that the pre-complaint processing period will be 90 calendar days. If the matter that I brought to the dispute resolution specialists attention has not been resolved before the 90th day, I have the right to file a formal complaint at any time thereafter up to 15 calendar days after receiving my notice of right to file a discrimination complaint.

## Privacy Act Notice

**Privacy Act Notice.** The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other

benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Counselee | Date |
| --- | --- |
| Melinda G. Wilson | 4/10/04 |

PS Form 2567-B, March 2001

A-000033

U.S. Postal Service

# Agreement to Extend 30-Day EEO Counseling Process



RECEIVED

MGR EEO DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT

| Case No. | |
|---|---|
| Date of Contact | March 31, 2004 |

I, **MELINDA G. WILSON**, in accordance with 29 C.F.R. §1614.105(e), hereby agree to postpone the final interview and to extend the informal counseling process for a period up to 60 additional days. In signing this agreement, I understand that I retain my right to file a formal complaint if the matter(s) which I raised during counseling is not resolved within 90 calendar days from the date of my first contact with the EEO Office, and at any time thereafter up to 15 calendar days after my receiving my notice of right to file a discrimination complaint.

## Privacy Act Notice

The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Signature of Counselee | Date |
|---|---|
| _Melinda Wilson_ | 4/10/04 |

PS Form 2567-A, March 2001

A000034

U.S. Postal Service
## Representation/Anonymity

| | Case No. |
|---|---|

**Representation**

The EEO Dispute Resolution Specialist has informed me that I am entitled to representation of my choosing.

[X] I authorize to represent me:

_Charles Szymanski - Law Offices of Markowtz and Richmc_
Name and Title of Representative

_121 South Broad St    11th Floor_
Street Address

_Philadelphia, PA    19107_
City/State/ZIP + 4

_(215) 875 - 3101_
Area Code and Telephone Number        Email Address

[ ] I waive representation at this time.

I understand that I must immediately notify the Manager, EEO Compliance and Appeals, located in my area, in writing, if at any time during the administrative processing of my complaint, I designate a representative and/or change the representative I have designated above. (Employees at Postal Service Headquarters and Headquarters Field Units, and employees of the Inspection Service should notify the EEO Appeals Review Specialist at Headquarters.)

**Anonymity**

The EEO Dispute Resolution Specialist has informed me of my right to remain anonymous during the informal processing stage.

[ ] I elect to remain anonymous.

[X] I waive anonymity.



**Privacy Act Notice**

Privacy Act Notice. The collection of this information is authorized by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e-16; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 633a; the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses,

grants or other benefits; to a congressional office at your request, to an expert, consultant or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

| Counselee's Signature | Date | |
|---|---|---|
| | | A-000035 |

PS Form 2584, March 2001

28 McAtey DE
New Castle DE
19720

MAUREEN MCMANUS
Mgr EED DisPut & Resolution
USPS South Jersey District
P.O Box 9001
BELLMAUR, N.J. 08099-9411

08099/9331



RECEIVED

MGR EED DISPUTE RESOLUTION
SOUTH JERSEY DISTRICT



000036

# COLLECTIVE BARGAINING AGREEMENT

Between
**American
Postal Workers
Union, AFL-CIO**

And
**U.S. Postal Service**

**November 21, 2000
November 20, 2003**





PENGAD-Bayonne, N.J.

**DEPOSITION
EXHIBIT**

Wilson 4

10-7-0



Blumberg No. 5119

EXHIBIT

A

037

**Article 15.1**

**Section 9. Field Federal Safety and Health Councils**

In those cities where Field Federal Safety and Health Councils exist, one representative of the Union who is on the Local Safety and Health Committee in an independent postal installation in that city and who serves as a member of such Councils, will be permitted to attend the meetings. Such employee will be excused from regularly assigned duties without loss of pay. Employer authorized payment as outlined above will be granted at the applicable straight time rate, provided the time spent in such meetings is a part of the employee's regular work day.

(The preceding Article, Article 14, shall apply to Transitional Employees)

**ARTICLE 15**
**GRIEVANCE-ARBITRATION PROCEDURE**

**Section 1. Definition**

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

**Section 2. Grievance Procedure Steps**

**Step 1:**

(a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within

**Article 15.2 (Step 1)**

fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. The employee, if he or she so desires, may be accompanied and represented by the employee's steward or a Union representative. The Union may also initiate a grievance at Step 1 within 14 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required. A Step 1 Union grievance may involve a complaint affecting more than one employee in the office. When the Union files a class action grievance, Management will designate the appropriate employer representative responsible for handling such complaint.

(b) In any such discussion the supervisor shall have authority to settle the grievance. The steward or other Union representative likewise shall have authority to settle or withdraw the grievance in whole or in part. No resolution reached as a result of such discussion shall be a precedent for any purpose.

(c) If no resolution is reached as a result of such discussion, the supervisor shall render a decision orally stating the reasons for the decision. The supervisor's decision should be stated during the discussion, if possible, but in no event shall it be given to the Union representative (or the grievant, if no Union representative was requested) later than five (5) days thereafter unless the parties agree to extend the five (5) day period. Within five (5) days after the supervisor's decision the supervisor shall, at the request of the Union representative, initial the standard grievance form that is used at Step 2 confirming the date upon which the decision was rendered.

