

**WILCOX & FETZER LTD.**

# In the Matter Of:

# Wilson

# v.

# American Postal Workers Union

## C.A. # 05-073 JJF

---

### Transcript of:

### Steven Collins

### October 7, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-000091

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MELINDA WILSON,                              )
                                             )
              Plaintiff,                     )
                                             )
v.                                           ) Civil Action No.
                                             ) 05-073 JJF
AMERICAN POSTAL WORKERS UNION,               )
Delaware Area Local AFL-CIO, and             )
UNITED STATES POSTAL SERVICE, an             )
independent establishment of the             )
Executive Branch of the Government           )
of the United States of America,             )
                                             )
              Defendants.                     )

Deposition of STEVEN COLLINS taken
pursuant to notice at the offices of the United States
Attorney, 1007 Orange Street, Suite 700, Wilmington,
Delaware, beginning at 11:30 a.m. on Friday, October
7, 2005, before Ann M. Calligan, Registered Merit
Reporter and Notary Public.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

A-000002

Page 14

1 was pending removal.
2 Q. And why was that an assumption on your part?
3 A. Because we kept on going back and forth. I
4 filed numerous grievances for her that management
5 placed her out of the building.
6 Q. Did you know prior to April 6 that management
7 had initiated removal proceedings against Ms. Wilson?
8 A. No.
9 Q. You did not?
10 A. Disciplinary procedure but not removal.
11 Q. Do you recall testimony yesterday from
12 Ms. Drummer indicating that she had hand delivered a
13 notice of removal to the Union on March 13th?
14 MR. LEFF: Objection to the form of the
15 question. She did not testify that she delivered a
16 notice of removal.
17 BY MR. BERNSTEIN:
18 Q. She delivered a document to the Union
19 indicating that Ms. Wilson was being removed?
20 A. I heard --
21 MR. LEFF: Object to the form of the
22 question.
23 Q. You heard that testimony, correct?
24 A. I heard it, yes.

Page 15

1 Q. Do you have any knowledge of either yourself or
2 anyone in the local union receiving any document such
3 as Ms. Drummer described?
4 A. No.
5 Q. Prior to April 6, I think you said you got a
6 phone call from Ms. Wilson on April 6 and met with her
7 that day?
8 A. Yes.
9 Q. Correct? Prior to April 6, were you aware that
10 Ms. Wilson was attempting to contact you or anyone
11 else in the Union?
12 A. No.
13 Q. Never got any phone messages never got any word
14 directly or indirectly about Ms. Wilson being -- or at
15 least the attempt to terminate Ms. Wilson's
16 employment?
17 A. No.
18 Q. So the phone call that you received from
19 Ms. Wilson on April 6 was the first indication that
20 you personally had that the Postal Service was
21 attempting to terminate her employment, correct?
22 A. Correct.
23 Q. And you met personally with Ms. Wilson on
24 April 6?

Page 16

1 A. Yes.
2 Q. Now, at that meeting did she show you the
3 notice of removal?
4 A. Yes.
5 Q. Or did she have it with her?
6 A. Yes.
7 Q. And do you recall looking at that?
8 A. Yes.
9 Q. Do you recall noticing the date of the notice
10 of removal letter?
11 A. The date as far as --
12 Q. What the date was on the letter.
13 A. On what -- there's a lot of dates on there.
14 Which date are you talking about?
15 Q. Let me get that.
16 A. There's one right there.
17 Q. All right. I'll show you this one. It's
18 Deposition Exhibit Wilson Number 1. You want to look
19 at that there's a date at the very top?
20 A. Mm-hmm.
21 Q. March 24th?
22 A. Yes.
23 Q. Do you recall noticing that on April 6?
24 A. Yes.

Page 17

1 Q. Let me ask you this, in dealing with grievances
2 is timing important? In other words, deadlines for
3 doing certain things?
4 A. Yes.
5 Q. And what was your understanding of the deadline
6 for filing grievances --
7 A. 14 --
8 Q. -- under the contract?
9 A. 14 days from the date of receipt of notice.
10 Q. Is 14 days from the date of receipt, or is that
11 your understanding?
12 A. The contract lays out clearly.
13 Q. Isn't there also language in the contract to
14 the effect of in so many words -- let me get it for
15 you so I don't misstate anything.
16 I'm going to show you Wilson 4 and
17 page 90, subparagraph A at the bottom of 91.
18 A. Are you talking C or D?
19 Q. Pardon me?
20 A. Are you talking about C or D.
21 Q. I'm talking about A.
22 A. You said on the bottom. That's 91 -- 90-A.
23 Q. Okay.
24 A. Okay. It says, "Any employee who feels

5 (Pages 14 to 17)

Page 18

1 aggrieved must discuss the grievance with the
2 employee's immediate supervisor within 14 days."
3 Q. Does it say anything about when the 14-day
4 period begins to run?
5 A. Of which the employee or the Union first
6 learned or may reasonably have expected to have
7 learned of its cause.
8 Q. And what is your understanding of that
9 provision?
10 A. That once an individual receives a notice of
11 removal, on that date the time clock starts clocking.
12 Q. Okay. When Ms. Wilson showed you the notice of
13 removal -- that's Wilson Number 1 -- did you pay any
14 particular attention to the fact that the letter
15 states that it was sent by certified mail?
16 A. I knew it was sent certified mail.
17 Q. Is that the normal practice?
18 A. No.
19 Q. How did you --
20 A. Melinda told me she was out of work.
21 Q. Did you ask her when she signed for the
22 certified mail notice?
23 A. Yes.
24 Q. What did she tell you?

Page 19

1 A. April 6.
2 Q. Did you also notice that this notice of removal
3 was sent by first class mail?
4 A. No.
5 Q. You did not notice that. Okay.
6 Did you do anything after April 6 to
7 determine when the Postal Service may have sent this
8 notice to Ms. Wilson?
9 A. I went by what the grievant wrote and told me.
10 Q. So when you say you went by what the grievant
11 wrote, you're talking about the handwritten statement,
12 Wilson Exhibit Number 2?
13 A. Yes.
14 Q. Did you hear Ms. Wilson testify that she put
15 down the date of April 6, 2004, because you told her
16 that's when she received it?
17 A. No.
18 MR. LEFF: Objection to the form of the
19 question.
20 BY MR. BERNSTEIN:
21 Q. That's the day you put down?
22 MR. LEFF: Objection.
23 Q. Do you recall that testimony?
24 A. I recall it.

Page 20

1 Q. Do you agree or disagree with that testimony?
2 A. Disagree.
3 MR. LEFF: Object to the form of question.
4 Q. What is the basis for your disagreement?
5 A. She told me that she got it on the 6th.
6 Q. Did you tell her to put that in the
7 handwritten?
8 A. Of course, you needed a whole scenario of when
9 you get everything, what the whole scenario of the
10 case.
11 Q. Were you concerned about getting the step 1
12 grievance on the table?
13 MR. LEFF: Object to the form of the
14 question.
15 Q. That there was any urgency to do that after
16 April 6?
17 A. Urgency?
18 Q. Yeah.
19 A. Explain yourself.
20 Q. Looking at this letter, you see it's dated
21 March 24?
22 A. That's the date that management prepared that
23 letter. I've done hundreds of grievances through the
24 years. That's the date that labor prepares it. It

Page 21

1 may take a week or two for it to get down to the
2 employee. And I argued on timeliness.
3 Q. I understand. But listen to my question.
4 Okay? And then you can answer the question. All
5 right?
6 Did you notice that this was dated March
7 24th, yes or no?
8 MR. LEFF: Object to the form of question.
9 Go ahead.
10 A. I don't recall because that date means nothing.
11 Q. Whether it means anything or not, my question
12 is, did you notice the date?
13 A. I don't recall.
14 Q. Yes or no. Okay.
15 Did it cross your mind that Ms. Wilson was
16 coming in to see you approximately 12 days after the
17 date of this letter? Did that concern you?
18 A. She called me and told me she just picked up
19 the letter, and then she was going to come over and
20 see me.
21 Q. I understand that. But when you actually see
22 the letter and you know the letter is dated March 24th
23 and now it's April 6th, did that passage of time
24 concern you at all?

6 (Pages 18 to 21)

Page 22

1  A. No.
2  Q. Let me ask you this. Were you satisfied in
3  your own mind that you had 14 days from April 6 to
4  file the step 1?
5  A. Absolutely.
6  Q. Okay. No question?
7  A. Absolutely.
8  Q. No doubt?
9  A. Third time. Absolutely.
10  Q. Now, as I understand it, when this case went to
11  arbitration, the arbitration hearing itself was
12  divided in two, is that correct?
13  A. No.
14  Q. That's not bifurcated?
15  A. They have heard -- we heard -- it wasn't an
16  actual bifurcation where we heard it just on the
17  14-day -- heard the 14-day argument first. Then we
18  went on with the merits. And that was the ruling that
19  the arbitrator ruled.
20  Q. So there was evidence taken on the timeliness
21  of the grievance issue, correct?
22  A. Yes.
23  Q. And there was also evidence taken on the
24  merits?

Page 23

1  A. Yes.
2  Q. But the arbitrator decided, I'm going to rule
3  separately on these issues, is that correct, or was
4  that by agreement?
5  A. He came out and had a conference between Andy
6  Keen and myself. He mentioned that he did not want
7  the labor rep's name brought in unless it had direct
8  evidence or matter of the case, and that he would hear
9  it on the timeliness and hear it on the merits also at
10  the same time.
11  Q. Okay. Did he indicate at some point that he
12  was going to make a separate decision on the
13  timeliness issue before making a decision on the
14  merits issue?
15  A. I don't recall.
16  Q. On the merits issue, can you describe for me
17  just in summary fashion what the defense was to the
18  charge that Ms. Wilson was working at Boscov's while
19  she was on sick-leave status?
20  A. We made the argument that the discipline was
21  untimely, for unjust cause, harsh, punitive, not
22  corrective in nature, in direct violation of the
23  EL 921.
24  Q. What's EL 921?

Page 24

1  A. The handbook and manual, Supervisor's Guide to
2  Handling Discipline.
3  Q. Now, was there any real dispute that Ms. Wilson
4  was working at Boscov's on the hours that the Postal
5  Service claims she was working?
6  A. No. My main argument was --
7  Q. No. No. No. Try and answer my question.
8  A. Try to frame it right then.
9  Q. Did the local union dispute factually the
10  Postal Service's contention that Ms. Wilson was
11  working at Boscov's on the hours that they said she
12  was working?
13  A. Did we dispute it? Yes.
14  Q. You did?
15  A. Yes.
16  Q. What evidence was there to dispute the facts of
17  what hours she was working?
18  A. There was clock rings.
19  Q. Clock rings from Boscov's?
20  A. The ones I have at the Postal Service showed
21  that Melinda was not at the Postal Service all but one
22  time, one date during her tour. So like three dates
23  or two dates, it was completely off her schedule from
24  the post office. So it was ingermane.

Page 25

1  At one time she was -- that was during her
2  tour, seven to three-thirty. We made the argument,
3  because Melinda suffers from asthma, she had an asthma
4  attack. She went home, took her inhaler, felt better,
5  and went to Boscov's.
6  Q. My question was, was the Union disputing the
7  hours that Ms. Wilson was working at Boscov's?
8  A. Yes.
9  Q. The Union said she wasn't working those hours?
10  A. You got to frame it different. I'm not -- go
11  ahead. Repeat yourself.
12  Q. For example, if the Postal Service was saying,
13  on December 20th, 2003, Ms. Wilson worked at Boscov's
14  from four o'clock in the afternoon till closing, was
15  the Union disputing that?
16  A. As far as dispute, what do you mean, make an
17  argument that --
18  Q. Saying she didn't work then. She wasn't
19  working at Boscov's that day or those hours?
20  A. We argued it wasn't a violation.
21  Q. No. No. No. Were you saying, apart from
22  whether it was a violation or not, was the Union
23  saying, no, she wasn't working there at the time you
24  said she was working there?

7 (Pages 22 to 25)

Page 26

1    A.  I don't recall.
2    Q.  Now, let's assume, just hypothetically, that on
3  days that Ms. Wilson took sick leave, whether it was
4  four hours, a half an hour, three hours, eight hours,
5  that that same calendar day she worked at Boscov's,
6  was the Union disputing that that was a violation
7  doing those things?
8    A.  We were --
9    Q.  Taking sick leave.
10    A.  We were saying she did not violate the
11  contract.
12    Q.  And what was the basis?
13    A.  Because that wasn't within the same time frame
14  of her duty hours within the Postal Service.
15    Q.  Now, are you familiar with the regulations
16  cited in the removal letter, that is, 513.312 on
17  page 2, two-thirds of the way down.
18    A.  Correct.
19    Q.  You're familiar with that?
20    A.  Yes.
21    Q.  Were you familiar with that at the time of this
22  grievance hearing?
23    A.  Yes.
24    Q.  What is your interpretation of that regulation?

Page 27

1    A.  Employee cannot call out sick at the post
2  office during their hours and go work the job at the
3  same time.
4    Q.  Isn't that what the Postal Service was saying
5  Ms. Wilson did?
6    A.  I don't know what the Postal Service was
7  saying.
8    Q.  You don't know what their allegation was?
9    A.  That is why we were arguing it because what
10  they contend -- that's why we had arbitration. They
11  contended one thing. We contend another.
12    Q.  I understand that. But wasn't it your
13  understanding that a Postal Service was saying
14  Ms. Wilson called in sick December 20, for example,
15  2003, and then, later that same day, worked at
16  Boscov's?
17    A.  That's what they are saying, yes.
18    Q.  Getting back to my earlier question, if that
19  was the allegation, number 1, was the Union disputing
20  factually that Ms. Wilson took sick leave on that day?
21    A.  Frame it again.
22    Q.  If the allegation was, for example, that on
23  December 20th, 2003 --
24    A.  Right.

Page 28

1    Q.  -- Ms. Wilson called in sick --
2    A.  Right.
3    Q.  -- and then went to work at Boscov's --
4    A.  Right.
5    Q.  -- was the Union, number 1, disputing that she
6  had called in sick that day, December 20th, or
7  disputing that she worked as Boscov's that day?
8    A.  I don't recall that now.
9    Q.  You don't know?
10    A.  I don't recall.
11    Q.  So your defense was it's okay to do that?
12    A.  No. Hell, no.
13    Q.  Well, if that was the allegation --
14    A.  Well, the grievance is right there.
15    Q.  If that was the allegation, what was the
16  defense?
17    A.  That it's not a violation of Ms. Wilson, not
18  doing it. She's not violating the EL.
19    Q.  She's not calling in sick and working at
20  Boscov's?
21        MR. LEFF:  Object to the form of the
22  question.
23    A.  She did call in sick, but we say it's not a
24  violation because it wasn't during the same hours.

Page 29

1  BY MR. BERNSTEIN:
2    Q.  Let me see if I understand it. Your contention
3  was it would only be a violation if, for example, she
4  called in sick from 8:30 a.m. to 4:00 p.m. and worked
5  at Boscov's from 1:00 p.m. to 4:00 p.m.?
6    A.  I would still argue.
7    Q.  No. No. No. Is that what the Union was
8  saying would have had to be a violation, that the hours
9  would have had to overlap?
10    A.  They did overlap on the 20th, and we argued
11  that also. We had a remedy for that.
12    Q.  So there was one date where they overlapped?
13    A.  One day where she left early, had an asthma
14  attack, went home, took an inhaler, and went to
15  Boscov's. Mr. Keen made the argument that there was
16  no way that Ms. Wilson could drive from her house --
17  and he had a Map Quest and leveled it out how long it
18  would take and drove the route. We even argued that.
19    Q.  Okay.
20    A.  Because I asked him if he was going to bring a
21  white Bronco in next.
22    Q.  Except for that one instance, the other hours
23  did not overlap, correct?
24    A.  That's only one that I recall that overlapped,

8 (Pages 26 to 29)

Page 30

1  yes.
2  Q. And would it be fair to say that, except for
3  that one instance where there was an overlap or an
4  alleged overlap, your argument was, if there was no
5  overlap, there was no violation, correct?
6  **A. Correct.**
7  Q. And that was the sum and substance of your
8  argument?
9  **A. We also argued that when she was sick during**
10 **the day because the night air aggravated it, she took**
11 **her medicines and felt better later on in the**
12 **afternoon and could perform her duties at Boscov's.**
13 Q. Do you recall Ms. Drummer testifying yesterday
14 that it would be improper to remove or take discipline
15 action against an employee who had approved FMLA
16 leave, no matter what they did on their leave time?
17      MS. HANNIGAN: Objection to the form of
18 the question.
19      MR. LEFF: Objection to the form of the
20 question.
21 BY MR. BERNSTEIN:
22 Q. Do you recall that testimony?
23 **A. Vaguely.**
24 Q. As vaguely or unvaguely as you recall it, do

Page 31

1  you vaguely disagree or agree with it?
2  **A. I agree with what part of it.**
3  Q. What she said. What part do you agree with?
4  **A. FMLA.**
5  Q. Yeah.
6  **A. Discipline employee for a governed absence.**
7  Q. You would agree that you can't do that?
8  **A. Correct.**
9  Q. What part do you disagree with?
10 **A. If it's approved FMLA absence, under Family**
11 **Medical Leave Act, you cannot discipline for it.**
12 Q. Did you argue that at the arbitration hearing?
13 **A. We argued everything at the arbitration**
14 **hearing.**
15 Q. Do you recall arguing that?
16 **A. We argued for ten hours.**
17 Q. I understand that. My question is, do you
18 recall arguing the FMLA point.
19 **A. I argued everything.**
20      MS. HANNIGAN: I'm sorry. What was that
21 final answer?
22      THE WITNESS: I argued everything.
23 BY MR. BERNSTEIN:
24 Q. In cases where you learn that the Postal

Page 32

1  Service is seeking removal of an employee, does the
2  Union take any action independently of being contacted
3  by the employee? Have you ever done that?
4  **A. You mean --**
5      MR. LEFF: Object to the form of the
6  question.
7  Q. In other words, let's say you learned on Monday
8  that Mr. X is being fired and you don't hear from
9  Mr. X for three or four days. Do you initiate a
10 step 1 grievance?
11 **A. I file a class action.**
12 Q. Why class action?
13 **A. Because the individual hasn't come forward and**
14 **I want to protect the interests of the Union.**
15 Q. Okay. You do that immediately?
16 **A. No. I have 14 days.**
17 Q. 14 days after you find out about it, correct?
18 **A. Yes.**
19 Q. And I think the last part of your answer was
20 you do that even though you may not have heard from
21 the employee to protect the employee's interest or the
22 Union's interest?
23 **A. Well, we just had an individual who got up and**
24 **moved to St. Louis, and we filed a class action on**

Page 33

1  **that, and she also didn't show up for arbitration. I**
2  **requested a ten-day show cause.**
3  Q. Now, maybe you can explain this. When you say
4  the employee moved to St. Louis, was that after some
5  disciplinary action had been taken against the
6  employee?
7  **A. Her boyfriend worked at Chrysler, for General**
8  **Motors, and she just got up and moved with him.**
9  Q. Just abandoned her job?
10 **A. If you want to call it that.**
11 Q. But she didn't tell the Postal Service she was
12 moving?
13 **A. I don't know.**
14 Q. Postal Service tried to remove her?
15 **A. Yes.**
16 Q. And you were not in contact with her, correct?
17 **A. The boyfriend called me.**
18 Q. Boyfriend called you and told you she was in
19 St. Louis?
20 **A. Yes.**
21 Q. How did you find out that the Postal Service
22 was removing this employee?
23 **A. The boyfriend.**
24 Q. From the boyfriend. All right.

9 (Pages 30 to 33)

Page 34

1    And you filed a step 1?
2    **A. Yes.**
3        MR. BERNSTEIN: Excuse me a moment.
4        (Discussion off the record.)
5        MR. BERNSTEIN: That's all I have.
6        MR. LEFF: Any questions?
7        MS. HANNIGAN: No.
8            EXAMINATION
9    BY MR. LEFF:
10   Q. Steve, I want to clarify a few things. I want
11   to go back to questions about covered FMLA absence.
12   If an employee takes covered FMLA absence tomorrow for
13   a serious health condition, instead of going to the
14   doctor or staying home and recuperates, that employee
15   goes, works for Sears, do you think the Postal Service
16   would have grounds to terminate that person if they
17   used their approved FMLA absence time to go work
18   another job during their Postal Service hours.
19   **A. They would go after them, yes.**
20   Q. And the Union might fight that, correct
21   **A. We've had it before.**
22   Q. Basically the Union fights every removal that's
23   out there?
24   **A. Yes.**

Page 35

1    Q. This is a person's job, right?
2    **A. Right.**
3    Q. And no matter what the merits are, if it's a
4    removal, the Union is pretty much going to fight it?
5    **A. Absolutely.**
6    Q. But the mere fact that the Union is fighting it
7    doesn't mean that the Postal Service didn't have cause
8    under the collective bargaining agreement; it's just
9    the Union's position that that should be for an
10   arbitrator to decide, right?
11   **A. Absolutely.**
12   Q. You said you made a number of arguments in
13   trying to prevail on the grievance challenging
14   Ms. Wilson's removal. One of them was that the Postal
15   Service was untimely in delivering the discipline in
16   the first place, correct?
17   **A. Correct.**
18   Q. Another one was that the Postal Service did not
19   have just cause to remove her, is that correct?
20   **A. Correct.**
21   Q. Is it correct that there were several arguments
22   under the just cause prong. One of them I think you
23   testified to was that, for the most part, the hours
24   she worked at Boscov's did not overlap the hours she

Page 36

1    worked at the Postal Service, is that correct?
2    **A. Correct.**
3    Q. Is it correct that an another argument you made
4    was that, look, she may have taken sick leave from the
5    Postal Service, but when she took sick leave from the
6    Postal Service she was actually sick. She went home,
7    took the medication to get better, and therefore
8    couldn't work. So she was not working, taking sick
9    leave, and then working another job which would be a
10   violation?
11   **A. Correct.**
12   Q. You also argued that, even if the Postal
13   Service had cause, a termination was too severe of a
14   penalty, is that correct?
15   **A. Absolutely.**
16   Q. What was that EL handbook violation argument
17   that you mentioned?
18   **A. EL 921 speaks of the way that a supervisor**
19   **should handle grievances and discipline, and we felt**
20   **that also was violated being as that the procedural**
21   **arguments that during the day in court was not a true**
22   **day in court, that it was more of a fact-finding**
23   **investigation, which is a violation of EL 921.**
24       **And we also made the argument that the**

Page 37

1    **concurring higher official, Carla Van Istendal, sat in**
2    **the day in court, and she was the concurring official.**
3    **We said that that was not an independent**
4    **investigation, which Postal Service is mandated by its**
5    **own handbook and manuals to do so. We also made that**
6    **argument at arbitration.**
7    Q. Am I missing any major arguments that you made?
8    Corrective, you said the discipline wasn't corrective.
9    Was that an argument you made?
10   **A. It wasn't corrective. It wasn't progressive as**
11   **per the contract.**
12   Q. And that was all attempts to mitigate the
13   harshness of the discipline. If you couldn't prevail
14   on the merits, at least get her back to work?
15   **A. Yes.**
16   Q. At any time, either before, during, or after
17   the arbitration hearing, did Ms. Wilson express to you
18   that you should have made different arguments on the
19   merits or additional arguments?
20   **A. No.**
21   Q. Looking at the notice of removal, why is that
22   March 24th, 2004, date not important in your opinion?
23   **A. Because that's the date that labor prepares it.**
24   **They sit on it at times before it gets back to the**

10 (Pages 34 to 37)

Page 38

1   floor. In order to have the supervisor review it,
2   read it, concur, send it to the MDO to review and
3   concur, so that means nothing. That's not ticking
4   time. The ticking time is generally they have a
5   signature spot on the last page where the -- if the
6   employee is at work, they sign it. That starts the
7   14 days.
8   Q. Has it been your experience that most removals
9   are done by handing it to the employee?
10   A. Yes.
11   Q. Do you know of any case where, in your
12   experience, an arbitrator held that a grievance was
13   not arbitrable because it was 14 days outside of the
14   date on the discipline?
15   A. Yes.
16   Q. So was that because it was also hand delivered
17   on the same date?
18   A. No. It's express mail.
19   Q. So it was express mail. And the employee
20   received it that day or the next day?
21   A. The next day.
22   Q. Did the arbitrator hold it to the date on the
23   discipline?
24   A. The date that it was a --

Page 39

1   Q. Or the date the employee received it?
2   A. The date that it was dropped off at his house.
3   Q. So it wasn't the date on the discipline, but it
4   was the date that the express mail was delivered?
5   A. Yes.
6   Q. So my question is, do you know of any case in
7   which the arbitrator held that a grievance was
8   untimely because it was 14 days after the date that
9   the discipline had on it?
10   A. Oh, absolutely not.
11   Q. In your experience, the tolling date begins
12   when the employee receives the discipline, whether
13   it's by hand or by mail?
14   A. Correct.
15   Q. Did you have any indication that Ms. Wilson
16   received the notice of removal prior to April 6, 2004?
17   A. No.
18   Q. Did Ms. Wilson ever tell you that she received
19   notice of removal by first class mail?
20   A. No.
21   Q. Your understanding, at what step did the Postal
22   Service raise the timeliness issue?
23   A. Step 2.
24   Q. Did you handle the step 2 of this grievance?

Page 40

1   A. No, I couldn't.
2   Q. Who did handle it?
3   A. Courtland Stinson, the vice-president.
4   Q. Why did he handle the step 2?
5   A. Under our constitution, he's mandated to do
6   step 2s.
7   Q. You handled the step 1, is that correct?
8   A. Correct.
9   Q. At any step did the Postal Service raise the
10   timeliness issue at step 1?
11   A. No.
12   Q. Do you know, under the collective bargaining
13   agreement, can an employee file his or her own
14   grievance at step 1?
15   A. Absolutely.
16   Q. An employee can file a step 1 grievance on his
17   or her own?
18   A. Yes.
19   Q. Once you had learned that Ms. Wilson received
20   the notice of removal, what did you do to prepare for
21   the grievance, what did you do to prepare the
22   grievance?
23   A. I brought Melinda down. I got her information
24   and started working on the grievance.

