UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAN 1 8 2006

| | |
|---|---|
| MELINDA WILSON )<br><br>Plaintiff, )<br><br>v. )<br><br>AMERICAN POSTAL WORKERS )<br>UNION, DELAWARE AREA LOCAL, )<br>AFL-CIO; and UNITED STATES POSTAL )<br>SERVICE, an independent establishment of )<br>the Executive Branch of the Government )<br>of the United States of America )<br><br>Defendants. ) | Civil Action No. 05-CV-73 |

## DECLARATION OF STEVEN COLLINS

I, STEVEN COLLINS, in lieu of an affidavit as permitted by 28 U.S.C. Section 1746, declare as follows:

1. I am the President of the Wilmington Delaware/Malcolm T. Smith Area Local, American Postal Workers Union, AFL-CIO ("Union"). I have held this position for over three years.

2. A true and accurate copy of the award in In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. N7C-1T-D 33175 (February 20, 1991, Arbitrator Arnold M. Zack) is attached hereto as Exhibit 1.

3. A true and accurate copy of the award in In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, AFL-CIO, Case No. F98T-1F-D 99274077 (April 26, 2000, Arbitrator William Eaton) is attached hereto as Exhibit 2.

*A- 000155*

4.    A true and accurate copy of the award in In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. H98C-1H-D 99232594 (November 6, 2000, Arbitrator M.K. Durham) is attached hereto as Exhibit 3.

5.    A true and accurate copy of the award in In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. J98T-1J-D 00152336 (November 6, 2000, Arbitrator John C. Fletcher) is attached hereto as Exhibit 4.

6.    A true and accurate copy of the award in In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. H00C-1H-D 02141148 (October 17, 2002, Arbitrator Linda S. Byars) is attached hereto as Exhibit 5.

7.    A true and accurate copy of the award in In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, AFL-CIO, Case No. B00C-1B-D 02181225 (June 23, 2003, Arbitrator Philip Harris) is attached hereto as Exhibit 6.

*A-000156*

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 17, 2006.

_Steven C Collins_
Steven Collins

A-000157

| Exhibit | Document |
| --- | --- |

1.     In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. N7C-1T-D 33175 (February 20, 1991, Arbitrator Arnold M. Zack)

2.     In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, AFL-CIO, Case No. F98T-1F-D 99274077 (April 26, 2000, Arbitrator William Eaton)

3.     In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. H98C-1H-D 99232594 (November 6, 2000, Arbitrator M.K. Durham)

4.     In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. J98T-1J-D 00152336 (November 6, 2000, Arbitrator John C. Fletcher)

5.     In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, Case No. H00C-1H-D 02141148 (October 17, 2002, Arbitrator Linda S. Byars)

6.     In the Matter of the Arbitration between United States Postal Service and American Postal Workers Union, AFL-CIO, Case No. B00C-1B-D 02181225 (June 23, 2003, Arbitrator Philip Harris)

A-000158

REGIONAL ARBITRATION PANEL

| In the Matter of the Arbitration | |
|---|---|
| between | GRIEVANT:   L. VON HEGEL |
| UNITED STATES POSTAL SERVICE | |
| and | POST OFFICE:  HICKSVILLE, NY |
| AMERICAN POSTAL WORKERS UNION | CASE NO:     N7C-1T-D 33175 |

BEFORE:  Arnold M. Zack, Arbitrator

APPEARANCES:

    For the US Postal Service:    Charles J. Spina

    For the Union:    Vincent Pantano

Place of Hearing:    Hicksville, NY

Date of Hearing:    February 12, 1991


        AWARD:

        The Removal of Lori Von Hegel was for just cause. Her grievance
        is denied.


Date of Award:        February 20, 1991

_Arnold M. Zack_
Arnold M. Zack

A-000159

***********************************************************************************

| UNITED STATES POSTAL SERVICE | ARBITRATION OPINION & DECISION |
|---|---|
| HICKSVILLE, NY | CASE NO. N7C-1T-D 33175 |
| AND | L. VON HEGEL TERMINATION |
| AMERICAN POSTAL WORKERS UNION | DATE OF DECISION: 2/20/91 . |
| | ARNOLD M. ZACK, ARBITRATOR |

***********************************************************************************

On February 12, 1991, I held a hearing to consider the following dispute.  Vincent Pantano, Local President, represented the Union.  Charles J. Spina, Labor Relations Assistant, represented the Postal Service.

***********************************************************************************

## THE ISSUE

The parties agreed upon the issue to be decided as follows:

"Was the removal of Lori Von Hegel for just cause?  If not, what shall be the remedy?

***********************************************************************************

## THE FACTS

Lori Von Hegel has been employed by the Postal Service since January 2, 1988, working either 11:00 PM to 7:30 AM or 12:00 Midnight to 3:30 AM.  Her prior disciplinary record shows Letters of Warning issued on June 1, 1988, July 7, 1988, and February 7, 1989 for failure to be regular in attendance (twice) and for absence from her work area.

At the time of her employ by the USPS, she had been working for Sears Roebuck & Co., as a part-time Customer Service Clerk, working late afternoon and early evening hours doing typing, data entry, filing, and answering telephones.  On May 30, 1988, Von Hegel allegedly sprained her left wrist while either lifting mail or putting it in postal bins while working in the bull pen area of the Mid-Island MPF.  The next day, she submitted a Form CA-1.  She sought medical treatment from Dr. Lew E. Abeu, who diagnosed a sprained hand but did not indicate a period of partial or total disability.  She was assigned to an eight-hour limited-duty position with a ten-pound

1

A- 000160

lifting restriction, and with right-handed work when performing grasping tasks. The Office of Workers Compensation Programs acceded to her claim for the condition of "Extension Tendentious" and authorized surgery relief. She continued to work at Sears until mid-June, 1988.

Her days of employment for both USPS and Sears, following her injury, read as follows:

|  | USPS | SEARS |
|---|---|---|
| May 30, 1988 | Date of Injury | 10.90 - 20.20 |
| June 10, 1988 | 8 Hours SL | AWOL |
| June 11, 1988 | Not Determined | 13.00 - 20.20 |
| June 13, 1988 | 2 Hours Sick Leave (Pain from Sprained Hand) | 17.20 - 21.20 |

On January 13, 1989, Von Hegel began an extended Sick Leave absence from the Postal Service. She returned to work for two and one half hours on January 25, and then went home for the rest of that day on Leave Without Pay status from 2:30 AM to 9:30 AM.

On January 23, 1989, she applied for a position as Data Entry Clerk for MSC/SID Tool Company. On her employment application for MSC/SID, she answered "NO" to the question "Have you physical defects which preclude you from performing in a reasonable manner the duties of the job for which you are applying." Her new position involved keying of data from handwritten sheets, and company representatives advised that it was "two-handed work." She began work for MSD/SID on January 25, 1989, working eleven hours from January 25 through 29, 1989. Von Hegel remained in the employ of MSD/SID through June 1989. During that period, the Postal Service listed her as follows:

| January 26, 1989 | Not Scheduled |
|---|---|
| January 27, 1989 | 8 Hours Sick Leave |
| January 28, 1989 | Worked Limited Duty |
| January 29, 1989 | Not Scheduled |

Her days of employment for both USPS and MSC/SID read as follows:

|  | USPS | MSC/SID |
|---|---|---|
| Jan 30, 1989 | 6 Hours Annual Leave (Arm hurts, wrist) | 9:52 AM - 2:01 PM |
| Feb 2, 1989 | Not Scheduled | 9:55 AM - 1:59 PM |

2

A-000161

| Feb 3, 1989 | 8 Hours Sick Leave | 9:56 AM - 2:02 PM |
| Feb 13, 1989, | 4 Hours Sick Leave (Arm hurts) | 9:57 AM - 2:01 PM |
| Feb 16, 1989 | Not Scheduled | 11:44 AM - 4:00 PM |
| Feb 17, 1989 | 8 Hours AWOL | 9:53 AM - 1:04 PM |
| March 21, 1989 | 8 Hours Sick Leave | 9:46 AM - 3:01 PM |
| March 22, 1989 | 8 Hours Sick Leave | 10:04 AM - 3:00 PM |
| March 23, 1989 | Not Scheduled | 10:33 AM - 3:00 PM |

On or about September 15, 1989, Von Hegel was placed in an Extended Leave Without Pay status as a result of two off-duty motor vehicle accidents. She claimed she was unable to perform her limited duty position. During that period, she took two courses at SUNY College of Technology at Farmingdale: Introduction to Computers/Data Processing and Foundation of Computer Programing, attaining a B grade in both courses.

On November 6, 1989, the Grievant was interviewed by Postal Inspector, W.P. Hayes and others. In the course of that interview, she stated, among other things:

"1. Her MSC/SID job was "one-handed" data entry, numerals only, working part-time February 1989 to July 1989.

2. She "didn't know" if she ever called in sick to the Postal Office and worked an outside position.

3. She was sick in bed with the flu during her Extended Sick Leave absence in January/February 1989, and denied working at the MSC/SID during that extended absence.

4. She described her Sears Customer Service position as answering phones and questions, and denied any typing.

5. She did not remember if she told her doctor about these other jobs."

Commencing September 15, 1989, Von Hegel continued on Extended Leave Without Pay and had not returned to work.

On May 30, 1990, Kenneth Hale, Manager Mid-Island MPF, sent the Grievant a Notice of Removal for the following charges:

"Charge #1: Misrepresentation of your Limited Duty Capacity - carrying on "two-handed" outside employment, applying for a job while alleging no physical defects, and performing private sector work which was inconsistent with her medical restrictions.

*A-000162*

3

Charge #2:  Engaging in gainful employment while in a Sick Leave status - utilizing six full days of Sick Leave benefits and five partial days of Sick Leave, working her part-time position at Sears and MSC/SID while claiming to be incapacitated for Postal duties.

Charges #3-13:  Absent Without Leave (AWOL) - changing of Leave to AWOL for the eleven foregoing days of Sick Leave.

Charge #14:  Misrepresentation of your inability to perform your Postal Service duties - attending two courses at SUNY while claiming to be unable to perform your limited duty position and being placed on an Extended Leave Without Pay status.

Charge #15:  Absent Without Leave - conversion of her absence since September 15, 1989 (while attending and participating in all classes) to AWOL."

The Union grieved the foregoing Notice of Removal and the case was appealed to arbitration.

The Union sent a certified letter to the grievant advising her of the date, time, and place for a meeting with Union representatives to prepare for the arbitration, as well as the date, time, and place of the arbitration hearing.  The Grievant refused to accept the letter and did not appear at the hearing.  The parties requested me to base my decision on the four-inch thick stack of documentary evidence provided.  No Testimony or oral argument was provided.  The following "contentions" are drawn from the documentary evidence presented to me.

**********************************************************************************************

## CONTENTIONS OF THE POSTAL SERVICE

The Postal Service contends that the Grievant was guilty of misrepresenting her limited duty capacity, that she was doing typing and "two-handed" work at Sears, when allegedly suffering a painful wrist and a ten pound lifting restriction, that she denied any limitations on her ability to work when applying for employment at MSC/SID, and that she did do keying of data and other work related tasks.  The Postal Service further contends that while on Sick Leave status on eleven separate occasions, and barred from gainful employment without prior authority, and while certifying she was incapacitated by submitting her Form 3971, Von Hegel was working at Sears and MSC/SID.  It also cites the dates of such work performance as more properly counting as AWOL dates and the claim of being unable to perform limited duty on September 15 as false

A-000163

4

when she was well enough to attend and complete two college courses which dates are also properly converted to AWOL.