(d) The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after receipt of the supervisor's decision. Such appeal

000038

Wilson S

**LABOR RELATIONS**
APR 19 2004
U.S. POSTAL SERVICE
WILMINGTON, DE

# AMERICAN POSTAL WORKERS UNION, AFL-CIO

55 ⬦ ® 1984

**STEP 2 GRIEVANCE APPEAL FORM**

| 1 DISCIPLINE (NATURE OF) OR CONTRACT (ISSUE) Removal | CRAFT Clerk | DATE | LOCAL GRIEVANCE #CLK-07-04 | USPS GRIEVANCE # |
|---|---|---|---|---|

INSTALLATION/SEC. CEN./BMC  Delaware Processing Dist. Ctr   PHONE 323-2241

2 TO USPS STEP 2 DESIGNEE (NAME & TITLE) Debbie Kelley-Brown   ADDRESS   CITY New Castle   STATE De   ZIP 19720

3 FROM: LOCAL UNION (NAME OF) Malcolm T Smith Area Local   PO Box 311 New Castle, De. 19720

4 STEP 2 AUTHORIZED UNION REP. - (NAME & TITLE) Courtland S. Stinson   AREA CODE PHONE (OFFICE) (302)323-0211   AREA CODE PHONE (OTHER) (302)322-8994

5 LOCAL UNION PRESIDENT Steven Collins   AREA CODE PHONE (OFFICE) (302)323-0211   AREA CODE PHONE (OTHER) (302)322-8994

## STEP 1 MEETING & DECISION   MET WITH

WHERE - WHEN

6 UNIT/SEC/BR/STA/OFC PDC Wilm De 19850   DATE/TIME 4/16/04   USPS REP SUPR Joe Pascual   GRIEVANT AND/OR STEWARD Collins   INITIALS CS   DISTRIBUTING ONLY VERIFIES

7 STEP 1 DECISION BY (NAME & TITLE) Joylyn J. Pascual SDO   DATE & TIME 4/16/04 1350   DATE OF DECISION   PHONE 345-4854

8 GRIEVANT PERSON RUN# Wilson, Melinda G   ADDRESS 28 Ashley Dr   CITY New Castle, De 19720   981-3029

9 SOCIAL SEC. NO. 2808 | SERVICE SENIORITY 4-85 | CRAFT Clerk | FTR-PTR-PTF ☑☐☐ | LEVEL 5 | STEP O | DUTY HRS 7-3:30 | OFF DAYS SA☒ S☒ M T W T F | LIFETIME SECURITY YES☒ NO☐ | VETERAN YES☐ NO☒

10 JOB#/PAY LOCATION (UNIT/SEC/BR/STA/OFCI) 215   WORK LOCATION CITY AND ZIP CODE Wilm, De PLDC 19850

11 Pursuant to Article 15 of the National Agreement we hereby appeal to Step 2 the following Grievance alleging a Violation of (but not limited to) the following: NATIONAL, (Art./Sec.)

LOCAL MEMO (ART./SEC.) OTHER MANUALS, POLICIES, L/M MINUTES, ETC.
Art. 2,5,15,16,17,19,30,31   EL-921, FMLA

12 DETAILED STATEMENT OF FACTS/CONTENTIONS OF THE GRIEVANT management issued the grievent a notice of removal for the charge of "improper conduct". She recieved the notice on 4/6/04. The union contents that this removal is for unjust cause, procedurally defective, untimely, punitive rather than corrective in nature, non-progressive, disputable and in direct violation of the EL-921. The grievent has a medical condition that at times she is sick and takes treatments that makes her feel better and is able to work. This removal is in violation of Art. 16.1 the principles of discipline, the grievent has not past discipline or discussions on this issue. The grievent was not given a proper day in court.

A-000039

List of attached papers as identified "For more info see attached"

13 CORRECTIVE ACTION REQUESTED For the removal issued to the grievent on 4/6/04 to be rescinded and expunged from all records, grievent to be made whole with all entitlements, back pay, holiday pay, benefits and all other entitlements. Hurt to be made whole

Stinson CSMR - President

E2 4-7-04
Wilson Melinda

Issue: Removal

Background: Management issued the grievant a
notice of removal for the charge of "improper
conduct". She recieved the notice on 4/6/04.

Union contention: violation of Art. 2, 5, 15, 16, 17, 19, 30, 31
of the EL-921, FMLA.
   The union contents that management is in violation of
the above when they issue the grievant a removal
for unjust cause, that is procedurally defective, untimely,
punitive rather than corrective in nature, non-progressi
disparate and in direct violation of the EL-921. The
grievant has a medical condition that at times she
is sick and takes treatment that makes her feel
better and is able to work. This removal is in
violation of Art. 161 the principles of discipline,
the grievant has no past discipline or discussions
on this issue. The grievant was not given a proper

A 000040

CL 4-7-04
Wilson, Melinda

day in court, but turned out to be a interview.
The dates she was accused of the 3971's were
never presented to her for questioning and that
is the reason "I don't know was given". This is
in direct violation of the EL-921 and evidince
must be presented to the grievent in the day in court
    Also removal is harsh and redimal and not
progressive or corrective. A discussion could have
avoid this major issue.
    Also this issue of discipline started after
the grievent stopped having a affair with the
ELt2 specialist at the same plant.
    The MDO also was involved in the investagtion
of the case and also is a concurring official which
is also in direct violation of the CBA and EL-921.
There was no impartial descision made and the
grievent never stood a chance of having a fair
day in court. This discipline came from the top
to the bottom in violation of the CBA and EL-921.
    Art. 16.1 b clearly lays out the just cause
provisions for termaintion and this case does not
make it, progression must be used.                A-000041

CL 4-7-04
Wilson Melinda.

Corrective action: For The Removal issued to the grievent on 4/6/04 to be rescinded and expunged from all Records, grievent to be made whole with all entitlements, back pay, holiday pay, benefits and all other entitlements

Grant to be made whole.

A-000042