Page 41

1   Q. What did working on the grievance entail?
2   A. I did a search on LexisNexis.
3   Q. What did you search on LexisNexis?
4   A. Removals that fit the criteria of Ms. Wilson.
5   I even did a -- it took me a while to dig it up. MSPB
6   case that was similar to Melinda's in Wilmington.
7   Q. But let's take this one at a time. Is it
8   correct that the APWU catalogs Postal Service employee
9   arbitration cases in a LexisNexis computer database?
10   A. Yes.
11   Q. So you searched that database?
12   A. Yes, I did.
13   Q. MSPB, does that stand for Merit Systems
14   Protection Board?
15   A. Yes, it does.
16   Q. Certain Postal Service employees have cases
17   before the Merit System Protection Board, correct?
18   A. Correct.
19   Q. So you searched for those cases also.
20   What else did you do?
21   A. I went through case files. I went to the CBRs,
22   which is collective bargaining reports which APWU puts
23   out to arbitration advocates. It's in paper form
24   where you go through and find similar cases to the

11 (Pages 38 to 41)

Page 42

1 ones that you're looking for.

2 Q. What else did you do?

3 A. Went to the ELM, went to the FMLA act.

4 Q. Did you prepare a request for information?

5 A. Yes, I did.

6 Q. Tell me about that.

7 A. At step 1 I requested information from the

8 supervisor Joylyn Pascual that I did the step 1 with,

9 asking for the records, and presented it to her.

10 Q. And did you do all this before you filed the

11 step 1?

12 A. This was all -- the investigation?

13 Q. Yes.

14 A. Yes.

15 Q. Why?

16 A. You want to make sure it's right.

17 Q. If, in your opinion, you've had time to file

18 the grievance, have you ever filed a grievance before

19 doing an investigation on a removal.

20 A. Not a removal, no.

21 Q. And why not?

22 A. Because they're so complicated, and there's so

23 much at stake.

24 Q. And it's possible if you don't include things

Page 43

1 that they may never get in?

2 A. Well, you have to make all your arguments at

3 step 1 or step 2. In our collective bargaining

4 agreement, if you don't make them prior to step 2,

5 you're barred, so they all have to be in there.

6 Q. When did you believe that you had to file the

7 grievance challenging Ms. Wilson's removal?

8 A. April 20th.

9 Q. And why is that?

10 A. Because that's the 14th day from April 6.

11 Q. Before the arbitration hearing, did you meet

12 with Ms. Wilson to discuss the timeliness issue?

13 A. Yes.

14 Q. And tell me about those discussions?

15 A. We were prepping the case the day before and

16 then down at our big Union office, and that's when I

17 noticed in the 2609 the step 2 summary that

18 Mr. Keen prepared, that he was making the argument of

19 timeliness.

20 Q. And tell me about your discussions with her

21 about how you anticipated fighting that timeliness

22 argument?

23 A. We were discussing -- in the 2609 Mr. Keen was

24 laying out the timeliness issue. I talked to Melinda

Page 44

1 and she was telling me that her and her husband were

2 having family problems and that she always didn't go

3 check her cluster box.

4 Q. That's her mailbox?

5 A. Yes. And that she went back and forth, and

6 that was when she found out that it was all in there,

7 the 5th, and she was going down to get it all.

8 Q. This was during your prearbitration

9 preparation?

10 A. Yes.

11 Q. Did Ms. Wilson at that point tell you that she

12 had received the first class mailing of the notice of

13 removal on March 30th or 31st?

14 A. I don't know if she told me that date. I found

15 out for sure that I know was when Mr. Keen presented

16 the EEO investigation paperwork there that's --

17 Q. I'll get to that in a second before the

18 arbitration here, did you know that Ms. Wilson had

19 received notice of removal prior to that certified

20 letter on April 6?

21 A. No.

22 Q. I want to show you Wilson Exhibit Number 3

23 which is the information for pre-complaint counseling.

24 During Ms. Wilson's testimony she stated that she had

Page 45

1 wrote that on March 31st that she received a notice of

2 removal. Did you see this document, exhibit 3 to

3 Ms. Wilson's deposition, prior to the arbitration

4 hearing?

5 A. No.

6 Q. Did you try to keep this document out?

7 A. Absolutely. I objected that Mr. Keen obtained

8 this with unclean hands, and the arbitrator ruled that

9 he would let it in for what it was worth as a

10 credibility issue.

11 Q. Do you recall, during the hearing, did

12 Ms. Wilson testify that the first time she received

13 the notice of removal was on April 6 when she signed

14 for the certified letter, if you recall.

15 A. Yeah. Right now I don't recall that.

16 Q. Do you think that the arbitrator in your

17 opinion that the arbitrator relied on this information

18 for pre-complaint counseling document in determining

19 that Ms. Wilson had noticed the removal on March 31st?

20 A. Oh, yes.

21      MR. LEFF: If you'll allow me, I'd like to

22 authenticate a few of the grievance documents through

23 Mr. Collins, just to save on doing that declaration.

24      MR. BERNSTEIN: Sure.

12 (Pages 42 to 45)

Page 46

1       MR. LEFF: Hopefully I can get through
2  these quickly.
3       Can you mark this.
4       (Collins Deposition Exhibit 1 was marked
5  for identification.)
6  BY MR. LEFF:
7    Q.  Mr. Collins, take a look at that document.
8  It's been marked exhibit 1. Can you tell me what that
9  is?
10    **A.  That was my bullet points that I was going**
11  **through of my arguments that I was going to make in**
12  **defense of Ms. Wilson.**
13    Q.  Okay. And 4/6/04, it says, sign for certified
14  letter. Can you tell me about that, right-hand
15  corner?
16    **A.  Right. I wrote that that's the date. Tell me**
17  **when the 14 days would start.**
18    Q.  Mr. Collins, if you had known that Ms. Wilson
19  had received the first class mail letter seven days,
20  six or seven days earlier than April 6, 2004, would
21  that have changed your belief of when the time limits
22  for filing a grievance had begun?
23    **A.  If I had known?**
24    Q.  Yes.

Page 47

1    **A.  Yes.**
2    Q.  So if Ms. Wilson had told you that she received
3  notice of removal by first class mail on March 31st,
4  you would have believed that the 14 days' time limit
5  had begun on March 31st?
6    **A.  Yes.**
7    Q.  And from your discussions with Ms. Wilson, you
8  believe that the first time she received the notice of
9  removal was April 6, is that correct?
10    **A.  Correct.**
11       MR. LEFF: Can you make this exhibit 2?
12       (Collins Deposition Exhibit 2 was marked
13  for identification.)
14  BY MR. LEFF:
15    Q.  Can you tell me what exhibit 2 is, please?
16    **A.  This is a request of information that I've**
17  **presented to Joylyn Pascual during the step 1 hearing.**
18    Q.  Is that something you prepared prior to the
19  filing the step 1 grievance?
20    **A.  Yes.**
21    Q.  Why did you do that?
22    **A.  This is information I need to go through to**
23  **make more arguments and prove my case.**
24    Q.  I want to show you from Ms. Wilson's exhibits.

Page 48

1  I think it was exhibit 5. Can you show the witness
2  exhibit 5 from Ms. Wilson's deposition?
3       Can you tell me what that document is?
4    **A.  This is the step 2 appeal. But what I do is --**
5  **this is how I write it up. When I do the step 1, I**
6  **write, through the years -- there's a step 1 form or**
7  **you can do it verbally. I do everything on step 2 and**
8  **have it when I do the step 1 grievance.**
9    Q.  So you prepared that prior to the filing of the
10  grievance?
11    **A.  Yes.**
12    Q.  And your reason was because you wanted to get
13  all the arguments down?
14    **A.  Yes. And another thing was that Joylyn**
15  **Pascual -- I had to make sure it was the 20th I did**
16  **the step 1. On the 16th, I went to the MDO to make**
17  **sure I had somebody to do that because Linda Drummer**
18  **was out and wasn't coming back until after the time**
19  **limit. So I had to get it done, and that's why they**
20  **appointed Joylyn Pascual as the step 1 supervisor.**
21    Q.  Let me make sure I understand that. First of
22  all, when you say MDO, you mean the manager of
23  distribution operations?
24    **A.  Yes.**

Page 49

1    Q.  Now, typically, to do the step 1, you would
2  meet with the removed employee's supervisor, correct?
3    **A.  Correct.**
4    Q.  That's that supervisor, Ms. Drummer, was on
5  leave at the time?
6    **A.  Yes.**
7    Q.  So you made extra sure that they had another
8  supervisor who you could meet with within the 14 days?
9    **A.  Correct.**
10    Q.  And you went to the MDO to get a Postal Service
11  supervisor appointed?
12    **A.  Yes.**
13    Q.  And you met with that person on April 16?
14    **A.  Yes.**
15    Q.  And that was, in your opinion or your view,
16  four days before the time limits for the grievance
17  ran?
18    **A.  Correct.**
19    Q.  And you did that to make extra careful sure
20  that the grievance was timely filed?
21    **A.  Absolutely.**
22    Q.  Approximately how many employees were in the
23  Union's bargaining unit at this time?
24    **A.  About 660.**

13 (Pages 46 to 49)

Page 50

1   Q. And approximately how many grievances does the
2 local file, oh, say, a year?
3   A. About a thousand.
4      MR. LEFF: Mark this.
5      (Collins Deposition Exhibit 3 was marked
6 for identification.)
7 BY MR. LEFF:
8   Q. Take a look at what's been marked exhibit 3.
9 Can you tell me what that document is?
10   A. That's the 2609, the step 2 denial.
11   Q. That's prepared by the Postal Service
12 representative?
13   A. Yes.
14   Q. And to your knowledge, is that the first time
15 the timeliness issue was raised?
16   A. Yes.
17   Q. The timeliness of the grievance issue?
18   A. Yes.
19      MR. LEFF: Make this exhibit 4, please.
20      (Collins Deposition Exhibit 4 was marked
21 for identification.)
22 BY MR. LEFF:
23   Q. Can you tell me what's been marked as
24 exhibit 4?

Page 51

1   A. This is what we consider additions,
2 corrections, or deletions. This is, after we receive
3 the denial, from the post service, we have five days
4 to rebut or make any other arguments than what they've
5 contended or to add anything that needs to be added.
6   Q. And is that something that Mr. Stinson
7 prepared?
8   A. Yes.
9   Q. And so that is rebutting the Postal Service
10 step 2 denial and any final arguments that the Union
11 wants to make?
12   A. Yes.
13   Q. And to your knowledge, Mr. Stinson challenged
14 the Postal Service timeliness --
15   A. Yes.
16   Q. -- assertions?
17   A. Yes.
18   Q. Did you prepare and read an opening statement
19 during the hearing?
20   A. Yes, I did.
21   Q. Did you submit arbitration awards to the
22 arbitrator in support of both the timeliness issue and
23 the merits issue?
24   A. Yes, I did.

Page 52

1      MR. LEFF: I have no further questions.
2      MS. HANNIGAN: Nothing from me.
3      MR. BERNSTEIN: Just a couple follow-up
4 questions.
5          EXAMINATION
6 BY MR. BERNSTEIN:
7   Q. Let me make sure I understand the step 1,
8 step 2 process. Isn't it true that, in order to
9 initiate a step 1 grievance, all you have to do is
10 have a meeting with a supervisor about the subject of
11 the grievance?
12   A. I think it's more in depth than that. It's not
13 as simple as you're saying.
14   Q. Tell me what you think the minimum that needs
15 to be done to initiate a step 1 grievance is.
16   A. I think it's case by case. If it's for the
17 unit, something small, it's simple. Something like
18 this, it's completely different.
19   Q. Is it your understanding that, at step 1, you
20 have to submit all of the arguments in support of a
21 grievance or you waive them?
22   A. They have to be there by step 2.
23   Q. So there's no waiver issue at step 1, correct?
24 In other words, if you don't say something in step 1,

Page 53

1 you're not waiving it?
2   A. But that's not -- being as I'm not doing the
3 step 2, I make them all at step 1 because there's no
4 guarantee that my counterpart is going to make them.
5 So I make them all at step 1.
6   Q. All right. But you don't have to, correct?
7   A. You don't have to, no.
8      MR. BERNSTEIN: Okay. That's all I have.
9      MR. LEFF: Couple follow-ups.
10          EXAMINATION
11 BY MR. LEFF:
12   Q. Under the collective bargaining agreement, you
13 can resolve a grievance at step 1, is that correct?
14   A. Under EL 921, it's mandated that it be resolved
15 at the lowest step possible. So, in order to resolve
16 it at the lowest step possible, you have to compile
17 all the information so the supervisor has all the
18 information to make an intelligent decision. But they
19 are mandated under EL 921 to resolve grievances at the
20 lowest possible step.
21   Q. So, in your review, it would help the grievant
22 to have all your arguments and ducks in a row at
23 step 1 so you can try to convince the supervisor to
24 resolve it?

14 (Pages 50 to 53)

Page 54

1   A.  **Absolutely.**

2       MR. LEFF:  Nothing further.

3       MS. HANNIGAN:  Nothing from me.

4              EXAMINATION

5  BY MR. BERNSTEIN:

6   Q.  Ever resolved a dismissal case at step 1?

7   A.  **Just last week.**

8   Q.  Any others?

9   A.  **I have, yes.**

10  Q.  You have.  Okay.

11      MR. BERNSTEIN:  That's all.

12      MR. LEFF:  We'll read and sign.

13      (Deposition ended at approximately

14  12:40 p.m.)

15

16

17

18

19

20

21

22

23

24

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

---

Page 55

1         INDEX TO TESTIMONY

2

3  STEVEN COLLINS                PAGE

4    Examination by Mr. Bernstein     3

5    Examination by Mr. Leff      34

6    Examination by Mr. Bernstein   52

7    Examination by Mr. Leff      53

8    Examination by Mr. Bernstein   54

9

10         -----

11

12       INDEX TO EXHIBITS

13

COLLINS DEPOSITION EXHIBIT NO.     PAGE

14

 1  One-page handwritten document      46

15

 2  Request for Information & Documents

16    Relative to Processing a Grievance    47

17  3  Four-page document dated April 27, 2004   50

18  4  17 pages of handwritten documents titled

      "Additions, Corrections or Deletions"   50

19

20

21

22

23

24

Page 56

Page 57

State of Delaware  )
                )
New Castle County  )

      CERTIFICATE OF REPORTER

     I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 7th day of October, 2005,
the deponent herein, STEVEN COLLINS, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.
     I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
     I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

           Ann M. Calligan, RMR
           (Certification No. 186-RPR)
           (Expires January 31, 2008)

CL4-D2-764

# AMERICAN POSTAL WORKERS UNION, AFL-CIO

| Grievant/Union | Nature of Allegation |
|---|---|
| Melinda Wilson /APW | Removal |

Date of Request

To: _____  Title: _____

From: Steve Collins  Title: President

Subject: **REQUEST FOR INFORMATION & DOCUMENTS RELATIVE TO PROCESSING A GRIEVANCE**

We request that the following documents and/or witnesses be made available to us in order to properly identify whether or not a grievance does exist and, if so, their relevancy to the grievance:

1. 2608
2. Copy of Day in court
3. Request for Discipline
4. all 3971's, 3972's
5. Clock Rings of days in question
6. FMLA papers

RECEIVED
LABOR RELATIONS

APR 19 2004

U.S. POSTAL SERVICE
WILMINGTON, DE 19850-9401

NOTE: Article 17, Section 3 requires the Employer to provide for review all documents, files, and other records necessary in processing a grievance. Article 31, Section 3 requires that the Employer make available for inspection by the Unions all relevant information necessary for collective bargaining or the enforcement, administration or interpretation of this Agreement. Under 8a(5) of the National Labor Relations Act it is an Unfair Labor Practice for the Employer to fail to supply relevant information for the purpose of collective bargaining. Grievance processing is an extension of the collective bargaining process.

[ ✓ ] REQUEST APPROVED          [ ] REQUEST DENIED

4/16/04
(date)

_____ (signed)
Jaylyn T. Pascual

for Linda Drummer

A-000104

DEPOSITION
EXHIBIT
Collins 9
10-7-05

SOUTH JERSEY DISTRICT

*UNITED STATES*
*POSTAL SERVICE*

Date:       April 27, 2004

Subject:    C00C-1C-D04114132  DIST081
            19-APR-04  CL40704
            WILSON
            WILMINGTON  DE  19850  9997

DEPOSITION
EXHIBIT
Collins 3
Q 10-7-05

To:         Courtland Stinson
            Vice President, Malcolm T. Smith Local, APWU

On 4/23/04 I met with you to discuss the above captioned grievance at Step 2. The issue in this grievance is whether management had just cause to issue a Notice of Removal to Melinda Wilson on 3/24/04.

The union contends that management violated the cited Articles of the CBA when they issued the Notice of Removal. The union contends that management violated Article 2 of the contract by issuing a Notice of Removal in that other employees hold second jobs and were not removed. The union contends that Article 5 was violated in that management violated past practice. The union contends that Article 15 was violated in that this grievance was not resolved at the lowest possible step of the grievance procedure. The union contends that Article 17 and Article 30 were violated in that not all information was received. The union contends a violation of Article 19 in that all handbooks and manuals were not followed. The union contends a violation of Article 30 in that management violated the LMOU. The union contends that the grievant did not know that she was violating postal regulations and that the disciplinary action was untimely. Further, the union contends that the grievant did not receive a proper "day in court" prior to the issuance of the removal. The union requests that the removal be rescinded and Ms. Wilson be made whole for all time since the removal was issued.

Management contends that this grievance is untimely. The grievance file indicates that the Notice of Removal was delivered to Ms. Wilson's address of record on 3/30/04. This is evidenced by the slotting letter signed by the letter carrier who attests that the first class letter was delivered to Ms. Wilson's address at 1:21pm on 3/30/04. This is also evidenced by the record of notice left for certified letter 7003 1010 0001 1223 5956 which was also delivered at 1:21pm on 3/30/04. The union filed a grievance at Step 1 on 4/16/04, beyond the 14 day time limit to file a grievance. There was no time extension granted for the filing at Step 1 and the 2608 indicates that the grievance is untimely. The union's contention that the 14 day period only began on 4/6/04 when Ms. Wilson signed for the certified letter is rejected. The union presented no other arguments or exhibits on the issue of the timeliness of the Step 1 appeal. The time limits proscribed by Article 15 are not flexible. Article 15 is clear that the untimely filing of this grievance at Step 1 renders this grievance waived.

The union contended that management violated Article 2 in that other employees who held second jobs were not removed. The union presented, in the form of a written statement by the grievant, that other employees were believed to hold second jobs and that management was disparate in

A-000105

- 2 -

issuing a removal to Ms. Wilson, while not removing these other employees. This contention of a violation of Article 2 is rejected. Ms. Wilson was not removed for holding a second job. Ms. Wilson was removed for the reasons in the Notice of Removal. The union's contention contained no indication whatsoever of any improper conduct by the other employees cited. The union's mere assertion of disparate treatment, without any supporting evidence of any wrongdoing on the part of the employees cited, fails to show in any way how Ms. Wilson's rights under Article 2 were violated.

The union contended that management violated Article 5. The union made no specific allegation of any particular action or event that violated Article 5, nor did the union in any way show evidence or make any argument about how the terms and conditions of employment as defined by Section 8(d) of the National Labor Relations Act was violated. The union's failure to provide any specific information about how they believe this provision to have been violated renders management incapable of conducting a complete investigation. Therefore, this argument must be waived.

The union contended that management violated Article 15 in that this grievance was not resolved at the lowest possible step. Management contends that all provisions of Article 15 were followed in the manner in which management addressed this appeal. The union filed this grievance untimely on 4/16/04 and received a Step 1 answer that same date. The 2608 indicates that the grievance was cited as untimely. The grievance was then filed to Step 2 and a timely Step 2 meeting held. Management's denial of the grievance was proper and within the provisions of Article 15.

The union contended that management violated Article 16 in that the discipline was not progressive, was punitive, and that the grievant did not receive a proper day in court interview. The union also contended that the discipline was untimely in that the dates cited in the removal are from November and December and that management issued the untimely discipline in March. These contentions are rejected. Management held a day in court interview with the grievant and her union representative on 3/10/04. At that interview, Ms. Wilson and her representative had full opportunity to reply to the charges and/or supply information to rebut or explain her actions. Ms. Wilson provided no information on any of the dates cited and indicated that she could not remember what had occurred on those dates, even though at the day in court interview she was provided with her clock ring inputs from both the USPS and Boscov's. The handwritten statement from Ms. Wilson presented at Step 2 indicates that now she remembers that she suffered from asthma attacks on the dates in question and later felt well enough to go to work at Boscov's after receiving sick leave from the USPS. I note that at no time between the 3/10 day in court interview and the Step 2 meeting did Ms. Wilson or her representative provide any additional information about the dates in question. The union offered no indication as to how Ms. Wilson could now in her 4/6 written statement remember what she could not remember on 3/10 or any time between 3/10 and when her written statement was provided on 4/23/04. The grievant's contention in her written statement that, "I didn't know what the DIC (day in court) was really about," is also flawed. Ms. Wilson was advised specifically at the beginning of the interview that the supervisor was

A-000106

- 3 -

considering discipline, up to and including removal, for improper conduct. Ms. Wilson was asked specific questions about days she was on sick leave for the USPS and worked at Boscov's. Ms. Wilson and her representative were given the opportunity to ask any questions or provide any information, but the only reply to these questions was that Ms. Wilson could not remember. The union's contentions that the discipline is punitive and not corrective are also rejected. This type of improper conduct is a serious offense that warrants removal. The grievant's contention that she did not know that "holding a second job was improper conduct" is also flawed. There is no dispute that in most cases, holding a second job that does not present conflicts with USPS duties does not violate the employment contract with the USPS. In this case however, Ms. Wilson's declaration that she was unable to work at the USPS, while on the same day working for a second employer clearly is improper. Any reasonable person would know that this is improper conduct and a serious breach of the employee/employer relationship. The union's contention that the discipline is untimely is also rejected. The file indicates that Ms. Wilson was embroiled in a dispute over the work limitations she was providing to the USPS and her duties at Boscov's (see grievance 04084651, 04070115, 04053770). The US Postal Inspection Service conducted an investigation into Ms. Wilson's conduct and completed an extensive Investigative Memorandum (IM) on 2/23/04. Supervisor Drummer received the IM shortly thereafter and after thoroughly reviewing the IM, conducted her own investigation culminating in the day in court interview with Ms. Wilson on 3/10/04. The Notice of Removal is dated 3/24/04. Given the serious nature of the charges, the seriousness of the contemplated penalty, and the voluminous amounts of information contained in the investigation, I find that the time that the supervisor took to investigate and decide to issue a removal is reasonable and is not a violation of Article 16. I also note that local management attempted to procure time records from Boscov's prior to the Inspection Service initiating an investigation, but the managerial personnel at Boscov's would not release the information. Only after contact by the Inspection Service would Boscov's release their time records. I also note that on 12/24 when Ms. Wilson was interviewed by MDO Van Istendal and SDO Drummer, Ms. Wilson would not answer any questions about her employment with Boscov's (see 04053770). Given these circumstances, management's turning to the Inspection Service for assistance in investigating Ms. Wilson's conduct was reasonable and proper, and the additional time it took to conduct a complete and thorough investigation was also reasonable and proper.

The union's contentions of violation of Article 17 and Article 31 are rejected. The parties at Step 2 identified the documents in the grievance file and agreed that all information that was requested was provided as part of this grievance. I also note that much of the information requested was supplied as part of grievances 04084651, 04070115, 04053770.

The union's contentions of violation of Article 30 is rejected. The union's failure to provide any specific information about how they believe this provision to have been violated renders management incapable of conducting a complete investigation and does not meet the union's burden of showing how the contract was violated. Therefore, this argument must be waived.

A-000107

- 4 -

The union's contention of violation of Article 19 is rejected. The union failed to cite any specific handbook or manual, nor any specific provision contained therein, excepting a general statement that the EL-921 was violated, and a listing of FMLA under Item 11 on the Step 2 appeal form. The contentions of the alleged EL-921 violations have already been addressed in this response. The union failed to show how any specific provision of the Family and Medical Leave Act was violated, or make any argument about any specific provision of the Act that was violated. The union cannot just simply state that there is a violation, the union must be specific as to what provision within the Act was violated. The parties were not in dispute that Ms. Wilson requested and was paid sick leave that was designated as FML for the dates in question. The union's failure to provide any specific information about how they believe this provision to have been violated renders management incapable of conducting a complete investigation, and does not meet the union's burden of showing how the contract was violated. Therefore, this argument must be waived.

Further, the remedy requested by the union is inappropriate given the facts of this grievance. Ms Wilson is currently still on Administrative Leave pending the effective date of the removal and has lost no money or benefits to date. The union's requested remedy of "grievant be made whole" is non-specific. The union has not shown that Ms. Wilson has lost anything to date. Ms. Wilson's 30 day notice period expires 30 days after 3/30/04. Only after that date could the union show that Ms. Wilson suffered any loss, and any loss would be limited to the amount of hours that Ms. Wilson normally worked.

No contentions other than those discussed in this response were provided at the Step 2 hearing. If you wish to provide additions and corrections in accord with Article 15, please send a copy directly to me.

In view of the foregoing I can find no contractual violation. All of the information requested by the union has been provided. This grievance is denied.

Andrew Keen
Labor Relations Specialist

Cc:     grievance file
        MDO Van Istendal
        SDO Drummer
        Plant Manager, DE P&DC

4-28-04

A-000108



**WILCOX & FETZER LTD.**

# In the Matter Of:

# Wilson

## v.

# American Postal Workers Union

## C.A. # 05-073 JJF

---

## Transcript of:

## Carla  Van Istendal

## October 6, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-000109

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MELINDA WILSON,                          )
                                         )
            Plaintiff,                   )
                                         )
v.                                       ) Civil Action No.
                                         ) 05-073 JJF
AMERICAN POSTAL WORKERS UNION,           )
Delaware Area Local AFL-CIO, and         )
UNITED STATES POSTAL SERVICE, an         )
independent establishment of the         )
Executive Branch of the Government       )
of the United States of America,         )
                                         )
            Defendants.                  )


            Deposition of CARLA VAN ISTENDAL taken
pursuant to notice at the offices of the United States
Attorney, 1007 Orange Street, Suite 700, Wilmington,
Delaware, beginning at 1:10 p.m. on Thursday, October
6, 2005, before Ann M. Calligan, Registered Merit
Reporter and Notary Public.

WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477

A- 000110

Page 2

APPEARANCES:

    JOSEPH M. BERNSTEIN, Esquire
      800 North King Street - Suite 302
      Wilmington, Delaware 19801
      on behalf of the Plaintiff;

    PETER J. LEFF, Esquire
    O'DONNELL, SCHWARTZ & ANDERSON, P.C.
      1300 L Street, NW - Suite 1200
      Washington, D.C. 20005-4126
      on behalf of Defendant American Postal
      Workers Union;

    PATRICIA C. HANNIGAN, Esquire
    Assistant United States Attorney
      The Nemours Building
      1007 Orange Street - Suite 700
      Post Office 2046
      Wilmington, Delaware 19899-2046
      on behalf of Defendant United States
      Postal Services.

ALSO PRESENT:

    MELINDA WILSON

    STEVEN COLLINS

    ANDREW KEEN

Page 3

1          CARLA VAN ISTENDAL,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5          EXAMINATION
6 BY MR. BERNSTEIN:
7    Q. Ms. Van Istendal, just preliminarily, my name
8 is Joe Bernstein. I'm an attorney, and I'm
9 representing Melinda Wilson. And Ms. Wilson has filed
10 a lawsuit against the Postal Service and the American
11 Postal Workers Union, and that lawsuit has to do with
12 her termination from employment which occurred around
13 in March of 2004.
14    **A. Okay.**
15    Q. Now, you're here today because you've been
16 identified as a person who has some knowledge about
17 what led up to that termination. Okay? And I'm here
18 to ask you some questions about that. And if you
19 don't understand a question, just feel free to
20 interrupt me. I'm very easygoing. I don't mind. And
21 I'll try and clarify it for you. But otherwise, if
22 you answer a question, I'll assume you understood the
23 question. Okay?
24      Do you have any questions so far?

Page 4

1    **A. Not yet.**
2    Q. First, could you pronounce your name so I don't
3 mispronounce it? I've heard all sorts of bad things.
4    **A. It's Van Istendal.**
5    Q. And can you tell me, what is your employment
6 with the Postal Service at the present time?
7    **A. I'm a manager of distribution operations for**
8 **tour 2, which is the day shift.**
9    Q. Now, let's start out with distribution
10 operations. What does that involve?
11    **A. Distribution operations is actually getting the**
12 **mail into the buildings, sorting it, and dispatching**
13 **it out of the buildings.**
14    Q. So this is incoming mail?
15    **A. Incoming and outgoing.**
16    Q. Incoming and outgoing.
17    **A. On my tour, though, we primarily deal with**
18 **incoming mail.**
19    Q. You said tour 2?
20    **A. Mm-hmm.**
21    Q. Is that a particular time frame?
22    **A. It's the day shift. Mostly between seven and**
23 **three-thirty.**
24    Q. Is there a particular facility you're working

Page 5

1 out of?
2    **A. It's the Delaware processing and distribution**
3 **center.**
4    Q. Where is that?
5    **A. 147 Quigley Boulevard in New Castle.**
6    Q. How long have you held that position?
7    **A. Since August of 2000.**
8    Q. Are you still in that position?
9    **A. Yes.**
10    Q. How long have you been with the Postal Service
11 all together?
12    **A. It will be 11 years October 15th.**
13    Q. In terms of chain of command, what is your
14 relationship with Linda Drummer?
15    **A. Linda at the time was my --**
16    Q. In March -- let's say late 2003, early 2004?
17    **A. She was the supervisor of distribution**
18 **operations, so she reported to me.**
19    Q. Is there more than one supervisor?
20    **A. Yes.**
21    Q. How is that divided up?
22    **A. They are divided mostly by work areas. For**
23 **example, Linda's job was to supervise the flat sorter**
24 **and also a manual pallet operation.**

2 (Pages 2 to 5)

Page 6

1   Q. What's a flat sorter?

2   A. It's a machine that takes pieces of mail that

3 are approximately 8 1/2 by 11, larger than letter size

4 pieces of mail, and sort them.

5   Q. Is that done manually?

6   A. No. It's done by an automated process, yes.

7   Q. And how many people like Linda Drummer are

8 there that report to you?

9   A. I have anywhere between five and seven people

10 in a different week.

11   Q. And I assume you have a counterpart on the

12 other shifts?

13   A. Yes.

14   Q. 24 hours --

15   A. Yes.

16   Q. -- a day operation?

17   A. Yes.

18   Q. Six days a week, seven days a week?

19   A. Seven days a week.

20   Q. Okay. Fair enough.

21      Now, first I'm showing you what's been

22 marked as Keen Exhibit Number 1. Just ask you to take

23 a few minutes to look at that, and I want to ask you

24 some questions about that document.

Page 7

1   A. Okay.

2      (Pause.)

3   Q. Have you had a chance to look that over?

4   A. Yes.

5   Q. Have you ever signed this document before

6 today?

7   A. Never.

8   Q. Now, I believe you are listed, if I'm not

9 mistaken -- no. I'm sorry, you're not listed as a

10 person who participated in this.

11      Okay. Let me skip over that.

12      First thing I want to show you is if you

13 could show the witness Keen Exhibit Number 6?

14   A. Thank you.

15   Q. Just take a moment to look at that.

16      (Pause.)

17   A. Okay.

18   Q. Okay. Have you seen that document before?

19   A. Yes.

20   Q. In fact, your name is a signatory on that

21 document?

22   A. Yes. Yes.

23   Q. Did you participate in preparing that document?

24   A. I provided information that's in the document.

Page 8

1   Q. Did you actually help sit down and write it?

2   A. To type this? No.

3   Q. Or dictate it or --

4   A. As I said --

5   Q. -- or anything like that?

6   A. -- I gave information that's provided in this

7 letter.

8   Q. Who did you give the information to?

9   A. Information went -- well, part of it was with

10 Linda Drummer, and we provide that information to

11 labor relations.

12   Q. And who was that?

13   A. This would have gone to Andy Keen.

14   Q. And is that something that you believe Mr. Keen

15 composed?

16   A. I don't know.

17   Q. You don't know. Did you eventually get

18 something back from somebody for you to sign?

19   A. I got this paper.

20   Q. Okay. For you to sign?

21   A. Yes.

22   Q. And I assume you read it over --

23   A. Yes.

24   Q. -- before you signed it?

Page 9

1   A. Absolutely.

2   Q. Now, that exhibit lists several infractions of

3 the ELM, is that right?

4   A. I don't know that it lists infractions. It

5 lists sections from the ELM.

6   Q. Well, is the basis for the removal those

7 sections of the ELM?

8   A. Yes.

9   Q. And could you describe in your own words what

10 conduct by Melinda Wilson you felt justified her

11 removal from the Postal Service?

12   A. Well, in particular, that if you are in a

13 sick-leave status, then you should not be gainfully

14 employed outside the Postal Service. In particular,

15 the biggest incident for me was leaving work at three

16 o'clock on a particular day and requesting sick leave

17 and going to work at Boscov's at 3:18 on that same

18 day.

19   Q. Do you know what day that was?

20   A. If I can look at the documents --

21   Q. Okay. Sure.

22   A. That would be on December 12th of 2003.

23   Q. And when did you come to learn that Ms. Wilson

24 took sick leave at three o'clock and went to Boscov's

3 (Pages 6 to 9)

Page 10

1  within a half an hour?
2  **A. I don't know the exact date.**
3  Q. But how did it come to your attention?
4  **A. When I read the investigative memorandum from**
5  **the postal inspectors.**
6  Q. And did that investigative memoranda include a
7  listing of hours that Ms. Wilson worked at the Postal
8  Service and hours that Ms. Wilson worked at Boscov's?
9  **A. Yes.**
10 Q. There was like a spread sheet type thing?
11 **A. Yes.**
12 Q. And does the Postal Service have a policy that
13 prohibits outside employment?
14 **A. No.**
15 Q. But if you're on sick leave, what do you have
16 to do, and you're working outside of the Postal
17 Service, are you not allowed to work?
18 **A. I don't know what you mean.**
19 Q. Let's say you're on sick-leave status. You
20 said that's what Ms. Wilson did wrong. She was on
21 sick-leave status and, while she was on sick-leave
22 status, worked at Boscov's on days that she was on
23 sick-leave status?
24 **A. Right.**

Page 11

1  Q. Is that a fair statement of what she did wrong?
2      MS. HANNIGAN: Objection to the form of
3  the question. I don't think the witness has said
4  that's the only thing she did wrong. But you can
5  answer the question.
6  **A. I don't think I really understood. It went in**
7  **a couple of different directions.**
8  Q. I'm sorry. Let me see if I can try that again.
9      Would it be fair to say that, in your
10 opinion, what Ms. Wilson did wrong that caused the
11 Postal Service to seek her removal was working in an
12 outside job while she was on sick-leave status on
13 particular days?
14 **A. Those are part of the factors, yes.**
15 Q. Tell me what the other factors were?
16 **A. The other factors were, as we were going**
17 **through this whole investigation, a reluctance on**
18 **Ms. Wilson's part to provide information when it was**
19 **requested in different interviews.**
20 Q. Let me stop you there for a moment. What
21 information did you request her to provide and what
22 was the response?
23 **A. On which occasion?**
24 Q. Well, let's start chronologically. When was

Page 12

1  the earliest time you asked Ms. Wilson to provide you
2  with information about her employment at Boscov's?
3  **A. On December 24th of 2003.**
4  Q. Now, prior to December 24th, 2003, were you
5  aware personally, personal knowledge from wherever it
6  came from that she was working at Boscov's?
7  **A. Yes.**
8  Q. And how did you come to know that? When did
9  you know that?
10 **A. My initial way of knowing it was through**
11 **supervisor Linda Drummer. It was sometime late**
12 **November, early December. I don't know the exact day,**
13 **but she came in and told me she was out holiday**
14 **shopping and had witnessed Ms. Wilson working at**
15 **Boscov's.**
16 Q. Now, when you spoke to Linda Drummer about this
17 or when she told you about this, did you say anything
18 to her or express some concern that Ms. Wilson was
19 doing something wrong?
20 **A. I expressed concern that it appeared that the**
21 **work that she was doing at Boscov's violated the**
22 **medical restrictions she had provided to the Postal**
23 **Service.**
24 Q. And did you ask Ms. Drummer to do anything to

Page 13

1  follow up on this information she gave you?
2  **A. I asked her to ask for updated medical**
3  **documentation from Ms. Wilson.**
4  Q. Okay. And do you know what the result of that
5  request was?
6  **A. Yes. We got updated medical restrictions.**
7  Q. Were they different than the restrictions that
8  had been in place before you got the updated
9  restrictions?
10 **A. No. They were exactly the same.**
11 Q. I understand that on December 24th, Ms. Wilson
12 was called in and told to go home, is that correct?
13 **A. At the end, yes.**
14 Q. At the end? That was the outcome of the
15 meeting?
16 **A. Yes.**
17 Q. And could you tell me, did you participate in
18 that meeting?
19 **A. Yes, I did.**
20 Q. Can you tell me the purpose of that meeting?
21 Start there.
22 **A. The purpose of the meeting was to clarify once**
23 **again her medical status with the Postal Service. She**
24 **had received information from Shared Services which**

4 (Pages 10 to 13)

Page 14

1  stated that all of Ms. Wilson's medical claims were
2  either closed or denied, which meant that she was no
3  longer entitled to a limited-duty status. Because I
4  had information that said that she was working at
5  Boscov's, doing work that was directly in opposition
6  to medical information that we had, I wanted that
7  information clarified.
8      Q.  In your mind, was she entitled or not entitled
9  to limited-duty status in December of 2004?
10     A.  She was not once we received the information
11 from Shared Services that said all of her claims were
12 either closed or denied.
13     Q.  So if she were to seek some kind of
14 limited-duty status or some kind of accommodations,
15 she would have to go back to square 1 with a new
16 request?
17     A.  Right. You can't request limited duty unless
18 you have a valid claim.
19     Q.  And was that brought to Ms. Wilson's attention
20 at that time at that meeting?
21     A.  Well, the only way for her to file a new claim
22 would be to file an accident report. So, no.
23     Q.  My question is, when you sat down with
24 Ms. Wilson on December 24th, did you or Ms. Drummer

Page 15

1  say, "Hey, Ms. Wilson, the information we have
2  indicates you're not entitled to light duty status."
3      A.  I didn't say she wasn't entitled to light duty
4  status. I said she wasn't entitled to limited-duty
5  status.
6      Q.  I'm sorry. Limited-duty status.
7      A.  Yes. That was explained to her several times.
8      Q.  What did she say?
9      A.  She said she was entitled to limited-duty
10 status.
11     Q.  In the context of that, did you confront her
12 with the Boscov's situation?
13     A.  We spoke about that afterwards.
14     Q.  After you told her to go home?
15     A.  No.
16     Q.  Or during the meeting?
17     A.  As we talked about the limited-duty status,
18 Ms. Wilson continued to say that she was entitled to
19 limited duty. She told me that she had a form in her
20 locker which would prove to me that she was entitled
21 to limited duty, and I allowed her to go get that
22 form. However, that form did not prove that she was
23 entitled to limited duty.
24     Q.  How did the Boscov's subject come up?

Page 16

1      A.  At that point, once I explained to her again
2  that she was not entitled to limited duty, I asked her
3  if she was working outside of the Postal Service.
4      Q.  And what did she say?
5      A.  She refused to answer.
6      Q.  Now, you knew she was?
7      A.  Yes.
8      Q.  Did you tell her, I know you're working at
9  Boscov's?
10     A.  Not until after I asked her.
11     Q.  Did you eventually during this meeting?
12     A.  Then I said I have proof that you are working
13 outside the Postal Service.
14     Q.  What did she say?
15     A.  She said nothing.
16     Q.  Okay.
17     A.  And then subsequently, after I asked her about
18 her medical restrictions and that I had information
19 that which the job she was performing at Boscov's was
20 not -- with the documentation that she had provided
21 us, that she was performing work there that she did
22 not perform for us. She told me that her
23 documentation was only valid for the Postal Service.
24     Q.  So basically she was telling you, when I'm on

Page 17

1  my own time, I can do whatever I want to do?
2      A.  I don't know what she was trying to say.
3      Q.  Was that your impression?
4      A.  She was telling me that her documentation was
5  only valid for the Postal Service.
6      Q.  Now, at that time on December 24th, were you
7  aware of the regulation that cited in number 6 about
8  no outside employment while on sick leave and it's
9  ELM 513.312?
10         MS. HANNIGAN: You're referring to Keen
11 Exhibit 6?
12         MR. BERNSTEIN: Yes. Keen Exhibit 6. I'm
13 sorry.
14 BY MR. BERNSTEIN:
15     Q.  You had personal knowledge of that?
16     A.  Yes.
17     Q.  Is that something that comes up a lot?
18     A.  Not normally.
19     Q.  Is it common or unusual for Postal Service
20 employees to have some kind of second job or outside
21 employment?
22     A.  I can't answer that.
23     Q.  You don't know? Just anecdotally if you know.
24     A.  I couldn't say if it's common. I don't know

5 (Pages 14 to 17)

Page 18

1  what people do when they are outside of work.
2  Q. But you found out about Ms. Wilson through
3  Ms. Drummer?
4  A. Yes.
5  Q. I saw her working at Boscov's?
6  A. Yes.
7  Q. And as of December 24th, did you have personal
8  knowledge that on several occasions prior to December
9  24th, Ms. Wilson had taken sick leave on one or more
10 days?
11 A. Yes. I knew she wasn't at work, yes.
12 Q. How did you know that?
13 A. Because I get a call-out sheet every day of who
14 doesn't report to work.
15 Q. Were you paying particular attention to
16 Ms. Wilson or was it just something that you just
17 happened to see, make a mental note of?
18 A. It was a sheet that I've pulled for the entire
19 tour, all of my employees to see who is and isn't at
20 work.
21 Q. So this is something important to you that you
22 remember or is it just something that you -- I'm sure
23 you get a lot of papers across your desk every day,
24 and you don't memorize all of them, right?

Page 19

1  A. I don't know what you mean by being important.
2  Q. Well, did you pay particular attention to the
3  fact that Ms. Wilson was taking some sick-leave time
4  in November and December?
5  A. I don't pay particular attention to any single
6  employee. I pay particular attention to how many
7  people are off on my shift on a day and whether or not
8  we can clear the mail.
9  Q. But when you're sitting there on December 24th,
10 with Melinda Wilson sitting across the desk or table
11 or whatever, you knew in your mind that she had had a
12 number of absences over the past month?
13 A. That had nothing to do with that conversation.
14 Q. No. No. My question is, did you know?
15 A. Did I know? Well, I had seen the papers, but
16 that didn't mean that I remembered who took what on
17 what day.
18 Q. I'm not asking about particular days. I'm just
19 asking you, was that something that was on your radar
20 screen when you were talking to Ms. Wilson?
21 A. No.
22 Q. It was not?
23 A. No.
24 Q. Did you ever tell Ms. Wilson in so many words,

Page 20

1  you know, you have to be careful about outside
2  employment because there are a number of regulations,
3  postal regulations that may get you in trouble?
4  A. No.
5  Q. You never said that?
6  A. No.
7  Q. You sent her home on December 24th?
8  A. Yes, I did.
9  Q. And the reason was?
10 A. The reason was that at that point, as I stated
11 earlier, she was not entitled to limited duty. She
12 would be entitled to light duty, however, because her
13 medical restrictions conflicted with something I knew
14 that she was doing at outside employment. Since her
15 medical restrictions were in question, I sent her home
16 until she provided updated medical documentation.
17 Q. So you sent her home because she was saying, "I
18 have restrictions," and you didn't think she did.
19 Would the alternative be, say, just continue working
20 or you didn't want her to do that?
21 A. I sent her home because the piece of paper that
22 she provided to us from her doctor stated that she was
23 not able to do certain things that I had factual
24 knowledge that she was performing at another place

Page 21

1  outside of the Postal Service.
2  Q. But was she performing or did she have to
3  perform those things at the Postal Service or not in
4  her job?
5  A. In her normal job?
6  Q. Yes.
7  A. Yes. She would have had to. However, she was
8  telling me that she was not able to do that.
9  Q. Did she, in fact, do those things or you don't
10 know?
11 A. She didn't do them.
12 Q. So in your mind there was a conflict between
13 what you understood she was doing at Boscov's and what
14 she was doing at the Postal Service?
15 A. There was a conflict between the medical
16 restrictions that she provided to me and what I knew
17 she was doing outside the Postal Service.
18 Q. Now, you mentioned there were other things that
19 Ms. Wilson did that, in your mind, led to her removal.
20 Do you remember that?
21 A. Yes.
22 Q. What were --
23 A. Part of it for me was I have to take into
24 account the overall conduct of an employee and their

6 (Pages 18 to 21)

Page 26

1  also MW 0510, and additionally -- I don't think the
2  other pages have been stamped, but it's all stapled
3  together, and there are a number of requests for
4  notification of absences attached to that?
5        MS. HANNIGAN:  I believe in the Bates
6  stamp documentation, these were produced.  These all
7  appear consecutively beginning at about 510 through
8  516, 17.
9     Q.  First page of Van Istendal Exhibit Number 1
10  appears to be a letter from a LuAnn Ashmen to a Larry
11  Bucci.  Who is LuAnn Ashmen?
12     **A.  She's a postal inspector.**
13     Q.  Was she involved in the investigation of
14  Ms. Wilson to your knowledge?
15     **A.  Yes.**
16     Q.  Was she the main person who did the
17  investigation?
18     **A.  I don't know.**
19     Q.  You don't know.  Okay.
20        Who is Larry Bucci?
21     **A.  Larry Bucci is the FMLA coordinator for the**
22  **Delaware processing and distribution center.**
23     Q.  Can you tell me what an FMLA coordinator is?
24     **A.  I can try.**

Page 27

1     Q.  All right.
2     **A.  That is the person who coordinates the Family**
3  **Medical Leave Act information for the processing and**
4  **distribution center.  He is the person who requests**
5  **all the certifications, the medical documentation, and**
6  **who approves or disapproves the requests.**
7     Q.  Now, does Mr. Bucci deal with any issues other
8  than Family Medical Leave Act requests?
9     **A.  I don't know.**
10     Q.  Is there any difference between making a
11  request for leave under the Family Medical Leave Act
12  and under the sick leave policies?
13     **A.  Are you talking about procedure-wise or -- I**
14  **don't know.**
15     Q.  Any way you want to characterize it.
16     **A.  Well, procedure-wise, everyone calls in to the**
17  **same phone number.  If I want to call out sick or I**
18  **want to call out emergency annual or FMLA, it's the**
19  **same phone number that I have to call.  Once that's**
20  **done, then things can differ.**
21     Q.  Now, on page MW 0510, there are a number of
22  dates listed, one in November and three -- it looks
23  like seven dates in December.  Do you see those?
24     **A.  Yes.**

Page 28

1     Q.  Now, and those correlate with specific requests
2  for notification on the following pages of that
3  exhibit.  If you want to look that over, check that
4  out, you certainly can.
5        MS. HANNIGAN:  Off the record.
6        (Discussion off the record.)
7        (Pause.)
8  BY MR. BERNSTEIN:
9     Q.  Now, this the letter and the FMLA leave
10  requests that are stapled to that letter, was that
11  something that was given to you prior to the
12  preparation of the removal notice?
13     **A.  I don't remember if this was included in the IM**
14  **or not.  I'd have to see it.**
15     Q.  Well, going back to the removal notice, it
16  indicates a number of dates that match up with those
17  dates --
18     **A.  Right.**
19     Q.  -- where the allegation is that Ms. Wilson was
20  working at Boscov's on days she took sick leave?
21     **A.  Right.**
22     Q.  So it would be fair to say that it was
23  incorporated in the removal?  That information --
24     **A.  The information, yes.**

Page 29

1     Q.  -- was incorporated in the removal letter?
2     **A.  Yes.**
3     Q.  And do you recognize the handwriting on
4  page 0510, 2 hours, 8 hours, .5 hours?
5     **A.  No.**
6     Q.  So your handwriting?
7     **A.  No.**
8     Q.  But you don't know whose it is?
9     **A.  No.**
10     Q.  Have you pinpointed any specific time when you
11  learned that Ms. Wilson was working at Boscov's on
12  days she had taken sick leave?
13     **A.  It would be after December 24th.  I can't tell**
14  **you the exact date.  I didn't go back at that point**
15  **and look for dates.**
16     Q.  Sometime between December 24th and March 24th
17  when the removal letter was authored?
18     **A.  Yes.**
19     Q.  Now, on December 24th, Ms. Wilson was sent
20  home, right?
21     **A.  Yes.**
22     Q.  And told not to come back until she gets more
23  medical documentation?
24     **A.  Yes.**

8 (Pages 26 to 29)

Page 30

1   Q. Do you know how long she was out?
2   A. **Off the top of my head, no, but if I look at**
3   **the papers, I can tell you.**
4   Q. It was more than a couple weeks, wasn't it?
5   A. **I can't tell you unless I look at the papers.**
6   Q. Do you know whether she came back and what the
7   circumstances were?
8   A. **I know she did come back to work. I don't know**
9   **what you mean by under what circumstances.**
10  Q. Do you know whether there was a grievance
11  filed?
12  A. **Yes. I know there a grievance filed.**
13  Q. Over her being sent home?
14  A. **Yes.**
15  Q. Do you know the outcome of that grievance?
16  A. **I know at the step 2 level it was denied.**
17  Q. Do you know what happened after that?
18  A. **No.**
19  Q. Do you know whether some accommodation or
20  accord was reached that allowed her to return to work
21  even if the grievance wasn't settled fully and
22  finally?
23  A. **I know that she had subsequently filed an**
24  **another CA-2 form and that she received a letter from**

Page 31

1   her supervisor, Linda Drummer, telling her to report
2   back to work.
3   Q. What's a CA-2 form?
4   A. **It's a form -- it's an accident form, but it's**
5   **not for traumatic injury. It's for an occupational**
6   **illness.**
7   Q. Now, when the removal notice was prepared, is
8   there some protocol for notifying the employee that
9   the Postal Service wants to fire them?
10  A. **Well, yes.**
11  Q. Tell me what that is.
12  A. **The protocol would be, if the person is at work**
13  **at that time, then we would bring that person into the**
14  **office. The supervisor would go through the notice of**
15  **removal with them, notify them that they are being**
16  **removed, and have the letter signed off on.**
17  Q. You mean acknowledge that the employee --
18  A. **Yes. That they received it. Not that they**
19  **agree with it, but they received it.**
20  Q. Did that happen in Ms. Wilson's case with
21  respect to the March 24 letter? Was she at work on
22  March 24th or thereabouts --
23  A. **I don't know.**
24  Q. -- and called into the office?

Page 32

1   A. **I don't know. I don't remember.**
2   Q. If the person is not at work, say, they are on
3   vacation or something, what happens?
4   A. **If a person were on vacation, then they**
5   **wouldn't receive a notice of removal until they came**
6   **back. If they are out on some type of extended leave**
7   **or they are -- you know, whatever it might be, they**
8   **are home suspension, out on emergency placement,**
9   **whatever it might be, we would mail them the letter**
10  **certified plus one letter regular mail.**
11  Q. Is that something that's in the collective
12  bargaining agreement, if you know?
13  A. **I don't know.**
14  Q. Or is that something that you do as a matter of
15  practice?
16  A. **It's the way that I've always -- I don't know**
17  **where it comes from, but that's the way we've always**
18  **done it.**
19  Q. Do you know whether notification by mail
20  occurred in this particular case?
21  A. **I know that this letter says it was sent**
22  **certified and one copy via first class mail.**
23  Q. Is there any record that Ms. Wilson was handed
24  it and personally signed that she got it?