It concludes that she misrepresented her limited-duty restrictions and that such blatant falsification justified her removal.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CONTENTIONS OF THE UNION

The Union contends that there is no grounds for disciplining Von Hegel, that the employer violated Art 15.2D, Art 17.3 and Art 31.3 in pursuing the removal. The Union asserts that there was inadequate concurrence in the imposition of the removal, that there was no impropriety in Von Hegel's working part-time while fulfilling her Postal Service obligations. It notes that sick people always feel worse at night and that such feelings then do not preclude being fit enough to work elsewhere later in the day after normal Postal Service work hours.

The Union concludes that there was no higher level reviews and concurrence of the Removal action, that the Removal action was punitive and untimely and without just cause, that the Grievant did, in fact, suffer a medically verified injury on duty, that the AWOL charges are a total fabrication and as listed, do not constitute a violation of ERM 513.312, that the Grievant's attendance at courses at SUNY Farmingdale did not violate her work restrictions, that her part-time employment at SMC/SID was not in violation of any restrictions in that her job required "one-handed" keying, and that the Employer's action was punitive, not corrective. Accordingly, it urges the grievance be sustained in full.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DISCUSSION

At the outset, I find no procedural justification for overturning this grievance on the grounds of any improper concurrence. The written concurrence of Thomas F. Rosati on May 30, 1990 appears to meet the requirements of Art 16 Sec 8 of the parties' agreement. This leads me to a consideration of the case on its merits.

This grievance lacks merit. Ms. Von Hegel was on limited duty because of an injured left wrist, commencing May 30, 1988. While there is obviously no impropriety in her working for Sears on her off-duty hours prior to that date while she was fully performing her normal Postal duties, the evidence as to her external work after that date at Sears and later at MSC/SID, in the absence of

5

A-000164

contradictory testimony, shows that she was engaged in "two-handed" work at Sears, and that she performed her MSC/SID work after denying to that employer that she was suffering any physical defects, or suffering limitations in her ability to work. The tasks performed at these two employers appear on their face to be inconsistent with her medical restrictions. The Employer made a prima facie case of her performing for outside employers, tasks that she claimed she was unable to perform for the Postal Service, justifying her placement on Limited Duty status. The Union in its step Two Answer, alleged these were no such contradictions, but such allegations do not constitute proof, and the Grievant failed, despite adequate notice, to attend the hearing and rebut that prima facie case. Furthermore, it is clear under Sec 513.312 of the Employee and Labor Relations Manual, "Any employee who is in Sick Leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authorities." The record shows that Von Hegel was on Sick Leave and Leave Without Pay in li-+eu of Sick Leave on two other days, that she submitted Forms 3971 for those dates, certifying her incapacity for duty and that she worked on those same days (without prior approval) for four to seven hours for Sears or MSC/SID. Again, while such after hours work would have been permitted for an employee who fulfilled her Postal Service tour obligations, the Grievant here was on Sick Leave and therefore fell under the requirements of Sec 513.312. The Postal Service has made a prima facie case of a violation of the ELRM which the Grievant has declined to rebut through participation in the arbitration hearing.

Under the circumstances, I find no need to examine the other charges against the Grievant. Having failed to rebut the prima facie case offered by the Postal Service in the charges above considered, I find there was just cause for the employer's Removal action to stand as issued.

**************************************************************************************

**DECISION**

The Removal of Lori Von Hegel was for just cause. Her grievance is denied.

*Arnold M. Zack*

Arnold M. Zack

A-000165

## REGULAR ARBITRATION PANEL

| | |
|---|---|
| In the Matter of the Arbitration ) | Grievant:  Earnest L. Cutley |
| between ) | Post Office:  Los Angeles CA |
| UNITED STATES POSTAL SERVICE ) | USPS Case No.:  F98T-1F-D 99274077 |
| and ) | APWU Case No.:  MG2028209199 |
| AMERICAN POSTAL WORKERS ) UNION, AFL-CIO ) | Arbitrator's Ref. No.:  B589 |

BEFORE:                William Eaton, Arbitrator

APPEARANCES:

     For the U.S. Postal Service:    James C. Andrews

     For the Union:                  Shirley Jasper

| | |
|---|---|
| Place of Hearing: | Los Angeles California |
| Date of Hearing: | March 9 2000 |
| Date of Award: | April 26 2000 |
| Relevant Contract Provision: | Article 16 |
| Contract Year: | Current |
| Type of Grievance: | Removal |

### AWARD SUMMARY

The Grievant claimed and was paid sick leave from the Postal Service on days he worked at a second job.  The Union has failed to present reasonable grounds for exoneration.  The grievance is denied.

_William Eaton_
William Eaton, Arbitrator

A-000166

## STATEMENT OF THE CASE

The issue to be determined is whether Grievant Earnest L. Cutley was removed for just cause, and if not what the remedy shall be. Hearing was held at the Los Angeles Bulk Mail Center on March 9 and March 10 2000, at which time both parties were fully and fairly represented by counsel of their choosing. The Grievant was present throughout the hearing and testified on his own behalf. Following presentation of evidence, it was agreed that the matter would be submitted upon simultaneous filing of post-hearing briefs, which was completed on March 29 2000.

The Grievant had been employed by the Postal Service for approximately 12 years. His position was Laborer Custodian, PS-3 level, at the time of the Notice of Proposed Removal, July 2 1999, charging him with Abuse of Leave and Unsatisfactory Attendance/AWOL. On July 23 1999 he was issued a Letter of Decision removing him from the Service effective August 7 1999. He also held a second job, with the Los Angeles Unified School District, as Plant Manager II, and was charged with working at that job while claiming sick leave with the Postal Service, in addition to which he was listed as AWOL for 72 hours from June 21 1999 through July 1 1999.

The Union argues that the Grievant was never informed of the rule stated in ELM 513.312, that all of the leave at issue was approved by submission of Forms 3971, and that the AWOL charges are improperly supported, so that the Grievant should be reinstated and made whole.

## Applicable ELM Provisions

*513.312  Restriction.* An employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority.

*513.362* For absences in excess of three (3) days, employees are required to submit medical documentation or other acceptable evidence of inability to work.

A-000167

## Postal Inspection Investigation

In October of 1998 the Postal Inspection Service was requested by Manager of Maintenance Operations, Byron Cruise, to investigate fraudulent use of sick leave by the Grievant, and was supplied with a number of Forms 3971 indicating days he had applied for, and been granted, sick leave. In November of 1998 Postal Inspectors obtained documentation from the Los Angeles Unified School District (LAUSD) verifying that the Grievant had in fact worked at LAUSD on 16 days on which he had also applied for and been paid sick leave by the Postal Service. These facts and supporting documents were transmitted to the Postal Service by letter of February 18 1999 from Regina J. King, Postal Inspector.

On March 4 1999 a supplemental report was also transmitted indicating that the job description for the Grievant's work with LAUSD included the ability to "safely lift and move heavy supplies and equipment," and the ability to "stand and walk for long periods of time," the job description itself being enclosed with the supplemental memorandum.


## February 24 1999 Meeting

Supervisor of Maintenance Operations, Oscar Newton, called an investigative meeting on February 24 1999 that included, in addition to himself, Maintenance Supervisor Efren Anduyo, the Grievant, and the Grievant's Shop Steward, Larry Gant.

According to Supervisor Anduyo, the Grievant was asked whether he had a second job and refused to answer at least three times. Anduyo said the Grievant was not informed that he had violated a Postal Service regulation, nor was ELM 513.312 cited to him at the meeting. Anduyo agrees with others that the substance of the Grievant's response was, "Show me a written statement," or, "Show me the charges."

Supervisor Newton testified that the purpose of the meeting was to give the Grievant his "day in court," and asserted that he had informed the Grievant that he

A-000168

had an investigative memorandum from the Inspection Service stating that he had a job at school and that he had worked that job on sick-leave days. According to Newton, the Grievant "got emotional" when asked such questions so that Shop Steward Gant tried to "cold-water" the situation, that is, to calm down the Grievant. Supervisor Newton agrees that he did not allege "abuse" of sick leave at the time. When the Grievant refused any further answers, Newton closed the meeting after approximately 15 minutes.

Shop Steward Gant testified that neither he nor the Grievant was told the purpose of the meeting, but agrees that Supervisor Newton referred to a memorandum concerning conduct unbecoming a Postal worker, although he did not say what the source of the memorandum was, specifically that the Grievant was working at his school job. Gant agrees that the Grievant did ask for something in writing, but asserted that the Grievant remained calm, and simply asked for documents or charges, and that no rule violation was cited to him. Gant said that he had no occasion to be a peacemaker at the meeting, as Supervisor Newton had stated, for the reason that there was no need to act in such a role.

According to the Grievant, Newton first instructed Shop Steward Gant to remain silent, saying that he, Newton, was talking to the Grievant. The Grievant stated that Newton simply informed him that "something came to my attention," indicating conduct unbecoming a Postal worker, but that the reference was vague. The Grievant agrees that he did ask Newton to put whatever it was in writing, saying that he did not know how to respond if there was nothing specific.

On April 9 1999 Supervisor Newton wrote a memorandum to the Grievant instructing him to return for a further meeting so that he could respond to the issue raised in the last meeting. On April 14 the Grievant responded with a memorandum to Supervisor Newton. According to that memorandum, Supervisor Newton had stated that if he finds out that there were days that the Grievant worked at the school board and called in sick or took off from the postal service, Management would see to it that he would be fired for committing fraud.

A-000169

## School Board Job

Senior Employee Relations Analyst, John A. Brasfield Jr., testified that the Grievant's most recent schedule at the school was the A shift, from approximately 0730 to 1600. He identified a job description for Plant Manager II that indicated duties including both supervisorial and participation in custodial work, including cleaning, sweeping, cleaning equipment, and similar duties. Among special physical requirements listed were: "Safely lift and move heavy supplies and equipment," and, "Stand and walk for long periods of time." When shown the Grievant's physical limitations, discussed below, Mr. Brasfield testified that the Grievant could not have performed those functions. He agreed, however, that he did not know what the Grievant's specific assignment had been, and stated that he had not personally observed the Grievant at work.

Supervisor Newton testified that, although he had been aware that the Grievant had a second job, he had been unable to establish clearly whether there was any overlap in the shifts, the Grievant's shift at the Postal Service having been scheduled from 1500 to 2330.

The Grievant testified that he had worked for LAUSD for some sixteen years, but said that in recent years he had performed no physical labor, but only supervisorial and administrative duties. He said he is presently off the job for health reasons. He stated that he had informed Supervisor Newton of a second job prior to the present issues having arisen. He maintained that his schedule at the school was 0600 to 1430, stating that the A shift hours testified to by Mr. Brasfield, 0730 to 1600, did not apply to Plant Manager II positions.