Page 33

1   A. **I don't know.**
2   Q. You don't know. Okay.
3      Is there any protocol when a postal
4   employee is dismissed for notifying the union that
5   that person is a member of?
6   A. **I would think that goes to the employee. I've**
7   **never had to do that, notify the union.**
8      MR. BERNSTEIN: Could I prevail upon you
9   again, your copier? I forgot to make a copy of these
10  two pages. Would you mind?
11     MS. HANNIGAN: That's fine.
12     (Pause.)
13     MR. BERNSTEIN: Could we have this marked
14  as the next exhibit?
15     (Van Istendal Deposition Exhibit 2 was
16  marked for identification.)
17  BY MR. BERNSTEIN:
18  Q. Ms. Van Istendal, take a moment to look at
19  that, and first question is, have you ever seen that
20  before?
21  A. **Well, as I reviewed the file, I saw documents**
22  **that looked like this. I can't tell you if it was**
23  **this exact one, though.**
24  Q. Can you tell me what it is?

9 (Pages 30 to 33)

Page 46

1   Q.  You're familiar with those phrases?

2   A.  Yes, I am.

3   Q.  For clarity on the record, could you explain

4   what they are and any differences between the two?

5   A.  Sure.

6   Q.  Thank you.

7   A.  **Limited duty is extended to someone who has**

8   **sustained an injury while in employment at the Postal**

9   **Service. We are required to provide work for someone**

10  **who has injured themselves in the course of their duty**

11  **for the Postal Service. Light duty is -- for example,**

12  **I'm home and I fall down the steps and I break my leg**

13  **and I'm not able to carry mail. So I'm coming in and**

14  **requesting light duty. I'm requesting that you give**

15  **me an assignment that I can perform while I'm**

16  **incapacitated. I'm not required to provide you light**

17  **duty, but we should do that to the best of our**

18  **ability.**

19  Q.  Ma'am, I want to turn your attention to your

20  Exhibit Number 2, the last two lines. It says a DIC

21  was held on 3/10/04. Is DIC, is that day in court?

22  A.  Yes, it is.

23  Q.  Can you explain what that is?

24  A.  A day in court is -- another term for it is a

Page 47

1   predisciplinary interview. It's where an employee

2   would come in. If they choose to have a shop steward

3   represent them, they can have that person come in.

4   And either we would have a list of prepared questions

5   or the supervisor just has questions that they ask

6   that person where, if we believe they've committed an

7   infraction, that employee has the opportunity to

8   explain why that infraction was committed and possibly

9   give us a reason to not give them corrective action.

10  Q.  In your experience, are employees typically

11  removed or issued a letter of removal on the same day

12  that the day in court or predisciplinary interview

13  occurs?

14  A.  No. Not normally.

15  Q.  Do you know, was Ms. Wilson issued her letter

16  of removal on the day her day in court was held on

17  March 10, 2004?

18  A.  I don't -- no.

19  Q.  I'm sorry. You don't know or --

20  A.  No. No, she wasn't.

21  Q.  It says here, going on, a copy of complete

22  investigation was provided to the employee and the

23  Union at this time. I assume meaning on or around

24  March 10, 2004. Do you know whether the complete

Page 48

1   investigation was provided to the Union on or around

2   March 10, 2004, with respect to Ms. Wilson?

3   A.  **I sat in the day in court, and a copy of the**

4   **investigative memorandum from the inspection service**

5   **was provided at that time. And they were also able to**

6   **view a copy of the videotape that the inspection**

7   **service had taken.**

8   Q.  To your recollection, Ms. Wilson was

9   represented by a union steward during that day in

10  court predisciplinary meeting?

11  A.  **Yes, she was.**

12  Q.  Thank you.

13      Going on to the next page, it says the

14  Union was notified of the decision to request removal

15  on 3/13/04 in writing. My first question is, what is

16  a decision to request removal?

17  A.  **If we -- it's called a proposed removal when**

18  **you give someone a notice of removal. It's not that**

19  **they are removed that day. For example, normally a**

20  **person has 30 days. Depending on the person, the**

21  **situation, we might actually send them home and pay**

22  **them administratively up until their removal goes**

23  **through. The particular terms that are in here are**

24  **probably more of a labor relations term and you'd have**

Page 49

1   to ask someone for all those definitions.

2   Q.  Let me ask you this. If you know, before a

3   notice of removal or letter of removal is issued, is

4   there a process in which the issuance of that notice

5   of removal or letter of removal needs to be satisfied?

6   A.  **What do you mean by "needs to be satisfied"?**

7   Q.  Is there a form that has to be filled out

8   requesting the removal that has --

9   A.  **Yes.**

10  Q.  -- an official signature and concurring

11  official signature?

12  A.  **Yes.**

13  Q.  Can you explain that process to the best of

14  your knowledge?

15  A.  **Okay. Normally what would happen -- for**

16  **example, let's say it's my shift and it's one of my**

17  **employees. A supervisor would decide that they want**

18  **to issue discipline to someone. They do -- or that**

19  **they're considering issuing discipline. They do the**

20  **day in court with the employee first. Based on the**

21  **answers that they get from the employee and the day in**

22  **court and all the other factors, they decide whether**

23  **or not they are going to issue discipline. When it**

24  **gets to the level of a suspension or removal, they**

13 (Pages 46 to 49)

Page 50

1  have to come to me, and I have to sign off on whether
2  or not I agree with that. So they prepare the request
3  for discipline. They put all their reasons in there.
4  When they bring it to me, then I sit down and I talk
5  with them first because I want to know all the
6  different things that are behind this. I don't just
7  sign off on suspending someone or removing them
8  without thinking about it on my own first.
9    Q. So for removals of employees on your shift, a
10  supervisor makes a decision, but before the notice of
11  removal can be issued, you must concur or someone at
12  your level must be the concurring official and you go
13  through your own investigation so you're satisfied
14  that the person is being removed for just cause or in
15  accordance with the contract?
16    A. No. My investigation might only involve
17  reading the documentation that's provided. It might
18  not be going out and doing something on top of it. It
19  may just be looking at something that was provided and
20  deciding whether or not that was the level that the
21  supervisor has requested.
22    Q. Now, do you mind if we make this the next
23  Van Istendal exhibit.
24      (Van Istendal Deposition Exhibit 5 was

Page 51

1  marked for identification.)
2  BY MR. LEFF:
3    Q. Take a look at what's been marked Van Istendal
4  5, please.
5    A. Okay.
6    Q. Are you familiar with this document?
7    A. Yes, I am.
8    Q. Can you tell me what this is, please?
9    A. This is a request for disciplinary action.
10  This is the form that the supervisor has to fill out
11  saying exactly what type of discipline they are
12  requesting. And then this form goes to labor
13  relations.
14    Q. Am I accurate to say that supervisor Linda
15  Drummer submitted this on March 16, 2004, and you've
16  concurred with the discipline on March 17, 2004?
17    A. Yes.
18    Q. Now, the actual discipline was not issued prior
19  to March 17, 2004, is that accurate?
20    A. Right.
21    Q. And at some point after this -- again, let me
22  just make sure I understand. You say this gets sent
23  to labor relations?
24    A. Yes.

Page 52

1    Q. And then labor relations issues a notice of
2  removal for you to review and sign, is that correct?
3    A. First for the supervisor and then for the
4  manager to concur with it once again.
5    Q. And then once the supervisor and the manager
6  and yourself as the manager signs off on the notice of
7  removal, am I correct in saying, then, it is issued to
8  the employee?
9    A. Yes. It's either issued to them in person or
10  mailed to them if they are not at work presently.
11    Q. So turning back to Van Istendal 2, where it
12  says, top of the second page, the Union was notified
13  of the decision to request removal on March 13th,
14  2004, based on what you've told me with respect to Van Istendal Number 5, there was not a
15  respect to Van Istendal Number 5, there was not a
16  removal decision as of March 13th, 2004 --
17    A. Not that I know of.
18    Q. -- for Ms. Wilson?
19    A. Not that I know of, no.
20    Q. In your experience, can a request for removal
21  be denied?
22    A. By -- I don't know. By a manager?
23    Q. By a manager, yes.
24    A. Sure. If you -- for example, if someone

Page 53

1  brought something to me and I didn't feel it was at
2  the level for removal, I thought maybe it warranted a
3  14-day suspension instead, then I would sit and I
4  would discuss that with that supervisor. And as it
5  says on here, there's a line for "do not concur." So
6  I can choose not to concur with it.
7    Q. So the fact that a removal request has been
8  made, does not mean that the employee will actually be
9  removed; it will depend on the circumstances of the
10  situation, correct?
11    A. Yes.
12    Q. Do you know whether the Union was notified of
13  the decision to request removal on March 13th, 2004?
14    A. I don't know.
15    Q. It says on here, certified and slotted letter
16  was mailed to Ms. Wilson on March 29, 2004. Is that
17  your understanding of what happened?
18    A. Yes. I believe that's the procedure. That was
19  what's stated on the notice of removal.
20    Q. And what's your understanding under the
21  collective bargaining agreement of when the time
22  limits begin to run for filing a grievance over a
23  notice of removal?
24    A. Once employee has it, has received it, it's 14

14 (Pages 50 to 53)

Page 54

1 days.
2 Q. Is it has received or reasonably should have
3 received it?
4 A. Well, if they are standing in front of me, I
5 know they received it, so -- or reasonably received
6 it.
7 Q. Turning back to Exhibit Number 5, is it correct
8 to say that, once you concurred on the discipline, you
9 did not notify the Union that you had concurred on a
10 removal for Ms. Wilson?
11 A. No. That's not something I would normally do.
12        MR. LEFF: I asked the Union president if
13 he has any questions for you while you're under oath.
14 Gave him the opportunity. He said no, so I'm done.
15        MS. HANNIGAN: I have a couple I'd like to
16 follow up with.
17        EXAMINATION
18 BY MS. HANNIGAN:
19 Q. Ms. Van Istendal, you testified earlier that
20 you, in addition to the issue of working another job
21 while on sick-leave status and doing things at another
22 job that she had said she was medically prohibited
23 from doing with the Postal Service, in addition to
24 those two items, you said you consider the overall

Page 55

1 conduct of the employee in reaching a determination
2 about removal, is that fair?
3 A. Yes.
4 Q. And you referred to a comment that Ms. Wilson
5 had made to you that she was, quote, never going to
6 return to her job, to full duty, and you indicated on
7 two occasions she had been found to be belligerent
8 while at work?
9 A. Yes.
10 Q. And that you considered that as part of the
11 overall conduct of the employee, is that correct?
12 A. Yes.
13 Q. And then you were asked whether there was
14 anything in the notice of removal that reflected that
15 and reflected the fact that you considered the overall
16 conduct of the employee, and I'd just like to call
17 your attention in Keen Number 6, which is the notice
18 of removal --
19 A. Right.
20 Q. -- the bottom of the second page, under the
21 section 666.2, behavior and personal habits. Are
22 there characteristics that are listed in there that
23 you think were relevant to your consideration of the
24 overall conduct of this employee?

Page 56

1 A. Yes. Because to me, when you -- part of it is
2 when it says about being honest, being reliable,
3 reliable is someone reporting to work. And when I
4 look at an overall package -- for example, from the
5 investigative memorandum that says that you called out
6 sick today, you worked at Boscov's during the night.
7 You called out sick again the next day. You're
8 showing me that you are not reliable as a postal
9 employee.
10        Where it also says that you have to be
11 courteous, I don't consider being belligerent on the
12 floor or telling someone that they need -- a manager
13 that they need to check their attitude as courteous.
14 That's not proper work conduct in my consideration.
15 Q. One other issue, the question of whether FMLA
16 leave that Ms. Wilson applied for and was granted was
17 paid leave or not, can you clarify that for us on the
18 record? Was Ms. Wilson, in fact, paid for the time
19 she took off as FMLA leave as noted by the leave slips
20 contained in Van Istendal Number 1?
21 A. I have to look at these.
22 Q. Sure.
23 A. Do you want me to tell you day by day or just
24 in general? For example, the one on November 5th says

Page 57

1 FMLA sick leave. So that would have been paid leave.
2 The next one, FMLA sick leave, that's paid leave.
3 Sick leave, paid leave. FMLA sick leave, also paid
4 leave. FMLA sick leave, paid leave. FMLA sick leave,
5 paid leave. FMLA sick leave on the 24th, that's also
6 paid leave.
7 Q. So I'll note for the record that you've just
8 gone page by page through Van Istendal number 1 and
9 indicated on each occasion listed there, where
10 Ms. Wilson applied for and was granted FMLA leave, she
11 was, in fact, paid for her time that she was out on
12 sick leave?
13 A. Yes.
14        MR. LEFF: Thank you. I have nothing
15 else.
16        MR. BERNSTEIN: Nothing else from me. So
17 we are done.
18        MS. HANNIGAN: We'll read and sign,
19 please.
20        (Deposition ended at approximately
21 2:30 p.m.)
22
23
24

15 (Pages 54 to 57)



UNITED STATES POSTAL INSPECTION SERVICE

PHILADELPHIA DIVISION

February 17, 2004

Larry Bucci
Time & Attendance Manager
P.O. Box 10000
Wilmington, DE 19850

I am conducting a criminal investigation on Melinda Wilson (SSN 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) a mail processor at the Delaware P&DC. I would like to request Ms. Wilson's FMLA Certification verification for FMLA sick leave for the following dates:

✓ November 5, 2003 — 2 hrs.
✓ December 5, 2003 — 8 hrs.
✓ December 12, 2003 — ,50 hrs.
✓ December 17, 2003 — 4 hrs.
✓ December 18, 2003 — 8 hrs.
✓ December 19, 2003 — 8 hrs.
✓ December 20, 2003 — 8 hrs.
✓ December 24, 2003 —     hrs.

The request for this information should be kept confidential in order not to obstruct this investigation. If you need more information from me, contact me at (215-895-8469).

LuAnn Ashmen
Postal Inspector





PO BOX 7500
PHILADELPHIA PA 19101-9000
TELEPHONE 215-895-8450
FAX: 215-895-8470

A-000121

**UNITED STATES POSTAL SERVICE®**

## Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | | Scheduled | Un-scheduled | PP | Year |
|---|---|---|---|---|---|---|---|---|
| Wilson, Melinda G | 221 62 2808 | 11 5 03 | 2 | | | | 2A | 03 |

| Installation (For PM leave, show city, state, and ZIP code) | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | | Day | Init. | Ho |
|---|---|---|---|---|---|---|---|---|---|
| Wilmington DE 19850 | | 215 | 110 | 11-5 | 1350 | Sat 01 | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | | Thru Date | Hour |
|---|---|---|---|---|---|
| 07.00 | | | ☐ No Call | 11-5 | 1550 |

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance |
|---|---|---|---|
| ☐ Annual | ☑ For FMLA Leave (Certification reviewed) OK | | ☐ Yes ☐ No |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | |
| ☑ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | Lunch-Out | |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-In | ENTERED |
| ☐ COP | ☐ For Higher Level (1723 on file) | End Work | ERMS |
| ☑ Other: FMLA | ☐ Scheme Training Testing, Qualifying (Memo on file) | | |

Remarks (Do not enter medical information)
No Lunch

| | Total Hours | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date 11/5/5 | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| Melinda A Wilson | | 11/9 05/5/03 |

### Official Action on Application (Return copy of signed request to employee)

☐ Approved, not FMLA*   ☑ Approved, FMLA (See Publication 71)   ☐ Approved FMLA, Pending Documentation Noted on Reverse

☐ Disapproved (Give reason):

☐ Ineligible for FMLA (Estimate eligibility data): _____

Signature of Supervisor and Date
SmBucci   11-6-03

☐ Continued on Reverse

PS Form **3971**, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 10

CL 4-09-04


EXHIBIT

A 000122

**UNITED STATES POSTAL SERVICE**

# Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) WILSON, MELINDA G | Social Security No. 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 | Date Submitted 12/05/2003 | No. of Hours Requested 8.00 | | | PP 26 | Year 2003 |
|---|---|---|---|---|---|---|---|

| Installation (For PM leave, show city, state and ZIP code) 09-6821 - DELAWARE P&DF | | | | |
|---|---|---|---|---|
| | N/S Day | Pay Loc. # 215 | D/A Code 11-0 | From Date 12/05/2003 | Hour 07:00 |

| Time of Call or Request 06:09 | Scheduled Reporting Time 07:00 | Employee Can Be Reached At (If needed) (302) 395-4854 | | Thru Date 12/05/2003 | Hour 15:30 |

☐ No Call

| | | | Scheduled | Un-Scheduled | | PP | | Year |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Day | Init. | Hours |

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | | | SAT |
|---|---|---|---|---|---|
| ☐ Annual | ☒ For FMLA Leave (Certification reviewed) | | | | SUN |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | Approved in Advance | | | MON |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | ☐ Yes ☐ No | | | TUE |
| ☒ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | Begin Work | | | WED |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | | | | THU |
| ☐ COP | ☐ For Higher Level (1723 on file) | Lunch-Out | | | |
| ☒ Other: ISL | ☐ Scheme Training Testing, Qualifying (Memo on file) | Lunch-In | | x | FRI |

Remarks (Do not enter medical information)
NOT IOD; FMLA LEAVE
WRH

End Work

Total Hours

| | | | | FRI | x | 10 | 8 |
|---|---|---|---|---|---|---|---|
| | | | | SAT | | | |
| | | | | SUN | | | |
| | | | | MON | | | |
| | | | | TUE | | | |
| | | | | WED | | | |
| | | | | THU | | | |
| | | | | FRI | | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date M.Wilson 12/4/03 | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified 12/09/03 |
|---|---|---|

**Official Action on Application** (Return copy of signed request to employee)

| ☐ Approved, not FMLA* | ☒ Approved, FMLA (See Publication 71) | ☐ Approved FMLA, Pending Documentation Noted on Reverse | Signature of Supervisor and Date 12-5-03 |
|---|---|---|---|

☐ Disapproved (Give Reason):

☐ Ineligible for FMLA (Estimate eligibility date):

☐ Continued on Reverse

PS Form 3971, April 2001

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment for not more than 5 years, or both. (18 U.S.C. 1001)

---

| During This Absence, I Was Incapacitated for Duty by: | | Leave Types (Information Only) | | | | | | PP | | Year |
|---|---|---|---|---|---|---|---|---|---|---|

| ☐ Sickness | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related) | Leave Type | Time Card Code | PSDS Code | | Scheduled | Un-Scheduled | Day | Init. | Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ On-the-Job Injury | | AL- FMLA | | | | | | SAT | | |
| ☐ Off- the-Job Injury | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related) | SL- FMLA | 55/01 | 32 | | | | | | |
| ☐ Pregnancy and Confinement | | LWOP - FMLA - Part Day | 56/02 | 33 | | | | SUN | | |
| | | LWOP - FMLA - Full Day | 59/05 | 36 | | | | | | |
| During This Absence, I Was Unavailable for Duty Because | | LWOP - Lieu of Sick Leave | 60/06 | 37 | | | | MON | | |
| ☐ Sick Leave for Dependent Care | ☐ Placement of a Child with Employee for Adoption or Foster Care | LWOP - Proffered | 59/60 | 20 | | | | | | |
| ☐ Birth of Child - Bonding | | LWOP - Personal Reasons | 59/60 | 21 | | | | TUE | | |
| Additional Information Regarding Denial of Leave Protection Under FMLA | | LWOP - Part Day | 59/60 | 22 | | | | | | |
| ☐ Employee Not Eligible - Less than 1250 Hours Worked. | | LWOP - Full Day | 59 | 23 | | | | WED | | |
| ☐ Employee Not Eligible - Not Employed with USPS 1 Year. | | LWOP - AWOL | 60 | 23 | | | | | | |
| ☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year. | | LWOP - IOD (Not FMLA) -OWCP | 59/60 | 24 | | | | THU | | |
| ☐ Absence Not for a Covered Condition. | | LWOP - Maternity | 49 | 25 | | | | | | |
| ☐ Absence Not for a Covered Family Member. | | LWOP - Suspension | 59/60 | 26 | | | | FRI | | |
| ☐ Requested Documentation Not Provided. | | LWOP - Union Official | 59/60 | 27 | | | | | | |
| ☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection | | LWOP - Suspension Pending Termination | 84 | 28 | | | | SAT | | |
| Additional Documentation Required | | | 59/60 | 29 | | | | SUN | | |
| | | Continuation of Pay - USPS | 71 | 03 | | | | | | |
| | | Continuation of Pay - USPS-FMLA | 71/03 | 34 | | | | MON | | |
| | | Continuation of Pay - FMLA-IOD-OWCP | 49/04 | 35 | | | | | | |
| | | Court Duty | 61 | 04 | | | | TUE | | |
| | | Military Leave | 67 | 05 | | | | | | |
| | | Postmaster's Organization | 89 | 08 | | | | WED | | |
| **Privacy Act:** The collection of this information is authorized by 39 USC 401,1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office.) Completion of this form is voluntary. If this information is not provided, official leave may not be granted. | | Blood Donor Leave | 69 | 09 | | | | THU | | |
| | | Other Paid Leave | 86 | 10 | | | | | | |
| | | Convention Leave | 66 | 12 | | | | FRI | | |
| | | Acts of God | 78 | 13 | | | | | | |
| | | Veteran's Funeral | 86 | 10 | | | | | | |
| | | Relocation | 80 | 15 | | | | | | |
| | | Civil Defense | 77 | 16 | | | | | | |
| | | Civil Disorder | 81 | 17 | | | | | | |
| | | Voting Leave | 85 | 18 | | | | | | |

PS Form 3971, April 2001 (Reverse)

A-000123

CL 4-07-04

## Request for or Notification of Absence

**UNITED STATES POSTAL SERVICE®**

Employee's Name (Last, First, M.I.) 

Social Security No. 2808  Date Submitted 12/12/03  No. of Hours Requested 1/2

Installation (For PM leave, show city, state, and ZIP code) WILM DE 19850

N/S Day 2-3  Pay Loc. # 215  D/A Code 11  From Date 12/9  Hour 1500

Time of Call or Request  Scheduled Reporting Time 15:00  Employee Can Be Reached At (if needed)

☐ No Call   Thru Date 12/9  Hour 1550

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See reverse)
- ☒ Sick (See reverse)
- ☐ Late
- ☐ COP
- ☒ Other _FMLA_

**Documentation (For official use only)**
- ☒ For FMLA Leave (Certification reviewed) OK
- ☐ For COP Leave (CA1 on file)
- ☐ For Advanced Sick Leave (1221 on file)
- ☐ For Military Leave (Orders reviewed)
- ☐ For Court Leave (Summons reviewed)
- ☐ For Higher Level (1723 on file)
- ☐ Scheme Training Testing, Qualifying (Memo on file)

Revised Schedule for (Date)  Approved in Advance ☐ Yes ☐ No

Begin Work

Lunch-Out

Lunch-In

End Work

Total Hours

Remarks (Do not enter medical information)

| | Day | Init. | Hours |
|---|---|---|---|
| Sat 01 | | | |
| Sun 02 | | | |
| Mon 03 | | | |
| Tue 04 | | | |
| Wed 05 | | | |
| Thur 06 | | | |
| Fri 07 | | | |
| Sat 08 | | | |
| Sun 09 | | | |
| Mon 10 | | | |
| Tue 11 | | | |
| Wed 12 | | | |
| Thur 13 | | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

Employee's Signature and Date 12/12/03 Melinda Wilson  Signature of Person Recording Absence and Date  Signature of Supervisor and Date Notified 12/12/03

**Official Action on Application** *(Return copy of signed request to employee)*
- ☐ Approved, not FMLA
- ☒ Approved, FMLA (See Publication 71)
- ☐ Approved FMLA, Pending Documentation Noted on Reverse.
- ☐ Disapproved (Give reason):
- ☐ Ineligible for FMLA (Estimate eligibility date):

Signature of Supervisor and Date  JmBucci 12-15-03

☐ Continued on Reverse

PS Form 3971, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

**UNITED STATES POSTAL SERVICE®**

## Request for or Notification of Absence

Employee's Name (Last, First, M.I.) 