On the Forms 3971 requesting sick leave for the 16 days at issue, under the "Remarks" column there would be such entries as "on-the-job injury," "FMLA," or "due to the flu," the predominant reference being to an on-the-job injury. The Grievant testified that he submitted doctors' excuses for each of the days, and it is stipulated that there is no issue concerning the doctors' slips for the 16 days charged. Asked on cross-examination whether he did in fact work for the school board on the dates indicated, when he had requested sick leave, he agreed that "on

A-000170

some" he did, and that on some occasions he called in for sick leave while performing work at the school. An examination of the relevant dates during the arbitration hearing indicated that he had called in for sick leave on some four or five occasions while employed and on duty at the school.

## Unsatisfactory Attendance/AWOL

From February through April 1999 the Postal Service sent the Grievant some half-dozen letters of inquiry noting that he had asked for sick leave on PS Forms 3971, and inquiring when he might return to work. The letters quoted ELM Section 513.362, concerning absences in excess of three days.

On April 16 1999 the Grievant replied to a letter of inquiry of April 1, contending, in general, that he had complied with all Postal Regulations, and asserting that, "it is Managements goal to have all Individuals on Light & Limited duty removed from the roll." The Grievant testified in regard to the AWOL charge that he had been charged AWOL on several dates when the record indicates he had submitted doctors' slips.

## Medical Status

The Grievant received an occupational injury, which is uncontested, leading to a diagnosis on December 10 1997 of bilateral tendonitis of both hands, chronic; rheumatologic disorder, both hands, chronic; but rejecting a claim of carpal tunnel syndrome. The resulting restrictions were that he should perform no strong clenching or gripping with either hand, and should not lift more than 25 pounds. As a result of this diagnosis the Grievant was given a rehabilitation job offer on February 13 1998, Job Modified Labor Custodial PS-03, which the Grievant accepted, but with a number of comments in so doing.

Maintenance Manager, Byron Cruise, testified that the Grievant continued to list on-the-job injury on his 3971s, even though the accommodation had been made, and he was working in a modified laborer custodial status. Cruise testified that the Grievant ignored repeated instructions to list a proper excuse on the 3971s, since

A-000171

there was no additional CA-7 application outstanding. The Grievant also qualified for serious illness under the Family Medical Leave Act (FMLA). A certification from his health care provider under FMLA, dated April 23 1999, indicated that he could lift no more than two pounds, and could do no "forceful pushing, pulling, no repetitive finger-wrist motion." The indication of probable duration was that it was not possible to make that determination.

Supervisor Newton testified that the allowable hours under FMLA had expired by the time the present dispute arose, but stated that he had not so advised the Grievant in writing.


## ARGUMENTS

### Postal Service

It was established through unrefuted testimony and documentation that the Grievant was at work with the LAUSD on the dates cited in charge No. 1 of the Notice of Removal, and also that the Grievant did request sick leave from the Postal Service on the cited dates.

We also know that the Grievant would request sick leave and indicate on the 3971 that it was due to his on-the-job injury, but he would continue to work his eight hours for the school board. On certain 3971s, when asked to tell the time that the 3971 indicated that he called the Postal Service to request sick leave, then asked would he have still been at work for the school board, the Grievant replied, "Yes," he would.

The Grievant's scheduled work hours for the school board were from 0600 to 1430. On June 1 1998 at 1125 the Grievant requested sick leave while still at work with the school board, and this request was made approximately three hours before he was to get off work from the board. The same thing applied to Inspection Service Exhibit 4, dated June 15 1998. The Grievant called and requested sick leave at 1200, which was two hours before he was to get off work from the board. There are

A-000172

also some other days in question as to whether or not the Grievant would have still been at work with the board.

Based upon the Grievant's testimony and the documented 3971s we know that he had already made up his mind that he was not going to go to work for the Postal Service on those days, thus he committed fraud by his actions as he called to get sick leave while he continued to work at the board. The Grievant was well aware of the fact that he was not entitled to work for the school board for eight hours and during those eight hours before his shift ended call the Postal Service to request sick leave.

It is very clear that the Grievant made a career decision by his actions and his decision was that he preferred to work for the Los Angeles Unified School District and not the U.S. Postal Service.

In addressing charge No. 2, we know that the following things did occur. The Grievant was absent intermittently from February 13 1998 through August 17 1998. The Form 3972 reveals that the Grievant served a 14-day suspension from June 7 1999 to June 18 1999 for Unsatisfactory Attendance/AWOL. The Grievant never returned to work after serving this suspension, and was AWOL from June 21 1999 to July 1 1999. The Notice of Removal was dated July 2 1999 and was received by the Grievant on July 7 1999. The Grievant could have continued to work at the Post Office until his effective date of removal, yet he chose not to report back to his job with the Postal Service. Instead, he called in and requested sick leave, as noted by dates cited in charge No. 2 of the removal notice.

The Grievant continues to work for the LA Unified School District. Again, the Grievant has made a career decision that he prefers to work for the school board.

The Postal Service does not recall the Union ever addressing charge No. 2 of the Proposed Notice of Removal, however, the Agency did address this charge. Supervisor Newton testified that he had several discussions with the Grievant regarding his attendance irregularities. There are several letters that were admitted into evidence which revealed that Supervisor Newton requested the

A-000173

Grievant to return to work. When asked if the Grievant ever returned to work as requested, his response was no, he had not reported back to work.

Neither the Union nor the Grievant produced any substantiation for the AWOLs cited in charge No. 2 of the *Proposed Notice of Removal*, June 21 1999 to July 1 1999, a total of 72 hours. Even if the Grievant had substantiated this absence he still has demonstrated unsatisfactory attendance as charged and abusive use of his sick leave. On the 991 the Grievant indicated that he had perfect attendance with the LA Unified School District.

The Grievant was a Shop Steward at the time of his receiving the Proposed Notice of Removal, which will lead to the conclusion that he was aware of Postal rules, regulations and policies in order for him to represent and advise employees of their rights and responsibilities to the Postal Service.

It has been established in many prior Postal Service arbitration awards in the Western Region, as well as in the private sector, that no employer, including the Postal Service, must support continued irregular attendance by a habitual absentee offender. The evidence of record clearly establishes that the Grievant's attendance was unsatisfactory and clearly establishes abuse of his sick leave.

The Postal Service has continuously taken the position that signed 3971s are for pay status only, and not for condoning the underlying absence or the cumulative extent of it. Any of the absences that were cited and substantiated under the Family Medical Leave Act were approved accordingly.

In conclusion, it is clear to the Postal Service and hopefully to the Arbitrator that the Grievant made a career decision as to whom his loyalty was given and for whom he preferred to work, and the record clearly establishes and demonstrates that the Grievant preferred to work for the Los Angeles Unified School District.

In light of the foregoing, we believe that the Postal Service's imposition of the Proposed Notice of Removal was neither arbitrary, capricious, nor unreasonable, but was an action take for just cause. Thus, we would respectfully request that the Arbitrator uphold that action and deny the grievance.

A-000174

## Union

The Grievant is a 12-year veteran with the Postal Service, his position is Laborer Custodian PS-3. He came into the Postal Service as a PS-5 Air Records Processor. He remained in that position until he met with an occupational injury which resulted in two operations and a reassignment to the Maintenance Department. He was placed on OWCP and is currently on FMLA.

The testimony of Management did not dispute the fact that it was known for a number of years that the employee had two jobs and that he was on OWCP and FMLA. Today's testimony from Supervisor Newton and Shop Steward Gant did not dispute that fact. He has supported his family, including three children, and maintained two jobs to do so.

Inspector Regina King gave testimony that the Inspection Service only got involved at the request of Byron Cruise, who was the Manager on the Grievant's tour of duty. He did not involve Supervisor Newton until after he received an inspection report. Testimony was given by both that they acted upon that report even though it was not complete, and they acted prior to doing any independent investigation of their own. Nor did they conduct a pre-disciplinary interview prior to the issuance of discipline.

The testimony of Mr. Brasfield only served to verify that the Grievant did indeed work for the Los Angeles School District, which is undisputed. He had no knowledge of the Grievant beyond that. He could not testify as to the actual job duties of the Grievant or to his actual reporting time.

The Union's position is that Management knew of the Grievant's dual status for months prior to utilizing leave. Testimony from Management (Newton, Cruise, Anduyo) all indicated that the Grievant was never actually told he violated the rule he was alleged to be in violation of.

The Union has proven that Management acted punitively in the issuance of discipline prior to complete investigation and interview with the employee. Testimony from Supervisor Newton was that he indeed sent the Grievant letters of inquiry that only cited violations of 513.312, the rule for absences of three days or

9

A-000175

more. The Grievant complied with that provision, as documented in the evidence presented by the Union and Management on 3971 leave slips approved by Supervisor Newton. ELM 513.362 was never cited until the Grievant received a Letter of Removal. Testimony by Management was that they were aware of the Grievant's FMLA status and knew the requirement for compliance with OWCP. Testimony from Supervisor Newton also indicated that he did not check dates submitted by the Inspection Service which were in conflict with the 3972 absence analysis forms submitted.

The Grievant was listed as AWOL on the 3972 absence analysis form while his 3971 leave slip indicated approved leave supported by medical documentation included in the case file. Management testified that an investigation meeting was called, but all agreed that the Grievant was never told of an ELM violation rule, or a need to comply with a rule, or that one even existed.

The Union position is that Management was aware of the Grievant's dual status and Inspection Service memo five months prior to taking any action against the employee or advising him of the regulation broken. The Union has shown there was no intent and no willfulness on the part of the Grievant.

The Union asks that the Arbitrator take into consideration the years of service the Grievant has, and that the outcome of this hearing could bear heavily on his total employment. A man who worked with such diligence to provide income for his family could now have no income for his family. The Union is sure that is not the intent of the Postal Service to its employees with years of service.

The Union therefore requests that the Grievant's removal be expunged and that he be returned to duty and made whole for all losses in connection with this grievance.


## ANALYSIS

On the abuse of sick leave issue the Grievant and Shop Steward Gant maintained at the arbitration hearing that the Grievant was never advised of the

A-000176

belief of the Service that he had applied for sick leave and was so paid while at the same time working at his LAUSD job.   Supervisor Newton testified, as did Supervisor Anduyo, that the Grievant was advised that the Postal Service had information indicating that he had worked at the school while on sick leave, although it may be that he was not specifically told that there was an Investigative Memorandum to that effect.

The Grievant himself, however, in his memorandum of April 14 1999 addressed to Supervisor Newton, admits that, at the February 24 meeting, Newton had said to him that if he found out that "there were days that I worked in the school board and called-in-sick or took off from the postal service," Management would see to it that he would be fired for committing fraud.  This clearly apprised the Grievant of the concern of the Postal Service, which was that he worked at the school board while calling in sick.   Moreover, contrary to his testimony at the arbitration hearing, the inference that he had committed fraud was also clearly admitted by the Grievant himself.

Finally, at the arbitration hearing the Grievant admitted that on "some" days that he called in sick he worked at the school board, and that he even called in from his school job to claim sick leave, the evidence being that this occurred on at least four or five occasions.