Social Security No. 2808  Date Submitted 12/17/03  No. of Hours Requested 4

Installation (For PM leave, show city, state, and ZIP code) Wilm DE 19850 DEP+DC

N/S Day 2-3  Pay Loc. # 215  D/A Code 10  From Date 12/17  Hour 11.00

Time of Call or Request  Scheduled Reporting Time 07.00  Employee Can Be Reached At (if needed)

☐ No Call   Thru Date 12/17  Hour 1500

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See reverse)
- ☒ Sick (See reverse)
- ☐ Late
- ☐ COP
- ☐ Other _FMLA_

**Documentation (For official use only)**
- ☒ For FMLA Leave (Certification reviewed) OK
- ☐ For COP Leave (CA1 on file)
- ☐ For Advanced Sick Leave (1221 on file)
- ☐ For Military Leave (Orders reviewed)
- ☐ For Court Leave (Summons reviewed)
- ☐ For Higher Level (1723 on file)
- ☐ Scheme Training Testing, Qualifying (Memo on file)

Revised Schedule for (Date)  Approved in Advance ☐ Yes ☐ No

Begin Work

Lunch-Out

Lunch-In

End Work

Total Hours

Remarks (Do not enter medical information)

| | Day | Init. | Hours |
|---|---|---|---|
| Sat 01 | | | |
| Sun 02 | | | |
| Mon 03 | | | |
| Tue 04 | | | |
| Wed 05 | | | 4 |
| Thur 06 | | | |
| Fri 07 | | | |
| Sat 08 | | | |
| Sun 09 | | | |
| Mon 10 | | | |
| Tue 11 | | | |
| Wed 12 | | | |
| Thur 13 | | | |
| Fri 14 | | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

Employee's Signature and Date 12/17/03 Melinda Wilson  Signature of Person Recording Absence and Date  Signature of Supervisor and Date Notified

**Official Action on Application** *(Return copy of signed request to employee)*
- ☐ Approved, not FMLA
- ☒ Approved, FMLA (See Publication 71)
- ☐ Approved FMLA, Pending Documentation Noted on Reverse.
- ☐ Disapproved (Give reason):
- ☐ Ineligible for FMLA (Estimate eligibility date):

Signature of Supervisor and Date  JmBucci 12/02/03

☐ Continued on Reverse

PS Form 3971, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

A-000124

CL 4-02-04

CL 4-07-04

# UNITED STATES POSTAL SERVICE

## Request for or Notification of Absence

| Employee's Name (Last, first, M.I.) WILSON, MELINDA G | Social Security No. 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 | Date Submitted 12/18/2003 | No. of Hours Requested 8.00 | | PP 1 | Year 2004 |
|---|---|---|---|---|---|---|

| Installation (For PM leave, show city, state and ZIP code) 09-6821 - DELAWARE P&DF | N/S Day | Pay Loc. # 215 | D/A Code 11-0 | From Date 12/18/2003 | Hour 07:00 | |

| Time of Call or Request 06:05 | Scheduled Reporting Time 07:00 | Employee Can Be Reached At (If needed) (302) 395-4854 | ☐ No Call | Thru Date 12/18/2003 | Hour 15:30 |

|  | Day | Init. | Hours |
|---|---|---|---|
| | SAT | | |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | 10 | 8 T-6 9 |
| | FRI | | |
| | SAT | | |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | | |
| | FRI | | |

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See reverse)
- ☒ Sick (See reverse)
- ☐ Late
- ☐ COP
- ☐ Other: fSL

**Documentation (For official use only)**
- ☒ For FMLA Leave (Certification reviewed)
- ☐ For COP Leave (CA1 on file)
- ☐ For Advanced Sick Leave (1221 on file)
- ☐ For Military Leave (Orders reviewed)
- ☐ For Court Leave (Summons reviewed)
- ☐ For Higher Level (1723 on file)
- ☐ Scheme Training Testing, Qualifying (Memo on file)

Revised Schedule for (Date)

| | |
|---|---|
| Begin Work | |
| Lunch-Out | |
| Lunch-In | |
| End Work | |
| Total Hours | |

**Approved in Advance**
☐ Yes  ☐ No

**Remarks** (Do not enter medical information)
NOT IOD; FMLA LEAVE
WRH

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

Employee's Signature and Date 12/18/03

Signature of Person Recording Absence and Date

Signature of Supervisor and Date Notified 12/18/03

**Official Action on Application** (Return copy of signed request to employee)
- ☐ Approved, not FMLA*
- ☐ Disapproved (Give Reason)
- ☐ Approved, FMLA (See Publication 71)
- ☐ Approved FMLA, Pending Documentation Noted on Reverse

Signature of Supervisor and Date
Sannucci 12-18-03

☐ Ineligible for FMLA (Estimate eligibility date): _____

☐ Continued on Reverse

PS Form 3971, April 2001

**Warning :** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

**During This Absence, I Was Incapacitated for Duty by:**
- ☐ Sickness
- ☐ On-the-Job Injury
- ☐ Off- the-Job Injury
- ☐ Pregnancy and Confinement
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related)
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related)

**During This Absence, I Was Unavailable for Duty because**
- ☐ Sick Leave for Dependent Care
- ☐ Placement of a Child with Employee for Adoption or Foster Care
- ☐ Birth of Child - Bonding

**Additional Information Regarding Denial of Leave Protection Under FML**
- ☐ Employee Not Eligible - Less than 1250 Hours Worked.
- ☐ Employee Not Eligible - Not Employed with USPS 1 Year.
- ☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year.
- ☐ Absence Not for a Covered Condition.
- ☐ Absence Not for a Covered Family Member.
- ☐ Requested Documentation Not Provided.
- ☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection

**Additional Documentation Required**

| Leave Types (Information Only) | | | | | PP | Year |
|---|---|---|---|---|---|---|
| Leave Type | Time Card Code | PSDS Code | Scheduled | Un-Scheduled | Day | Init. | Hours |
| AL- FMLA | 55/01 | 32 | | | SAT | | |
| SL- FMLA | 56/02 | 33 | | | | | |
| LWOP - FMLA - Part Day | 59/05 | 36 | | | SUN | | |
| LWOP - FMLA - Full Day | 60/06 | 37 | | | | | |
| LWOP - Lieu of Sick Leave | 59/60 | 20 | | | MON | | |
| LWOP - Proffered | 59/60 | 21 | | | | | |
| LWOP - Personal Reasons | 59/60 | 22 | | | TUE | | |
| LWOP - Part Day | 59 | 23 | | | | | |
| LWOP - Full Day | 60 | 23 | | | WED | | |
| LWOP - AWOL | 59/60 | 24 | | | | | |
| LWOP - IOD (Not FMLA) -OWCP | 49 | 25 | | | THU | | |
| LWOP - Maternity | 59/60 | 26 | | | | | |
| LWOP - Suspension | 59/60 | 27 | | | FRI | | |
| LWOP - Union Official | 84 | 28 | | | | | |
| LWOP - Suspension Pending Termination | 59/60 | 29 | | | SAT | | |
| Continuation of Pay - USPS | 71 | 03 | | | SUN | | |
| Continuation of Pay - USPS-FMLA | 71/03 | 34 | | | MON | | |
| Continuation of Pay - FMLA-IOD-OWCP | 49/04 | 35 | | | | | |
| Court Duty | 61 | 04 | | | TUE | | |
| Military Leave | 67 | 05 | | | | | |
| Postmaster's Organization | 89 | 08 | | | WED | | |
| Blood Donor Leave | 69 | 09 | | | | | |
| Other Paid Leave | 86 | 10 | | | THU | | |
| Convention Leave | 66 | 12 | | | | | |
| Acts of God | 78 | 13 | | | FRI | | |
| Veteran's Funeral | 86 | 10 | | | | | |
| Relocation | 80 | 15 | | | | | |
| Civil Defense | 77 | 16 | | | | | |
| Civil Disorder | 81 | 17 | | | | | |
| Voting Leave | 85 | 18 | | | | | |

...cy Act: The collection of this information is authorized by 39 USC 401, 1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

A-000125

CL 4-07-04

**UNITED STATES POSTAL SERVICE**

**Request for or Notification of Absence**

| Employee's Name (Last, first, M.I.) | | | | |
|---|---|---|---|---|
| WILSON, MELINDA G | Social Security No. 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 | Date Submitted 12/19/2003 | No. of Hours Requested 8.00 | |

| Installation (For PM leave, show city, state and ZIP code) | | | PP 1 | Year 2004 |
|---|---|---|---|---|
| 09-6821 - DELAWARE P&DF | N/S Day | Pay Loc. # 215 | D/A Code 11-0 | From Date 12/19/2003 | Hour 07:00 | | |

| Time of Call or Request 07:21 | Scheduled Reporting Time 07:00 | Employee Can Be Reached At (If needed) (302) 395-4854 | | No Call | Thru Date 12/19/2003 | Hour 15:30 | | | |

**Type of Absence**
- [ ] Annual
- [ ] Carrier 701 Rule
- [ ] LWOP (See reverse)
- [x] Sick (See reverse)
- [ ] Late
- [ ] COP
- [x] Other: fSL

**Documentation (For official use only)**
- [x] For FMLA Leave (Certification reviewed)
- [ ] For COP Leave (CA1 on file)
- [ ] For Advanced Sick Leave (1221 on file)
- [ ] For Military Leave (Orders reviewed)
- [ ] For Court Leave (Summons reviewed)
- [ ] For Higher Level (1723 on file)
- [ ] Scheme Training Testing, Qualifying (Memo on file)

Revised Schedule for (Date)

**Approved in Advance**
- [ ] Yes  [ ] No

| Begin Work | |
| Lunch-Out | |
| Lunch-In | |
| End Work | |
| Total Hours | |

**Remarks** (Do not enter medical information)
NOT IOD; FMLA LEAVE MAP

| | Day | Init. | Hours |
|---|---|---|---|
| SAT | | | |
| SUN | | | |
| MON | | | |
| TUE | | | |
| WED | | | |
| THU | | | |
| FRI | | *D | 8 |
| SAT | | | |
| SUN | | | |
| MON | | | |
| TUE | | | |
| WED | | | |
| THU | | | |
| FRI | | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

Employee's Signature and Date    12/19    Signature of Person Recording Absence and Date

Signature of Supervisor and Date Notified    Lisa Dunn  12/19/03

**Official Action on Application** (Return copy of signed request to employee)
- [ ] Approved, not FMLA*
- [ ] Approved, FMLA (See Publication 71)
- [ ] Approved FMLA, Pending Documentation Noted on Reverse
- [ ] Disapproved (Give Reason):
- [ ] Ineligible for FMLA (Estimate eligibility date):
- [ ] Continued on Reverse

Signature of Supervisor and Date    JMarie 12-25-03

PS Form 3971, April 2001

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

**During This Absence, I Was Incapacitated for Duty by:**
- [ ] Sickness
- [ ] On-the-Job Injury
- [ ] Off- the-Job Injury
- [ ] Pregnancy and Confinement
- [ ] Undergoing Medical, Dental, or Optical Examination or Treatment (Job related)
- [ ] Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related)

**During This Absence, I Was Unavailable for Duty Because**
- [ ] Sick Leave for Dependent Care
- [ ] Birth of Child - Bonding
- [ ] Placement of a Child with Employee for Adoption or Foster Care

**Additional Information Regarding Denial of Leave Protection Under FMLA**
- [ ] Employee Not Eligible - Less than 1250 Hours Worked.
- [ ] Employee Not Eligible - Not Employed with USPS 1 Year.
- [ ] Employee Has Exhausted FMLA Entitlement in Current Leave Year.
- [ ] Absence Not for a Covered Condition.
- [ ] Absence Not for a Covered Family Member.
- [ ] Requested Documentation Not Provided.
- [ ] Documentation Provided. Does Not Meet Criteria for FMLA Protection

Additional Documentation Required

| Leave Type | Time Card Code | PSDS Code |
|---|---|---|
| AL- FMLA | | |
| SL- FMLA | 55/01 | 32 |
| LWOP - FMLA - Part Day | 56/02 | 33 |
| LWOP - FMLA - Full Day | 59/05 | 36 |
| LWOP - Lieu of Sick Leave | 60/06 | 37 |
| LWOP - Proffered | 59/60 | 20 |
| LWOP - Personal Reasons | 59/60 | 21 |
| LWOP - Part Day | 59/60 | 22 |
| LWOP - Full Day | 59 | 23 |
| LWOP - AWOL | 60 | 23 |
| LWOP - IOD (NOT FMLA) -OWCP | 59/60 | 24 |
| LWOP - Maternity | 49 | 25 |
| LWOP - Suspension | 59/60 | 26 |
| LWOP - Union Official | 59/60 | 27 |
| LWOP - Suspension Pending Termination | 84 | 28 |
| Continuation of Pay - USPS | 59/60 | 29 |
| Continuation of Pay - USPS-FMLA | 71 | 03 |
| Continuation of Pay - FMLA-IOD-OWCP | 71/63 | 34 |
| Court Duty | 49/04 | 35 |
| Military Leave | 61 | 04 |
| Postmaster's Organization | 67 | 05 |
| Blood Donor Leave | 89 | 08 |
| Other Paid Leave | 69 | 09 |
| Convention Leave | 86 | 10 |
| Acts of God | 66 | 12 |
| Veteran's Funeral | 78 | 13 |
| Relocation | 86 | 10 |
| Civil Defense | 80 | 15 |
| Civil Disorder | 77 | 16 |
| Voting Leave | 81 | 17 |
| | 85 | 18 |

**Leave Types** (Information Only)

| | Day | Init. | Hours |
|---|---|---|---|
| SAT | | | |
| SUN | | | |
| MON | | | |
| TUE | | | |
| WED | | | |
| THU | | | |
| FRI | | | |
| SAT | | | |
| SUN | | | |
| MON | | | |
| TUE | | | |
| WED | | | |
| THU | | | |
| FRI | | | |

**Privacy Act:** The collection of this information is authorized by 39 USC 401,1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

PS Form 3971, April 2001 (Reverse)

A 000126

# UNITED STATES POSTAL SERVICE

## Request for or Notification of Absence

| Employee's Name (Last, first, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | | PP | Year |
|---|---|---|---|---|---|---|
| WILSON, MELINDA G | 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 | 12/20/2003 | 8.00 | | 1 | 2004 |

| Installation (For PM leave, show city, state and ZIP code) | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | | | |
|---|---|---|---|---|---|---|---|---|
| 09-6821 - DELAWARE P&DF | | 215 | 11-0 | 12/20/2003 | 07:00 | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | | Thru Date | Hour | | Day | Init. | Hours |
|---|---|---|---|---|---|---|---|---|---|
| 06:20 | 07:00 | (302) 395-4854 | ☐ No Call | 12/20/2003 | 15:30 | SAT | | | |

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See reverse)
- ☒ Sick (See reverse)
- ☐ Late
- ☐ COP
- ☐ Other: fSL

**Documentation (For official use only)**
- ☐ For FMLA Leave (Certification reviewed)
- ☒ For COP Leave (CA1 on file)
- ☐ For Advanced Sick Leave (1221 on file)
- ☐ For Military Leave (Orders reviewed)
- ☐ For Court Leave (Summons reviewed)
- ☐ For Higher Level (1723 on file)
- ☐ Scheme Training Testing, Qualifying (Memo on file)

Revised Schedule for (Date)

Approved in Advance  ☐ Yes  ☐ No

| | |
|---|---|
| Begin Work | |
| Lunch-Out | |
| Lunch-In | |
| End Work | |
| Total Hours | |

**Remarks (Do not enter medical information)**
NOT IOD; FMLA LEAVE wat

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| M Wils 2/3/04 | | L.A.Derm 12/6/03 |

**Official Action on Application (Return copy of signed request to employee)**
- ☐ Approved, not FMLA*
- ☒ Approved, FMLA (See Publication 71)
- ☐ Approved, FMLA, Pending Documentation Noted on Reverse
- ☐ Disapproved (Give Reason)
- ☐ Ineligible for FMLA (Estimate eligibility date):

Signature of Supervisor and Date
EMBucci 12-2-03

☐ Continued on Reverse

PS Form 3971, April 2001

**Warning:** The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

| | Day | Init. | Hours |
|---|---|---|---|
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | | |
| | FRI | | |
| | SAT | | Fø |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | | |
| | FRI | | |

---

**During This Absence, I Was Incapacitated for Duty by:**
- ☐ Sickness
- ☐ On-the-Job Injury
- ☐ Off-the-Job Injury
- ☐ Pregnancy and Confinement
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related)
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related)

**During This Absence, I Was Unavailable for Duty Because**
- ☐ Sick Leave for Dependent Care
- ☐ Birth of Child - Bonding
- ☐ Placement of a Child with Employee for Adoption or Foster Care

**Additional Information Regarding Denial of Leave Protection Under FMLA**
- ☐ Employee Not Eligible - Less than 1250 Hours Worked.
- ☐ Employee Not Eligible - Not Employed with USPS 1 Year.
- ☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year.
- ☐ Absence Not for a Covered Condition.
- ☐ Absence Not for a Covered Family Member.
- ☐ Requested Documentation Not Provided.
- ☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection

**Additional Documentation Required**

**Privacy Act:** The collection of this information is authorized by 39 USC 401,1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

| Leave Type | Time Card Code | PSDS Code |
|---|---|---|
| AL- FMLA | | |
| SL- FMLA | 55/01 | 32 |
| LWOP - FMLA - Part Day | 56/02 | 33 |
| LWOP - FMLA - Full Day | 59/05 | 36 |
| LWOP - Lieu of Sick Leave | 60/06 | 37 |
| LWOP - Proffered | 59/60 | 20 |
| LWOP - Personal Reasons | 59/60 | 21 |
| LWOP - Part Day | 59/60 | 22 |
| LWOP - Full Day | 59 | 23 |
| LWOP - AWOL | 60 | 23 |
| LWOP - IOD (Not FMLA) -OWCP | 59/60 | 24 |
| LWOP - Maternity | 49 | 25 |
| LWOP - Suspension | 59/60 | 26 |
| LWOP - Union Official | 59/60 | 27 |
| LWOP - Suspension Pending Termination | 84 | 28 |
| Continuation of Pay - USPS | 59/60 | 29 |
| Continuation of Pay - USPS-FMLA | 71 | 03 |
| Continuation of Pay - FMLA-IOD-OWCP | 71/03 | 34 |
| Court Duty | 49/04 | 35 |
| Military Leave | 61 | 04 |
| Postmaster's Organization | 67 | 05 |
| Blood Donor Leave | 89 | 08 |
| Other Paid Leave | 69 | 09 |
| Convention Leave | 86 | 10 |
| Acts of God | 66 | 12 |
| Veteran's Funeral | 78 | 13 |
| Relocation | 86 | 10 |
| Civil Defense | 80 | 15 |
| Civil Disorder | 77 | 16 |
| Voting Leave | 81 | 17 |
| | 85 | 18 |

**Leave Types (Information Only)**

| | PP | Year |
|---|---|---|

| | Day | Init. | Hours |
|---|---|---|---|
| | SAT | | |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | | |
| | FRI | | |
| | SAT | | |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | | |
| | FRI | | |

PS Form 3971, April 2001 (Reverse)

A- 000127

CLH-07-ncl

# UNITED STATES
# POSTAL SERVICE

**Request for or Notification of Absence**

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted 12/24/03 | Leave Hours Requested | | | Schedule | Un-Schedule | PP 01 | Year 04 |
|---|---|---|---|---|---|---|---|---|---|

Wilson M. G.    2808

| Installation (For PM leave, show city, state, and ZIP code) | N/S Day | Pay Loc # 215 | D/A Code | From Date Hour 12/24/025 | | | Day | Init. | Hours |

Wilm DE 19850

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (if needed) | | Thru Date Hour 12/24 | | | Sat 01 | | |

☐ No Call

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance |
|---|---|---|---|
| ☐ Annual | ☐ For FMLA Leave (Certification reviewed) | | ☐ Yes ☐ No |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | |
| ☑ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | | |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-Out | |
| ☐ COP | ☐ For Higher Level (1723 on file) | Lunch-In | |
| ☐ Other: FMLA | ☐ Scheme Training Testing, Qualifying (Memo on file) | End Work | |

| Sun 02 | | |
| Mon 03 | | |
| Tue 04 | | |
| Wed 05 | | |
| Thur 06 | | |
| Fri 07 | | |
| Sat 08 | | |

Remarks (Do not enter medical information)
etc. required

Total Hours

| Sun 09 | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date 12/24/03 | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
Melissa M. Fisher    MW Wilm    12/24/03

| Mon 10 | | |
| Tue 11 | | |

**Official Action on Application** *(Return copy of signed request to employee)*

| Wed 12 | X | |

| Signature of Supervisor and Date |

☐ Approved, not FMLA*   ☐ Approved, FMLA (See Publication 71)   ☑ Approved FMLA, Pending Documentation Noted on Reverse.

☐ Disapproved (Give reason):

FMLA 12-24-03

| Thur 13 | | |
| Fri 14 | | |

☐ Ineligible for FMLA (Estimate eligibility date): _____    ☐ Continued on Reverse

PS Form **3971**, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

| During This Absence, I Was Incapacitated for Duty by: | |
|---|---|
| ☐ Sickness | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related) |
| ☐ On-the-Job Injury | |
| ☐ Off-the-Job Injury | |
| ☐ Pregnancy and Confinement | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related) |
| ☐ Exposed to a Contagious Disease | |

| During This Absence, I Was Unavailable for Duty Because: | |
|---|---|
| ☐ Sick Leave for Dependent Care | ☐ Placement of a Child with Employee for Adoption or Foster Care |
| ☐ Birth of Child - Bonding | |

Additional Information Regarding Denial of Leave Protection Under FMLA:
☐ Employee Not Eligible – Less than 1250 Hours Worked.
☐ Employee Not Eligible – Not Employed with USPS 1 Year.
☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year.
☐ Absence Not for a Covered Condition.
☐ Absence Not for a Covered Family Member.
☐ Requested Documentation Not Provided.
☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection.

Additional Documentation Required
— MDO Van Istendal requested med. Doc. be provided for this absence to protect the best interests of the USPS. SLmB

| Leave Types (Information Only) | | | Scheduled | Un-Scheduled | PP | Year |
|---|---|---|---|---|---|---|
| Leave Type | Time Card Code | PSDS Code | | | | |
| AL–FMLA | 55/01 | 32 | | | Sat 01 | |
| SL–FMLA | 56/02 | 33 | | | Sun 02 | |
| LWOP – FMLA – Part Day | 59/05 | 36 | | | Mon 03 | |
| LWOP – FMLA – Full Day | 60/06 | 37 | | | Tue 04 | |
| LWOP – Lieu of Sick Leave | 59/60 | 20 | | | Wed 05 | |
| LWOP – Proffered | 59/60 | 21 | | | Thur 06 | |
| LWOP – Personal Reasons | 59/60 | 22 | | | Fri 07 | |
| LWOP – Part Day | 59 | 23 | | | Sat 08 | |
| LWOP – Full Day | 60 | 23 | | | Sun 09 | |
| LWOP – AWOL | 59/60 | 24 | | | Mon 10 | |
| LWOP – IOD (Not FMLA) - OWCP | 49 | 25 | | | Tue 11 | |
| LWOP – Maternity | 59/60 | 26 | | | Wed 12 | |
| LWOP – Suspension | 59/60 | 27 | | | Thur 13 | |
| LWOP – Union Official | 84 | 28 | | | Fri 14 | |
| LWOP – Suspension Pending Termination | 59/60 | 29 | | | | |
| Continuation of Pay – USPS | 71 | 03 | | | | |
| Continuation of Pay – USPS-FMLA | 71/03 | 34 | | | | |
| Continuation of Pay FMLA-IOD-OWCP | 49/04 | 35 | | | | |
| Court Duty | 61 | 04 | | | | |
| Military Leave | 67 | 05 | | | | |
| Postmaster's Organization | 89 | 08 | | | | |
| Blood Donor Leave | 69 | 09 | | | | |
| Other Paid Leave | 86 | 10 | | | | |
| Convention Leave | 66 | 12 | | | | |
| Acts of God | 78 | 13 | | | | |
| Veteran's Funeral | 86 | 10 | | | | |
| Relocation | 80 | 15 | | | | |
| Civil Defense | 77 | 16 | | | | |
| Civil Disorder | 81 | 17 | | | | |
| Voting Leave | 85 | 18 | | | | |

Privacy Act: The collection of this information is authorized by 39 USC 401, 1001, 1002, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office. Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

PS Form **3971**, April 2001 (Page 2 of 2)

A-000128

DEPOSITION
EXHIBIT
Von Iskendal 5
2-16-6-05

# REQUEST FOR DISCIPLINARY ACTION OR ATAL ACTIONS

MANAGER, DISTRIBUTION OPERATIONS

CL 4-07-04

EMPLOYEE NAME: Wilson, Molinda G          SSN: 221 52 2808

CRAFT: Clerk          TOUR: 2          PAY LOCATION: 215

ATAL ACTION REQUESTED:          PLACE ON ATAL _____

REMOVE FROM ATAL _____
(SUBMIT COPY OF 3972 WITH ANY ATAL ACTION)

DISCIPLINARY ACTION REQUESTED:          LETER OF WARNING _____

(SUBMIT COPY OF 3972 & 3971's WITH ANY          ** 7 DAY SUSPENSION _____
OTHER REQUESTS FOR DISCIPLINARY ACTION)

          ** 14 DAY SUSPENSION _____

          REQUEST FOR REMOVAL ✓

** ON SUSPENSIONS - RECORD ELEMENTS OF EMPLOYEES PAST RECORD THAT HAVE BEEN
CONSIDERED IN ARRIVING AT THIS DECISION.

TYPE OF DISCIPLINARY ACTION Removal          DATE ISSUED 3/16/04

SUSPENSION IS FOR FTR - LIST DATE OF LAST FTR DISCIPLINARY LETTER _____

RECOMMENDED CHARGE: Improper Conduct

_____

DATE OF INCIDENT: Oct. 2003 - December 2003

SUPERVISORS STATEMENT: Employee directly violated Elm 513.312, 661.42c

and 661.2  See attached.

_____

_____

_____

_____

_____

_____

_____

COURT GIVEN: DATE: 3/10/04          A-000129

SUBMITTED BY: Linda J Alexander          DATE: 3/16/04

CONCUR: _____          DATE: 3/17/04

DO NOT CONCUR: _____          DATE: _____



**WILCOX & FETZER LTD.**

# In the Matter Of:

# Wilson

## v.

# American Postal Workers Union

## C.A. # 05-073 JJF

_____

## Transcript of:

## Andrew Keen

## October 6, 2005

_____

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-000130

Wilson          v.          American Postal Workers Union
Andrew Keen     C.A. # 05-073 JJF          October 6, 2005
Case 1:05-cv-00073-JJF    Document 34-4    Filed 02/23/2006    Page 41 of 64

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MELINDA WILSON,                 )
                               )
         Plaintiff,          )
                               )
v.                           ) Civil Action No.
                               ) 05-073 JJF
AMERICAN POSTAL WORKERS UNION,   )
Delaware Area Local AFL-CIO, and   )
UNITED STATES POSTAL SERVICE, an   )
independent establishment of the   )
Executive Branch of the Government   )
of the United States of America,    )
                               )
         Defendants.         )


Deposition of ANDREW KEEN taken pursuant to notice at the offices of the United States Attorney, 1007 Orange Street, Suite 700, Wilmington, Delaware, beginning at 10:00 a.m. on Thursday, October 6, 2005, before Ann M. Calligan, Registered Merit Reporter and Notary Public.


WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477

A-000131

Wilson
Andrew Keen
v.
C.A. # 05-073 JJF
American Postal Workers Union
October 6, 2005

Case 1:05-cv-00073-JJF     Document 34-4     Filed 02/23/2006     Page 42 of 64

Page 2

APPEARANCES:

JOSEPH M. BERNSTEIN, Esquire
800 North King Street - Suite 302
Wilmington, Delaware 19801
on behalf of the Plaintiff;

PETER J. LEFF, Esquire
O'DONNELL, SCHWARTZ & ANDERSON, P.C.
1300 L Street, NW - Suite 1200
Washington, D.C. 20005-4126
on behalf of Defendant American Postal
Workers Union;

PATRICIA C. HANNIGAN, Esquire
Assistant United States Attorney
The Nemours Building
1007 Orange Street - Suite 700
Post Office 2046
Wilmington, Delaware 19899-2046
on behalf of Defendant United States
Postal Services.