The Union contends that the Grievant cannot be properly charged with abuse of sick leave for the reason that he was never specifically advised of the contents of ELM Section 513.312, and that he was not advised at the investigative interview of February 24 what the charges against him were.  As indicated, testimony of both Postal Service witnesses, and the Grievant's own admission, shows that he was fully aware at the February 24 meeting what the Post Office was concerned about. One is left to wonder, in any case, why an employee of ten years' experience, and a Shop Steward at that, would have to be advised that he might be committing a fraudulent act by claiming sick leave from the Postal Service on a day when he worked at another job.

A 000177

Nor can it be claimed that the Grievant is being unfairly treated, or that progressive discipline has not been applied. He received a letter of warning on September 24 1998 for failure to follow instructions; served a seven-day suspension in January of 1999 for failure to follow instructions and unauthorized absence from his assignment; and a 14-day suspension only five months later, in June 1999, for failure to follow instructions and unsatisfactory attendance. Removal is the next logical step in such a series of disciplinary actions, particularly when they follow so closely upon one another.

In these circumstances the Union has failed to present reasonable grounds to exonerate the Grievant in whole or in part.

### AWARD

Grievant Earnest L. Cutley was removed for just cause. The grievance is denied.

William Eaton, Arbitrator

April 26 2000

A-000178

Regular Arbitration Panel


In the Matter at Arbitration       Grievant: Dawn Howard
Between the
United States Postal Service       Office: Tampa P&DC, FL
And the
American Postal Workers Union      Case: H98C-1H-D99232594
                                         061299PD03


Before: M. K. Durham, J.D.

Appearances:

        For the Postal Service:  Angela Ferguson
        For the Union:  Richard A. Phillips

Place of Hearing:  Tampa, FL
Date of Hearing:   September 8, 2000 (Cites by mail)
Date of Award:     November 6, 2000

Relevant Contract Provisions: Articles 16, 19

Contract Year: 1998-2000
Type of Grievance:  Discipline (Discharge)


### Award Summary

Discharge for misconduct within the ambit of just cause. Grievant
violated ELM 513.312, which requires that an employee in sick
leave status may not engage in any gainful employment unless prior
approval has been granted.  Grievant called off on sick or leave
without pay from the Postal Service and then went to her second
job. The supervisor continued to approve her absences, unaware of
the fact that Grievant was well enough to go to work that same day
elsewhere.  A lengthy delay in proposing the termination out of
consideration for the Grievant's high-risk pregnancy and her
newborn's care is defense to Union's charge of laches, or
unexcusable delay.


*MKDurham*
M.K. Durham, J.D.


A-000179

## I.   ISSUE

Did the Employer have just cause for the removal?   If not, what shall be the appropriate remedy?

## II.   BACKGROUND

At the first day of this arbitration in March of 2000 convened to determine whether a removal was for just cause, the Union proffered a Motion to Suppress all evidence obtained from an administrative subpoena served by the U.S. Postal Service, Office of Inspector General, to continental Airlines… The Union charged that "the subpoena dated July 27, 1998 was served under deceptive and false means, violated applicable laws (Fourth Amendment), and caused irreparable harm to the Grievant's right to due process."

Management argued that the question of whether an employees Fourth Amendment rights are violated is clearly a matter to be decided in the courts, not in arbitration.   If it does not prevail on this point, the Service argues that there was simply a minor administrative error in the subpoena which did not render the subpoena invalid or create a harmful procedural error.

The Arbitrator denied the Union's motion to suppress the evidence.


## III. OPINION

The Grievant worked full-time for the Postal Service as a clerk and part-time for Continental Airlines as a telephone reservation agent for four years prior to the discharge.   The hours of the two jobs never overlapped.   The Grievant had followed appropriate Postal procedures regarding initial notification of outside employment.   Even though several Postal supervisors purchased tickets through the Grievant in her role as reservation agent, the Grievant's supervisor was not aware that she was engaging in outside employment during the relevant period of time.   The supervisor was very lenient in granting the Grievant's requests for sick leave and leave without pay, even on short notice.

The Service removed the Grievant for alleged misconduct effective July of 1999 based on undisputed facts.   Grievant requested and received from the Postal Service sick leave, emergency annual, or LWOP between the dates of January of 1997 and March of 1998.   She went to work at Continental Airlines on the same day and worked non-overlapping hours.

A-000180

Grievant worked the night shift at the Post Office.  The Grievant missed 649 hours (81 nights) of work with the Postal Service during this period; simultaneously, however, she worked 435 hours (44 days) with Continental.  The Service argued that common sense says that an employee cannot engage in such a practice and expect to keep her job.

Additionally, cites the Service, ELM language at 513.312 prohibits the Grievant's practice:

> An employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority.

The Service charged the Grievant with working at Continental Airlines at the expense of her full time position at USPS in violation of ELM 666.1 & .2.

The Union argued that the Grievant was not aware that she violated Postal rules by her practice. The Union argued that Grievant did not know that she was in sick leave status with the postal service for 8 hours *prior to* calling off sick as well as for 16 hours *after* calling off sick.  Additionally, the Union claimed given that her outside employment was Post Office-approved, she did not know she could be discharged strictly on the basis of her choosing to work her previously approved second job.

The Union asserts that the Service suffered or permitted her to take leave without corrective discipline, performance, or attendance-related personnel action. The Union also argued the doctrine of laches, or inexcusable delay.  The action was proposed 2 1/2 years after the first incident and 1 1/4 years after the last incident complained of.  States the Union, if there was objection to so many missed days of work, the Grievant's attention to a potential problem should have been grabbed sooner.  (It is noted that a prior removal based on some of the same attendance deficiencies asserted in this grievance, from May through October of 1997, was reversed by her supervisor at step 2 based on Grievant's assertion that she had been out of state caring for her now deceased grandmother.  However, the supervisor testified credibly at our hearing that he would never have overturned the discharge had he known the truth that during that time period, the Grievant actually returned to Tampa several times to work at

A- 000181

Continental Airlines in order to keep her employment status with Continental.)

The Grievant preferred to work at Continental because the work as reservation agent was done while sitting and was easier for her. Additionally, the Grievant earned free or reduced fare flight privileges as part of her benefit package with Continental.

I am not persuaded that by working at Continental Airlines, the Grievant rendered herself unable to work at the Postal Service. She had worked both jobs for 3 years prior, with no problem listed in our record. However, the Service has every right to object to the Grievant's conduct.

The Grievant abused the leniency in discretionary leave approval shown by her supervisor. He did not know she was working at Continental. There is no doubt in my mind that had supervision known she was working her after hours job continually while calling off from the Postal Service, the absences would not have been approved and discipline would have been forthcoming. I am persuaded that the Grievant knew this as well and did not apply for permission pursuant to ELM 513.312 to continue her outside employment while in sick leave status.

Section 513.312 is an additional requirement for those employees who have already registered outside employment with the Service. This section must apply to situations like the one here, where the employment is outside Postal duty hours, because we know that an employee cannot engage in outside employment during the same hours as her Postal assignment. Therefore, "sick leave status" must extend beyond an eight-hour shift. In any event there were times when the Grievant called off for a number of consecutive days, during which she worked at Continental.

In violating ELM 513.312, the Grievant acted with disregard of her coworkers who did work which should have been done by the Grievant. The Grievant abused the trust of her supervisor.

I cannot fault the supervisor for not taking action earlier. He had no reason to disbelieve the Grievant. A supervisor has no obligation to police his employees. When he found out he was being hoodwinked by the Grievant, Grievant was in midst of a high-risk pregnancy. The decision to allow the Grievant to give birth and mother her child during its first few months before beginning the initiating the investigative interview with her was reasonable. Thus, I cannot sustain the Union's claim of laches.

A-000182

The Grievant was simply lucky that she got away with her misconduct for so long.

The Grievant had ample chance during the pre-disciplinary investigation to justify her absences. She did not. I do not believe that the delay in proposing the removal, prompted by consideration of her baby's wellbeing, prejudiced the Grievant.


## IV.    AWARD

Grievant denied.


Respectfully submitted,

M.K. Durham, J.D.
Arbitrator

A-000183

## REGULAR REGIONAL ARBITRATION PANEL

| | | |
|---|---|---|
| In the Matter of the Arbitration | ) | |
| | ) | **Grievant:**   Donna M. Ariola |
| **between** | ) | |
| | ) | **Post Office:**  Chicago BMC Illinois |
| **United States Postal Service** | ) | |
| | ) | **Case No:** |
| **and** | ) | **USPS**  J98T-1J-D 00152336 |
| | ) | **APWU** 00M42 |
| **American Postal Workers Union** | ) | |

**Before:**          **John C. FLETCHER, Arbitrator**

**Appearances:**

>     **For the Postal Service:**    Juanita Smallwood, Labor Relations Specialist
>     USPS Central Illinois District
>     Bedford Park, Illinois  60499-9402
>
>     **For the Union:**    Benjamin A. Barnes, Sr., Arbitration Advocate
>     APWU Maintenance Division
>     Gary, Indiana  46401

**Place of Hearing:**          Chicago BMC, Forest Park, Illinois

**Date of Hearing:**          October 19, 2000

**Date of Award:**          November 6, 2000

**Relevant Contract Provisions:**    Article 16, National Agreement

**Contract Year:**          1998 - 2000

**Type of Grievance:**          Discipline - Removal

### Award Summary

Management had just cause to effect the removal of Ms. Donna M. Ariola when she worked a second job while she was on medical restrictions on her Postal Service job, and she worked at that job while on sick leave.

_____

**John C. FLETCHER, Arbitrator**

A-000184

## OPINION AND AWARD

### J98T-1J-D 00152336 [00M42]
### Chicago BMC, Forest Park, Illinois
### Donna M. Ariola - Removal

**Background:**

On August, 22, 1977, while working as a Mailhandler in the Chicago Bulk Mail Center, the herein Grievant, Ms. Donna M. Ariola, injured her back while lifting a mail sack. In January 1979, Grievant was separated from Postal Service employment to OWCP rolls, where she remained until early 1981. In February of that year, the Service's Injury Compensation Officer referred Grievant to an Orthopedic Surgeon for examination. On February 23, 1981, that Surgeon provided the Postal Service with the results of his findings, which indicated that she "has apparently sustained a lumbosacral strain, but may return to work as she is improved." The doctor further opined that he "would not allow her to lift more than fifty pounds at work."

After receipt of this determination a meeting was held on March 20, 1981 with Ms. Ariola and several Postal Service Managers "for the purpose of finding suitable work" within Grievant's medical limitations. When asked about the doctor's evaluation Ms. Ariola indicated that her orthopedic doctor had restricted her to lifting 20 to 30 pounds. (The meeting minutes indicate that having Grievant examined by a "third doctor" was discussed. However the record is silent if this ever occurred.) Nonetheless, Ms. Ariola was told that she was being offered a modified custodian job on Tour 1, at the same salary level she had when she had

A- 000185

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

been employed as a Mailhandler. She was also assured that she would not be expected to perform tasks that exceeded her medical restrictions. Grievant indicated that she would prefer to go on light duty in the Re-wrap Section, but was told that for various reasons (including fluctuations in volume) this was not available. At the conclusion of the meeting, Grievant signed the job offer, which was effective at 11:00 p.m., April 4, 1981. Thereafter Grievant was reinstated to Postal Service employment as a rehabilitated employee in the Maintenance Craft on Tour 1, with an 11:00 p.m. starting time.