ALSO PRESENT:

MELINDA WILSON

STEVEN COLLINS

Page 3

1      ANDREW KEEN,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5      EXAMINATION
6 BY MR. BERNSTEIN:
7   Q.  Mr. Keen, preliminarily, my name is Joseph
8 Bernstein. I'm an attorney, and I'm representing
9 Melinda Wilson. Melinda Wilson has filed a lawsuit
10 against the Postal Service and the American Postal
11 Workers Union concerning her dismissal from
12 employment, and that occurred back in March, April of
13 2004. Okay.
14      Now, you've been identified as somebody
15 who may have some knowledge or information about the
16 events that that lawsuit concerns and that's why
17 you're here today.
18      Now, have you ever had your deposition
19 taken before?
20   A.  I have.
21   Q.  So you're familiar with the procedure in a
22 deposition?
23   A.  I am.
24   Q.  Approximately how many times have you been

Page 4

1 deposed?
2   A.  Five.
3   Q.  Okay. And just a couple ground rules. If
4 there is any question that you don't understand, just
5 interrupt me, tell me what you don't understand, and
6 I'll try and clarify it.
7   A.  Yes, sir.
8   Q.  Otherwise I'll assume, if you answer the
9 question, that you understood the question.
10   A.  Yes, sir.
11   Q.  Fair enough?
12      Do you have any questions up to this
13 point?
14   A.  I do not.
15   Q.  First, what is your age, sir?
16   A.  45.
17   Q.  I didn't mean to embarrass you.
18   A.  That's okay.
19   Q.  And how long have you been employed with the
20 Postal Service?
21   A.  21 years.
22   Q.  What is your current position?
23   A.  Manager, labor relations.
24   Q.  And does that cover a geographic area?

Page 5

1   A.  It does.
2   Q.  What geographic area?
3   A.  The southern half of New Jersey and entire
4 state of Delaware.
5   Q.  Do you have people that work under you?
6   A.  I do.
7   Q.  Do they cover geographic areas or how is that
8 divided up?
9   A.  Loosely geographically.
10   Q.  Okay. And they all report to you?
11   A.  Correct.
12   Q.  And who do you report to?
13   A.  I have a manager of human resources.
14   Q.  And is that a national manager?
15   A.  No. That covers the same geographic area as I
16 do.
17      (Keen Deposition Exhibit 1 was marked for
18 identification.)
19 BY MR. BERNSTEIN:
20   Q.  Now, I want to show you a document that's been
21 marked as Keen Number 1. Take a look at that.
22      (Pause.)
23   Q.  Mr. Keen, I'm showing you what's been marked as
24 Keen Number 1, and I would ask you if you've ever seen

2 (Pages 2 to 5)

Wilson                                                    American Postal Workers Union
Andrew Keen                                               October 6, 2005
Case 1:05-cv-00073-JJF    Document 34-4    Filed 02/23/2006    Page 43 of 64

C.A. # 05-073 JJF

Page 6

1 that document before?
2    A.  I don't know that I've seen this document. I
3 don't recall seeing this document.
4    Q.  Would you like to take a moment and read it
5 through, or do you know what it is?  Let me ask you
6 that first.
7    A.  I do know what it is.
8    Q.  Tell me what it is.
9    A.  It appears to be responses to interrogatories.
10    Q.  And on question 1, your name is listed as a
11 person who participated in preparing this response, is
12 that correct?
13    A.  You're asking me what question number 1 says?
14    Q.  That's what it says, and I'm asking you if you
15 did, in fact, participate in preparing these answers?
16    A.  I had discussions with attorneys who are
17 presumptive have prepared the document.
18    Q.  But you didn't review it before it was
19 finalized?
20    A.  I don't recall.
21    Q.  Okay.  Fair enough.
22        Now, getting back to some background
23 information, in your capacity as labor relations
24 manager, at what point do you get involved in, let's

Page 7

1 say, proposed disciplinary actions against postal
2 employees?
3    A.  It depends on what is brought to my attention
4 when. I don't get involved in all. I get involved in
5 some.
6    Q.  Did you get involved in the proposed
7 termination of employment of Ms. Wilson?
8    A.  I did -- I was involved, yes.
9    Q.  Were you involved before the formal
10 notification that she was being terminated was issued?
11    A.  Yes.
12    Q.  What was the extent of your involvement?
13    A.  I received a phone call from a labor specialist
14 who relayed information to me and asked for my advice.
15    Q.  Do you know the name of that person?
16    A.  Isaac Morris.
17    Q.  And do you recall what Mr. Morris told you?
18    A.  I do.
19    Q.  Tell me what he told you.
20    A.  He told me that the -- I'm not sure if it was
21 Linda Drummer and Carla Van Istendal or Carla
22 Van Istendal. One of those folks had come to him,
23 explained that they had -- Ms. Drummer had seen
24 Ms. Wilson working at a Boscov's. There was some

Page 8

1 issues with her work restriction status.  And I was
2 asked for some advice on what they should do at that
3 point, how to handle the situation.
4    Q.  Now, do you recall the time frame that that
5 occurred?
6    A.  December. I don't remember the date. A few
7 weeks before Christmas I believe.
8    Q.  In 2003?
9    A.  Yes.
10    Q.  And did you respond or how did you respond to
11 that inquiry?
12    A.  I responded to Mr. Morris that she should
13 contact the inspection service to see if they could
14 assist in investigating the matter.
15    Q.  That was the postal inspectors?
16    A.  That's correct.
17    Q.  Do you know if that was done?
18    A.  I was told. Mr. Morris told me that he had
19 done so.
20    Q.  Can you tell me your next involvement with
21 Ms. Wilson?
22    A.  I believe it was probably a week or so later
23 that Mr. Morris advised that the inspection service
24 was not able to go out and participate in any

Page 9

1 investigation. And again, I was called and asked for
2 advice.
3    Q.  And do you recall what your advice was?
4    A.  Yes. I believe my advice was to ask the MDO,
5 manager of distribution operations, Carla
6 Van Istendal, to go out to speak with Ms. Wilson and
7 to go out to Boscov's to speak to the supervisor or
8 the manager out there.
9    Q.  When you spoke to Ms. Van Istendal --
10    A.  Correct.
11    Q.  -- was there any particular thing that you
12 wanted her to find out for you?
13    A.  I believe what I thought was pertinent was to
14 find out what type of employment Ms. Wilson was
15 engaged in in Boscov's, and what was the nature of her
16 work at Boscov's.
17    Q.  Now, does the Postal Service have any kind of
18 rule or regulation that prohibits employees from
19 having outside employment?
20    A.  Prohibits?
21    Q.  Yes.
22    A.  Only certain types.
23    Q.  Tell me what types.
24    A.  Things that would conflict with their postal

3 (Pages 6 to 9)

Page 14

1   from that encounter between Ms. Van Istendal and
2   Ms. Wilson?
3      A.  I'm not sure if I spoke with Ms. Van Istendal
4   that day or not.  But she relayed to me that
5   Ms. Wilson was brought in, and there was some
6   discussion at that point.  And I believe that was on
7   Christmas Eve, and she relayed to me that they had had
8   that discussion.
9      Q.  Did Ms. Van Istendal relate to you what
10  Ms. Wilson said about the situation if anything?
11     A.  She did.
12     Q.  Do you remember what it was?
13     A.  She said that -- I'm not sure if this is from
14  the first or second meeting with Ms. Wilson that
15  Ms. Wilson was adamant that she had had a work-related
16  injury or work claim.  She was adamant that her work
17  restrictions were just for her Postal Service work.
18  It had nothing to do with her -- anything outside the
19  post office, and that she wasn't going to answer
20  anything about anything outside the post office, and
21  wouldn't -- wouldn't discuss anything about Boscov's
22  or anything that's outside the post office.  "I don't
23  have to talk to you about that" was the gist of it.
24     Q.  Do you know whether yourself or

Page 15

1   Ms. Van Istendal, or you directed Ms. Van Istendal to
2   tell Ms. Wilson, you know, your position is incorrect,
3   that it is a concern that the post office and you need
4   to tell us what we want to know.
5      A.  I was told that was discussed.
6      Q.  And the response was?
7      A.  That had nothing to do with her post office,
8   and she wasn't going to discuss it.
9      Q.  So what you're getting back from
10  Ms. Van Istendal at this point is she spoke to
11  Ms. Wilson and Ms. Wilson didn't want to talk about it
12  in so many words?
13     A.  That was a part of it, sure.
14     Q.  Your next involvement?
15     A.  There were -- I believe, on the 24th the
16  outcome was that Ms. Wilson -- they had advised her
17  that they were not going to allow her to work under
18  these -- the medical restrictions that Ms. Wilson had
19  wanted to work under, and my next involvement was, I
20  believe, when I was notified of various phone messages
21  that Ms. Wilson had left.  I'm not sure if it was that
22  same day or not.
23     Q.  Now, let me make sure I understand.  This
24  occurred in January, sometime, do you think?

Page 16

1      A.  No.
2      Q.  December?
3      A.  It was December 24th was the meeting with
4   Ms. Wilson.
5      Q.  And the outcome of that meeting as you
6   understand it was Ms. Wilson was told, number 1, the
7   restrictions that you are working under will no longer
8   apply, is that correct?
9      A.  Yes.
10     Q.  And number 2, if you don't want to work under
11  that scenario, you can leave or you're --
12     A.  Well, I believe also --
13     Q.  Or she was told to leave?
14     A.  I believe what also was communicated was, you
15  need to -- you need to get this cleaned up if these
16  restrictions -- you need to provide updated or
17  different medical because there's certainly a conflict
18  here.
19     Q.  So, on December 24th, the gist of the -- there
20  was a meeting between Ms. Van Istendal and Ms. Wilson,
21  I take it?
22     A.  I believe that's correct.
23     Q.  And the outcome of that was we are not going to
24  let you continue to work under your current

Page 17

1   restrictions?
2      A.  Correct.
3      Q.  Correct.  And you need to either come back to
4   us with more medical information, and until you do,
5   you're off the clock, so to speak?
6      A.  Or you may take leave.
7      Q.  You can take leave, but we don't want you
8   working?
9      A.  That's correct.
10     Q.  Is that correct?
11     A.  We are not going to permit you to work until we
12  get this cleared up.  You need to take leave.
13     Q.  Okay.
14         (Discussion off the record.)
15         (Pause.)
16  BY MR. BERNSTEIN:
17     Q.  Do you know whether or not that action sending
18  Ms. Wilson home resulted in any sort of grievance that
19  was filed on the part of the Union?
20     A.  I know it did.
21     Q.  It did?
22     A.  Yes, it did.
23     Q.  And do you know what that grievance was or what
24  the Union was trying to do?

5 (Pages 14 to 17)

Page 18

1  A. I do.
2  Q. What was that?
3  A. The grievance said that we had violated the
4  contract, the collective bargaining agreement by
5  not -- by not allowing Ms. Wilson to work subsequent
6  to 12/24 until she had cleared up the medical issues,
7  medical conflicts.
8  MR. BERNSTEIN: Have this marked as
9  Keen 2.
10  (Keen Deposition Exhibit 2 was marked for
11  identification.)
12  BY MR. BERNSTEIN:
13  Q. Mr. Keen, I'm showing you what's been marked as
14  Keen 2. It's also identified as Bates stamp MW 0938
15  through 0941 for the record. That's at the bottom.
16  A. I see.
17  Q. And this appears to be a document from you to a
18  Courtland Stinson, is that correct?
19  A. Yes.
20  Q. Now, who is Mr. Stinson?
21  A. Mr. Stinson is the vice-president of the
22  American Postal Workers Union, Wilmington, Delaware,
23  Local.
24  Q. Is he kind of your counterpart in the Union

Page 19

1  or --
2  A. He is an officer of the Union.
3  Q. Do you regularly send him materials like this
4  concerning the Postal Service's position with respect
5  to a grievance?
6  A. Either myself or a member of my staff, yes.
7  Q. And this particular document, Keen Number 2, is
8  dated February 3rd, 2004, and does this document
9  relate to the Postal Service's action in sending
10  Ms. Wilson home until she can get her medical
11  restrictions clarified and the Union's action in
12  filing a grievance over that?
13  A. That's correct.
14  Q. And I'm not going to ask you to go through this
15  document. It speaks for itself, but could you tell me
16  just generally the purpose of your sending this
17  particular document to Mr. Stinson?
18  A. Our collective bargaining agreement has certain
19  bargained for steps in the adjudication of a grievance
20  filed. The Union filed a grievance. I met with
21  Mr. Stinson to discuss the issue at what is known as
22  step 2 of our grievance procedure.
23  Q. That's a face-to-face?
24  A. That's correct.

Page 20

1  Q. Or on the phone?
2  A. This was face-to-face.
3  Q. Okay.
4  A. And I am required to provide a written response
5  in regard to the union's contentions and this is that
6  written response.
7  Q. Now, do you know whether this kind of a step 2
8  letter -- would that be fair to say?
9  A. It is known as --
10  MS. HANNIGAN: Wait until he finishes the
11  question before you answer it, please.
12  Q. Go ahead.
13  A. This is known as a step 2 answer.
14  Q. Now, what happened with this grievance after
15  you submitted this step 2 answer, if you know?
16  A. I believe the Union appealed this to step 3 of
17  the grievance arbitration procedure.
18  Q. And what is step 3, can you just generally
19  describe what happens at step 3?
20  A. Two other folks would look at the issue and
21  have a meeting about it, and discuss.
22  Q. Now, would those be people on the Postal
23  Service side or higher up on the food chain than you?
24  A. That's usually correct.

Page 21

1  Q. Who would that be in this particular case, if
2  you know?
3  A. I don't know for sure.
4  Q. Do you know the ultimate outcome or resolution
5  of this particular grievance?
6  A. I believe -- I don't know for certain. I
7  believe it to be pending an arbitration hearing.
8  Q. You're sure it wasn't resolved?
9  MS. HANNIGAN: Objection to the form of
10  the question. He just testified he didn't know for
11  sure.
12  Q. You don't know for sure?
13  A. I'm not certain.
14  Q. Do you know whether or not Ms. Wilson went back
15  to work in either February or March of 2004?
16  A. I know that she did go back to work.
17  Q. Do you know what the circumstances were that
18  she went back to work?
19  A. I do.
20  Q. What were they?
21  A. Ms. Wilson provided additional medical
22  information documentation, and subsequent to that,
23  Ms. Wilson was sent a notice to return to duty.
24  Q. And she did so?

6 (Pages 18 to 21)

Page 22

1   A. She did.
2   Q. Now, during this time that Ms. Wilson was off
3   work, do you know whether or not she was working at
4   Boscov's?
5   A. I don't recall. I don't know.
6   Q. I'm talking about January 2004, February 2004?
7   A. I don't recall.
8   Q. You don't know. Okay.
9       With respect to your initial concern about
10  Ms. Wilson possibly working hours at Boscov's when she
11  was on duty at the Postal Service, do you know whether
12  that issue was addressed by Ms. Van Istendal in
13  December when she told Ms. Wilson she needed to go
14  home?
15  A. Ask me that again, please.
16  Q. You had two concerns about Ms. Wilson's work at
17  Boscov's. One was -- I want to call it physical
18  limitations conflict. Okay?
19  A. Yes.
20  Q. Do you know what I'm talking about?
21  A. I do.
22  Q. And the second concern was working hours at
23  Boscov's that might have conflicted with her work
24  hours at the Postal Service?

Page 23

1   A. That's correct.
2   Q. So we are going to call that the hours
3   conflict. Okay?
4   A. Very good.
5   Q. And do you know whether or not the hours
6   conflict was addressed in December 2003 or not?
7   A. I know that Ms. Van Istendal attempted to get
8   that information from the manager she spoke with at
9   Boscov's, and the response from Boscov's was that they
10  would not provide that information, the specific work
11  hours, absent a subpoena, I believe.
12  Q. So Boscov's says, "We are not going to give you
13  specific work hours," correct?
14  A. That was correct.
15  Q. Now, from your side, you certainly had the
16  ability to find out what hours Ms. Wilson was assigned
17  to work at the Postal Service and whether she, in
18  fact, worked those hours?
19  A. Yes.
20  Q. Would that be fair?
21  A. Yes.
22  Q. You all keep attendance records and things like
23  that?
24  A. Yes.

Page 24

1   Q. You looked into that or told somebody else to
2   look into that or not?
3   A. I do know that Ms. Drummer or Ms. Van Istendal
4   had looked at that information in the month of
5   December.
6   Q. But they didn't know, according to you, the
7   other side when she was working at Boscov's?
8   A. I don't think they knew with specificity.
9       MR. BERNSTEIN: Okay. Next document,
10  Keen 3.
11      (Keen Deposition Exhibit 3 was marked for
12  identification.)
13  BY MR. BERNSTEIN:
14  Q. You have Keen Number 3 in front of you?
15  A. I do, sir.
16  Q. Now, could you tell me, this, again, appears to
17  be a step 2 letter, correct?
18  A. It does. May I review it for a moment, please?
19  Q. Sure. Take your time.
20  A. Okay.
21  Q. As I understand it, this has to do with a
22  grievance concerning a sexual harassment claim that
23  Ms. Wilson had filed, is that correct?
24  A. No.

Page 25

1   Q. It's not? Tell me what it is.
2   A. This grievance was about union representation.
3   Q. Did this grievance have anything to do with the
4   issue of Ms. Wilson's physical limitations or time
5   limitations as we described before?
6   A. No.
7   Q. Do you know if this grievance was ever
8   resolved?
9   A. I cannot say with certainty, but again, I
10  believe that this is also pending an arbitration
11  hearing.
12      MR. BERNSTEIN: And just for the record,
13  Keen 3 is MW 0954 through 956.
14      (Keen Deposition Exhibit 4 was marked for
15  identification.)
16  BY MR. BERNSTEIN:
17  Q. I'm showing you Keen Number 4, which is also
18  MW 0933 and 0934.
19  A. I have it.
20      (Pause.)
21  Q. Okay?
22  A. Yes, sir.
23  Q. Are you familiar -- you just spent the last
24  couple minutes reading Keen 4 over?

Page 26

1  A.  That's correct.
2  Q.  Now, this is another step 2 letter?
3  A.  Yes.
4  Q.  And this appears to concern a grievance filed
5  by the Union over the issue of Ms. Wilson being sent
6  home on December 24th, would that be fair to say?
7  A.  Yes.
8  Q.  And on page 933, the large paragraph there, it
9  appears to state management's position with respect to
10 this grievance?
11 A.  Correct.
12 Q.  And on the following page 934, beginning with
13 the second paragraph, you tried to summarize the
14 Union's position?
15 A.  Which paragraph, please?
16 Q.  Second and third paragraph.
17     Or you're trying to refute their position.
18 Let's put it that way.
19 A.  That's correct.  These are responses.  In the
20 first case, response to a contended violation of
21 article 10; the second, a contended violation of
22 article 19.
23 Q.  Do you know the outcome of this particular
24 grievance?

Page 27

1  A.  I do not with certainty, but again, I believe
2  that this grievance is still pending arbitration.
3     MR. BERNSTEIN:  Okay.  Next one.
4     (Keen Deposition Exhibit 5 was marked for
5  identification.)
6  BY MR. BERNSTEIN:
7  Q.  You're now looking at Keen Number 5, which is
8  also MW 0929 through 0932?
9  A.  Yes.
10 Q.  Are you familiar with this document?
11 A.  I am.
12 Q.  This is another step 2 letter?
13 A.  Yes.
14 Q.  And this letter concerns the notice of removal
15 that was sent to Ms. Wilson in March, March 24th,
16 2004?
17 A.  Yes.
18 Q.  Now, are you familiar with that notice of
19 removal?
20 A.  Yes.
21 Q.  Would you like to look at that to refresh your
22 recollection?
23 A.  If you're going to ask me questions about it.
24 Q.  Yeah.  I'm going to ask you some questions.

Page 28

1  Let me take a moment to find it.
2     (Keen Deposition Exhibit 6 was marked for
3  identification.)
4  BY MR. BERNSTEIN:
5  Q.  Mr. Keen, you're now looking at a document
6  dated March 24, 2004, entitled notice of removal, and
7  it is MW 0035 through MW 0037.
8  A.  Yes.
9  Q.  Now, let's talk about the notice of removal
10 first.  Did you play any role in preparing this?
11 A.  Yes.
12 Q.  What role did you play?
13 A.  I believe I wrote it.
14     MS. HANNIGAN:  Objection to the form of
15 the question.  "Preparing this."  What "this" are we
16 talking about?
17     MR. BERNSTEIN:  I'm sorry.  This document.
18     MS. HANNIGAN:  Not the notice of removal
19 itself, but this document?
20     MR. BERNSTEIN:  The notice of removal.
21     MS. HANNIGAN:  Okay.  Sorry.
22 BY MR. BERNSTEIN:
23 Q.  Even though it's signed by Ms. Drummer and
24 Ms. Van Istendal, you're the person who authored it?

Page 29

1  A.  I drafted this at their request.
2  Q.  Now, at the time you drafted this notice of
3  removal, what other additional information had you
4  received between late December 2003, when we were
5  talking about the physical limitations issue and the
6  time limitations issue and when you drafted this, what
7  else had you gotten?
8  A.  The supervisor and the MDO, manager of
9  distribution operations, Ms. Van Istendal, had
10 received in the interim -- I believe they had
11 retrieved -- they had gone back and pulled some
12 medical documentation.  They had received an
13 investigative memorandum from the U.S. Postal
14 Inspection Service.  They had received -- incorporated
15 therein was information from the Boscov folks.  They
16 had interviewed Ms. Wilson again relative to the
17 incident cited in the removal.
18 Q.  Now, I want to ask you to turn to page 0036,
19 and at the very bottom there are some citations to the
20 employee and labor relations manual, and I guess a
21 shorthand for that is ELM, is that correct?
22 A.  That's correct.
23 Q.  And there are several sections cited.  The
24 first section cited is 513.312.  And that states, "An

8 (Pages 26 to 29)

Page 30

1  employee who is in sick-leave status may not engage in
2  any gainful employment unless prior approval has been
3  granted by the appropriate authority."
4         And then it says, "See 661 code of ethical
5  conduct?"
6         Now, I take it this particular provision
7  in the ELM says if you're on sick leave. You can't
8  work any place else, in so many words, without
9  permission, is that correct?
10  A. Yes.
11  Q. Do you know whether or not Ms. Wilson was on
12  sick-leave status when she was working someplace else?
13  And I assume we are talking about Boscov's here?
14  A. Yes.
15  Q. She was.
16         Let me take a little tangent here.
17  Sick-leave status refers to employees asking for time
18  off due to illness?
19  A. Is that a question?
20  Q. Yes. Well, it was meant as a question.
21  A. Ask me again, please.
22  Q. Why don't you tell me in your own words your
23  interpretation of what sick-leave status is for
24  purposes of ELM 513.312.

Page 32

1  A. That's correct.
2  Q. Or I can be covered by the Family Medical Leave
3  Act even though I personally am not ill?
4  A. Correct.
5  Q. Correct?
6  A. Yes.
7  Q. Now, does ELM 513.312, when it refers to
8  sick-leave status, cover any kind of sick-leave status
9  whether it's under FMLA or not, or does it just refer
10  to sick-leave status in your interpretation?
11  A. It says what it says.
12  Q. And the reference to 661, code of ethical
13  conduct, does that refer to sick-leave status or the
14  appropriate authority, or you don't know?
15  A. Could you point me to the reference, please.
16  Q. Okay. It's on page 0036.
17  A. Oh, I'm sorry. In the parentheses there?
18  Q. Yeah. Do you know what that is?
19  A. The code of ethical conduct?
20  Q. Yeah.
21  A. I do. I do not have it memorized.
22  Q. There's some document --
23  A. There is.
24  Q. -- that exists? Okay.

Page 31

1  A. Okay. Sick leave is defined by the same
2  manual. Although I cannot quote it directly, I will
3  tell you generally, an employee who is incapacitated
4  for duty is entitled to use the benefit of sick leave.
5  Q. There is any definition in the manual or
6  regulations between sick-leave status and leave, for
7  example, under the Family Medical Leave Act?
8  A. Yes.
9  Q. What's the difference?
10  A. The sick leave is a leave type, family and
11  medical leave is a leave designation.
12  Q. Well, I guess you're going to have to translate
13  that for me. How does it differ substantively?
14  A. Okay. Substantively, there are leave types in
15  the Postal Service system whereby employees take time
16  off from work whether that be in a paid status or a
17  non-paid status. Any or all of those leave types
18  could also be designated as protected under the Family
19  Medical Leave Act, depending on the nature of absence.
20  Q. So I can be on sick leave and also be covered
21  by the Family Medical Leave Act?
22  A. That's possible, yes. Yes.
23  Q. And I can be on sick leave and not be covered
24  by the Family Medical Leave Act?

Page 33

1         Is there a procedure for an employee who
2  wants to work outside employment while they are on
3  sick-leave status to get approval for that?
4  A. They would need to request approval through
5  their manager and through appropriate channels.
6  Q. Is there some form for that, if you know?
7  A. Not to my knowledge.
8  Q. Now, turning back to MW page 36, the second
9  citation there is to ELM 661.42, and that appears to
10  prohibit outside employment or other outside activity
11  that's not compatible with the full and proper
12  discharge of duties and responsibilities of post
13  office employment.
14         Can you describe factually how you
15  contended Ms. Wilson violated that particular section
16  of ELM? What did she do, in other words?
17  A. You're asking my opinion?
18  Q. You cited this. So what I'm asking you is, you
19  must have had some conduct or misconduct in mind when
20  you cited this, and I just want to know what it was?
21  A. Okay. In my opinion, her -- Ms. Wilson's
22  employment at Boscov's was not compatible with the
23  full and proper discharge of the duties and
24  responsibilities of Postal Service employment.