While working her modified custodian assignment, Grievant re-injured her back on December 9, 1993, while "bending and sweeping." This resulted in another OWCP claim that was accepted for payment by DOL. Following "recovery" from that injury the restrictions placed on Grievant's modified custodian job were expanded to exclude "mopping or cleaning activities," with limited bending, and no lifting over 35 pounds. Also, Grievant was to avoid prolonged standing or sitting without the opportunity to move about. Thereafter, Grievant's only assigned work functions were to clean water fountains and wipe down tables in several cafeteria areas in the BMC.

Sometime in January 2000, a co-worker of Grievant's approached their Supervisor and complained that "it was not fair that Ariola gets all the easy work when she is able to work a second job." The Supervisor contacted the Inspection Service to have them find out if Grievant was indeed working a second job. The Inspection Service determined that Grievant did have a second job, becoming

A- 000186

employed on January 26, 1999, at a Dominick's Finer Food store near her residence, that she worked there between 20 and 30 hours each week as a cashier, usually scheduled between 3:00 p.m. and 9:30 p.m., Monday through Thursday. The Inspection Service also learned that at times in the last quarter of 1999, Grievant had worked at her second job on days that she had not worked her schedule at the Bulk Mail Center because she was on sick leave.

Following a pre-discipline interview, Grievant, on April 25, 2000, was issued a notice of removal. The removal was based on two charges, reading:

Charge 1 - UNACCEPTABLE CONDUCT

Specifically, since January 26, 1999, you have been employed at a Dominick's Food Store in a position as a *Cashier/Clerk* where your normal working hours are from 23 to 30 hours per week and one of the job requirements is standing 100% of the time. This is in direct violation of your Postal work restrictions, which states that you may only stand a maximum of 3 hours per day and also states that you can only work 8 hours per day.

When questioned during your pre-disciplinary hearing about your restrictions you were very vague and you further stated that someone at Dominick's is there to help with any lifting. You were then asked about standing for 6 to 8 hours as required by the job at the Dominick's store and you responded, you didn't see anything wrong with working two jobs, in that you needed the money.

Charge 2 -UNACCEPTABLE CONDUCT

Specifically, your are in violation of the ELM 513.312 (Engaging in gainful employment while in a sick leave status), and ELM 661.42, conflict of interests which states no employee will engage in outside employment which impairs mental or physical ability to perform Postal Service duties and responsibilities. The records show that on several occasions you had work hours at Dominick's store on a day previous to your use of Sick Leave at the CBMC and that on one occasion you presented Medical substantiation stating you were incapacitated (ill) and unable to work at the CBMC, but worked during this same period at Dominick's.

When questioned on these charges during your pre-disciplinary hearing, you stated that you didn't see anything wrong with this because the time you worked at Dominick's did not correspond with your regular Postal hours.

APWU filed a grievance challenging the removal on both procedural and substantive grounds. Following a denial at Step 2, the removal was appealed directly to arbitration.

## THE ISSUE

The parties' Advocates are in agreement that the issue should be stated as:

.Did the Postal Service have just cause to effect the removal of Ms. Donna M. Ariola?

If not what shall the remedy be?

There are no procedural or jurisdictional impediments to a final and binding award in this matter.

## THE POSITION OF THE PARTIES

### The Position of the Postal Service:

The Postal Service first notes that the issue involved in Ms. Ariola's removal is not working a second job, but rather it is working a second job that is beyond her restrictions at the Post Office, and working a second job on days that she was absent from her Postal Service job because she claimed to be sick. It points out that Grievant was under severe medical restrictions. Nonetheless, she was unable to work within these restrictions without having "numerous accidents" over the years. Because of her accidents and her medical restrictions Grievant was

A- 000188

accommodated by the Postal Service with a job that required little more than that she show up for work - wiping off tables and cleaning water fountains - an effort on the part of Management to provide her with some type of work within her restrictions.

Her second job at Dominick's Finer Foods, though, encompassed work that was beyond her Postal Service restrictions. It invovled standing 100% of the time, as well as lifting, bending, and stooping. And, Grievant would go to work at Dominick's, perform all of these duties, and then call the Post Office and ask to be excused because she was now too sick to come to work, the Service notes. Referencing Section 513.312 of the ELM, the Service says that when an employee claims sick leave, she is sick for all purposes of employment at whatever time the employee may have worked. Thus, it makes no difference that the hours of her Dominick's job do not parallel the hours of her Postal Service job for which she received sick leave. If you are too sick to come to work for the Postal Service your are too sick to work elsewhere, Management asserts.

In response to the assertion that Grievant now has a current medical release indicating that she is able to do more things, the Service states that it was her responsibility to provide information pertaining to changes in her limitations to OWCP and Management, but she failed to do so until after the discipline was issued, and this is too little too late.

On the claim that the discipline assessed was excessive and punitive in the case of a 20 year-plus employee, the Service responds that Grievant's conduct was

A- 000189

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

egregious, she claimed sick leave she was not entitled to, worked another job when she was on sick leave, concealed facts about her physical limitations, and generally misrepresented her medical condition. Accordingly, it was proper to proceed directly to removal without following any progressive discipline steps.

## The Position of the Union:

The Union first argues that Grievant's Supervisor did not make a proper investigation before he proceeded to discipline of removal. It asserts that all the Supervisor did was rely on the IM, which he is not privileged to do. Any Supervisor issuing discipline must conduct his own independent investigation, it is stressed. The Union also argues that procedural defect obtained when it was not furnished all of the material it requested. For example, it was never provided with a definitive explanation as to precisely what Grievant's medical restrictions were. Instead, it was only given a copy of an undated 0-13 that had a couple of notes scribbled on it pertaining to Grievant. In this regard Grievant cannot be accused of work activity beyond her restrictions if the restrictions are not known, the Union says.

The Union stresses that Article 16 contemplates that discipline be progressive. In this matter removal of an employee with over twenty years of service, an employee with a discipline free record, is punitive. And, because this is a removal case, in effect the imposition of the industrial capital punishment, Management must be held to the highest standard of proof to support its action, proof that is clear and convincing, it is argued.

A- 000190

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

On the merits, the Union says that Grievant was never aware of the rule she is said to have violated. One of the seven tests for the administration of discipline requires that the rule breached be adequately published and that the employee be aware of its proscriptions. This is missing in this matter, the Union insists.

With regard to the charge of using sick leave and working at her second job, the Union points out that at no time was Grievant working at the second job when she should have been working at the Post Office - the hours of the two simply did not conflict with each other, it is noted.

APWU also argued that Grievant should have been sent for a fitness for duty examination, rather that be removed, in order to determine just what her physical limitations were.

Concern is also raised with regard to the motive of the individual that brought this matter to the attention of Management. The Union has asked that this person be identified, as some discriminatory motive - race or sex - may be involved, but Management has refused. Failure of Management to make a full disclosure in this regard hinders the Union's defense, and provides another basis for throwing the discipline out, it is asserted.

Finally, the Union suggests that Grievant was provided misleading direction by the Inspection Service and her Supervisor. When she was interviewed by the Inspection Service she asked is she should quit her second job but was never given an answer. In her pre-disciplinary interview, she asked her

A-00019.

Supervisor the same question, and he responded "I don't care what you do," which could be interpreted as not being concerned if she continued to work at Dominick's as well as at the BMC.

## DISCUSSION

Two basic elements are involved in Management's decision to effect Grievant's removal. The first, that Grievant worked a second job that required that she work beyond her Postal Service work restrictions. The second, that Grievant worked this second job at times that she was on paid sick leave from the Postal Service. Proof establishing that either charge is correct is sufficient to warrant discipline, and when the conduct is egregious, Management need not follow the precepts of progressive discipline. In this matter Management has offered sufficient proof to establish that both charges are well founded.

For many years Grievant has been assigned to a modified custodian position because of her claimed physical impairment. The duties of this position, it is obvious, were of a "make-work" nature, designed so that Management could secure minimal productivity from an employee that claimed to have been disabled as a result of an on-the-job event – an employee that was required to be continued in employment because of this event. Medical restrictions are physical limitations that are in place twenty-four hours a day. These limitations are not in place only when an employee is "clocked-in" at the Post Office. Any activity, work or play, that occurs away from the Postal Service work site which demonstrates that an employee is exceeding one's medical restrictions is sufficient to establish that

A-000192

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

material misrepresentation of physical condition is present. In this matter, Grievant's work at her second job at Dominick's for over a year "before she was caught" demonstrates that she repeatedly participated in physical activity that greatly exceeded the medical restrictions she had in place governing her Postal Service employment. Accordingly, it must be concluded that the proof offered by Management is sufficient to establish that this charge is correct.

With regard to the matter of Grievant working at her second job on days that she was on sick leave from the Postal Service, this charge, too, has been established. There are several elements involved in this charge, only one need be mentioned in this decision – her sick leave absence between May 11-17, 1999. To cover that absence Grievant submitted a doctor's note indicating that she was incapacitated for that entire period. During that period she was paid 8 hours sick leave on Tuesday the 11th, Wednesday the 12th, Thursday 13th, and Monday the 17th. However on the 11th Grievant worked at Dominick's.

Grievant's explanation, that she left work feeling sick, took medication that made her feel some better, so she tried to work her Dominick's job, but had to leave early as she was feeling ill again, makes no difference, because applicable regulations of the Postal Service proscribe any outside employment while on sick leave, without prior Management approval.

Also, her contention that the absence between May 11, 1999 and May 17, 1999 was not a continuous absence, but instead occurred day-to-day is not credited. While Grievant did call-in several times, the initial call occurred a 10:20

A-000193

p.m. on May 10, 1999. In that call, Grievant requested 16 hours sick leave, covering her Tour 1 assignment beginning at 11:00 p.m. for Service Days, Tuesday May 11th and Wednesday May 12th. Yet she was able to report for work at Dominick's on May 11th at 3:30 p.m., even though she represented the night before that she was too sick to work at the Post Office the tour before and the tour after she was able to work at Dominick's. Accordingly, it must be concluded that the proof offered by Management is sufficient to establish that this charge is correct.

Management, having established that it had just cause to impose discipline as a result of Grievant's outside work activity exceeding her medical restrictions and working a second job while on sick leave, our next task is to determine if the discipline assessed is appropriate and then if procedural flaw is present so as to require modification. In this matter, the Arbitrator agrees that Grievant's conduct was sufficiently egregious so as to warrant severe discipline. Grievant represented to the Postal Service that her medical condition was such that she was only able to do minimal work. These representations occurred over an extended period of time. Nonetheless, for over a year Grievant was able to work a second job that required that she vastly exceed these limitations. This conduct boarders on fraud, if it is indeed not actual fraud. Many arbitrations have concluded that fraudulent activity in personal injury situations is grounds for immediate removal without following the tenets of progressive discipline.

A-000194

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

The second charge is just as serious. While only one instance of working at the other job while on sick leave has been discussed in this decision, it should be noted that several others are contained in this record. Any Postal Service employee, to say nothing of one with more than twenty years of service, should be aware that an employee claiming sick leave is sick for all activity – not just the time that the employee would be scheduled at the Postal facility. It is a serious offense when an employee claims that they are too sick to work for the Postal Seville, but is able to work at their second job. In such circumstances progressive discipline need not be followed and Management, when the circumstances warrant, may proceed directly to removal.