9 (Pages 30 to 33)

Page 34

1    Q.  In what way?  I mean, Boscov's doesn't compete
2    with the Postal Service, do they?
3    A.  Not to my knowledge.
4    Q.  How was it incompatible?
5    A.  In Ms. Wilson's case, there were a number of
6    occasions where she had reported out sick for the
7    Postal Service and subsequently reported for duty at
8    Boscov's.  I believe on one occasion she had reported
9    out sick for the post office and then went immediately
10   over to Boscov's and began working.
11   Q.  So is there anything else you want to add to
12   support that particular violation?
13   A.  I do not.
14   Q.  The next section you cited as a grounds for
15   removal is section 666.2, and that reads, "Employees
16   are expected to conduct themselves during and outside
17   of working hours in a manner which reflects favorably
18   upon the Postal Service."  And then it says, "Although
19   it is not the policy of the Postal Service to
20   interfere with the private lives of employees, it does
21   require postal personnel be honest, reliable,
22   trustworthy, courteous, and of good character and
23   reputation, and employees are expected to maintain
24   satisfactory personal habits as not to be obnoxious or

Page 35

1    offensive to other persons or create unpleasant
2    working conditions."
3            And my question with respect to section
4    666.2 is, can you tell me in your mind what conduct or
5    misconduct by Ms. Wilson violated section 666.2?
6    A.  I believed her behavior to be improper, her
7    conduct to be improper under these for the reasons
8    I've already said:  for reporting out sick for the
9    Postal Service and on the same days reporting to work
10   at Boscov's, and on at least one occasion for leaving
11   the Postal Service and reporting to Boscov's -- on
12   sick leave and then reporting directly to Boscov's.
13   Q.  Now, in recommending that Ms. Wilson be removed
14   from the Postal Service, was there anything else that
15   you would have used or did use to justify her removal?
16   A.  I don't believe I said that I recommended she
17   be removed from the postal service.
18   Q.  Well, you drafted this letter?
19   A.  I did.
20   Q.  Right.  And what's it say?
21   A.  It says what it says.
22   Q.  Did you recommend she be removed?
23   A.  It's not myself decision to make.  It's not my
24   recommendation.

Page 36

1    Q.  Did anyone else have any input into this?
2    A.  This was the decision of Ms. Drummer concurred
3    on by Ms. Van Istendal.
4    Q.  Did Ms. Drummer ask you to draft a removal
5    letter?
6    A.  She did.
7    Q.  Did Ms. Van Istendal concur with that?
8    A.  She did.
9    Q.  For example, if you're sending a employer
10   removal letter and one of the things that you're
11   relying on would be prior disciplinary actions against
12   that employee as grounds for removal, would that be
13   cited in the removal letter or not?
14   A.  Generally, yes.
15   Q.  Was that cited in here?
16   A.  There are no prior actions cited in this
17   letter.
18   Q.  Does the collective bargaining agreement, if
19   you're going to rely on prior disciplinary actions,
20   require that those be set out?
21   A.  Yes.
22   Q.  Take a moment and just go through.
23       (Pause.)
24       MR. BERNSTEIN:  If you bear with me a few

Page 37

1    more minutes, we are going to be done soon.  Okay?
2        THE WITNESS:  Very good.
3    BY MR. BERNSTEIN:
4    Q.  I'm just going to show you some things, and I'm
5    looking for Bates stamps on these.  They don't have
6    them.
7        I'm looking for them, but the only thing
8    on there -- I'm not sure where these came from.  These
9    don't have Bates stamps on them.  Do you see one?
10       MS. HANNIGAN:  Well, let's go off the
11   record.
12       (Discussion off the record.)
13   BY MR. BERNSTEIN:
14   Q.  I'm going to show you something at the top.  It
15   says, "Employee Everything Report."  Do you know what
16   that is?
17   A.  I do.
18   Q.  Tell me what that is.
19   A.  This is a computer print-out of the employee's
20   activities in using our electronic time system.  This
21   is essentially a time-card punch record.
22   Q.  And at the top it would -- kind of
23   self-explanatory.  Start in.  Begin tour.  End tour.
24   That sort of thing.  Okay.

10 (Pages 34 to 37)

Page 38

1      And do you know whether these Employee
2 Everything Reports for Ms. Wilson were relied on in
3 determining whether she was supposed to be working at
4 the Postal Service and when she actually did work at
5 the Postal Service during these alleged overlaps with
6 Boscov's?
7    A.   I'm sure they were.
8    Q.   The next document I'm showing you, it doesn't
9 have a Bates stamp number and there are several pages.
10 I'm just going to show you one page. And it appears
11 to be a comparison of hours at the Postal Service and
12 hours at Boscov's. And there are a number of --
13      MS. HANNIGAN: Similar documentation
14 appears Bates numbered beginning 0346.
15      MR. BERNSTEIN: I don't know why these
16 aren't stamped.
17      MR. LEFF: Probably came from the Union's
18 grievance file.
19      MR. BERNSTEIN: I'm just going to call
20 this -- looks like a comparative time spread sheet.
21 BY MR. BERNSTEIN:
22    Q.   Have you ever seen that form before?
23    A.   Yes.
24    Q.   And can you tell me what that is, and if you

Page 39

1 know, how it was compiled?
2    A.   This is part of the U.S. Postal Inspection
3 Service investigative memorandum report.
4    Q.   This would have been something that was
5 generated by the Postal Service inspector who handled
6 this case?
7    A.   That's correct.
8    Q.   This was something that was provided to you
9 prior to your decision or Postal Service's decision to
10 remove Ms. Wilson?
11    A.   Yes.
12    Q.   Something you relied on?
13    A.   I think so, yes.
14      MS. HANNIGAN: Let me mark that for the
15 record.
16      MR. BERNSTEIN: You want to make an extra
17 copy of this one? You know, just copy for the record,
18 if you want, show what it is.
19      MS. HANNIGAN: Just the cover page?
20      MR. BERNSTEIN: Yeah. Show what it is.
21 I'm just trying to figure out what those things are.
22      You may want to do the same thing with
23 that other one we did, the first one, the everything
24 thing.

Page 40

1      MS. HANNIGAN: Thanks.
2      (Pause.)
3      MR. LEFF: So we are making that
4 everything report 7 and comparison 8?
5      MR. BERNSTEIN: Yeah. Just the first
6 page. I'm not putting them all in.
7      (Keen Deposition Exhibits 7 and 8 were
8 marked for identification.)
9      MR. BERNSTEIN: Okay. That's it.
10      MS. HANNIGAN: Nothing from me.
11      MR. LEFF: I actually have a few
12 questions, if you don't mind, Mr. Keen. Promise to
13 make it short.
14      THE WITNESS: May I have a moment, please?
15 May I speak outside?
16      MS. HANNIGAN: Certainly. We can't talk
17 about the substance of your testimony, but...
18      THE WITNESS: I won't talk about the
19 substance.
20      MS. HANNIGAN: Is that all right?
21      MR. BERNSTEIN: I take your word for it.
22      (Pause.)
23      MS. HANNIGAN: Back on the record. The
24 witness had a question about the status of the union

Page 41

1 relative to the Postal Service.
2      MR. BERNSTEIN: Okay.
3          EXAMINATION
4 BY MR. LEFF:
5    Q.   Mr. Keen, this is Peter Leff. I'm counsel for
6 the Union.
7      You may have stated it, but how many years
8 have you been a labor relations representative for the
9 Postal Service approximately?
10    A.   Seven.
11    Q.   Seven years. In your experience or maybe not
12 even experience, but do you know, do removal
13 grievances take priority over other grievances such as
14 contract interpretation grievances and lower level
15 disciplinary grievances?
16      MS. HANNIGAN: Objection to the form of
17 the question. I don't understand what you mean by
18 priority. Maybe the witness does, and he can answer
19 it if he does.
20    Q.   Scheduling priority?
21    A.   They do.
22    Q.   Can you look at your exhibit number 2, please,
23 sir?
24    A.   I have it.

11 (Pages 38 to 41)

Page 42

1   Q.   Great. Just to bring us back up, am I correct
2   that your testimony was that your understanding of
3   this grievance was it was a Union challenge to the
4   Postal Service decision to not allow Ms. Wilson to
5   work until she provided updated medical documentation?
6   **A.   Correct. That they would no longer honor her**
7   **medical restrictions and her current limited duty job**
8   **offer.**
9   Q.   Based on your experience as a labor
10  representative, in your opinion, was the Union using
11  its best efforts? In your dealing with the Union, was
12  the Union using its best efforts to try to prevail on
13  the grievance?
14      MS. HANNIGAN: Objection to the form of
15  the question. You're asking his opinion?
16      MR. LEFF: In his dealings with the Union
17  on this grievance, based on his experience, did he
18  have any sense that -- was it his sense in dealing
19  with unions that the Union was using its best efforts
20  to prevail on this grievance.
21      MS. HANNIGAN: So it's his opinion?
22      MR. LEFF: Yes, his opinion.
23      MS. HANNIGAN: He can answer it.
24  **A.   In my opinion they put a vigorous -- vigorous**

Page 43

1   **efforts into the grievance.**
2   Q.   Thank you, sir.
3       Turning to your exhibit number 3, you
4   testified that this was a grievance over a
5   representation issue, is that correct?
6   **A.   Yes.**
7   Q.   Again, let me ask a preliminary question.
8   Melinda Wilson's name is listed in this step 2 letter.
9   Do you know, was the basis of the Union's grievance
10  something that happened to Ms. Wilson with respect to
11  representation that the Union believed violated the
12  contract, was that your understanding?
13  **A.   Ask me that again, please.**
14  Q.   I guess I just want to clarify, was it your
15  understanding that the Union filed a grievance on the
16  basis of a representation issue involving Melinda
17  Wilson, at least in part?
18  **A.   The Union filed a class action grievance and**
19  **cited the occurrence involving Ms. Wilson as part of**
20  **their class action grievance.**
21  Q.   Okay. Thank you for clarifying that.
22      Again, based on your experience and your
23  dealing with the Union on this grievance, did you get
24  any sense or, in your opinion, was the Union not using

Page 44

1   its best efforts to try to prevail on this grievance?
2   **A.   Again, I believe -- my recollection is the**
3   **Union put forth a vigorous pursuit of the grievance.**
4   Q.   Thank you.
5       Turning to exhibit number 4, is it
6   accurate to say that, in your opinion, the grievance
7   that was filed with respect to exhibit 4 was
8   repetitive to an earlier grievance that the Union
9   filed?
10  **A.   That was my contention, yes.**
11  Q.   And again, was the underlying issue in this
12  grievance, at least to your understanding, not
13  allowing Melinda Wilson to return to duty until she
14  presented updated medical information and
15  restrictions?
16  **A.   That's correct.**
17  Q.   Turning your attention to exhibit 5, sir, as a
18  predicate, this was a grievance that the Union filed
19  challenging the issuance of a notice of removal to
20  Melinda Wilson, is that correct?
21  **A.   That is correct.**
22  Q.   Again, based on your experience, did you have
23  any sense that the Union was not using its best
24  efforts to try to prevail on this grievance and

Page 45

1   prevail on bringing Ms. Wilson back to work?
2   **A.   Again, I thought they put forth vigorous**
3   **pursuit of the grievance.**
4   Q.   I want to turn your attention to paragraph 3,
5   there's a line in there near the bottom of that
6   paragraph that says, "The Union's contention that the
7   14-day period only began on 4/6/04."
8   **A.   I'm sorry. Stop, please. Point that to me**
9   **again.**
10      MS. HANNIGAN: Here.
11      THE WITNESS: Thank you.
12  BY MR. LEFF:
13  Q.   It says, "Union contention that the 14-day
14  period only began on 4/6/04 when Ms. Wilson signed for
15  the certified letter is rejected."
16      Was it your understanding that, with
17  respect to this grievance, that the Union was arguing
18  that the time limits for filing the grievance began
19  when Ms. Wilson signed for the certified letter?
20  **A.   Yes. That was the argument made.**
21  Q.   And is it your understanding that the Postal
22  Service's argument with respect to the timeliness of
23  the grievance was the time limit for the grievance
24  began when both the notice of certified letter and I

12 (Pages 42 to 45)

Wilson
v.
American Postal Workers Union
Andrew Keen
C.A. # 05-073 JJF
October 6, 2005
Case 1:05-cv-00073-JJF     Document 34-4     Filed 02/23/2006     Page 52 of 64

Page 46

1  guess the letter -- let me back up. Let me strike
2  that question for a minute.
3       Do you recall that the Postal Service sent
4  the notice of removal to Ms. Wilson both by certified
5  mail and by regular mail?
6  **A. I do.**
7  Q. Turning to the argument of the Postal Service
8  on the timeliness issue, am I correct in saying that
9  the Postal Service's argument that the time limits for
10 filing the grievance began when the notice of the
11 certified letter and the regular mailer were slotted
12 in Ms. Wilson's home or personal mail box?
13 **A. The following day.**
14 Q. The following day?
15 **A. Yes, sir.**
16 Q. And that, if I recollect, that was about a
17 five- to seven-day difference in time, do you recall?
18      MS. HANNIGAN: Objection to the form of
19 the question. Difference between what and what?
20 Q. The slotting of the regular mail letter and the
21 certified notice and the signing of the certified
22 letter, if you recall?
23 **A. Reading from Exhibit 5, it tells me that the**
24 **slotted notice of delivery of first class was**

Page 47

1  **accomplished at 1:21 p.m. on March 30th of '04, and**
2  **that the notice for certified letter was left at that**
3  **same time and date and -- I'm sorry. Go ahead.**
4  Q. Turning back to the arguments that the Union
5  made in this grievance, do you recall that the Union
6  made both a number of procedural and substantive
7  arguments, do you recollect that?
8  **A. Ask that in another way, please. I don't**
9  **understand.**
10 Q. Fair enough. Procedural meaning processes that
11 need to be filed with respect to the timing of when
12 the discipline comes, the day in court, things of that
13 nature, and procedural meaning whether there was just
14 cause, whether there was progressive discipline,
15 whether ELM procedures were followed, things of that
16 nature. Did that clear it up?
17 **A. Yes. The Union made various arguments, both**
18 **procedural and substantive, as you defined it.**
19 Q. Am I correct that you were the arbitration
20 advocate for the Postal Service for the notice of
21 removal grievance?
22 **A. That's correct.**
23 Q. And Steve Collins, the president of the local
24 union was the arbitration advocate for the Union, is

Page 48

1  that correct?
2  **A. Yes, sir.**
3  Q. Turning your attention to the arbitration
4  hearing, do you recall -- let me ask this. Did you
5  call witnesses on the Postal Service's behalf?
6  **A. I did.**
7  Q. Do you recall that Steve Collins cross-examined
8  those witnesses?
9  **A. I do.**
10 Q. And did he cross-examine those witnesses?
11 **A. Yes, he did.**
12 Q. Do you recall whether Mr. Collins called
13 witnesses for the Union's behalf and asked that
14 witness or those witnesses questions?
15 **A. Yes.**
16 Q. And did he do that?
17 **A. Yes.**
18 Q. Do you recall whether Mr. Collins entered any
19 exhibits?
20 **A. Yes.**
21 Q. And did he enter any exhibits?
22 **A. Yes.**
23 Q. Do you recall whether Mr. Collins made
24 objections to exhibits that you wanted to introduce?

Page 49

1  **A. Yes.**
2  Q. And did he make such objections?
3  **A. Yes.**
4  Q. Do you recall that Mr. Collins submitted
5  arbitration awards to the arbitrator after the
6  hearing?
7  **A. Yes.**
8  Q. And did he submit such arbitration award?
9  **A. Yes.**
10 Q. Again, based on your experience as a labor
11 representative for the Postal Service, did anything
12 happen during that hearing where you would form an
13 opinion that the Union did not try to use its best
14 efforts to prevail on both the timeliness of the
15 grievance argument and the merits of the removal case?
16 **A. I thought the Union put a vigorous advocacy**
17 **effort forward.**
18      MR. LEFF: Thank you. I have no further
19 questions.
20      MS. HANNIGAN: Nothing.
21      MR. BERNSTEIN: Couple of follow-up
22 questions.
23
24

13 (Pages 46 to 49)

Page 50

1      EXAMINATION
2  BY MR. BERNSTEIN:
3      Q.  Mr. Keen, when a notice of removal is sent,
4  does the collective bargaining agreement specify how
5  that is to be delivered to the employee?
6      A.  It does not.
7      Q.  Are there any practices or procedures for doing
8  that?
9      A.  Generally, if the employee is at work, it will
10 be hand delivered.  If the employee is not at work, we
11 will send notices via first class mail and via some
12 form of trackable mail device, whether that be express
13 mail or certified mail or...
14     Q.  Is that just a practice in the Postal Service,
15 or is it codified anywhere?
16     A.  I don't -- if it is codified, I'm not aware of
17 it.  I would more aptly categorize that as a practice.
18     Q.  Is it a practice to also notify that
19 employees's union at or about the same time that the
20 notice of removal is sent to the employee?
21     A.  No.
22     Q.  It is not?
23     A.  No.
24     Q.  Does the collective bargaining agreement

Page 51

1  provide for time periods in which to file a grievance
2  concerning a notice of removal?
3      A.  Yes.
4      Q.  And is that specified in the collective
5  bargaining agreement?
6      A.  Yes.
7      Q.  And does the collective bargaining agreement --
8  for example, if a grievance is not timely filed in
9  management's opinion, does management reserve the
10 right to challenge the timeliness of the grievance?
11     A.  Yes.
12     Q.  Is there provision for waiving the timeliness
13 argument in the CBA?
14     A.  Ask me that again, please.
15     Q.  Is there any provision in the collective
16 bargaining agreement that says, for example, if you
17 don't raise a timeliness argument at a certain point,
18 you've waived it?
19     A.  Yes.
20     Q.  And do you know what section that is?  If you
21 don't, that's okay?
22     A.  Article 15.
23     Q.  I'm not trying to quiz you here.
24     A.  I couldn't tell you specificity.  I believe

Page 52

1  it's in article 15.
2      Q.  Now, when you get a grievance in response to a
3  notice of removal, is timeliness one of the first
4  things you look at?
5      A.  Yes.
6      Q.  Is that kind of a routine thing that you do?
7      A.  Yes.
8      Q.  In this particular case, Ms. Wilson's case, you
9  raised an objection to the timeliness of the grievance
10 filed by the Union, correct?
11     A.  Yes.
12     Q.  And at the arbitration hearing, you presented
13 evidence and authority about the time of delivery,
14 method of delivery, the date the Union responded,
15 correct?
16     A.  Yes.
17     Q.  And the arbitrator ruled that the grievance was
18 not timely filed, correct?
19     A.  Yes.
20         MR. BERNSTEIN:  That's all I have.
21         MS. HANNIGAN:  I do have one more then.
22         EXAMINATION
23 BY MS. HANNIGAN:
24     Q.  Was there other evidence, documentary evidence

Page 53

1  on which you relied in reaching a conclusion that the
2  grievance had not been timely filed?
3      A.  Yes.
4      Q.  What was that?
5      A.  One of the exhibits at the arbitration hearing
6  was documents from an EEO filing for Ms. Wilson
7  whereby she had claimed -- she asserted that she
8  received the notice on the 30th of March, I believe,
9  and also was verified that she had made a telephone
10 call the following day to investigate how to file an
11 EEO complaint.
12         MS. HANNIGAN:  I don't have anything else.
13         MR. BERNSTEIN:  Okay.  Do you want to
14 explain to Mr. Keen about waiving?
15         MS. HANNIGAN:  We'll read and sign,
16 please.
17         (Deposition ended at approximately
18 11:35 a.m.)
19
20
21
22
23
24

14 (Pages 50 to 53)

**UNITED STATES**
**POSTAL SERVICE** ®

| Report: | TAC500R3 | | | |
|---|---|---|---|---|
| YrPPWk: | 2003-25-2 to 2004-05-2 | Restricted USPS T&A Information | Date: | 02/24/04 |
| Fin. #: | 09-6821 | DELAWARE P&DF | Time: | 02:08 PM |
| YrPPWk: | 2003-25-2 | Employee Everything Report | Page: | 1 |
| Sub-Unit: | 0000 | Weekly | | |

| Pay Loc/Fin. Unit | 215 / 0000 | | | | Variable EAS | N | Annual Lv Bal. | | 60.01 | FMLA Hrs | 1598.55 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee ID | 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 | | | | Borrowed | N | Sick Lv Bal. | | 38.96 | FMLA Used | 223.51 |
| Employee Name | WILSON | | M  G | | Auto H/L | N | LWOP Lv Bal. | | 79.09 | SLDC Used | 00.00 |

| Job | D/A | LDC | Oper/Lu | RSC | Lvl | FLSA | Route # | Fin. # | Loaned Fin. # | Effective Start | Effective End | Begin Tour | End Tour | Lunch Amt. | 1261 Ind. | Schedule |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base | 11-0 | 1400 | 0430-00 | P0 | 05 | N | 000000 | 09-6821 | | 2003-25-2 | 2003-25-2 | 07.00 | 15.50 | 0.50 | N | S--TWTF |

**Processed Clock Rings**

**Saturday**

| | Base | | 05200: 006.00 | 05500: 002.00 | | | | |
|---|---|---|---|---|---|---|---|---|
| | EBR # | | | | | | | |
| 000-0000 | BT | 11/22 | 07.00 | 09-6821 | 0430-00 | 000000 | | |
| | | | | | | | 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 | 11/22 | 07.12 |
| 000-0000 | 05500 | 11/22 | 07.00 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | 08.00 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 | 11/11 | 09.33 (W)Ring Deleted From PC |
| 004-0101 | ET | 11/22 | 13.00 | 09-6821 | 0430-00 | 000000 | 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 | 11/14 | 09.70 |
| | | | | | | | | | 00.00 (W)NonScheduled End Tour |
| 000-0000 | 05500 | 11/22 | 13.00 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | 02.00 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 | 11/22 | 07.12 |
| | | | | | | | | | 00.00 |

**Tuesday**

| | Base | | 05200: 006.00 | 05500: 002.00 | 07000: 001.72 | | | |
|---|---|---|---|---|---|---|---|---|
| | EBR # | | | | | | | |
| 003-0101 | BT | 11/25 | 07.00 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | | | 00.00 |
| 000-0000 | 05500 | 11/25 | 07.00 | 09-6821 | 0430-00 | 000000 | 02.00 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 | 11/25 | 12.93 |
| 000-0000 | 05500 | 11/25 | 07.00 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | 08.00 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 | 11/11 | 09.33 (W)Ring Deleted From PC |
| 002-0101 | MV | 11/25 | 11.28 | 09-6821 | 6070-00 | 000000 | 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 | 11/14 | 09.68 |
| | | | | | | | | | 00.00 |
| 004-0101 | ET | 11/25 | 13.00 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | | | 00.00 (W)NonScheduled End Tour |
| | | | | | | | | | 00.00 |

**Wednesday**

| | Base | | 05200: 008.00 | 07000: 001.36 | | | | |
|---|---|---|---|---|---|---|---|---|
| | EBR # | | | | | | | |
| 000-0000 | 05500 | 11/26 | 07.00 | 09-6821 | 0430-00 | 000000 | 08.00 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 | 11/11 | 09.33 (W)Ring Deleted From PC |
| 003-0101 | BT | 11/26 | 07.04 | 09-6821 | 0430-00 | 000000 | 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 | 11/14 | 09.68 |
| 003-0101 | OL | 11/26 | 13.00 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | | | 00.00 |
| 003-0101 | IL | 11/26 | 13.42 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | | | 00.00 |
| 002-0101 | MV | 11/26 | 14.13 | 09-6821 | 6070-00 | 000000 | | | 00.00 |
| | | | | | | | | | 00.00 |
| 004-0101 | ET | 11/26 | 15.49 | 09-6821 | 0430-00 | 000000 | | | 00.00 |
| | | | | | | | | | 00.00 |

**Thursday**

| | Base | | 05800: 008.00 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | EBR # | | | | | | | |

**.Jay**

| | Base | | 05500: 008.00 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | EBR # | | | | | | | |
| 000-0000 | 05500 | 11/28 | 07.00 | 09-6821 | 0430-00 | 000000 | 08.00 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 | 11/11 | 09.33 |
| | | | | | | | | | 00.00 |

**Weekly Total**
Paid Hours :     Base        052: 020.00     055: 012.00     056: ...

A 000144

*DEPOSITION EXHIBIT*
Keen 7
a 10-6-05

Melinda Wilson

BOSCOV'S

USPS
PP 24-1 (Nov 1 - 7 2003)

**SATURDAY - 11/01/03**

Base                05200:  8.00        07000:  2.38

EBR #

003-0101    BT    MV                    07.05
002-0101    MV                          07.34
004-0101    OL                          09.72
004-0101    IL                          13.05
004-0101    ET                          13.51

TOTAL                                   15.50        10:44 am
                                                     2:52 pm
                          8 HOURS                    4.13 HOURS

**SUNDAY - 11/02/03**        Non-Scheduled

                             Begin
                             End

TOTAL                        0 HOURS

**MONDAY - 11/03/04**        Non-Scheduled

                             Begin
                             End

TOTAL                        0 HOURS

**TUESDAY - 11/04/03**

Base                05200:  8.00        07000:  1.84        3:13 pm
                                                            2:45 pm
EBR #                                                       6.24 HOURS

003-0101    BT                          6.96
002-0101    MV                          11.16
000-0000    OL                          13.00
001-0104    IL                          13.50
003-0101    MV                          14.06        4:59 pm
004-0101    ET                                       2:51 pm
                                                     4.86 HOURS

TOTAL                                   15.44

                          8 HOURS

02400 - AWOL
04300 - Penalty OT
05200 - Work Hours
05500 - Annual Leave
05699 - Sick Leave - FMLA
05800 - Holiday
06000 - LWOP - Full Day
07000 - Steward Duty Time



**EXHIBIT**
_eM#3_

**DEPOSITION
EXHIBIT**
_Sao8_
10-6-05
PENGAD-Bayonne, N.J.

A-000145

LI-ᴲ



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Wilson

## v.

# American Postal Workers Union

### C.A. # 05-073 JJF

---

### Transcript of:

### Linda Drummer

### October 6, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A- 000146

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MELINDA WILSON,                )
                                )
           Plaintiff,          )
                                )
v.                              ) Civil Action No.
                                ) 05-073 JJF
AMERICAN POSTAL WORKERS UNION,    )
Delaware Area Local AFL-CIO, and    )
UNITED STATES POSTAL SERVICE, an    )
independent establishment of the    )
Executive Branch of the Government   )
of the United States of America,     )
                                )
           Defendants.         )


          Deposition of LINDA DRUMMER taken pursuant
to notice at the offices of the United States
Attorney, 1007 Orange Street, Suite 700, Wilmington,
Delaware, beginning at 3:00 P.m. on Thursday, October
6, 2005, before Ann M. Calligan, Registered Merit
Reporter and Notary Public.


WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477

*A-000147*

Page 2

APPEARANCES:

    JOSEPH M. BERNSTEIN, Esquire
    800 North King Street - Suite 302
    Wilmington, Delaware 19801
    on behalf of the Plaintiff;

    PETER J. LEFF, Esquire
    O'DONNELL, SCHWARTZ & ANDERSON, P.C.
    1300 L Street, NW - Suite 1200
    Washington, D.C. 20005-4126
    on behalf of Defendant American Postal
    Workers Union;

    PATRICIA C. HANNIGAN, Esquire
    Assistant United States Attorney
    The Nemours Building
    1007 Orange Street - Suite 700
    Post Office 2046
    Wilmington, Delaware 19899-2046
    on behalf of Defendant United States
    Postal Services.

ALSO PRESENT:

    MELINDA WILSON

    STEVEN COLLINS

    ANDREW KEEN

Page 3

1          LINDA DRUMMER,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5         EXAMINATION
6  BY MR. BERNSTEIN:
7  Q.  Ms. Drummer, we were just introduced. My name
8  is Joe Bernstein. I'm an attorney. I'm representing
9  Melinda Wilson, and Ms. Wilson has filed a lawsuit
10  about her termination from employment which occurred
11  in March of 2004. And you've been identified as a
12  person who may have some information about that
13  lawsuit or the events leading up to that. And you're
14  here today so I can ask you some questions about that.
15      You're under oath, and I'm sure you've
16  talked with Ms. Hannigan and she's advised you what a
17  deposition is.
18  A.  Right.
19  Q.  Do you have any questions so far?
20  A.  No.
21  Q.  Have you ever given a deposition before?
22  A.  No.
23  Q.  First time. Okay.
24      First of all, can you tell me your

Page 4

1  educational background?
2  A.  I have a bachelor's degree.
3  Q.  When did you get your bachelor's degree?
4  A.  In '83.
5  Q.  What college?
6  A.  Delaware State University.
7  Q.  And you currently are employed with the Postal
8  Service?
9  A.  Yes.
10  Q.  How long have you been employed with the Postal
11  Service?
12  A.  Began in '88. It's about 17 years.
13  Q.  Do you have any other outside employment other
14  than Postal Service?
15  A.  No.
16  Q.  Have you ever had any outside employment?
17  A.  Yes, I have.
18  Q.  While you were with the Postal Service?
19  A.  Yes.
20  Q.  What was that?
21  A.  Working at amazon.com.
22  Q.  When did you work at amazon.com?
23  A.  Probably around 2001. About eight months.
24  Q.  Was that a job that you took to supplement your

Page 5

1  income?
2  A.  Yes.
3  Q.  And back in the fall of 2003 and early 2004,
4  what was your position with the Postal Service?
5  A.  Supervisor on day shift.
6  Q.  Is there a particular section or segment that
7  you supervise?
8  A.  Yeah. Flat sorter, primary section.
9  Q.  Flat sorter?
10  A.  Yes.
11  Q.  Can you speak up a little bit. I know you have
12  a soft voice. I want to make sure that the court
13  reporter can hear.
14      And how many employees work under your
15  supervision?
16  A.  About 25 to 30.
17  Q.  Now, did you work a particular shift?
18  A.  I work day shift.
19  Q.  What are the hours for day shift?
20  A.  Seven to three-thirty.
21  Q.  Seven to three-thirty. Okay.
22      And was Melinda Wilson one of the people
23  who worked day shift as a flat -- what did we call it
24  now?

2 (Pages 2 to 5)

Page 6

1   A.  Flat sorter.
2   Q.  Flat sorter?
3   A.  Yeah.  She got the job in June of 2002.
4   Q.  From 2002 up until the time that she left the
5   Postal Service, were you her immediate supervisor on
6   the day shift?
7   A.  While she was on the flat sorter, I did
8   everything, her time, attendance, and whatever she
9   needed.  After she left the flat sorter in October --
10  she still had the job, but she moved to a letter
11  sorting operation.
12  Q.  That was not under your supervision?
13  A.  It wasn't under my direct supervision, no.
14  Q.  Now, I want to turn your attention to -- let me
15  ask you this way.  Did there come a time when you
16  learned that Ms. Wilson had employment outside of the
17  Postal Service?
18  A.  Yes.
19  Q.  And do you know when that came to your
20  attention and how?
21  A.  Actually Melinda told me herself, and it was in
22  the fall.  It was in the fall of 2003.
23  Q.  How did it come about?
24  A.  General conversation.

Page 7

1   Q.  She told you, "Hey, I got a job at Boscov's"?
2   A.  Mm-hmm.
3   Q.  Did she seem pleased with the job?
4   A.  She seemed happy about it.
5   Q.  What kind of job?  What did she tell you about
6   the job?
7   A.  I believe she told me she was working as a
8   sales clerk.
9   Q.  I know Boscov's has a couple locations in New
10  Castle County.  Did she tell you where she was
11  working?
12  A.  I don't recall she told me where.
13  Q.  Did that employment with Boscov's raise any red
14  flags in your mind as a supervisor, or was it just
15  something you just kind of mentally filed away?
16  A.  Basically I mentally filed it away, yeah.
17  Q.  Did there come a time when you were shopping at
18  Boscov's and saw Ms. Wilson?
19  A.  Yes.
20  Q.  Can you tell me when that was?
21  A.  Probably November, December, sometime around
22  there.
23  Q.  Which Boscov's store was that?
24  A.  The store on 273.

Page 8

1   Q.  Did you have any conversations with her then?
2   A.  I stopped and spoke with her, yes.
3   Q.  Buy anything from her?
4   A.  No.
5   Q.  Did there come a time when Ms. Wilson's
6   employment at Boscov's became a concern of yours in
7   your capacity as her supervisor?
8   A.  It became a concern when I had -- I mentioned
9   it to my boss that, hey, I saw Melinda Wilson working
10  at Boscov's.
11  Q.  Who's your boss?
12  A.  Carla Van Istendal.
13  Q.  When was the occasion?  Was there something
14  that prompted you to mention this?
15  A.  No.  We were --
16  Q.  Do you remember how it came up?
17  A.  We were either getting ready to have our plan 5
18  meeting, which is our morning -- we have a morning
19  meeting and I just said, "Oh, by the way I saw Melinda
20  working at Boscov's."
21  Q.  What was Ms. Van Istendal's reaction to that?
22  A.  She said, was she working outside of her
23  restrictions?  She just asked me.
24  Q.  When you say working outside of restrictions --

Page 9

1   A.  Mm-hmm.
2   Q.  -- did you know what she was talking about?
3   A.  Yeah, I do.
4   Q.  What was she talking about?
5   A.  She was referring to the restrictions that had
6   been -- were on file at the post office for Melinda.
7   Q.  Were those restrictions something that you were
8   aware of?
9   A.  Yes.
10  Q.  Was that a concern of yours before she brought
11  it up?
12  A.  I hadn't thought about it.
13  Q.  Did she ask you to do anything at that point?
14  A.  I know she asked me to contact Shared Services,
15  which is a one of our departments that handles injury
16  and stuff like that.  I don't recall exactly what
17  happened after.
18  Q.  Did she ask you to find out any particular
19  information from Shared Services?
20  A.  Find out if she had a case on file.
21  Q.  I'm sorry?
22  A.  Find out if she had an active case on file.
23  Find out what her situation was.
24  Q.  Why is that significant, have an active case on

3 (Pages 6 to 9)

Page 18

1  physically at work to call in the 800 number and get a
2  computer-generated form like that, is it not?
3  **A.  They are at work?**
4  Q.  If I'm at work --
5  **A.  And you call from work --**
6  Q.  Yeah.
7  **A.  -- to the 800 number?**
8  Q.  Yeah.  I can do that, right?
9  **A.  Yes.**
10  Q.  If I'm at work, I can do either one or the
11  other?
12  **A.  Yes.**
13  Q.  But in any event, however the process starts,
14  whether it's a phone call or handwritten request, the
15  first line person who will get that and have some
16  discretion to grant it or deny it would be you?
17  **A.  Right.**
18  Q.  Correct? Okay.
19       Now, in November and December according to
20  that exhibit -- and that was Van Istendal Number 1 --
21  it appears that Ms. Wilson put in a number of sick
22  leave requests.  And I think they are all summarized
23  on the front page there.  And if you'd like to look at
24  them and compare the -- I think those are the forms

Page 19

1  for the dates that are on the front page.
2  **A.  Right.**
3  Q.  And you can look those through just to satisfy
4  yourself.  Is that correct?
5  **A.  Yes.**
6  Q.  Now, these requests are all -- the first one,
7  November 5th, it looks like two hours is requested?
8  **A.  Mm-hmm.**
9  Q.  And on November 5th, would it be fair to say
10  that you knew that Ms. Wilson was working at Boscov's
11  as of November 5th?
12  **A.  Yes.**
13  Q.  December 5th, request is for eight hours.  Did
14  you know that Ms. Wilson was working at Boscov's on
15  December 5th?
16  **A.  Yes.**
17  Q.  I mean, had a job there whether she worked that
18  particular day or not?
19  **A.  Right.  I assume she still was there, yes.**
20  Q.  Let me ask you this, just to interrupt, go off
21  on a tangent for a little bit here.  Did you know what
22  Ms. Wilson's hours at Boscov's were?
23  **A.  Specifically at this time, no.**
24  Q.  In November, December you did not know, but you

Page 20

1  knew she was working there?
2  **A.  Right.**
3  Q.  And for each one of these requests, they were
4  approved by you, is that correct?
5  **A.  I notified the one on the 5th was family**
6  **medical.  So I don't approve family medical.  Larry**
7  **Bucci does the family medical coordinator.**
8  Q.  I noticed a lot of these where it says type of
9  absence, some of them are checked off sick leave,
10  sick, and some other FMLA.  Is that appropriate to
11  check off more than one box on that form?
12  **A.  Yes.**
13  Q.  And who decides which boxes to check off on
14  that form?
15  **A.  The employee makes the request for the type of**
16  **leave.**
17  Q.  I think all of these FMLA is checked off?
18  **A.  Mm-hmm.**
19  Q.  Do you have authority to approve leave under
20  FMLA?
21  **A.  No.**
22  Q.  So if you get this sheet of paper and FMLA is
23  checked off, even though you approved it --
24  **A.  I notify it.**

Page 21

1  Q.  What do you do?
2  **A.  It gets sent to Larry Bucci.**
3  Q.  I'm sorry?
4  **A.  It gets sent to the family medical leave**
5  **coordinator.**
6  Q.  And is that something that's done right away or
7  is it something that's done by e-mail or --
8  **A.  No.**
9  Q.  -- physically how is that done?
10  **A.  The slip is physically put into a box that**
11  **Larry Bucci picks up.**
12  Q.  Daily?
13  **A.  Daily, weekly.**
14  Q.  Well, let's look at the first one that is, date
15  submitted, 11/5/03.  Two hours requested.  And it's
16  from 11/5, 1300 to 11/5, 1550.  So that would be three
17  o'clock in the afternoon to -- I think it's -- I'm
18  horrible on military time.
19  **A.  One to three-thirty.**
20  Q.  Okay.  One to three-thirty.
21       So it looks like -- it doesn't say what
22  time it was put in.  But obviously it was put in -- it
23  looks like it was granted the same day?
24  **A.  Well, Larry Bucci signed it 11/6.**

6 (Pages 18 to 21)

**Page 26**

1  she was working at Boscov's?
2  **A. I wasn't.**
3  Q.  Or what days?
4  **A. I wasn't.**
5  Q.  Was that something the postal inspector people
6  were asked to do?
7  **A. Yes.**
8  Q.  And did that information get back to you?
9  **A. It got back to me in February.**
10  Q.  In February?
11  **A. Mm-hmm.**
12  Q.  Now, at that time, as I understand it,
13  Ms. Wilson was still off, having been sent home
14  December 24th?
15  **A. She came back the beginning of February.**
16  Q.  Do you know the circumstances how she came back
17  in the beginning of February? She filed a grievance
18  about the December 24th being sent home, correct?
19  **A. Right.**
20  Q.  Do you know how it came about that she returned
21  to work in early February?
22  **A. Apparently Shared Services sent Carla**
23  **Van Istendal a letter -- information on the e-mail**
24  **that she was now -- they would offer limited duty.**

**Page 27**

1  Q.  Offer limited duty?
2  **A. Limited duty.**
3  Q.  So that's on-the-job injury --
4  **A. Right.**
5  Q.  -- type duty? Okay.
6      And the word came down to call her back?
7  **A. Right.**
8  Q.  To limited duty?
9  **A. Right.**
10  Q.  And did she come back?
11  **A. A few days after we sent the letter.**
12  Q.  And when she came back, did you express any
13  concern to Ms. Wilson about continuing to work at
14  Boscov's or working at Boscov's or did the subject
15  never come up?
16  **A. We were still waiting for the investigation,**
17  **so, no, I didn't say anything to her.**
18  Q.  So nothing was said?
19  **A. No.**
20  Q.  Now, did there come a time when the postal
21  investigation was completed?
22  **A. Yes.**
23  Q.  And do you know approximately when that was?
24  **A. Near the end of February.**

**Page 28**

1  Q.  And were you apprised of the results of that
2  investigation?
3  **A. Yes.**
4  Q.  And sitting here today, can you tell me what
5  the results were?
6  **A. They had done a lot of research on -- they had**
7  **completely gotten all the information from Boscov's,**
8  **all of her work hours, a copy of the application, the**
9  **duties of the job. It also outlined some of the past**
10  **history of what medical documentation had been**
11  **submitted prior to Melinda.**
12  Q.  And were there any discussions about possibly
13  taking some disciplinary action against Ms. Wilson as
14  a result of this employment at Boscov's?
15  **A. I was given the information. I reviewed it and**
16  **put together questions based on information and I held**
17  **a day in court with Melinda.**
18  Q.  Well, my question is -- let me ask you this.
19  You mentioned day in court. Who decides that a day in
20  court is going to be initiated?
21  **A. I believe the supervisor.**
22  Q.  Is that you?
23  **A. Yes.**
24  Q.  Did you consult with anybody prior to

**Page 29**

1  initiating that process?
2  **A. Not that I recall.**
3  Q.  Did you talk to Carla and say, hey, I want
4  to --
5  **A. Have a day in court?**
6  Q.  -- have a day in court on Melinda Wilson?
7  **A. It is possible we talked about it. I don't**
8  **have to talk to my boss. If there's an infraction, I**
9  **can schedule a day in court.**
10  Q.  You can do that on your own?
11  **A. Yes.**
12  Q.  Now, at the time there's this day in court,
13  have you formulated something in your own mind that
14  you want to find out about?
15  **A. I had questions I needed answers to that only**
16  **Melinda could answer based on the information that the**
17  **inspection service had come up with.**
18  Q.  Now, is a day in court something that you use
19  to decide whether anything else is going to happen?
20  **A. Yes.**
21  Q.  And is the employee told that --
22  **A. Yes.**
23  Q.  -- at the day in court?
24  **A. Yes.**

8 (Pages 26 to 29)

Page 30

1   Q.  Are they told you're considering firing them or
2  disciplining them?
3   **A.  In my day in court I typed out everything I was**
4  **going to say so that I wouldn't forget anything, and**
5  **the document is here somewhere.  And I've read it.**
6   Q.  I want to show it to you in just a minute.
7  Okay?
8   **A.  Okay.**
9        MR. BERNSTEIN:  Why don't we have this
10  document -- for the record, top page is MW 0038 and
11  0039, 0040, 41, 42, and 43.
12       MS. HANNIGAN:  That's being marked?
13       MR. BERNSTEIN:  MW 0038 to 43.
14       MR. LEFF:  Will it be Drummer 1?
15       MR. BERNSTEIN:  Yes.  Make this Drummer 1.
16       (Drummer Deposition Exhibit 1 was marked
17  for identification.)
18  BY MR. BERNSTEIN:
19   Q.  Take a look at Drummer Number 1, and my first
20  question is, is this the document that you prepared in
21  preparation for Ms. Wilson's day in court meeting?  Is
22  that what it is?
23   **A.  Yes.**
24   Q.  Would it be fair to call it a meeting?

Page 31

1   **A.  Yes.**
2   Q.  And your answer --
3   **A.  Yes.**
4   Q.  It is.  Okay.
5        Now, it looks like the first two pages of
6  this exhibit, I guess, are questions you wrote out --
7   **A.  Right.**
8   Q.  -- that you wanted to ask Ms. Wilson?
9   **A.  Right.**
10   Q.  Now, the third page of this document, is that
11  your handwriting?
12   **A.  No.  Those are not my notes.**
13   Q.  Whose handwriting is it?
14   **A.  Those are Carla Van Istendal.**
15   Q.  Did she attend the day in court meeting too?
16   **A.  Yes.**
17   Q.  Did she take notes?
18   **A.  Yes.**
19   Q.  And those are her notes?
20   **A.  Yes.**
21   Q.  And it looks like she wrote down answers?
22   **A.  Mm-hmm.**
23   Q.  Did you write down anything?
24   **A.  I did take my own notes, and I wrote down**

Page 32

1  **answers.**
2   Q.  Is that page 42 and 43?
3   **A.  It's not here.  My notes were submitted on a**
4  **copy of the questions.  I went and typed them after**
5  **the interview.  I typed them out.  So you should have**
6  **questions with typewritten notes.**
7   Q.  Okay.  I got that.  All right.
8        Why don't we have this one marked as
9  Drummer 2?  Before you do that, do you know who
10  page 42 and 43 -- looks like different handwriting
11  than 41 and 42.  Do you recognize that handwriting?
12   **A.  I'm assuming it's all Carla's.**
13   Q.  To me it looks different.  I don't know.  Maybe
14  it's the same.  Not a handwriting expert.
15        I don't know.
16       MS. HANNIGAN:  I don't know.
17       MR. BERNSTEIN:  Okay.  That's all right..
18       (Drummer Deposition Exhibit 2 was marked
19  for identification.)
20  BY MR. BERNSTEIN:
21   Q.  For the record, I'm showing you Drummer
22  number 2 which is also Bates stamped MW 762 through
23  0766.
24        Is Drummer Number 2 what you just referred

Page 33

1  to when you went back and --
2   **A.  Typed in.**
3   Q.  -- typed in the answers --
4   **A.  Yes.**
5   Q.  -- from your handwritten notes?
6   **A.  Yes.**
7   Q.  And that's the end product?
8   **A.  Yes.**
9   Q.  Now, this occurred on March 10th, correct?
10   **A.  Yes.**
11   Q.  Now, this day in court, is that something that
12  is in the collective bargaining agreement, has to be
13  done?
14   **A.  I'm not sure where it is.  I know we've been**
15  **instructed that, before we can consider anything, do**
16  **an investigation.**
17   Q.  Now, does Ms. Wilson in this case have a right
18  to representation?
19   **A.  Yes.**
20   Q.  And she's told that, and do you recall whether
21  there was a union rep --
22   **A.  Yes, there was.**
23   Q.  -- at the day in court --
24   **A.  Yes.**

9 (Pages 30 to 33)

**Page 34**

1   Q. -- meeting and that occurred on March 10th?

2   A. Mm-hmm.

3   Q. Correct? Okay.

4      Now, as a result of that meeting on March

5 10th, was there any change in Ms. Wilson's job status?

6 Was she sent home like happened on December 24th, or

7 was there anything that happened as a result of the

8 day-in-court meeting?

9   A. At the end of the day in court, I believe --

10 there are some notes here somewhere. I believe I

11 walked her out of the building.

12   Q. What did you tell her?

13   A. Don't come back. I told her we would get in

14 touch with her somehow, either by writing --

15   Q. You told her not to come back until you got in

16 touch with her, or someone?

17   A. I believe that was what happened.

18   Q. Is that something that you did on your own

19 accord, or was that something you were instructed to

20 do by somebody else?

21   A. To have her leave?

22   Q. Yeah.

23   A. It probably was advised that we should have her

24 leave.

**Page 35**

1   Q. Did Carla play a role?

2   A. Carla could, right. Right.

3   Q. Anybody else?

4   A. Not that I --

5   Q. Did you call anybody?

6   A. I didn't call anybody.

7   Q. Do you know if Carla did?

8   A. I don't know.

9   Q. And at the time she is asked to leave, did you

10 all take her i-d badge --

11   A. Yes.

12   Q. -- or keys or anything like that?

13   A. Yes.

14   Q. And was that a paid-leave status or unpaid

15 leave?

16   A. It was paid leave.

17   Q. Paid-leave status. Okay.

18      What was the next thing that happened

19 after March 10th?

20   A. I took that information that I received from

21 Melinda as well as what was given by the investigation

22 and made the decision to request removal.

23   Q. Did you send a memo to somebody?

24   A. To tell them what I decided?

**Page 36**

1   Q. Yes.

2   A. Yes.

3   Q. Who would that have gone to?

4   A. I provided a handwritten copy to the Union.

5   Q. How did you do that?

6   A. I probably walked it to their union office and

7 handed it to whoever was in there and asked them to

8 make sure it got to --

9   Q. When you say a handwritten copy?

10   A. I wrote out a note handwritten, "I have decided

11 to request removal."

12   Q. And you walked that over to --

13   A. The union office.

14   Q. Now, is there a union office right on the --

15   A. On the workman floor.

16   Q. -- on the work site, on the floor?

17   A. Yeah.

18   Q. Is somebody always there?

19   A. Most of the time.

20   Q. Did you get somebody to sign for that or

21 anything? Did you just drop it off to whoever is

22 there?

23   A. I believe whoever was in the office. I had it

24 in an envelope. I said, could you make sure this gets

**Page 37**

1 to, and I want to make sure this gets -- I think I

2 sent it to Pat McLaughlin who was the shop steward who

3 was in the day in court.

4   Q. After you did that, did you get any feedback

5 from the union rep, shop steward about this

6 handwritten note?

7   A. No.

8   Q. What was the next thing you did?

9   A. I got a copy of the discipline form that we

10 have and wrote up the case and sent it to labor

11 relations.

12   Q. Who would that have gone to?

13   A. That would have gone to Andy Keen.

14   Q. Did there come a time when either you or Carla

15 asked Andy Keen to help you prepare a removal letter?

16   A. Yes.

17   Q. How did that come about?

18   A. I believe -- well, Carla would have been the

19 one doing it. Probably gave her the packet to get to

20 him because he's in south Jersey. So it would have

21 either have had to be faxed or mailed.

22   Q. Did you get something back from Andy Keen?

23   A. Right. The official letter that was to be

24 issued.

10 (Pages 34 to 37)

Page 50

1  to request the removal of Ms. Wilson from postal
2  employment, is that correct?
3  **A.  Yes.**
4  Q.  Your decision to request removal of Ms. Wilson,
5  was that a final decision, meaning that that was a
6  decision that would go through no matter what, or was
7  that a decision that had to be reviewed and approved
8  by other people?
9  **A.  I made the final decision.**
10  Q.  Does that decision need a concurring official
11  approval?
12  **A.  The request form has to have a concurring**
13  **official.**
14  Q.  Is it true that a Postal Service employee
15  cannot be removed solely on your authorization,
16  meaning that, before an employee can be removed from
17  the Postal Service, you need to get another official,
18  typically your manager, to concur on that decision?
19  **A.  Right.**
20  Q.  So I'm correct when I ask that you have the
21  final authority, though you have the right to make the
22  decision to remove an employee, it is not final until
23  it is approved by your manager?
24  **A.  Right.**

Page 51

1  Q.  So when you stated that you notified the Union
2  of the decision to request removal on March 13, '04,
3  do you recall, had that decision been concurred with
4  yet by your supervisor?
5  **A.  No.  I hadn't filled out the documentation, the**
6  **paperwork.  I hadn't filled out the proper paperwork.**
7  Q.  You did that after the 13th?
8  **A.  After the 13th.**
9  Q.  And it is true hypothetically that, upon your
10  decision to remove an employee, that your supervisor
11  would decide, no, the removal is not appropriate, and
12  if the supervisor decided that, the employee actually
13  would not be removed, is that correct?
14  **A.  I've never seen a situation, but I would say**
15  **probably.**
16  Q.  It could happen?
17  **A.  Right.**
18  Q.  That's the need for the concurring official,
19  you assume?
20  **A.  Right.**
21  Q.  At the time you decided to request removal of
22  Ms. Wilson on March 13th, 2004, was Ms. Wilson
23  actually removed from the Postal Service, or did that
24  occur at a later date?

Page 52

1  **A.  Once she receives a notice, she's got 30 days**
2  **before it actually goes into effect.**
3  Q.  So once she receives the notice of removal, she
4  is removed, is that correct?
5  **A.  After 30 days.**
6  Q.  Okay.  I understand.
7      And Ms. Wilson, is it your understanding,
8  was sent the notice of removal at the end of March
9  2004?
10  **A.  Yes.**
11  Q.  Just so I understand the process, after March
12  13, 2004, you filled out the request for removal
13  paperwork, sent it to your supervisor,
14  Ms. Van Istendal.  Your understanding is she
15  concurred.  You received a blank notice of removal
16  back from labor relations?
17  **A.  Right.**
18  Q.  Reviewed it and signed it, is that correct?
19  **A.  Right.**
20  Q.  And then Ms. Van Istendal also signed off on
21  that notice of removal letter, is that correct?
22  **A.  She concurred, yes.**
23  Q.  And then did you send it out to Ms. Wilson or
24  did --

Page 53

1  **A.  I believe the secretary -- it had to go out**
2  **slotted and certified, and I believe the secretary**
3  **sent it out.**
4  Q.  That occurred after both you and
5  Ms. Van Istendal signed off on it?
6  **A.  Right.**
7  Q.  Do you know if an employee can grieve a removal
8  before receiving a notice of removal?
9  **A.  They have to receive it before they can grieve**
10  **it.**
11  Q.  So they receive the notice of removal and then
12  they have the right to grieve it?
13  **A.  Right.**
14  Q.  At the arbitration hearing regarding
15  Ms. Wilson's removal, you testified.  Was that as a
16  witness for the Postal Service?
17  **A.  I believe so.**
18  Q.  Do you recall that Steve Collins was the
19  Union's advocate?
20  **A.  Yes.**
21  Q.  Do you remember him cross-examining you, asking
22  questions?
23  **A.  Yes, he did.**
24      MR. LEFF:  I have no further questions.

14 (Pages 50 to 53)