The Union has stressed from the very first steps of the grievance procedure that Grievant's Supervisor failed to make an adequate investigation into the matter before he imposed discipline. In this regard the Union asserts that the Supervisor merely relied upon the IM as his investigation. This contention overlooks the fact that it was the Supervisor himself that asked the Inspection Service to investigate Grievant's second job with Dominick's. In the circumstances present here it would be the Inspection Service that had the resources to go to Dominick's and interview the Store Manager, it was the Inspection Service that had the ability to secure the job description of a food store cashier, it was the Inspection Service that had subpoena power to secure Grievant's employment records from Dominick's. These are functions of the Inspection Service, and Grievant's Supervisor, who has a mission vastly different, should be privileged to utilize this resource as a part of the required investigation he is obligated to make. Moreover, upon receipt of the

A- 000195

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

IM, Grievant's Supervisor conducted a pre-disciplinary interview with her, where the facts developed were fully discussed. The totality of these facts do not even hint that the Supervisor failed in his responsibility to conduct his own investigation into this matter.

The Union has asserted that Grievant should have been sent for an FFD. This notion is also misplaced. If Grievant, when she went to work at Dominick's – or at any other time for that matter – believed that her medical condition had sufficiently improved so that she was able to relax her restrictions and work a second job, it was incumbent upon her to notify her Supervisor of this. Anything less is material misrepresentation of one's physical condition to continue on light or limited duty when not eligible to do so. That Grievant was not sent for an FFD does not warrant modification of the discipline assessed.

Finally, we will look at the charge that the Supervisor never disclosed the name of the individual that brought Grievant's second job to his attention. The Union requested this information so as to explore the motive of this individual. The motive of an individual reporting employee or supervisory misconduct has nothing to do with the merits of the charge of misconduct itself. It is facts that determine if misconduct occurred – not the motive of the tipster. This case is not flawed because Management refused to share the name of the tipster with the Union.

The grievance is without merit. It will be denied.

A 000196

## A W A R D

Management had just cause to effect the removal of Ms. Donna M. Ariola when she worked a second job while she was on medical restrictions on her Postal Service job, and she worked at that job while on sick leave.

John C. FLETCHER, Arbitrator

A-000197

## SOUTHEAST REGION REGULAR ARBITRATION PANEL

```
-------------------------------------------------------------
IN THE MATTER OF THE ARBITRATION.GRIEVANT:  Massie
                                         .
                                         .
UNITED STATES POSTAL SERVICE             .POST OFFICE: Sarasota, FL
                                         .
         and                             .
                                         .CASE NO.: H00C-1H-D 02141148
AMERICAN POSTAL WORKERS UNION            .
                                         .
                                         .
-------------------------------------------------------------
```

BEFORE:  Linda S. Byars, Arbitrator

APPEARANCES:

    For the U. S. Postal Service:  Cindy S. Beierlein
                                       Labor Relations Specialist

    For the Union:  Bud Hissam
                    Arbitration Advocate

Place of Hearing:  Manasota PDC, Florida

Date of Hearing:  August 27, 2002

Briefs:  Postmarked September 27, 2002

Contract Provisions:  Article 16, Article 19 (ELM 513.312)

Date of Award:  October 17, 2002

### Award Summary

The Postal Service had just cause to issue a Notice of
Removal to the Grievant when she misused FMLA leave.  The
Grievance is denied.

1

A-000198

BACKGROUND

By memorandum dated April 22, 2002, the Grievant, who is a level four Mail Processor working 2250-0700 hours and has a seniority date of January 31, 1987,  was charged with improper conduct and issued a Notice of Removal signed by Supervisor Distribution Operations Mary Fleury. Specifically, the Grievant was charged as follows:

"1.  On February 26, 2002 at approximately 1:45 p.m. your BMW was observed parked in the church parking lot next to the Ethic Hair Salon.  You had not worked the night before, February 25, 2001 nor did you report for duty on the evening of February 26, 2002.

2.  On March 1, 2002, you left your residence at approximately 11: 25 a.m.  You proceeded to the Ethnic Hair Salon and arrived at approximately 1:00 p.m.  During the observations, you came out of the salon and talked on your cell phone. Although observations ended at 5:00 p.m. you remained at the Ethnic Hair Salon.

3.  On March 8, 2002, your vehicle was again observed at the Ethnic Hair Salon.  On this occasion observations by the Postal Inspection Service began at 1:24 p. m. and ended at 4;30 p.m. During this time you remained at the Ethnic Hair Salon.

4.  On March 14, 2002 you left your residence at approximately 1:20 p.m. and drove to Firkins Pre-owned Car Dealership in Bradenton, FL.  From there you continued to the Ethnic Hair Salon and arrived at approximately 2:00 p.m.  You remained at the hair salon until approximately 7:00 p.m. You then returned to the dealership and test-drove several vehicles before returning to your residence.

As previously noted during the time you were

2

A-000199

working at the Ethnic Hair Salon you absented
yourself from work based on the fact that you were
incapacitated.  Documentation from your health
care practitioners certify that you have illnesses
relating to migraine headaches and bells palsy.
As indicated above while you claimed you were
incapacitated for work you were in fact working at
the Ethnic Hair Salon.  An investigative interview
relative to the above circumstances was conducted
on April 8, 2002.

As a Postal employee you are well aware of your
responsibility to refrain from engaging in
dishonest conduct or other conduct prejudicial to
the Postal Service.  You are well aware that
employees are expected to be honest, reliable, and
trustworthy. As the facts relate during the time
in which you called in sick you were engaged in
gainful employment at the Ethnic Hair Salon.  Your
actions as described above are a very serious
matter of such gravity that the Postal Service has
lost all confidence in  your creditability as a
Postal employee.  Your actions are  inconsistent
with the Code of Ethical Conduct 661.2, Standards
of Conduct 661.3, 661.53, and 513.312 of the
Employee and Labor Relations Manual and will not
be tolerated." [Joint Exhibit No. 2, p. 2.]

Cited in the removal notice is a Letter of Warning dated

January 24, 2002 for Continued Unsatisfactory Attendance -

Tardiness.  The removal action was requested by Supervisor

Fleury on April 10, 2002 and was concurred in by Tour 1 MDO

Norris Hamm on April 11, 2002.

The Union protested the removal action by filing a Step

1 Grievance on May 4, 2002 that was denied the same day by

SDO Kevin Badgley.  The Union appealed the Grievance to Step

2 on May 7, 2002, and MDO Hamm denied the Grievance in a

memorandum dated May 29, 2002.  The Union filed Corrections

3

A- 000200

and Additions dated June 1, 2002 and the same day appealed
the Grievance to arbitration.  The Parties agree that the
Grievance is properly before the Arbitrator and jointly
submit the following as the statement of issue.

STATEMENT OF ISSUE

Did the Postal Service have just cause to issue the
Notice of Removal, and, if so, what should be the remedy?

POSITIONS OF THE PARTIES

Position of the Postal Service

The Postal Service maintains that while the Grievant
requested and received  SWOP or LWOP under the guise of
FMLA, she continued to work at the Ethnic Hair Salon on the
very same day.  In so doing, the Grievant violated Section
513.312 of the Employee and Labor Relations Manual, which
states,

> "An employee who is in a sick leave status may not
> engage in any gainful employment unless prior
> approval has been granted by the appropriate
> authority."

The Postal Service submits that if the Grievant were
incapacitated for work with migraines and/or Bells Palsy, as
she claims, she would certainly stay home and rest with
minimal activity and only as necessary.  The Postal Service
further submits that the Grievant's action show a total

4

A-000201

disregard for her coworkers, who did the work she should have been doing, and that her actions abused the trust of her managers and supervisors.

The Postal Service maintains that the Grievant's refusal to respond to questions during the investigation by the Inspection Service, during the investigative interview by her supervisor and even at the arbitration hearing calls for an adverse inference.[1] The Postal Service had only FMLA documentation for migraine headaches during the period in question, and the Grievant did not explain or even try to inform Management that she had FMLA for another condition. However, regardless of whether she was claiming FMLA for migraines or Bells Palsy, the Grievant failed in her duties as a Clerk and as an employee of the United States Postal Service. She chose to go to her own place of business and to drive her personal vehicle as well as test drive several other vehicles when she claimed to be unable to work her Clerk job for the Postal Service.[2]

Contrary to the Union's argument, the Postal Service maintains that having the concurring official act as the Step 2 designee is not a harmful error. The EL 921 Handbook is a "Supervisor's Guide To Handling Grievances." The guidelines are not necessarily requirements that must be

□
[1] In support of this position, the Postal Service cites a decision by the Supreme Court in Erickson vs. LaChance.

5

A- 000202

strictly complied with, and no employee right is created
when the guidelines are not followed.[3]

The Postal Service maintains that it had just cause to
issue the Notice of Removal.  The Postal Service urges the
Arbitrator to uphold the action by denying the Grievance.

## Position of the Union

The Union maintains that Management has failed to meet
its burden of proving that the Grievant was actually working
while at her hair salon or showing that the Grievant's
actions were in any way fraudulent.  The Union further
maintains that Management relied solely on the report of the
Inspection Service.  Neither the Grievant's supervisor nor
any other official in Manasota Management conducted an
independent investigation, as outlined in the Memo of
Understanding, which states,

> "The parties further acknowledge the necessity of
> an independent review of the facts by management
> prior to the issuance of disciplinary action. . .
> ." [Union Exhibit No. 1.]

The Union further maintains that because the concurring
official was also the management official who heard the

---

[2] The Postal Service cites Case No. H98C-1H-D 99232594 decided by
Arbitrator M. K. Durham as supportive of its position.
[3] In support of its position that no harmful error occurs when the
concurring official also services as the Step 2 designee, the Postal
Service cites the following:
    Case No. K98C-1K-C 00229363 decided by Arbitrator Jacquelin F.
    Drucker
    Case No. W7C-5S-D 17193 decided by Arbitrator Ernest E. Marlatt

6

A-000203

Grievance at Step 2, the Grievant was unable to obtain an impartial hearing at the second step of the grievance procedure.

The only restrictions placed on the Grievant by her physician was that she was not permitted to work during the period of February 8, 2002 through March 10, 2002.  The Grievant's doctor did not place the Grievant under any restrictions that precluded her from driving a car, walking, using a cell phone or performing any other necessary functions of life.  The Union submits that there was nothing on the video tape showing the Grievant doing anything outside the parameter of the doctor's restrictions.  During the period of the surveillance, the Grievant was not forewarned that her actions would result in discipline, nor did Management invoke its right to ask the Grievant for recertification of her medical condition or send her for a second medical opinion.

The Union asserts that the Grievant's testimony was credible as to the condition of Bell's Palsy and her migraine headaches as well as her restrictions.  The Grievant explained that other beauticians handled her clients at the Hair Salon while she was out of work and that she may have taken care of problems that did not require performing work outside of her restrictions.  The Union

Case No. J90M-1J-D 94008783 decided by Arbitrator Bernard Dobranski

A- 000204

further asserts that the testimony of the Grievant's physician should be credited over that of the Postal Inspector.  The Postal Inspector testified that the doctor responded "no" when asked if he had seen the Grievant recently but that he made no mention of any such question or response in the Investigative Memorandum.  However, the doctor testified from his notes at the arbitration hearing that he had seen the Grievant on February 8, 15 and 25, 2002 and that he had recommended therapy sessions during the same time period.

The Grievant's supervisor admitted that she did not go to the hair salon to observe the Grievant's actions during the time period of the surveillance, and she further testified that she did not personally witness the Grievant perform work at the hair salon.  It is clear, the Union asserts, that the supervisor's reliance on the Investigative Memorandum is the sole reason she used for the discipline. Contrary to the supervisor's assertion that the Grievant was uncooperative in her interview, a review of the interview as contained in the record demonstrates that the Grievant responded to the questions as completely as could be expected given her right to privacy and that the answers had already been provided in the FMLA documentation given to Management by the Grievant.

8

A- 000205

The evidence fails to demonstrate action by the Grievant that is tantamount to removal.[4]  Moreover, the Grievant has no discipline in her record pertaining to improper conduct.  Accordingly, the Union urges the Arbitrator to sustain the Grievance by expunging the Notice of Removal from any and all of the Grievant's records and by making her whole in any and all respects.

OPINION

As the Union maintains, the case turns primarily on a credibility determination, and, as the Union also maintains, there were no physical restrictions on the Grievant as demonstrated by her physician's statement in the record and his testimony by telephone at arbitration.  However, the Union's conclusion that the Grievant can engage in activity of her choice while taking leave as long as her physician restricts her from work is not a reasonable one.

The Grievant's physician testified that he completed his statement with the understanding that she would not be able to function at work when she was suffering with a migraine.  The Grievant's ability to attend to other

☐
[4] In support of its position, the Union cites the following cases:

    Case No. G90C-1G-D 94012024 decided by Arbitrator Linda S. Byars
    Case No. H90C-1H-D 01124930 decided by Arbitrator Christopher E. Miles
    Case No. E7C-2A-D 34888 decided by Arbitrator Walter H. Powell

9

A-000206

employment duties at the hair salon she owns during the time she was taking leave does not support a conclusion that she was suffering with a migraine headache.  As the Postal Service also contends, her failure to obtain prior approval to engage in gainful employment while in leave status is a violation of Section 513.312 of the Employee and Labor Relations Manual.[5]

The credible evidence clearly demonstrates that the Grievant was engaged in gainful employment while she was in leave status.  Even she admits that during the periods she was observed at the Ethnic Hair Salon, she was "checking on" a business enterprise she owned and operated.  She admits that during the time she was claiming FMLA leave she was attending to business at her salon and "making sure everything was running smoothly," dealing with "problems with customers," and checking on "deliveries" of supplies.
 If the Grievant believed she was free to engage in such activity, she refused to admit such activity during the investigation by both the postal inspectors and during the investigative interview with her supervisor. Moreover, there was no sign of an "eye patch" in the surveillance video, as the physician testified he prescribed  in response to the question on direct examination, "What were the Grievant's

---

10

A- 000207

physical limitations?"  The Grievant offered no explanation at the arbitration hearing for the absence of the eye patch in the videotape or for her ability to continue a normal routine of "checking on business," driving, etc. while incapacitated for work with either migraines or "Bells Palsy."

As the Union contends, the Arbitrator does not find in the Investigative Memorandum where the Postal Inspector asked the physician about visits with the Grievant during the period in question.  However, the testimony elicited from the Postal Inspector on cross-examination does not, as the Union asserts, call for a credibility determination in favor of the Grievant.  At issue is whether or not her activities were improper during the period she was claiming leave and not whether or not she visited her physician during the period in question.

The Postal Service has an obligation and a right to investigate when Management believes an employee may be abusing leave.  As the Postal Service contends, the record demonstrates that the Grievant was very uncooperative during the investigation, and her refusal to provide a reasonable explanation for the observations made by the Inspection Service is persuasive proof that she had none.

---

[5] The conclusion here, as well as many other significant facts, distinguishes the instant case from those cited by the Union.

11

A-000208

Contrary to the Union's assertion, the Grievant's refusal to provide an explanation for her activities while under surveillance cannot be explained adequately by a desire for privacy or by her assertion that Management had FMLA documentation. The Grievant's refusal to even spell her last name for the Postal Inspector or to respond to the most basic questions that would have been also contained in her FMLA documentation demonstrates, as the Postal Service maintains, an unwillingness to cooperate and an attempt to conceal the facts. A review of the investigative interview (Joint Exhibit No. 2, pp. 5-7) demonstrates that not only did the Grievant refuse to inform Management of the FMLA condition for which she was claiming leave, but she responded "None of you (sic) business on all of the above dates," when asked "Explain why you were unable to report to work but were seen at the above locations at these dates and times." [Joint Exhibit No. 2, p. 6.]

The Arbitrator agrees with the Postal Service that professing an inability to report for duty under such circumstances is serious misconduct warranting discharge. Moreover, the Grievant's conduct during the two interviews convinces the Arbitrator that she knew her behavior was improper. The Grievant does not have to explain why she is able to spend hours everyday at her hair salon and she does

12

A-000209

not have to answer questions about her medical conditions, but if she chooses not to provide a reasonable explanation for her conduct, it is not unreasonable for Management to conclude that she is misusing leave as charged.

Relying on Article 16.2, the Union submits that the Grievant should have been warned at the beginning of the investigation by the Postal Inspectors that her conduct was improper. However, as the Postal Service pointed out to the Union Steward, discussion is used for "minor offenses" and not for serious misconduct as the evidence demonstrates was occurring in this case. The Union's argument that the Postal Service should have used progressive discipline in this case is likewise unreasonable. Progressive discipline is used for offenses that are more serious than those requiring discussion, but it is not usually considered appropriate for offenses that undermine the trust an employer has in an employee. In this case, it is understandable that the Grievant's supervisor found her behavior inconsistent with the Code of Ethical Conduct and of such gravity as to cause Management to lose confidence in her reliability and trustworthiness.

Contrary to the Union's assertion, the Arbitrator finds no contractual procedural violations during the investigation, and the record demonstrates that the Postal

13

A- 000210

Service conducted a fair and thorough investigation before taking disciplinary action. Neither the Memorandum of Understanding (Union Exhibit No. 1) nor Article 16, Section 8 of the National Agreement requires an "independent investigation," as asserted by the Union. The Memorandum of Understanding requires an "independent review of the facts by management prior to the issuance of disciplinary action (emphasis supplied)," and the evidence demonstrates that Management conducted such a review in this case.

The Union's reliance on the EL 921 Handbook, "Supervisor's Guide to Handling Grievances," and the assertion that the concurring official must be someone other than the Step 2 designee in order to guarantee an employee a fair hearing at Step 2 is without merit.[6] The roles of the reviewing authority and the Step 2 designee, as described in the Guide, can be performed by the same person and there is nothing in the Guide that prohibits the concurring official acting in both roles. It is to be hoped that when the reviewing authority looks at the facts supplied by the supervisor, he is reviewing "both sides." However, he is doing so individually, but when the Step 2 official looks "at both sides of the coin in an effort to resolve the grievance" locally, he is doing so collectively with the

14

A- 000211

Union's Step 2 official.

For the reasons stated above, the Arbitrator finds for the Postal Service and makes the following Award.

AWARD

The Postal Service had just cause to issue the Notice of Removal.  Accordingly, the Grievance is denied.

DATE:   October 17, 2002

Arbitrator

---

[6] As the Postal Service also contends ". . . no employee rights are created when these guidelines are not followed."  (EL 921 Handbook, p. i.)

15

A-000212

**REGULAR ARBITRATION PANEL**
------------------------------------

| | | | |
|---|---|---|---|
| In the Matter of the Arbitration | ( | Grievant: | Allison Batson |
| | ) | | |
| between | ( | Post Office: | Southern, CT |
| | ) | | |
| UNITED STATES POSTAL SERVICE | ( | USPS Case No: | B00C-1B-D 02181225 |
| | ) | | |
| and | ( | APWU Case No: | 02352 |
| | ) | | |
| AMERICAN POSTAL WORKERS | ( | | |
| UNION, AFL-CIO | ) | | |

------------------------------------

BEFORE:                       Philip Harris, Arbitrator

APPEARANCES:

        For the U.S. Postal Service: James W. Carr, Labor Relations Specialist
        For the Union:               Jo-Anne Colburn, Industrial Relations
                                     Director
Place of Hearing:            Wallingford, CT
Dates of Hearing:            March 23 and May 1, 2003
Date of Award:               June 23, 2003
Relevant Provisions:         Article 16, ELM
Contract Year:               2002
Type of Grievance:           Discipline

### Award Summary:

**Issue:** Was the Notice of Removal dated June 14, 2002 issued for just cause? If not, what shall the appropriate remedy be?

**Charge:** Violation of USPS Code of Ethical Conduct.

**Postal Service Position:** Ms. Batson had a pattern of requesting sick leave while working for another employer.

**Union Position:** The discipline was punitive, not progressive, represented double jeopardy, and lacking proof of wrongdoing.

**Opinion and Award:** The Grievant knew the work environment and did abuse sick leave. The grievance is denied.

*Philip Harris*
Philip Harris

A-000213

2

## Issue

Was the Notice of Removal dated June 14, 2002 issued for just cause? If not, what shall the appropriate remedy be?

## Facts

Allison Batson was employed by the Postal Service for eleven years. For almost a year she had a series of sick day payments while she worked at Stop & Shop on the same days, though not during her Postal Service tour of duty hours. She refused to provide all requested documentation for her illness absences.

## Relevant Provisions

**ARTICLE 16 - DISCIPLINE PROCEDURE**
**Section 1. Principles**

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

**ELM**
**Section 511.43 Employee Responsibilities**
"Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences. In addition, employees must provide acceptable evidence for absences when required."

**Section 513.312, Restriction**
"An employee who is sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority (see 660 Code of Ethics.)"

**Section 661, Code of Ethical Conduct**

**Section 661.42, Conflicts of Interest - Employment**
"...An employee may not engage in outside employment or other outside activity that is not compatible with the full and proper discharge of the duties and

A-000214

3

responsibilities of Postal Service employment.
Detailed rules cannot practically be prescribed that
will cover every situation of incompatible employment
or activity.  The following rules, however, provide
guidance for specific situations and illustrate
the manner in which the general principles should
be applied":

c.  "No employee will engage in outside employment
which impairs mental or physical ability to perform
Postal Service duties and responsibilities acceptably.

k.  "No employee will take sick leave to engage in
outside work."

## Postal Service Position

1.    "Ms. Batson's actions went to the heart of the employment
relationship...There just isn't any reasonable excuse for the grievant's
dishonest behavior." The Union intentionally delayed submitting Stop & Shop work
records because they were damning information (Postal Service Closing Statement
page 1, hereafter PSS 1).

2.    The Step 2 grievance papers make no reference to Management
withholding requested information, nor any reference in the appeal to Step 3.
Also, "Dishonesty and fraudulent behavior are not character traits that are
correctable." Arbitrator Roberts said, "There are certain infractions that are
so industrially hideous and simply not deserving of any progressive discipline
consideration" (see below) (PSS 2).

3.    He also asserted that fraud is "a terminal disease that cannot be
corrected through progression." Furthermore, Management thoroughly investigated
the matter and gave Ms. Batson two PDIs.  And the burden of proof is the
"preponderance of evidence," not "beyond a reasonable doubt."  Ms. Batson's
sister also worked both jobs, and not a coincidence.  "This was dishonesty via
the family plan to obtain undeserved financial gain."  The Grievant's sham got
her pay from two employers "without having to work double shifts."  There is no
evidence that she was able to work the other job.  And the Code of Ethics
requires approval to work elsewhere while on sick leave (PSS 3).

4.    Ms. Batson did not use her sick leave to recuperate, but to work at
Stop & Shop.  She was burning the candle at both ends, not getting proper rest
or sleep, and denying responsibility for her actions.  Arbitrator Holden heard
sister Jennifer Batson's case on the same issue (PSS 4).

5.    The sisters' similarities are there: the removal was too harsh; the

A- 000215

other job was not physically demanding; no request for light duty; awareness of employment conditions; and no permission sought. The Arbitrator upheld the termination and mentioned there was no prior discipline.

Arbitrator Parkinson heard a grievant whose other job was student teaching. He said the Postal duties caused him mental and physical stress, but he never filed a claim for this, suggesting "his allegations of disability were unsupported" (PSS 5).

6.     So too Ms. Batson should be regarded. When asked for documentation about Stop & Shop, she said, "my obligation to the Postal Service is from 11 p.m. to 7:30 a.m." Parkinson said, "trust and honesty are the cornerstone of any effective employer-employee relationship," and that Grievant gave cause to question his integrity and commitment to it. He undermined Postal efficiency and caused potential morale problems. The nature of his action is not offset by the absence of prior discipline. The grievance was denied (PSS 6).

7.     The above is on point. Ms. Batson's "type of behavior cannot be corrected by lessor [sic] discipline."

Arbitrator Cohen heard another similar case. The grievant said her Postal job was stressful and caused sick leave, but she recovered enough to attend the second job. The Arbitrator said, "Logically, if she is too ill to work for the Postal Service, she is too ill to work elsewhere (PSS 7).

8.     Cohen upheld the removal saying she misused sick leave by working a second job while on it.

He heard another such case wherein the grievant on three occasions claimed incapacitation yet reported "on his own time" to another job (PSS 8).

9.     The Arbitrator said, "It is not possible to divide the time for purposes of sick leave and claim that one is not sick during part of the day, but sick during the rest of the day, and to alternate in this fashion for several days."

"Ms. Batson unbelievably alternated in this fashion in at least 18 instances."

In a third case by Arbitrator Cohen, the grievant worked another job where he started prior to the end of the Postal shift for which he was on sick leave! Cohen denied the grievance saying, "Grievant has been shown to have deliberately supplied false information to obtain benefits to which he had no right" (PSS 9).

10.     Arbitrator Roberts' case cited previously had a Grievant who provided medical documentation and had no prior discipline. Yet he sustained the removal because the other job constituted a fraud. "When first hired into any position, regardless of employer, profession or industry, all employees understand that

5

fraud or deception will not be tolerated."

Ms. Batson has no credibility (PSS 10).

11. One of her sick leave requests covering 01/26/02 through 01/29/02 was for her contracting the flu. Yet she worked at Stop & Shop 01/28/02 and 01/29/02. "This is simply not credible." She sought two pay checks while working one job.

Referee Sizensky's case was whether Ms. Batson was discharged for willful misconduct. Ms. Sizensky noted that the Grievant agreed to the employment requirement regarding a second job while on sick leave (PSS 11).

12. The Referee also said the Grievant was not cooperative in providing information and answering questions. Hence Ms. Batson was discharged for willful misconduct (PSS 12).

13. Ms. Batson's sister was removed for similar behavior. And the claim of double jeopardy is bogus. It is defined in Black's Law Dictionary as being for the same offense. The Grievant's prior disciplines were for irregular attendance. The present violation relates to the Code of Ethical Conduct (PSS 13).

14. "She was duplicitous when she applied for payment from USPS while reporting for work at Stop & Shop." The Postal Service cannot trust Ms. Batson. The grievance should be denied (PSS 14).


**Union Position**

1. "The highest level of proof must be shown," which the Service did not meet. The Grievant has always said she has nothing to hide. (Union Closing Statement page 1, hereafter US 1).

2. Ms. Batson never denied having a part-time job, which many Postal employees do. She would not have taken so visible a position if it were against the rules. The Postal Service did not prove that the second job impaired her mentally or physically. There was no proof of a conflict of interest (US 2).

3. "She took sick leave because she was sick," not to engage in the other job. The document she signed eleven years ago said a second job may lead to an investigation, not a firing (US 3).

4. The Grievant was not given the specific dates and hours involved in the charge. The investigation was incomplete (US 4).

5. Ms. Batson was unaware of the ELMs that were cited, and not forewarned of possible discipline for violations. The evidence against her is

A-000217

circumstantial at best (US 5).

6.    Her sister, "whose case must stand alone and isolated," was the only employee removed "for the same alleged offense." The Grievant had an LOW and 7-day suspension as prior discipline (US 6).

7.    She had been charged with failing to be regular in attendance. The same dates involved then are again being cited in the instant matter. This is double jeopardy: the earlier dates should be disallowed, reducing the number to half the original (US 7).

8.    Only three sick days overlapped with the other job in almost two years. Ms. Batson was unaware of the rule requiring approval to work while on sick leave, or she would have complied with it (US 8).

9.    The Grievant made every effort to maintain her schedule. In her sister's case the Arbitrator said "The Union did not argue that the records submitted into evidence by the Postal Service were inaccurate" (US 9).

10.    Her sister did not testify or explain the absence pattern, different from the case at bar.

In support of its position, the Union submitted three arbitration awards. The first was heard by Rose Jacobs, Case No. B98C-4B-D 01101475. A Postal Clerk was on sick leave due to an on-the-job injury, but continued to work at his part-time job as a card dealer not inconsistent with his medical restrictions. However, the Arbitrator was concerned primarily with the question of whether the employee was aware of the rule to get approval to work while on sick leave. She concluded he was not because everyone at the Post Office knew for eight years of his dealer job and "He would never have chosen a second job with thousands of people walking around that might have spotted him had he known it was against the rule." But there was misconduct by the employee, leading to no back pay associated with his reinstatement (US 10).

11.    The second case was also heard by Arbitrator Rose Jacobs, No. B98C-1B-D 00089750. An employee was on FMLA leave and returned after it expired. The documentation he produced did not cover the period of absence, which was then entered as AWOL leading to his removal. He later got another FMLA certification for the remainder of his absence. Ms. Jacobs said Management was aware of his illness because of past FMLA leaves. Also, "The Arbitrator is further persuaded that the Grievant had no reason to disbelieve he was on FMLA leave for the period of his absence especially since his documentation supplied to the medical unit for the same malady was found just as acceptable as it was in the past." The Grievant was restored to his position and made whole.

The third case was heard by Arbitrator George Sulzer, No. B98C-1B-D

A-000218

00016932.  The Grievant was absent from her job for 104 hours claiming a child-care emergency, and failed to produce the requested documentation.  It was then discovered she was working as a cook in a newly opened, family owned restaurant.  She was terminated based on an allegation of fraud.  Mr. Sulzer determined that the facts justified the emergency characterization, there being four children involved.  Also, the Service did not disprove the Grievant's contention that she prepared the restaurant food during off hours from her tour.  Though she was AWOL, it was not ground for the removal.  She was restored to her job and made whole.

The Union in the case at bar asserted that reasonable doubt should be resolved in favor of Ms. Batson.  The burden of proof should be "beyond a reasonable doubt (US 11).

12.  The Grievant should be made whole and the Arbitrator retain jurisdiction (US 12).

## Opinion

A major reason to deny the grievance is the serious, self-inflicted harm Ms. Batson brought to her credibility. One of her numerous sick days was for "flu like symptoms," (from which she seemingly made a rather rapid recovery!)  Yet during the illness she worked her second job!  This point was picked up by the Department of Labor of the State of Connecticut.  In its review of her claim for employment benefits, the Referee said concerning the second job,  " I n  o n e instance, the claimant claimed to have the flu, which would clearly debilitate the claimant from working at all jobs and not simply the claimant's post office position."  It does debilitate with fever, headaches, sore throat, body aches, etc., as many an adult and/or parent can testify.  For Ms. Batson to be fit for duty at Stop & Shop is unlikely, a reasonable person would conclude. Furthermore, her value as an employee in the second job was recognized early-on; she was promoted from cashier to job recruiter, processing some 400 job applications monthly, selecting the people to interview and checking references. The Arbitrator thinks it unlikely that she would reward the Stop & Shop executive suite by reporting to work with a disease, a contagious virus!  It is more rather than less likely that the Grievant was not so afflicted.

This conclusion on Ms. Batson's credibility readily justifies taking a close look at her other statements and actions.  She has a long string of sick days, to the point where her sick day bank is depleted even though she has 104

A-000219

hours of such benefit per year for the past eleven years. This stands out as excessive use, particularly because she refused to submit as requested documentation for the absences. This is uncooperative and violative of Section 511.43 above. In addition, "On another occasion, the claimant failed to notify the employer of her absence, which constitutes willful misconduct even if the claimant had good cause for the absence," said the State of Connecticut Referee.

As to her knowledge of the work environment, the Grievant admitted to signing a Statement of Understanding by Employee, including the points below:

> 4. I understand that if I am absent due to illness or injury for more than two days, I must call in advance to advise that I intend to report for duty, and when.
> 5. I understand that, when a supervisor deems it necessary under appropriate regulations, I may be required to furnish a doctor's certification or other acceptable evidence to substantiate any absence which I claim is due to illness or injury.
> 6. I also recognize that I am subject to investigation if I work for another employer on a day when I report sick at the post office, even though the hours of the two jobs are different.

> I HAVE READ AND I AGREE TO THE ABOVE

She claimed that it was eleven years ago, and hence she did not recall signing it. *This is not a reason to ignore one's responsibilities. How about marriage vows (although some people are in denial)? What about the Declaration of Independence, the Constitution, apartment rental agreement, etc.? The beneficiaries of such meetings of the mind are entitled to enforcement.*

Ms. Batson's claimed unawareness of the work environment expectations is contradicted by the impression she creates. The Grievant is intelligent, quick-minded, verbal and personable. Her competence has been recognized at both jobs, a recruiter at Stop & Shop and actual Post Office service as an Acting Supervisor! She has been around the world of work for sometime, and also has demonstrated her skills at child-rearing while working: her daughter is entering college! But even without these impressive credentials, employees using common sense about attendance and work conflicts would come up with appropriate behaviors to be well regarded by Management.

It is most regrettable that Ms. Batson saw fit to work the system as she did. The Union arguments do not offset this. The double jeopardy issue is not precisely that, she having been previously charged with attendance irregularities. *It was subsequently learned about the second job and its relation to Postal sick leave.* The arbitration cases submitted by the Union do

A-000221

9

not come close to matching the credibility question in the case at bar.


**Award**

The Notice of Removal dated June 14, 2002 was issued to Ms. Allison Batson for just cause.  The grievance is denied.

A-009222