# VAN STENDAL DEPOSITION

A-0063

1    A.    Absolutely.

2    Q.    Now, that exhibit lists several infractions of

3    the ELM, is that right?

4    A.    I don't know that it lists infractions.    It

5    lists sections from the ELM.

6    Q.    Well, is the basis for the removal those

7    sections of the ELM?

8    A.    Yes.

9    Q.    And could you describe in your own words what

10   conduct by Melinda Wilson you felt justified her

11   removal from the Postal Service?

12   A.    Well, in particular, that if you are in a

13   sick-leave status, then you should not be gainfully

14   employed outside the Postal Service.    In particular,

15   the biggest incident for me was leaving work at three

16   o'clock on a particular day and requesting sick leave

17   and going to work at Boscov's at 3:18 on that same

18   day.

19   Q.    Do you know what day that was?

20   A.    If I can look at the documents --

21   Q.    Okay.    Sure.

22   A.    That would be on December 12th of 2003.

23   Q.    And when did you come to learn that Ms. Wilson

24   took sick leave at three o'clock and went to Boscov's



1     Q.    Is that a fair statement of what she did wrong?

2              MS. HANNIGAN:   Objection to the form of

3     the question.   I don't think the witness has said

4     that's the only thing she did wrong.   But you can

5     answer the question.

6     A.    I don't think I really understood.   It went in

7     a couple of different directions.

8     Q.    I'm sorry.   Let me see if I can try that again.

9              Would it be fair to say that, in your

10    opinion, what Ms. Wilson did wrong that caused the

11    Postal Service to seek her removal was working in an

12    outside job while she was on sick-leave status on

13    particular days?

14    A.    Those are part of the factors, yes.

15    Q.    Tell me what the other factors were?

16    A.    The other factors were, as we were going

17    through this whole investigation, a reluctance on

18    Ms. Wilson's part to provide information when it was

19    requested in different interviews.

20    Q.    Let me stop you there for a moment.   What

21    information did you request her to provide and what

22    was the response?

23    A.    On which occasion?

24    Q.    Well, let's start chronologically.   When was



1     the earliest time you asked Ms. Wilson to provide you

2     with information about her employment at Boscov's?

3         A.    On December 24th of 2003.

4         Q.    Now, prior to December 24th, 2003, were you

5     aware personally, personal knowledge from wherever it

6     came from that she was working at Boscov's?

7         A.    Yes.

8         Q.    And how did you come to know that?  When did

9     you know that?

10        A.    My initial way of knowing it was through

11    supervisor Linda Drummer.  It was sometime late

12    November, early December.  I don't know the exact day,

13    but she came in and told me she was out holiday

14    shopping and had witnessed Ms. Wilson working at

15    Boscov's.

16        Q.    Now, when you spoke to Linda Drummer about this

17    or when she told you about this, did you say anything

18    to her or express some concern that Ms. Wilson was

19    doing something wrong?

20        A.    I expressed concern that it appeared that the

21    work that she was doing at Boscov's violated the

22    medical restrictions she had provided to the Postal

23    Service.

24        Q.    And did you ask Ms. Drummer to do anything to



1    follow up on this information she gave you?

2        A.    I asked her to ask for updated medical

3    documentation from Ms. Wilson.

4        Q.    Okay.  And do you know what the result of that

5    request was?

6        A.    Yes.  We got updated medical restrictions.

7        Q.    Were they different than the restrictions that

8    had been in place before you got the updated

9    restrictions?

10       A.    No.  They were exactly the same.

11       Q.    I understand that on December 24th, Ms. Wilson

12   was called in and told to go home, is that correct?

13       A.    At the end, yes.

14       Q.    At the end?  That was the outcome of the

15   meeting?

16       A.    Yes.

17       Q.    And could you tell me, did you participate in

18   that meeting?

19       A.    Yes, I did.

20       Q.    Can you tell me the purpose of that meeting?

21   Start there.

22       A.    The purpose of the meeting was to clarify once

23   again her medical status with the Postal Service.  She

24   had received information from Shared Services which



1    stated that all of Ms. Wilson's medical claims were

2    either closed or denied, which meant that she was no

3    longer entitled to a limited-duty status.  Because I

4    had information that said that she was working at

5    Boscov's, doing work that was directly in opposition

6    to medical information that we had, I wanted that

7    information clarified.

8        Q.    In your mind, was she entitled or not entitled

9    to limited-duty status in December of 2004?

10       A.    She was not once we received the information

11   from Shared Services that said all of her claims were

12   either closed or denied.

13       Q.    So if she were to seek some kind of

14   limited-duty status or some kind of accommodations,

15   she would have to go back to square 1 with a new

16   request?

17       A.    Right.  You can't request limited duty unless

18   you have a valid claim.

19       Q.    And was that brought to Ms. Wilson's attention

20   at that time at that meeting?

21       A.    Well, the only way for her to file a new claim

22   would be to file an accident report.  So, no.

23       Q.    My question is, when you sat down with

24   Ms. Wilson on December 24th, did you or Ms. Drummer



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    say, "Hey, Ms. Wilson, the information we have

2    indicates you're not entitled to light duty status."

3       A.    I didn't say she wasn't entitled to light duty

4    status.    I said she wasn't entitled to limited-duty

5    status.

6       Q.    I'm sorry.    Limited-duty status.

7       A.    Yes.    That was explained to her several times.

8       Q.    What did she say?

9       A.    She said she was entitled to limited-duty

10   status.

11      Q.    In the context of that, did you confront her

12   with the Boscov's situation?

13      A.    We spoke about that afterwards.

14      Q.    After you told her to go home?

15      A.    No.

16      Q.    Or during the meeting?

17      A.    As we talked about the limited-duty status,

18   Ms. Wilson continued to say that she was entitled to

19   limited duty.    She told me that she had a form in her

20   locker which would prove to me that she was entitled

21   to limited duty, and I allowed her to go get that

22   form.    However, that form did not prove that she was

23   entitled to limited duty.

24      Q.    How did the Boscov's subject come up?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1       A.    At that point, once I explained to her again

2    that she was not entitled to limited duty, I asked her

3    if she was working outside of the Postal Service.

4       Q.    And what did she say?

5       A.    She refused to answer.

6       Q.    Now, you knew she was?

7       A.    Yes.

8       Q.    Did you tell her, I know you're working at

9    Boscov's?

10       A.    Not until after I asked her.

11       Q.    Did you eventually during this meeting?

12       A.    Then I said I have proof that you are working

13    outside the Postal Service.

14       Q.    What did she say?

15       A.    She said nothing.

16       Q.    Okay.

17       A.    And then subsequently, after I asked her about

18    her medical restrictions and that I had information

19    that which the job she was performing at Boscov's was

20    not -- with the documentation that she had provided

21    us, that she was performing work there that she did

22    not perform for us.  She told me that her

23    documentation was only valid for the Postal Service.

24       Q.    So basically she was telling you, when I'm on



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    my own time, I can do whatever I want to do?

2        A.   I don't know what she was trying to say.

3        Q.   Was that your impression?

4        A.   She was telling me that her documentation was

5    only valid for the Postal Service.

6        Q.   Now, at that time on December 24th, were you

7    aware of the regulation that cited in number 6 about

8    no outside employment while on sick leave and it's

9    ELM 513.312?

10            MS. HANNIGAN:   You're referring to Keen

11   Exhibit 6?

12            MR. BERNSTEIN:   Yes.   Keen Exhibit 6.   I'm

13   sorry.

14   BY MR. BERNSTEIN:

15       Q.   You had personal knowledge of that?

16       A.   Yes.

17       Q.   Is that something that comes up a lot?

18       A.   Not normally.

19       Q.   Is it common or unusual for Postal Service

20   employees to have some kind of second job or outside

21   employment?

22       A.   I can't answer that.

23       Q.   You don't know?   Just anecdotally if you know.

24       A.   I couldn't say if it's common.   I don't know



1    you know, you have to be careful about outside

2    employment because there are a number of regulations,

3    postal regulations that may get you in trouble?

4    A.    No.

5    Q.    You never said that?

6    A.    No.

7    Q.    You sent her home on December 24th?

8    A.    Yes, I did.

9    Q.    And the reason was?

10   A.    The reason was that at that point, as I stated

11   earlier, she was not entitled to limited duty.  She

12   would be entitled to light duty, however, because her

13   medical restrictions conflicted with something I knew

14   that she was doing at outside employment.  Since her

15   medical restrictions were in question, I sent her home

16   until she provided updated medical documentation.

17   Q.    So you sent her home because she was saying, "I

18   have restrictions," and you didn't think she did.

19   Would the alternative be, say, just continue working

20   or you didn't want her to do that?

21   A.    I sent her home because the piece of paper that

22   she provided to us from her doctor stated that she was

23   not able to do certain things that I had factual

24   knowledge that she was performing at another place



A-0072

1  outside of the Postal Service.

2      Q.   But was she performing or did she have to

3  perform those things at the Postal Service or not in

4  her job?

5      A.   In her normal job?

6      Q.   Yes.

7      A.   Yes.  She would have had to.  However, she was

8  telling me that she was not able to do that.

9      Q.   Did she, in fact, do those things or you don't

10  know?

11      A.   She didn't do them.

12      Q.   So in your mind there was a conflict between

13  what you understood she was doing at Boscov's and what

14  she was doing at the Postal Service?

15      A.   There was a conflict between the medical

16  restrictions that she provided to me and what I knew

17  she was doing outside the Postal Service.

18      Q.   Now, you mentioned there were other things that

19  Ms. Wilson did that, in your mind, led to her removal.

20  Do you remember that?

21      A.   Yes.

22      Q.   What were --

23      A.   Part of it for me was I have to take into

24  account the overall conduct of an employee and their



1    overall value to the Postal Service.  I had had a

2    prior conversation with Ms. Wilson.  She was actually

3    in representing another employee on a different

4    matter.  And after that discussion was over, I had

5    asked Ms. Wilson when she was going to return to full

6    duty.  And Ms. Wilson told me that she was never going

7    to return to her regular job.  She was never going to

8    perform at full duty.

9            And going back to that conversation and

10   what I knew she was doing at Boscov's, also told me

11   that she was not being particularly honest in my

12   opinion, and honesty is one of the things that we

13   require from a postal employee.

14       Q.   If the employee tells me, "I'm never going to

15   return to full duty," what's dishonest about that?

16       A.   Because at the time -- afterwards she was out

17   performing those duties in another place that was not

18   the Postal Service.

19       Q.   And do you remember when this conversation

20   occurred?

21       A.   It was several months before like November,

22   December.  I don't remember exactly what the day was,

23   but I know it was a couple of months before, and as I

24   said --



1      Q.    Before December?

2      A.    Yes.

3      Q.    Were there any other examples in your mind of

4    dishonest behavior as you characterized it?

5      A.    No.   There were other factors maybe that

6    weren't dishonest.  Ms. Wilson had, on occasion, been

7    belligerent with other supervisors and managers which

8    is also something that I took in as a factor because I

9    looked at the overall picture.

10     Q.    Give me an example of Ms. Wilson being

11    belligerent to other managers.

12     A.    Ms. Wilson was having a discussion with my

13    back-up manager, who replaces me when I'm not there.

14    And that manager was giving her an instruction and

15    Ms. Wilson chose not to follow that instruction and

16    went off onto the floor against that person's

17    instructions to go find a shop steward, which was not

18    proper.  Proceeded to yell on the floor, raise her

19    voice.

20          She had also put in for a supervisor

21    program, and her manager had at the time did not

22    concur with the evaluation and brought me the

23    paperwork because she had been belligerent with him

24    out on the floor and told him that he needed to check



1    also MW 0510, and additionally -- I don't think the

2    other pages have been stamped, but it's all stapled

3    together, and there are a number of requests for

4    notification of absences attached to that?

5              MS. HANNIGAN:   I believe in the Bates

6    stamp documentation, these were produced.  These all

7    appear consecutively beginning at about 510 through

8    516, 17.

9        Q.   First page of Van Istendal Exhibit Number 1

10   appears to be a letter from a LuAnn Ashmen to a Larry

11   Bucci.  Who is LuAnn Ashmen?

12       A.   She's a postal inspector.

13       Q.   Was she involved in the investigation of

14   Ms. Wilson to your knowledge?

15       A.   Yes.

16       Q.   Was she the main person who did the

17   investigation?

18       A.   I don't know.

19       Q.   You don't know.  Okay.

20              Who is Larry Bucci?

21       A.   Larry Bucci is the FMLA coordinator for the

22   Delaware processing and distribution center.

23       Q.   Can you tell me what an FMLA coordinator is?

24       A.   I can try.



Carla Van Istendal - Bernstein                    28

1     Q.   Now, and those correlate with specific requests

2  for notification on the following pages of that

3  exhibit.  If you want to look that over, check that

4  out, you certainly can.

5           MS. HANNIGAN:  Off the record.

6           (Discussion off the record.)

7           (Pause.)

8  BY MR. BERNSTEIN:

9     Q.   Now, this the letter and the FMLA leave

10  requests that are stapled to that letter, was that

11  something that was given to you prior to the

12  preparation of the removal notice?

13     A.   I don't remember if this was included in the IM

14  or not.  I'd have to see it.

15     Q.   Well, going back to the removal notice, it

16  indicates a number of dates that match up with those

17  dates --

18     A.   Right.

19     Q.   -- where the allegation is that Ms. Wilson was

20  working at Boscov's on days she took sick leave?

21     A.   Right.

22     Q.   So it would be fair to say that it was

23  incorporated in the removal?  That information --

24     A.   The information, yes.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A-0077

Carla Van Istendal - Bernstein                    29

1    Q.    -- was incorporated in the removal letter?

2    A.    Yes.

3    Q.    And do you recognize the handwriting on

4    page 0510, 2 hours, 8 hours, .5 hours?

5    A.    No.

6    Q.    So your handwriting?

7    A.    No.

8    Q.    But you don't know whose it is?

9    A.    No.

10    Q.    Have you pinpointed any specific time when you

11    learned that Ms. Wilson was working at Boscov's on

12    days she had taken sick leave?

13    A.    It would be after December 24th.  I can't tell

14    you the exact date.  I didn't go back at that point

15    and look for dates.

16    Q.    Sometime between December 24th and March 24th

17    when the removal letter was authored?

18    A.    Yes.

19    Q.    Now, on December 24th, Ms. Wilson was sent

20    home, right?

21    A.    Yes.

22    Q.    And told not to come back until she gets more

23    medical documentation?

24    A.    Yes.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    You're familiar with those phrases?

2    A.    Yes, I am.

3    Q.    For clarity on the record, could you explain

4    what they are and any differences between the two?

5    A.    Sure.

6    Q.    Thank you.

7    A.    Limited duty is extended to someone who has

8    sustained an injury while in employment at the Postal

9    Service.  We are required to provide work for someone

10    who has injured themselves in the course of their duty

11    for the Postal Service.  Light duty is -- for example,

12    I'm home and I fall down the steps and I break my leg

13    and I'm not able to carry mail.  So I'm coming in and

14    requesting light duty.  I'm requesting that you give

15    me an assignment that I can perform while I'm

16    incapacitated.  I'm not required to provide you light

17    duty, but we should do that to the best of our

18    ability.

19    Q.    Ma'am, I want to turn your attention to your

20    Exhibit Number 2, the last two lines.  It says a DIC

21    was held on 3/10/04.  Is DIC, is that day in court?

22    A.    Yes, it is.

23    Q.    Can you explain what that is?

24    A.    A day in court is -- another term for it is a



1    conduct of the employee in reaching a determination

2    about removal, is that fair?

3       A.    Yes.

4       Q.    And you referred to a comment that Ms. Wilson

5    had made to you that she was, quote, never going to

6    return to her job, to full duty, and you indicated on

7    two occasions she had been found to be belligerent

8    while at work?

9       A.    Yes.

10      Q.    And that you considered that as part of the

11   overall conduct of the employee, is that correct?

12      A.    Yes.

13      Q.    And then you were asked whether there was

14   anything in the notice of removal that reflected that

15   and reflected the fact that you considered the overall

16   conduct of the employee, and I'd just like to call

17   your attention in Keen Number 6, which is the notice

18   of removal --

19      A.    Right.

20      Q.    -- the bottom of the second page, under the

21   section 666.2, behavior and personal habits.  Are

22   there characteristics that are listed in there that

23   you think were relevant to your consideration of the

24   overall conduct of this employee?



1    A.    Yes.    Because to me, when you -- part of it is

2    when it says about being honest, being reliable,

3    reliable is someone reporting to work.    And when I

4    look at an overall package -- for example, from the

5    investigative memorandum that says that you called out

6    sick today, you worked at Boscov's during the night.

7    You called out sick again the next day.    You're

8    showing me that you are not reliable as a postal

9    employee.

10            Where it also says that you have to be

11   courteous, I don't consider being belligerent on the

12   floor or telling someone that they need -- a manager

13   that they need to check their attitude as courteous.

14   That's not proper work conduct in my consideration.

15   Q.    One other issue, the question of whether FMLA

16   leave that Ms. Wilson applied for and was granted was

17   paid leave or not, can you clarify that for us on the

18   record?    Was Ms. Wilson, in fact, paid for the time

19   she took off as FMLA leave as noted by the leave slips

20   contained in Van Istendal Number 1?

21   A.    I have to look at these.

22   Q.    Sure.

23   A.    Do you want me to tell you day by day or just

24   in general?    For example, the one on November 5th says



A-0081

1    FMLA sick leave.  So that would have been paid leave.

2    The next one, FMLA sick leave, that's paid leave.

3    Sick leave, paid leave.  FMLA sick leave, also paid

4    leave.  FMLA sick leave, paid leave.  FMLA sick leave,

5    paid leave.  FMLA sick leave on the 24th, that's also

6    paid leave.

7        Q.    So I'll note for the record that you've just

8    gone page by page through Van Istendal number 1 and

9    indicated on each occasion listed there, where

10   Ms. Wilson applied for and was granted FMLA leave, she

11   was, in fact, paid for her time that she was out on

12   sick leave?

13       A.    Yes.

14            MR. LEFF:  Thank you.  I have nothing

15   else.

16            MR. BERNSTEIN:  Nothing else from me.  So

17   we are done.

18            MS. HANNIGAN:  We'll read and sign,

19   please.

20            (Deposition ended at approximately

21   2:30 p.m.)

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-0082



UNITED STATES POSTAL INSPECTION SERVICE

PHILADELPHIA DIVISION

February 17, 2004

Larry Bucci
Time & Attendance Manager
P.O. Box 10000
Wilmington, DE 19850

I am conducting a criminal investigation on Melinda Wilson (SSN 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) a mail processor at the Delaware P&DC. I would like to request Ms. Wilson's FMLA Certification verification for FMLA sick leave for the following dates:

November 5, 2003 — 2 hrs.
December 5, 2003 — 8 hrs.
December 12, 2003 — 50 hrs.
December 17, 2003 — 4 hrs.
December 18, 2003 — 8 hrs.
December 19, 2003 — 8 hrs.
December 20, 2003 — 8 hrs.
December 24, 2003 — hrs.

The request for this information should be kept confidential in order not to obstruct this investigation. If you need more information from me, contact me at (215-895-8469).

LuAnn Ashmen
Postal Inspector



DEPOSITION
EXHIBIT
Non Intended 1
R— 10-6-05



RECEIVED
FEB 17 2004
JM Bucci
FMLA COORDINATOR

PO BOX 7500
PHILADELPHIA PA 19101-9000
TELEPHONE 215-895-8450
FAX: 215-895-8470

MW0510

A-0083

**UNITED STATES POSTAL SERVICE®**

## Request for or Notification of Absence

| Employee's Name (Last, First M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | | | | PP | | Year |
|---|---|---|---|---|---|---|---|---|---|
| Wilson, Melinda G | 221 67 2808 | 11/5/03 | 2 | Scheduled | Un-Scheduled | | 24 | | 03 |

| Installation (For PM leave, show city, state, and ZIP code) | N/S Day | Pay Loc # | D/A Code | From Date | Hour | | | Day | Init. | Ho |
|---|---|---|---|---|---|---|---|---|---|---|
| Wilmington, DE 19850 | | 215 | 110 | 11-5 | 1300 | | Sat 01 | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | Thru Date | Hour |
|---|---|---|---|---|
| 17.00 | | ☐ No Call | 11-5 | 1550 |

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance |
|---|---|---|---|
| ☐ Annual | ☑ For FMLA Leave (Certification reviewed) OK | | ☐ Yes  ☐ No |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | |
| ☑ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | Lunch-Out | |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-In | ENTERED |
| ☐ COP | ☐ For Higher Level (1723 on file) | End Work | ERMS |
| ☑ Other: FMLA | ☐ Scheme Training Testing, Qualifying (Memo on file) | End Work | |

Remarks (Do not enter medical information)

NO LUNCH

| | Total Hours | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date 11/5/03 | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| Melinda G Wilson | | 1819 11/5/03 |

**Official Action on Application** (Return copy of signed request to employee)

| ☐ Approval, not FMLA* | ☑ Approved, FMLA (See Publication 71) | ☐ Approved FMLA, Pending Documentation Noted on Reverse | Signature of Supervisor and Date 11-6-03 |
|---|---|---|---|
| ☐ Disapproved (Give reason): | | | Sm Bucci |
| ☐ Ineligible for FMLA (Estimate eligibility date): | | ☐ Continued on Reverse | |

PS Form 3971, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both, (18 U.S.C. 10

CL 4-09-04



EXHIBIT

Pl #4

A-0084

**UNITED STATES POSTAL SERVICE**

# Request for or Notification of Absence

| Employee's Name (Last, first, M.I.) WILSON, MELINDA G | Social Security No. 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 | Date Submitted 12/05/2003 | No. of Hours Requested 8.00 | | Scheduled | Un-Scheduled | PP 26 | | Year 2003 |
|---|---|---|---|---|---|---|---|---|---|

| Installation (For PM leave, show city, state and ZIP code) 09-6821 - DELAWARE P&DF | N/S Day | Pay Loc. # 215 | D/A Code 11-0 | From Date 12/05/2003 | Hour 07:00 | | | | Day | Init. | Hours |

| Time of Call or Request 06:09 | Scheduled Reporting Time 07:00 | Employee Can Be Reached At (If needed) (302) 395-4854 | No Call | Thru Date 12/05/2003 | Hour 15:30 | | SAT |

**Type of Absence**
- [ ] Annual
- [ ] Carrier 701 Rule
- [ ] LWOP (See reverse)
- [x] Sick (See reverse)
- [x] Late
- [ ] COP
- [x] Other: ISL

**Documentation (For official use only)**
- [x] For FMLA Leave (Certification reviewed)
- [ ] For COP Leave (CA1 on file)
- [ ] For Advanced Sick Leave (1221 on file)
- [ ] For Military Leave (Orders reviewed)
- [ ] For Court Leave (Summons reviewed)
- [ ] For Higher Level (1723 on file)
- [ ] Scheme Training Testing, Qualifying (Memo on file)

**Revised Schedule for (Date)**

**Approved in Advance** [ ] Yes [ ] No

Begin Work

Lunch-Out

Lunch-In

End Work

Total Hours

| | SUN |
| | MON |
| | TUE |
| | WED |
| | THU |
| x | FRI | 10 | 8 |
| | SAT |
| | SUN |
| | MON |
| | TUE |
| | WED |
| | THU |
| | FRI |

**Remarks (Do not enter medical information)**
NOT IOD; FMLA LEAVE
WRH

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date M.Wilson 12/4/03 | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified 12/09/03 |

**Official Action on Application (Return copy of signed request to employee)**

- [ ] Approved, not FMLA*
- [x] Approved, FMLA (See Publication 71)
- [ ] Approved FMLA, Pending Documentation Noted on Reverse
- [ ] Disapproved (Give Reason):
- [ ] Ineligible for FMLA (Estimate eligibility date): _____

Signature of Supervisor and Date

[ ] Continued on Reverse

PS Form 3971, April 2001

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

**During This Absence, I Was Incapacitated for Duty by:**
- [ ] Sickness
- [ ] On-the-Job Injury
- [ ] Off- the-Job Injury
- [ ] Pregnancy and Confinement
- [ ] Undergoing Medical, Dental, or Optical Examination or Treatment (Job related)
- [ ] Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related)

**During This Absence, I Was Unavailable for Duty Because**
- [ ] Sick Leave for Dependent Care
- [ ] Birth of Child - Bonding
- [ ] Placement of a Child with Employee for Adoption or Foster Care

**Additional Information Regarding Denial of Leave Protection Under FMLA**
- [ ] Employee Not Eligible - Less than 1250 Hours Worked.
- [ ] Employee Not Eligible - Not Employed with USPS 1 Year.
- [ ] Employee Has Exhausted FMLA Entitlement in Current Leave Year.
- [ ] Absence Not for a Covered Condition.
- [ ] Absence Not for a Covered Family Member.
- [ ] Requested Documentation Not Provided.
- [ ] Documentation Provided. Does Not Meet Criteria for FMLA Protection

Additional Documentation Required

Privacy Act: The collection of this information is authorized by 39 USC 401,1001, 1003, 1005; 5 USC 8339; and Public Law 103-1. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

**Leave Types (Information Only)**

| Leave Type | Time Card Code | PSDS Code | | Scheduled | Un-Scheduled | PP | | Year |
|---|---|---|---|---|---|---|---|---|
| AL- FMLA | 55/01 | 32 | | | | Day | Init. | Hours |
| SL- FMLA | 56/02 | 33 | | | | SAT | | |
| LWOP - FMLA - Part Day | 59/05 | 36 | | | | SUN | | |
| LWOP - FMLA - Full Day | 60/06 | 37 | | | | MON | | |
| LWOP - Lieu of Sick Leave | 59/60 | 20 | | | | | | |
| LWOP - Proffered | 59/60 | 21 | | | | TUE | | |
| LWOP - Personal Reasons | 59/60 | 22 | | | | WED | | |
| LWOP - Part Day | 59 | 23 | | | | THU | | |
| LWOP - Full Day | 60 | 23 | | | | | | |
| LWOP - AWOL | 59/60 | 24 | | | | FRI | | |
| LWOP - IOD (Not FMLA) -OWCP | 49 | 25 | | | | SAT | | |
| LWOP - Maternity | 59/60 | 26 | | | | SUN | | |
| LWOP - Suspension | 59/60 | 27 | | | | | | |
| LWOP - Union Official | 84 | 28 | | | | MON | | |
| LWOP - Suspension Pending Termination | 59/60 | 29 | | | | TUE | | |
| Continuation of Pay - USPS | 71 | 03 | | | | WED | | |
| Continuation of Pay - USPS-FMLA | 71/03 | 34 | | | | THU | | |
| Continuation of Pay - FMLA-IOD-OWCP | 49/04 | 35 | | | | FRI | | |
| Court Duty | 61 | 04 | | | | | | |
| Military Leave | 67 | 05 | | | | | | |
| Postmaster's Organization | 89 | 08 | | | | | | |
| Blood Donor Leave | 69 | 09 | | | | | | |
| Other Paid Leave | 86 | 10 | | | | | | |
| Convention Leave | 66 | 12 | | | | | | |
| Acts of God | 78 | 13 | | | | | | |
| Veteran's Funeral | 86 | 10 | | | | | | |
| Relocation | 80 | 15 | | | | | | |
| Civil Defense | 77 | 16 | | | | | | |
| Civil Disorder | 81 | 17 | | | | | | |
| Voting Leave | 85 | 18 | | | | | | |

PS Form 3971, April 2001 (Reverse)

CL 4-07-04

**UNITED STATES POSTAL SERVICE®**

## Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | PP | Year |
|---|---|---|---|---|---|
| WILSON, M G | 2808 | 12/12/03 | 1/2 | | 03 |

| Installation (For PM leave, show city, state, and ZIP code) | N/B Day | Pay Loc. # | D/A Code | From Date | Hour | | Day | Init. | Hou |
|---|---|---|---|---|---|---|---|---|---|
| WILM DE 19850 | 2-3 | 215 | 110 | 12/11 | 1500 | Sat 01 | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | Thru Date | Hour |
|---|---|---|---|---|
| | 15:00 | ☐ No Call | 12/11 | 1530 |

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance |
|---|---|---|---|
| ☐ Annual | ☑ For FMLA Leave (Certification reviewed) | | ☐ Yes ☐ No |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | |
| ☑ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | | |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-Out | |
| ☐ COP | ☐ For Higher Level (1723 on file) | Lunch-In | |
| ☑ Other FMLA | ☐ Scheme Training Testing, Qualifying (Memo on file) | End Work | |
| Remarks (Do not enter medical information) | | Total Hours | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| Melinda Wilson | | 12/12/03 |

### Official Action on Application (Return copy of signed request to employee)

☐ Approved, not FMLA*    ☑ Approved, FMLA (See Publication 71)    ☐ Approved FMLA, Pending Documentation Noted on Reverse

☐ Disapproved (Give reason): _____

☐ Ineligible for FMLA (Estimate eligibility date): _____

Signature of Supervisor and Date

Bucci  12-15-03

☐ Continued on Reverse

PS Form 3971, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

**UNITED STATES POSTAL SERVICE®**

## Request for or Notification of Absence

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | PP | Year |
|---|---|---|---|---|---|
| WILSON, M G | 2808 | 12/17/03 | 4 | 01 | 04 |

| Installation (For PM leave, show city, state, and ZIP code) | N/B Day | Pay Loc. # | D/A Code | From Date | Hour | | Day | Init. | Hours |
|---|---|---|---|---|---|---|---|---|---|
| Wilm DE 19850 DEP+DC | 2-3 | 215 | 110 | 12/17 | 1100 | Sat 01 | | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (If needed) | Thru Date | Hour |
|---|---|---|---|---|
| | 07:00 | ☐ No Call | 12/17 | 1500 |

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance |
|---|---|---|---|
| ☐ Annual | ☑ For FMLA Leave (Certification reviewed) | | ☐ Yes ☐ No |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | |
| ☑ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | | |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-Out | |
| ☐ COP | ☐ For Higher Level (1723 on file) | Lunch-In | |
| ☐ Other FMLA | ☐ Scheme Training Testing, Qualifying (Memo on file) | End Work | |
| Remarks (Do not enter medical information) | | Total Hours | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified |
|---|---|---|
| Melinda Wilson 12/17/03 | | 12/17/03 |

### Official Action on Application (Return copy of signed request to employee)

☐ Approved, not FMLA*    ☑ Approved, FMLA (See Publication 71)    ☐ Approved FMLA, Pending Documentation Noted on Reverse

☐ Disapproved (Give reason): _____

☐ Ineligible for FMLA (Estimate eligibility date): _____

Signature of Supervisor and Date

Bucci  12/22/03

☐ Continued on Reverse

PS Form 3971, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

CL 4-02-04

A-0086

CL 4-07-04

## UNITED STATES POSTAL SERVICE

# Request for or Notification of Absence

| Employee's Name (Last, first, M.I.) WILSON, MELINDA G | | Social Security No. 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 | Date Submitted 12/18/2003 | No. of Hours Requested 8.00 | | PP 1 | | Year 2004 |
|---|---|---|---|---|---|---|---|---|
| Installation (For PM leave, show city, state and ZIP code) 09-6821 - DELAWARE P&DF | | N/S Day | Pay Loc. # 2/5 | D/A Code 11-0 | From Date 12/18/2003 | Hour 07:00 | | |

| Time of Call or Request 06:05 | Scheduled Reporting Time 07:00 | Employee Can Be Reached At (If needed) (302) 395-4854 ☐ No Call | Thru Date 12/18/2003 | Hour 15:30 |
|---|---|---|---|---|

|  | Day | Init. | Hours |
|---|---|---|---|
| | SAT | | |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | 10 | 8 |
| | FRI | | |
| | SAT | | |
| | SUN | | |
| | MON | | |
| | TUE | | |
| | WED | | |
| | THU | | |
| | FRI | | |

**Type of Absence**
- ☐ Annual
- ☐ Carrier 701 Rule
- ☐ LWOP (See reverse)
- ☒ Sick (See reverse)
- ☐ Late
- ☐ COP
- ☒ Other: ISL

**Documentation (For official use only)**
- ☒ For FMLA Leave (Certification reviewed)
- ☐ For COP Leave (CA1 on file)
- ☐ For Advanced Sick Leave (1221 on file)
- ☐ For Military Leave (Orders reviewed)
- ☐ For Court Leave (Summons reviewed)
- ☐ For Higher Level (1723 on file)
- ☐ Scheme Training Testing, Qualifying (Memo on file)

Revised Schedule for (Date)

Approved in Advance ☐ Yes ☐ No

| | Begin Work | |
|---|---|---|
| | Lunch-Out | |
| | Lunch-In | |
| | End Work | |
| | Total Hours | |

**Remarks (Do not enter medical information)**
NOT IOD; FMLA LEAVE
WRH

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

Employee's Signature and Date [signature]    Signature of Person Recording Absence and Date [signature]    Signature of Supervisor and Date Notified [signature] 12/18/03

**Official Action on Application (Return copy of signed request to employee)**

☐ Approved, not FMLA*    ☐ Approved, FMLA (See Publication 71)    ☐ Approved FMLA, Pending Documentation Noted on Reverse    Signature of Supervisor and Date [signature] 12-18-03

☐ Disapproved (Give Reason):    Signature of Supervisor and Date [signature] 12-18-03

Ineligible for FMLA (Estimate eligibility date): _____    ☐ Continued on Reverse

PS Form 3971, April 2001

Warning : The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

**During This Absence, I Was Incapacitated for Duty by:**
- ☐ Sickness
- ☐ On-the-Job Injury
- ☐ Off- the-Job Injury
- ☐ Pregnancy and Confinement
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related)
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related)

**During This Absence, I Was Unavailable for Duty Because:**
- ☐ Sick Leave for Dependent Care
- ☐ Birth of Child - Bonding
- ☐ Placement of a Child with Employee for Adoption or Foster Care

**Additional Information Regarding Denial of Leave Protection Under FMLA**
- ☐ Employee Not Eligible - Less than 1250 Hours Worked.
- ☐ Employee Not Eligible - Not Employed with USPS 1 Year.
- ☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year.
- ☐ Absence Not for a Covered Condition.
- ☐ Absence Not for a Covered Family Member.
- ☐ Requested Documentation Not Provided.
- ☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection

Additional Documentation Required

**Leave Types (Information Only)**

| Leave Type | Time Card Code | PSDS Code |
|---|---|---|
| AL- FMLA | 55/01 | 32 |
| SL- FMLA | 56/02 | 33 |
| LWOP - FMLA - Part Day | 59/05 | 36 |
| LWOP - FMLA - Full Day | 60/06 | 37 |
| LWOP - Lieu of Sick Leave | 59/60 | 20 |
| LWOP - Proffered | 59/60 | 21 |
| LWOP - Personal Reasons | 59/60 | 22 |
| LWOP - Part Day | 59 | 23 |
| LWOP - Full Day | 60 | 23 |
| LWOP - AWOL | 59/60 | 24 |
| LWOP - IOD (Not FMLA) -OWCP | 49 | 25 |
| LWOP - Maternity | 59/60 | 26 |
| LWOP - Suspension | 59/60 | 27 |
| LWOP - Union Official | 84 | 28 |
| LWOP - Suspension Pending Termination | 59/60 | 29 |
| Continuation of Pay - USPS | 71 | 03 |
| Continuation of Pay - USPS-FMLA | 71/03 | 34 |
| Continuation of Pay - FMLA-IOD-OWCP | 49/04 | 35 |
| Court Duty | 61 | 04 |
| Military Leave | 67 | 05 |
| Postmaster's Organization | 89 | 08 |
| Blood Donor Leave | 69 | 09 |
| Other Paid Leave | 86 | 10 |
| Convention Leave | 66 | 12 |
| Acts of God | 72 | 13 |
| Veteran's Funeral | 86 | 10 |
| Relocation | 80 | 15 |
| Civil Defense | 77 | 16 |
| Civil Disorder | 81 | 17 |
| Voting Leave | 85 | 18 |

| Schedule | Use if Scheduled | | PP | | Year | |
|---|---|---|---|---|---|---|
| | | | Day | Init. | Hours | |
| | | | SAT | | | |
| | | | SUN | | | |
| | | | MON | | | |
| | | | TUE | | | |
| | | | WED | | | |
| | | | THU | | | |
| | | | FRI | | | |
| | | | SAT | | | |
| | | | SUN | | | |
| | | | MON | | | |
| | | | TUE | | | |
| | | | WED | | | |
| | | | THU | | | |
| | | | FRI | | | |

...y Act: The collection of this information is authorized by 39 USC 401, 1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

A-0087

*CL 4-07-04*

**UNITED STATES POSTAL SERVICE**  **Request for or Notification of Absence**

| Employee's Name (Last, first, M.I.)<br>WILSON, MELINDA G | Social Security No.<br>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 | Date Submitted<br>12/19/2003 | | No. of Hours Requested<br>8.00 | | PP<br>1 | Year<br>2004 |
|---|---|---|---|---|---|---|---|
| Installation (For PM leave, show city, state and ZIP code)<br>09-6821 - DELAWARE P&DF | N/S Day | Pay Loc. #<br>215 | D/A Code<br>11-0 | From Date<br>12/19/2003 | Hour<br>07:00 | | |

| | | | | | Day | Init. | Hours |
|---|---|---|---|---|---|---|---|
| Time of Call or Request<br>07:21 | Scheduled Reporting Time<br>07:00 | Employee Can Be Reached At (If needed)<br>(302) 395-4854 | ☐ No Call | Thru Date<br>12/19/2003 | Hour<br>15:30 | | SAT | | |

| Type of Absence | Documentation (For official use only) | Revised Schedule (or Date) | Approved in Advance | | |
|---|---|---|---|---|---|
| ☐ Annual | ☐ For FMLA Leave (Certification reviewed) | | ☐ Yes ☐ No | | |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | | | SUN |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | | | MON |
| ☒ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | | | | TUE |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-Out | | | WED |
| ☐ COP | ☐ For Higher Level (1723 on file) | | | | THU |
| ☒ Other /SL | ☐ Scheme Training Testing, Qualifying (Memo on file) | Lunch-In | | | FRI | 70 | 8 |

| Remarks (Do not enter medical information)<br>NOT IOD; FMLA LEAVE MAP | End Work | | SAT |
|---|---|---|---|
| | Total Hours | | SUN |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | | MON |
|---|---|---|---|---|
| *Melinda Wilson 12/19/03* | | *Fred Duncan 12/19/03* | | TUE |

| **Official Action on Application** (Return copy of signed request to employee) | | | WED |
|---|---|---|---|
| ☐ Approved, not FMLA* | ☐ Approved, FMLA<br>(See Publication 71) | ☐ Approved FMLA, Pending<br>Documentation Noted on Reverse | | THU |
| ☐ Disapproved (Give Reason): | | *signature 12-23-03* | FRI |
| ☐ Ineligible for FMLA (Estimate eligibility date): | | ☐ Continued on Reverse | |

PS Form 3971, April 2001     Warning : The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

| During This Absence, I Was Incapacitated for Duty by: | | Leave Types (Information Only) | | | | PP | | Year |
|---|---|---|---|---|---|---|---|---|
| ☐ Sickness | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related) | Leave Type | Time Card Code | PSDS Code | | | Day | Init. | Hours |
| ☐ On-the-Job Injury | | | | | | | | |
| ☐ Off-the-Job Injury | | AL-FMLA | 55/01 | 32 | | | SAT | | |
| ☐ Pregnancy and Confinement | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related) | SL-FMLA | 56/02 | 33 | | | SUN | | |
| | | LWOP - FMLA - Part Day | 59/05 | 36 | | | | | |
| During This Absence, I Was Unavailable for Duty because: | | LWOP - FMLA - Full Day | 60/06 | 37 | | | MON | | |
| ☐ Sick Leave for Dependent Care | ☐ Placement of a Child with Employee for Adoption or Foster Care | LWOP - Lieu of Sick Leave | 59/60 | 20 | | | | | |
| ☐ Birth of Child - Bonding | | LWOP - Proffered | 59/60 | 21 | | | TUE | | |
| Additional Information Regarding Denial of Leave Protection Under FMLA | | LWOP - Personal Reasons | 59/60 | 22 | | | | | |
| ☐ Employee Not Eligible - Less than 1250 Hours Worked. | | LWOP - Part Day | 59 | 23 | | | WED | | |
| ☐ Employee Not Eligible - Not Employed with USPS 1 Year. | | LWOP - Full Day | 60 | 23 | | | | | |
| ☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year. | | LWOP - AWOL | 59/60 | 24 | | | THU | | |
| ☐ Absence Not for a Covered Condition. | | LWOP - IOD (Not FMLA) -OWCP | 49 | 25 | | | | | |
| ☐ Absence Not for a Covered Family Member. | | LWOP - Maternity | 59/60 | 26 | | | FRI | | |
| ☐ Requested Documentation Not Provided. | | LWOP - Suspension | 59/60 | 27 | | | | | |
| ☐ Documentation Provided, Does Not Meet Criteria for FMLA Protection | | LWOP - Union Official | 84 | 28 | | | SAT | | |
| | | LWOP - Suspension Pending Termination | 59/60 | 29 | | | SUN | | |
| Additional Documentation Required | | Continuation of Pay - USPS | 71 | 33 | | | | | |
| | | Continuation of Pay - USPS-FMLA | 71/63 | 34 | | | MON | | |
| | | Continuation of Pay - FMLA-IOD-OWCP | 49/06 | 35 | | | | | |
| | | Court Duty | 61 | 04 | | | TUE | | |
| | | Military Leave | 67 | 05 | | | | | |
| | | Postmaster's Organization | 89 | 08 | | | WED | | |
| Privacy Act: The collection of this information is authorized by 39 USC 401,1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted. | | Blood Donor Leave | 69 | 09 | | | THU | | |
| | | Other Paid Leave | 96 | 10 | | | | | |
| | | Convention Leave | 66 | 12 | | | FRI | | |
| | | Acts of God | 78 | 13 | | | | | |
| | | Veteran's Funeral | 86 | 10 | | | | | |
| | | Relocation | 80 | 15 | | | | | |
| | | Civil Defense | 77 | 16 | | | | | |
| | | Civil Disorder | 81 | 17 | | | | | |
| | | Voting Leave | 85 | 18 | | | | | |

PS Form 3971, April 2001 (Reverse)

A-0088

**UNITED STATES POSTAL SERVICE**

## Request for or Notification of Absence

| Employee's Name (Last, first, M.I.)<br>WILSON, MELINDA G | Social Security No.<br>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 | Date Submitted<br>12/20/2003 | No. of Hours Requested<br>8.00 | | PP<br>1 | Year<br>2004 |
|---|---|---|---|---|---|---|

| Installation (For PM leave, show city, state and ZIP code)<br>09-6821 - DELAWARE P&DF | N/S Day | Pay Loc. #<br>215 | D/A Code<br>11-0 | From Date<br>12/20/2003 | Hour<br>07:00 | | Day | Init. | Hours |
|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | SAT | | |

| Time of Call or Request<br>06:20 | Scheduled Reporting Time<br>07:00 | Employee Can Be Reached At (If needed)<br>(302) 395-4854 | ☐ No Call | Thru Date<br>12/20/2003 | Hour<br>15:30 | | SUN | | |

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance<br>☐ Yes ☐ No | | MON | | |
|---|---|---|---|---|---|---|

Type of Absence:
- ☐ Annual — ☐ For FMLA Leave (Certification reviewed) — Begin Work — TUE
- ☐ Carrier 701 Rule — ☒ For COP Leave (CA1 on file) — WED
- ☐ LWOP (See reverse) — ☐ For Advanced Sick Leave (1221 on file) — Begin Work — WED
- ☒ Sick (See reverse) — ☐ For Military Leave (Orders reviewed) — Lunch-Out — THU
- ☐ Late — ☐ For Court Leave (Summons reviewed) — FRI
- ☐ COP — ☐ For Higher Level (1723 on file) — Lunch-In — SAT
- ☒ Other ISL — ☐ Scheme Training Testing, Qualifying (Memo on file) — End Work — FRI

| Remarks (Do not enter medical information)<br>NOT IOD; FMLA LEAVE was | End Work | | SAT | $\mathcal{LO}$ | 8 |
|---|---|---|---|---|---|

| | Total Hours | | SUN | | |

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | | MON | | |
|---|---|---|---|---|---|

| M Wils 12/13/04 | | 12/20/03 | | TUE | | |

**Official Action on Application** (Return copy of signed request to employee)

| | | | WED | | |

- ☐ Approved, not FMLA* — ☐ Approved, FMLA (See Publication 71) — ☐ Approved FMLA, Pending Documentation Noted on Reverse — THU
- ☐ Disapproved (Give Reason): 12-22-03 — FRI
- ☐ Ineligible for FMLA (Estimate eligibility date): — ☐ Continued on Reverse

PS Form 3971, April 2001    Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

| During This Absence, I Was Incapacitated for Duty by: | Leave Types (Information Only) | | | | PP | Year |
|---|---|---|---|---|---|---|

During This Absence, I Was Incapacitated for Duty by:
- ☐ Sickness
- ☐ On-the-Job Injury
- ☐ Off-the-Job Injury
- ☐ Pregnancy and Confinement
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related)
- ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related)

During This Absence, I Was Unavailable for Duty Because:
- ☐ Sick Leave for Dependent Care
- ☐ Birth of Child - Bonding
- ☐ Placement of a Child with Employee for Adoption or Foster Care

Additional Information Regarding Denial of Leave Protection Under FMLA:
- ☐ Employee Not Eligible - Less than 1250 Hours Worked.
- ☐ Employee Not Eligible - Not Employed with USPS 1 Year.
- ☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year.
- ☐ Absence Not for a Covered Condition.
- ☐ Absence Not for a Covered Family Member.
- ☐ Requested Documentation Not Provided.
- ☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection

Additional Documentation Required

| Leave Type | Time Card Code | PSDS Code | | Day | Init. | Hours |
|---|---|---|---|---|---|---|
| AL - FMLA | 55/01 | 32 | | SAT | | |
| SL - FMLA | 56/02 | 33 | | | | |
| LWOP - FMLA - Part Day | 59/05 | 36 | | SUN | | |
| LWOP - FMLA - Full Day | 60/06 | 37 | | | | |
| LWOP - Lieu of Sick Leave | 59/60 | 20 | | MON | | |
| LWOP - Proffered | 59/60 | 21 | | | | |
| LWOP - Personal Reasons | 59/60 | 22 | | TUE | | |
| LWOP - Part Day | 59 | 23 | | | | |
| LWOP - Full Day | 60 | 23 | | WED | | |
| LWOP - AWOL | 59/60 | 24 | | | | |
| LWOP - IOD (Not FMLA) - OWCP | 49 | 25 | | THU | | |
| LWOP - Maternity | 59/60 | 26 | | | | |
| LWOP - Suspension | 59/60 | 27 | | FRI | | |
| LWOP - Union Official | 84 | 28 | | | | |
| LWOP - Suspension Pending Termination | 59/60 | 29 | | SAT | | |
| Continuation of Pay - USPS | 71 | 03 | | SUN | | |
| Continuation of Pay - USPS-FMLA | 71/03 | 34 | | MON | | |
| Continuation of Pay - FMLA-IOD-OWCP | 49/04 | 35 | | | | |
| Court Duty | 61 | 04 | | TUE | | |
| Military Leave | 67 | 05 | | | | |
| Postmaster's Organization | 89 | 08 | | WED | | |
| Blood Donor Leave | 69 | 09 | | | | |
| Other Paid Leave | 86 | 10 | | THU | | |
| Convention Leave | 66 | 12 | | | | |
| Acts of God | 78 | 13 | | FRI | | |
| Veteran's Funeral | 86 | 10 | | | | |
| Relocation | 80 | 15 | | | | |
| Civil Defense | 77 | 16 | | | | |
| Civil Disorder | 81 | 17 | | | | |
| Voting Leave | 85 | 18 | | | | |

Privacy Act: The collection of this information is authorized by 39 USC 401,1001, 1003, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

PS Form 3971, April 2001 (Reverse)

CL 4-07-ncl

UNITED STATES
POSTAL SERVICE®

**Request for or Notification of Absence**

| Employee's Name (Last, First, M.I.) | Social Security No. | Date Submitted | No. of Hours Requested | Scheduled | Un-Scheduled | PP | Year |
|---|---|---|---|---|---|---|---|
| Wilson M.G. | 2808 | 12/24/03 | | | | 01 | 04 |

| Installation (For PM leave, show city, state, and ZIP code) | N/S Day | Pay Loc. # | D/A Code | From Date | Hour | | Day | Init. | Hours |
|---|---|---|---|---|---|---|---|---|---|
| WILM DE 1985□ | | 215 | | 12/24 | 025 | | Sat 01 | | |

| Time of Call or Request | Scheduled Reporting Time | Employee Can Be Reached At (if needed) | | Thru Date | Hour |
|---|---|---|---|---|---|
| | | ☐ No Call | | 12/24 | |

Sun 02

| Type of Absence | Documentation (For official use only) | Revised Schedule for (Date) | Approved in Advance | | |
|---|---|---|---|---|---|
| ☐ Annual | ☐ For FMLA Leave (Certification reviewed) | | ☐ Yes  ☐ No | Mon 03 |
| ☐ Carrier 701 Rule | ☐ For COP Leave (CA1 on file) | | | Tue 04 |
| ☐ LWOP (See reverse) | ☐ For Advanced Sick Leave (1221 on file) | Begin Work | | Wed 05 |
| ☒ Sick (See reverse) | ☐ For Military Leave (Orders reviewed) | | | Thur 06 |
| ☐ Late | ☐ For Court Leave (Summons reviewed) | Lunch-Out | | Fri 06 |
| ☐ COP | ☐ For Higher Level (1723 on file) | Lunch-In | | Sat 08 |
| ☐ Other: FMLA | ☐ For Scheme Training Testing, Qualifying (Memo on file) | End Work | | Sun 09 |

Remarks (Do not enter medical information)

Doc. required

Total Work

I understand that the annual leave authorized in excess of amount available to me during the leave year will be changed to LWOP.

| Employee's Signature and Date | Signature of Person Recording Absence and Date | Signature of Supervisor and Date Notified | | Mon 10 |
|---|---|---|---|---|
| Melissa G. Wilson 12/24/03 | | MM WMA 12/24/03 | | Tue 11 |

| | | | | Wed 12 |

**Official Action on Application** (Return copy of signed request to employee)

| ☐ Approved, not FMLA* | ☐ Approved, FMLA (See Publication 71) | ☒ Approved FMLA, Pending Documentation Noted on Reverse. | Signature of Supervisor and Date | Thur 13 |
|---|---|---|---|---|
| ☐ Disapproved (Give reason): | | JMMS 12-24-03 | | Fri 14 |

☐ Ineligible for FMLA (Estimate eligibility date): _____    ☐ Continued on Reverse

PS Form 3971, April 2001 (Page 1 of 2)

Warning: The furnishing of false information on this form may result in a fine of not more than $10,000 or imprisonment of not more than 5 years, or both. (18 U.S.C. 1001)

---

During This Absence, I Was Incapacitated for Duty by:

| | |
|---|---|
| ☐ Sickness | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Job related) |
| ☐ On-the-Job Injury | |
| ☐ Off-the-Job Injury | |
| ☐ Pregnancy and Confinement | ☐ Undergoing Medical, Dental, or Optical Examination or Treatment (Not job related) |
| ☐ Exposed to a Contagious Disease | |

During This Absence, I Was Unavailable for Duty Because:

| | |
|---|---|
| ☐ Sick Leave for Dependent Care | ☐ Placement of a Child with Employee for Adoption or Foster Care |
| ☐ Birth of Child - Bonding | |

Additional Information Regarding Denial of Leave Protection Under FMLA:

☐ Employee Not Eligible – Less than 1250 Hours Worked.
☐ Employee Not Eligible – Not Employed with USPS 1 Year.
☐ Employee Has Exhausted FMLA Entitlement in Current Leave Year.
☐ Absence Not for a Covered Condition.
☐ Absence Not for a Covered Family Member.
☐ Requested Documentation Not Provided.
☐ Documentation Provided. Does Not Meet Criteria for FMLA Protection.

Additional Documentation Required

—MDO Van Istendal requested Med. Dec. be provided for this absence to protect the best interests of the USPS     JMMS

Privacy Act: The collection of this information is authorized by 39 USC 401, 1001, 1002, 1005; 5 USC 8339; and Public Law 103-3. This information will be used to grant or deny your request for official leave from Postal Service duty. It may be disclosed under the routine uses given in Privacy Act system notices USPS 050.020 and USPS 120.070 (see appendix of Administrative Support Manual or, if you wish to obtain a copy of these notices contact your personnel office). Completion of this form is voluntary. If this information is not provided, official leave may not be granted.

PS Form 3971, April 2001 (Page 2 of 2)

| Leave Types (Information Only) | | | | Scheduled | Un-Scheduled | PP | Year |
|---|---|---|---|---|---|---|---|
| Leave Type | Time Card Code | PSDS Code | | | | Day | Init. | Hours |
| AL–FMLA | 55/01 | 32 | | | | Sat 01 |
| SL–FMLA | 56/02 | 33 | | | | Sun 02 |
| LWOP – FMLA – Part Day | 59/05 | 36 | | | | |
| LWOP – FMLA – Full Day | 60/06 | 37 | | | | Mon 03 |
| LWOP – Lieu of Sick Leave | 59/60 | 20 | | | | |
| LWOP – Proffered | 59/60 | 21 | | | | Tue 04 |
| LWOP – Personal Reasons | 59/60 | 22 | | | | |
| LWOP – Part Day | 59 | 23 | | | | Wed 05 |
| LWOP – Full Day | 60 | 23 | | | | |
| LWOP – AWOL | 59/60 | 24 | | | | Thur 06 |
| LWOP – IOD (Not FMLA) - OWCP | 49 | 25 | | | | |
| LWOP – Maternity | 59/60 | 26 | | | | Fri 07 |
| LWOP – Suspension | 59/60 | 27 | | | | |
| LWOP – Union Official | 84 | 28 | | | | Sat 08 |
| LWOP – Suspension Pending Termination | 59/60 | 29 | | | | Sun 09 |
| Continuation of Pay – USPS | 71 | 03 | | | | |
| Continuation of Pay – USPS-FMLA | 71/03 | 34 | | | | Mon 10 |
| Continuation of Pay FMLA-IOD-OWCP | 49/04 | 35 | | | | |
| Court Duty | 61 | 04 | | | | Tue 11 |
| Military Leave | 67 | 05 | | | | |
| Postmasters Organization | 89 | 08 | | | | Wed 12 |
| Blood Donor Leave | 69 | 09 | | | | |
| Other Paid Leave | 86 | 10 | | | | Thur 13 |
| Convention Leave | 66 | 12 | | | | |
| Acts of God | 78 | 13 | | | | Fri 14 |
| Veteran's Funeral | 86 | 10 | | | | |
| Relocation | 80 | 15 | | | | |
| Civil Defense | 77 | 16 | | | | |
| Civil Disorder | 81 | 17 | | | | |
| Voting Leave | 85 | 18 | | | | |

A-0090

U.S. Postal Service

**EEO Investigative Affidavit** *(Witness)*

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| | 1 | 4 | 1C-081-0019-04 |

| 1. Affiant's Name *(First, Middle, Last)* | 2. Employing Postal Facility |
|---|---|
| Carla M. VanIstendal | Delaware P & DC |

| 3. Position Title | 4. Grade Level | 5. Postal Address and ZIP + 4 | 6. Unit Assigned |
|---|---|---|---|
| Manager, Distribution Operations | EAS-19 | PO Box 10000 Wilmington DE 19850-9997 | Tour 2 |

### Privacy Act Notice

Privacy Act Notice. The collection of this information is authorized by The Equal Employment Opportunity Act of 1972, 42 U.S.C. 2000e-16; The Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.633a; The Rehabilitation Act of 1973, as amended, 29 U.S.C. 794a; and Executive Order 11478, as amended. This information will be used to adjudicate complaints of alleged discrimination and to evaluate the effectiveness of the EEO program. As a routine use, this information may be disclosed to an appropriate government agency, domestic or foreign, for law enforcement purposes; where pertinent, in a legal proceeding to which the USPS is a party or has an interest; to a government agency in order to obtain information relevant to a USPS decision concerning employment, security clearances, contracts, licenses, grants, permits or other benefits; to a government agency upon its request when relevant to its decision concerning employment, security clearances, security or suitability investigations, contracts, licenses, grants or other benefits; to a congressional office at your request; to an expert, consultant, or other person under contract with the USPS to fulfill an agency function; to the Federal Records Center for storage; to the Office of Management and Budget for review of private relief legislation; to an independent certified public accountant during an official audit of USPS finances; to an investigator, administrative judge or complaints examiner appointed by the Equal Employment Opportunity Commission for investigation of a formal EEO complaint under 29 CFR 1614; to the Merit Systems Protection Board or Office of Special Counsel for proceedings or investigations involving personnel practices and other matters within their jurisdiction; and to a labor organization as required by the National Labor Relations Act. Under the Privacy Act provision, the information requested is voluntary for the complainant, and for Postal Service employees and other witnesses.

### USPS Standards of Conduct

Postal Service regulations require all postal employees to cooperate in any postal investigation. Failure to supply the requested information could result in disciplinary action. (ELM 666)

My name is Carla M. Van Istendal. I am a female. I work at the Delaware P & DC. I am a Manager, Distribution Operations and my telephone number is 302-323-3780. Some time prior to the December 24, 2003 incident I had a conversation with Ms. Wilson about her work status. I asked her about her restrictions and when she would be able to return to full duty. Ms. Wilson informed me that she was never going to return to full duty. Upon learning this, I spoke with Ms. Wilson's supervisor, Linda Drummer, and asked her to look into the situation and her current status with Shared Services. In either late November or the beginning of December, Linda Drummer came to me and said she had been shopping for the holidays at Boscov's Department store and saw Ms. Wilson working there. This was of great concern because it appeared that the work Ms. Wilson was doing directly violated the medical documentation and restrictions she had provided to the US Postal Service. Linda and I discussed the situation and came to the decision that action needed to be taken, since this involved fraud in our opinion. At that point I contacted Labor Relations Specialist Isacce Morris to find out the proper procedures to handle this type of situation. We gave Ms. Wilson a letter asking her to update her medical restrictions. She provided the updated medical and it was dated December 12, 2003. The documentation stated that she was not able to stand for any portion of her work day and needed to stay in a modified case using a chair with armrests. After receiving this documentation, I consulted with Labor Relations and the Inspection Service. I went to interview the Human Resources Manager at Boscov's on Route 273 in Delaware. I had with me a list of questions provided by the US Postal Service's Law Department that I received from Mr. Morris. During this interview I determined that Ms. Wilson was in fact working at Boscov's and violating the medical restrictions she had provided the USPS. I brought that information to Labor Relations Specialist Morris and informed him that we wanted to take action based on that information. We had also received definitive information from Shared Services letting us know that all of Ms. Wilson's claims were either closed or denied. This meant that we were accommodating her in a light duty status. On December 24, 2003 I consulted with Labor Relations Specialist Morris again. I brought Ms. Wilson into the MDO's office and called Shop Steward Leon Tucker to the office to represent Ms. Wilson. I informed Ms. Wilson that I had some questions and concerns about her most recent documentation. I also told her that we had been in contact with Shared Services with in the past twenty-four (24) hours and that they had informed us that all her claims were either denied or closed. I asked Ms. Wilson if she was working outside of the Postal Service. She wanted to know why I was asking her the

| I declare under penalty of perjury that the foregoing is true and correct. | |
|---|---|
| Affiant's Signature | Date Signed |
| | 4/27/04 |

PS Form 2568-B, March 2001

DEPOSITION EXHIBIT
VanIstendal 4
10-6-05

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit** *(Continuation Sheet)* | 2 | 4 | 1C-081-0019-04 |

question and would not answer. I told her that I had proof that she was working outside of the Postal Service and that the work she was doing directly contradicted what her documentation stated she could do. I asked her once again if she was working outside of the USPS and she refused to answer. She did state that her medical documentation was only for the Post Office and that it didn't count for anything she did outside of the USPS. I informed Ms. Wilson that since her documentation was in question we were not able to accommodate her light duty. I told her that she needed to provide updated medical documentation and that once we had received and reviewed it, we would contact her as to her status. Labor Relations Specialist Isacce Morris has no supervisory relationship to Ms. Wilson. I have no knowledge of a consensual relationship between Mr. Morris and Ms. Wilson. Ms. Wilson never informed of any advances from Mr. Morris. I do not know if Ms. Wilson complained to other members of management about Mr. Morris. I was interviewed by fact-finders regarding Mr. Morris and Ms. Wilson after the December 24, 2003 incident. I do not have a copy of any internal harassment investigation findings nor have I ever seen them. I am not aware of any contact by telephone or otherwise after Ms. Wilson allegedly told Mr. Morris his advances were no longer welcome. I do not think Mr. Morris recommended she be taken off the clock because she told him his advances were no longer welcome. Ms. Wilson was taken off the clock because her medical documentation regarding her restrictions was in question. Ms. Wilson was considered to be on light duty since all her Claims at Shared Services were either closed or denied. Ms. Wilson was working outside of the Postal Service and performing duties there which were in direct conflict with the restrictions she provided the Postal Service. Ms. Wilson was informed of all these issues on December 24, 2003 and told that she was being taken off the clock. Ms. Wilson was also informed that she needed to provide updated medical documentation and that we would contact her as to her status once we had received and reviewed her updated documentation. I relied on Article 13 (APWU), ELM 661.42 and the Light Duty Policy to take Ms. Wilson off the clock. The RMOs who participated in the decision to take Ms. Wilson off the clock were: Linda Drummer, Isacce Morris, and myself. Mr. Morris' role was providing technical assistance and expertise to Ms. Drummer and myself regarding contractual issues so that she and I had the information we needed to reach our decision. Linda Drummer (Ms. Wilson's direct supervisor) and I (Ms. Wilson's MDO) discussed all the information and decided that based on the medical restrictions provided, the conditions of her outside employment, Article 13, and the Light Duty Policy that Ms. Wilson should be taken off the clock on December 24, 2003. A copy of Ms. Wilson's medical restrictions, dated December 12, 2003 is

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| | 4/27/04 |

PS Form 2569, March 2001

| | Page No. | No. Pages | Case No. |
|---|---|---|---|
| **EEO Investigative Affidavit** *(Continuation Sheet)* | 3 | 4 | 1C-081-0019-04 |

attached. Ms. Wilson was accommodated in a modified letter case. Ms. Wilson gave us medical documentation

dated December 12, 2003 which was identical to her previous documentation. Article 13, ELM 661.42 and the Light

Duty Policy helped guide me when I discovered that Ms. Wilson was working outside of her restrictions at another

job outside of her employment with the USPS. I found out that Ms. Wilson was working at Boscov's when in either

late November or early December Linda Drummer informed me she had seen Ms. Wilson working there while she

was out shopping for the holidays. Ms. Drummer told me that Ms. Wilson was working as a sales clerk in the

Women's Department, standing on the floor and helping customers. Since the documentation Ms. Wilson had

provided the Agency stated she was not permitted to stand at all, we knew she was working outside of her restrict-

tions at another job. I interviewed Mr. Dan Carty, HR Manager at Boscov's Department Store, Newark, DE, at

12:30 p.m. on December 22, 2003. Mr. Carty told me there were no sit down jobs available and that Ms. Wilson

had to stand while performing her duties. Mr. Carty told me that Ms. Wilson worked five (5) days per week and

approximately twenty-five (25) hours each week. I have attached a copy of my hand-written notes from that inter-

view. I have never had any reason to take any other employee off the clock for working outside of their restrictions

at an outside job. I do not have access to USPS cellular phone records for Mr. Morris. They should be available

through the South Jersey District office if Mr. Morris has been issued a USPS cellular phone. I have the following

phone numbers on record for Ms. Wilson: Home 302-395-4854 and Emergency 302-395-4854. As stated earlier,

Linda Drummer and I discussed all the information available to us regarding taking Ms. Wilson off the clock for

working outside the Agency and violating her medical restrictions. I relied on Article 13 of the APWU contract,

The Light Duty Policy, and ELM 661.42 when deciding that Ms. Wilson should be taken off the clock. The policies

are uniformly applied; however, I have no examples since I have never dealt with another of my employees working

outside of the Agency and violating their medical restrictions. I did not know of any similar employees to Ms. Wilson

(same tour, shift, work location, job duties, supervisor, chain of command, etc.). I had no knowledge of discipline

either. I was not aware of Ms. Wilson's prior EEO activity. Ms. Wilson did file a grievance in this matter. I have

attached a copy of the Step 2 decision. The main factor in deciding to take Ms. Wilson off the clock on December

24, 2003 was that she was working outside of the Postal Service and performing job duties there which she said

she was incapable of performing here. Ms. Wilson has an obligation to the Postal Service as her primary source

of employment to perform to the best of her ability. Since she was able to perform outside of her restrictions at her

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| | 4/27/04 |

PS Form 2569, March 2001

| Page No. | No. Pages | Case No. |
|---|---|---|
| 4 | 4 | 1C-081-0019-04 |

**EEO Investigative Affidavit** *(Continuation Sheet)*

other employment, I decided the right course of action, based on the Agency's rules and regulations, was to take

Ms. Wilson off the clock on December 24, 2003. On that day when I brought Ms. Wilson into the office in order to

gather more information, she chose to be uncooperative and not answer my questions. As I stated earlier,

Ms. Wilson also stated that her restrictions did not count for anything other than the Postal Service. In my opinion,

that is not in concert with ELM 661.42. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

**I declare under penalty of perjury that the foregoing is true and correct.**

| Affiant's Signature | Date Signed |
|---|---|
| | 4/27/04 |

PS Form 2569, March 2001

# DRUMMER
# DEPOSITION

A-0095

Linda Drummer - Bernstein                    7

1    Q.    She told you, "Hey, I got a job at Boscov's"?

2    A.    Mm-hmm.

3    Q.    Did she seem pleased with the job?

4    A.    She seemed happy about it.

5    Q.    What kind of job?  What did she tell you about

6    the job?

7    A.    I believe she told me she was working as a

8    sales clerk.

9    Q.    I know Boscov's has a couple locations in New

10   Castle County.  Did she tell you where she was

11   working?

12   A.    I don't recall she told me where.

13   Q.    Did that employment with Boscov's raise any red

14   flags in your mind as a supervisor, or was it just

15   something you just kind of mentally filed away?

16   A.    Basically I mentally filed it away, yeah.

17   Q.    Did there come a time when you were shopping at

18   Boscov's and saw Ms. Wilson?

19   A.    Yes.

20   Q.    Can you tell me when that was?

21   A.    Probably November, December, sometime around

22   there.

23   Q.    Which Boscov's store was that?

24   A.    The store on 273.



1      Q.    Did you have any conversations with her then?

2      A.    I stopped and spoke with her, yes.

3      Q.    Buy anything from her?

4      A.    No.

5      Q.    Did there come a time when Ms. Wilson's

6   employment at Boscov's became a concern of yours in

7   your capacity as her supervisor?

8      A.    It became a concern when I had -- I mentioned

9   it to my boss that, hey, I saw Melinda Wilson working

10  at Boscov's.

11     Q.    Who's your boss?

12     A.    Carla Van Istendal.

13     Q.    When was the occasion?  Was there something

14  that prompted you to mention this?

15     A.    No.  We were --

16     Q.    Do you remember how it came up?

17     A.    We were either getting ready to have our plan 5

18  meeting, which is our morning -- we have a morning

19  meeting and I just said, "Oh, by the way I saw Melinda

20  working at Boscov's."

21     Q.    What was Ms. Van Istendal's reaction to that?

22     A.    She said, was she working outside of her

23  restrictions?  She just asked me.

24     Q.    When you say working outside of restrictions --



WILCOX & FETZER LTD.
Registered Professional Reporters

10/5/04 Supervisor's Statement

"Just cause" is the issuance of discipline based on certain criteria. Is there a reasonable rule; has a through investigation been conducted; is the discipline issued consistently and equitably; is it reasonable in relation to the infraction.

The removal issued to Melinda Wilson was based on 1- there is a reasonable rule stating that a postal employee cannot be gainfully employed while in sick leave status and also a rule that states that outside employment can not impair mental or physical ability to perform postal service duties. 2- In my attempt to do a through investigation by means of a pre-disciplinary interview, the employee gave absolutely no reason for her actions so I had the base my decision on the information gather in the IM. 3- We are dealing with an employee with almost 20 years of postal experience, who has been a 204-B and has served as a shop steward. It is not reasonable to believe that such an employee would lack knowledge of basic standards of conduct that are expected of all employees in an industrial environment.

Why didn't I choose to use corrective action instead of removal?

I felt that progressive discipline was not appropriate because this is one of broken trust that it essential in an employer/employee relationship. This violation falls into the same category as stealing from the post office or its customers. Mis-use or abuse of sick leave costs the P.O. large amounts of money in overtime. Sick leave is a benefit provided to employees to cover them when they are totally incapacitated. It is not provided so that the employee can save their energies for another job and still get paid from the post office. This practice is dishonest and deems the abuser as an untrustworthy employee. Allowing a dishonest employee to continue working in the PO is not a correctable



DEPOSITION EXHIBIT

MW/0783

A-0098

Wilson, Melinda    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
Addendum to supervisor statement provided on 1/13/04 and on 5/4/04

Melinda Wilson worked the flat sorter from approximately June 6, 2002 to
October 13, 2002. During this period of time she spent as much time off of
the machine as she possibly could. This means that when we had an excess
of employees she would volunteer to go to a letter casing job. There doesn't
appear to be a full week during this time period in which she worked her job
for 40 hours. She often used leave time to go home early at least 2 days per
week. While on the flat sorter she was required to move mail to the machine
for processing. She did this as little as possible. Wilson would have her
fellow male co-workers to move the mail for her as often as she could.
When this was not possible she would be absent from the area when it was
her turn to move mail. She attempted to rally the other employees into
refusing to bring mail to the machine. This was not successful because the
other clerks knew that once the mail for the machine is placed in the staging
area then it was their responsibility to move it to the machine. The crew
consists of males and females. The other females, both small and larger
sized, were very capable of moving the ergo carts loaded with magazines
without assistance. When assistance was needed they are instructed to ask
another employee to help move the equipment. Wilson claimed that she was
too small to move the move the equipment.  She was not the only small
female working in the area.  Her contention was that the mail handlers
should bring all mails to and take it away from the machine after processing.

The ergo carts used to transport flat (magazines and catalogues) were
carefully designed to accommodate any size person who might be required
to handle the equipment. These carts are designed to protect the users back
by automatically adjusting in height. They are on wheels and are very easy
to maneuver. All employees were trained on the safe use of the carts before
they were put into service. These carts weigh about 410 lbs. empty. They
weigh a maximum of 1500 lbs. loaded with mail. Again they were designed
to be ergonomically safe for all sizes of employees to use.

Wilson stated in the Ca form that she filed that she had been moving 1-1/2
tons of mail around since she began the job in June 15, 2002 until the time
she filed the claim. She stopped working any job that required her to lift

MW/0784

A-0099

Page 2
Wilson, Melinda   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
Addendum to supervisor statement


more than 10 pounds in October 2002. The postal service does not have any
equipment weigh 3000 pounds that would have to be manually moved.
Wilson has not moved anything weighing more than 5-10 pounds since
October 2002. She was accommodated with a chair with arms for many
years prior to her position on the flat sorter.   Wilson provided medical
documentation stating that she could do the duties of the flat sorter so that
she could bid on a day job with Sunday/ Monday off.   She began the job
June 2002, may never have worked a full 40 hour week in the job, and went
back to restricted duty job sitting in an armed chair in October 2002.  This is
where she remained until she was removed from the postal service pending
termination in March 2004.


Linda Drummer
Supervisor Distribution Operations

MW/0026

DEPOSITION
EXHIBIT
Drummer 5
0. 16-6-05

Partial
Supervisor's
File

Several months ago Melinda Wilson was in my office
representing another employee for something unrelated
to this grievance. At the end of that session, I
asked Melinda to stay so I could discuss her work
situation. I asked her when she felt she would be
able to return to full duty and her bid job on the
flat sorter. She told me that she was never going
to return to her job because she needed surgery
and she was not going to have it. Upon learning
this I spoke with Ms Wilson's supervisor, Linda
Drummer, and asked her to look into this
situation and her current status with Shared Services.

Sometime in the beginning of December Linda Drummer
came to me and said she had been shopping for
the holidays at Boscov's and saw Ms Wilson
working there. This was of great concern because it
appeared that the work Ms Wilson was performing
directly violated the medical documentation and
restrictions she had provided to the US Postal Service.
Linda and I discussed the situation and came to
decision that action needed to be taken since this
involved fraud in our opinion. At that point
I contacted Labor Relations Specialist Isacc Morris
to find out the proper procedures to handle this
type of situation. We gave Ms Wilson a letter
requesting updated medical. She provided the
documentation and it was dated December 12, 2003.
The documentation stated that she was not able

to stand for any portion of her work day or needed to stay in a modified case using a chair with armrests

After receiving this documentation I consulted with Labor Relations and the Inspection Service. I went to interview the Human Resources Manager at Boscov's Department Store on Route 273 in Newark, Delaware. I had with me a list of questions provided by the US Postal Service's Law Department that I received from Mr Morris. They were as follows; How long had Ms Wilson been employed at Boscov's? How many hours per day did she work? What are her job duties? Can we have a copy of her job description and duties? Can we have a copy of her payroll records? I met with Mr Dan Carty, HR Manager, on December 22, 2003 at 12:30 pm for approximately 15 to 20 minutes. He told me that Ms Wilson had been employed at Boscov's since October 20, 2003 as a sales person in the Women's Department. Mr Carty said Ms Wilson worked approximately 25 hours per week in a 5 day work week. He said that her job required her to stand the entire time she was performing her duties. He was not able to give me a copy of her job description or payroll records. Mr Carty stated we would have to send a request to their legal department to acquire that information.

I brought that information to Labor Relations Specialist

Morris and unformed him that we wanted to take action based on that information. We had also received definitive information from Shared Services letting us know that all of Ms Wilson's claims were either closed or denied. This meant that we were accomodating Ms Wilson in a light duty status. As all of these things were occuring, Ms Wilson asked if she could participate in an EEO hearing on December 23, 2003 for training purposes. Her supervisor granted her leave so she could attend. I was also involved in this EEO hearing.

On December 24, 2003 I consulted with Labor again. I brought Ms Wilson into the MDO's office and called Shop Steward Aaron Tucker to the office to participate. This was approximately 9:30 AM. I unformed Ms Wilson that I had some questions and concerns about her most recent documentation. I also told her that we had been in contact with Shared Services within the past 24 hours and that they had informed us that all her claims were either denied or closed. I asked Ms Wilson if she was working outside of the Postal Service. She wouldn't answer me and wanted to know why I was asking her the question. I told her that I had proof that she was working outside of the

directly contradicted what her documentation stated she could do. I asked her again if she was working outside of the Postal Service and she refused to answer once again. I informed Ms Wilson that we would no longer be able to accomodate her on light duty and that she would have to give me a slip for Annual leave or leave without pay to cover her until she provided updated medical documentation for our review. During these exchange Mail Handler AVP John Brown had entered the room for a moment and Ms Wilson told him that he was being paid back for participating in the EEO hearing. I tried to explain to Ms Wilson that all of this had occurred before I even knew she was going to be present at the hearing, but Ms Wilson did not acknowledge that.

During our discussion Ms Wilson told me she had paperwork proving that she had a valid limited claim and asked if she could go to her locker to get it. When she returned she had a copy of an initial offer from her supervisor Linda Drummer. I told her that the document she was showing me only strengthened my argument that something was awry with her documentation, since the offer stated that the only work she was capable of was sorting mail in a modified case while seated in a chair with armrests. I also reiterated that all her claims of Sharid Services were

either closed or denied. I told her again that we were not going to accomodate her with her current documentation and that she would need to clock out. I explained to her that she would need to provide updated medical documentation for our review and that we would contact her as to her status. I reminded her that I would need a slip for either annual leave or leave without pay. Ms Wilson said she was going to request administrative leave. I told her if she did, it would be denied and she would be absent without leave.

Ms Wilson requested time on the clock to contact OWCP and Shared Services about the status of her claims. I denied that request because it was inappropriate. Ms Wilson then told me that she wanted to file an EEO complaint and that she wanted to do that on the clock. I allowed her to call the South Jersey EEO office from the MDO's office and she requested the paperwork. Once that was done, I asked her for her leave slip and told her she was to leave the premises. Ms Wilson gave me a slip for FMLA sick leave. I told her that it was not the appropriate leave type. She told me she was using FMLA because I made her sick. I told her that documentation was required. And I wrote that on the 3971.

She did not acknowledge that and would not speak to me at that point. At no time did I deny Ms Wilson the opportunity to take a set of light duty request forms. She never requested any forms and continued to insist that she was not a light duty case and that she was to be accomodated in a limited duty status. I told her repeatedly that I was requiring updated documentation for my review.

Ms Wilson did not request either annual leave or leave without pay to cover her until she provided new documentation. She only turned in a slip for FMLA sick leave to cover her on December 24, 2003 from her end tour of 1025 to her normal end tour of 1550. At present Ms Wilson is being carried in an absent without leave (AWOL) status.

A-0106

# KEEN
# DEPOSITION

1       Q.    In what way?  I mean, Boscov's doesn't compete

2    with the Postal Service, do they?

3       A.    Not to my knowledge.

4       Q.    How was it incompatible?

5       A.    In Ms. Wilson's case, there were a number of

6    occasions where she had reported out sick for the

7    Postal Service and subsequently reported for duty at

8    Boscov's.  I believe on one occasion she had reported

9    out sick for the post office and then went immediately

10   over to Boscov's and began working.

11      Q.    So is there anything else you want to add to

12   support that particular violation?

13      A.    I do not.

14      Q.    The next section you cited as a grounds for

15   removal is section 666.2, and that reads, "Employees

16   are expected to conduct themselves during and outside

17   of working hours in a manner which reflects favorably

18   upon the Postal Service."  And then it says, "Although

19   it is not the policy of the Postal Service to

20   interfere with the private lives of employees, it does

21   require postal personnel be honest, reliable,

22   trustworthy, courteous, and of good character and

23   reputation, and employees are expected to maintain

24   satisfactory personal habits as not to be obnoxious or



1    offensive to other persons or create unpleasant

2    working conditions."

3            And my question with respect to section

4    666.2 is, can you tell me in your mind what conduct or

5    misconduct by Ms. Wilson violated section 666.2?

6    A.    I believed her behavior to be improper, her

7    conduct to be improper under these for the reasons

8    I've already said:  for reporting out sick for the

9    Postal Service and on the same days reporting to work

10   at Boscov's, and on at least one occasion for leaving

11   the Postal Service and reporting to Boscov's -- on

12   sick leave and then reporting directly to Boscov's.

13   Q.    Now, in recommending that Ms. Wilson be removed

14   from the Postal Service, was there anything else that

15   you would have used or did use to justify her removal?

16   A.    I don't believe I said that I recommended she

17   be removed from the postal service.

18   Q.    Well, you drafted this letter?

19   A.    I did.

20   Q.    Right.  And what's it say?

21   A.    It says what it says.

22   Q.    Did you recommend she be removed?

23   A.    It's not myself decision to make.  It's not my

24   recommendation.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1        Q.    Great.    Just to bring us back up, am I correct

2    that your testimony was that your understanding of

3    this grievance was it was a Union challenge to the

4    Postal Service decision to not allow Ms. Wilson to

5    work until she provided updated medical documentation?

6        A.    Correct.    That they would no longer honor her

7    medical restrictions and her current limited duty job

8    offer.

9        Q.    Based on your experience as a labor

10   representative, in your opinion, was the Union using

11   its best efforts?    In your dealing with the Union, was

12   the Union using its best efforts to try to prevail on

13   the grievance?

14              MS. HANNIGAN:    Objection to the form of

15   the question.    You're asking his opinion?

16              MR. LEFF:    In his dealings with the Union

17   on this grievance, based on his experience, did he

18   have any sense that -- was it his sense in dealing

19   with unions that the Union was using its best efforts

20   to prevail on this grievance.

21              MS. HANNIGAN:    So it's his opinion?

22              MR. LEFF:    Yes, his opinion.

23              MS. HANNIGAN:    He can answer it.

24       A.    In my opinion they put a vigorous -- vigorous



1    efforts into the grievance.

2        Q.    Thank you, sir.

3              Turning to your exhibit number 3, you

4    testified that this was a grievance over a

5    representation issue, is that correct?

6        A.    Yes.

7        Q.    Again, let me ask a preliminary question.

8    Melinda Wilson's name is listed in this step 2 letter.

9    Do you know, was the basis of the Union's grievance

10   something that happened to Ms. Wilson with respect to

11   representation that the Union believed violated the

12   contract, was that your understanding?

13       A.    Ask me that again, please.

14       Q.    I guess I just want to clarify, was it your

15   understanding that the Union filed a grievance on the

16   basis of a representation issue involving Melinda

17   Wilson, at least in part?

18       A.    The Union filed a class action grievance and

19   cited the occurrence involving Ms. Wilson as part of

20   their class action grievance.

21       Q.    Okay.   Thank you for clarifying that.

22             Again, based on your experience and your

23   dealing with the Union on this grievance, did you get

24   any sense or, in your opinion, was the Union not using



1    accomplished at 1:21 p.m. on March 30th of '04, and

2    that the notice for certified letter was left at that

3    same time and date and -- I'm sorry.  Go ahead.

4        Q.    Turning back to the arguments that the Union

5    made in this grievance, do you recall that the Union

6    made both a number of procedural and substantive

7    arguments, do you recollect that?

8        A.    Ask that in another way, please.  I don't

9    understand.

10       Q.    Fair enough.  Procedural meaning processes that

11   need to be filed with respect to the timing of when

12   the discipline comes, the day in court, things of that

13   nature, and procedural meaning whether there was just

14   cause, whether there was progressive discipline,

15   whether ELM procedures were followed, things of that

16   nature.  Did that clear it up?

17       A.    Yes.  The Union made various arguments, both

18   procedural and substantive, as you defined it.

19       Q.    Am I correct that you were the arbitration

20   advocate for the Postal Service for the notice of

21   removal grievance?

22       A.    That's correct.

23       Q.    And Steve Collins, the president of the local

24   union was the arbitration advocate for the Union, is



1    that correct?

2       A.    Yes, sir.

3       Q.    Turning your attention to the arbitration

4    hearing, do you recall -- let me ask this.  Did you

5    call witnesses on the Postal Service's behalf?

6       A.    I did.

7       Q.    Do you recall that Steve Collins cross-examined

8    those witnesses?

9       A.    I do.

10      Q.    And did he cross-examine those witnesses?

11      A.    Yes, he did.

12      Q.    Do you recall whether Mr. Collins called

13   witnesses for the Union's behalf and asked that

14   witness or those witnesses questions?

15      A.    Yes.

16      Q.    And did he do that?

17      A.    Yes.

18      Q.    Do you recall whether Mr. Collins entered any

19   exhibits?

20      A.    Yes.

21      Q.    And did he enter any exhibits?

22      A.    Yes.

23      Q.    Do you recall whether Mr. Collins made

24   objections to exhibits that you wanted to introduce?



1     A.    Yes.

2     Q.    And did he make such objections?

3     A.    Yes.

4     Q.    Do you recall that Mr. Collins submitted

5     arbitration awards to the arbitrator after the

6     hearing?

7     A.    Yes.

8     Q.    And did he submit such arbitration award?

9     A.    Yes.

10    Q.    Again, based on your experience as a labor

11    representative for the Postal Service, did anything

12    happen during that hearing where you would form an

13    opinion that the Union did not try to use its best

14    efforts to prevail on both the timeliness of the

15    grievance argument and the merits of the removal case?

16    A.    I thought the Union put a vigorous advocacy

17    effort forward.

18              MR. LEFF:    Thank you.   I have no further

19    questions.

20              MS. HANNIGAN:   Nothing.

21              MR. BERNSTEIN:   Couple of follow-up

22    questions.

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters



SOUTH JERSEY DISTRICT
**UNITED STATES**
**POSTAL SERVICE**

Date:        March 23, 2004

Subject:     C00C1CD04084651
             CL230204
             WILSON
             WILMINGTON DE P&DC

To:          Courtland Stinson
             APWU, Malcolm Smith Local
             DE P&DC

On 3/18/04 we met to discuss the above captioned grievance at Step 2. The 7 day period to schedule a step 2 meeting was extended by mutual consent. The issue in this grievance is whether management violated Article 10 and Article 19 of the CBA when Melinda Wilson was placed on ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

The union contends that management violated the cited Articles 10 and 19 of the CBA when they placed Ms. Wilson on unpaid leave, specifically on AWOL from 12/27 to 2/2/04. The union contends that management improperly instructed Ms. Wilson not to report for duty, and that therefore Ms. Wilson is entitled to be compensated. The union requests that Ms. Wilson be paid for all time lost from 12/27 to 2/2/04.

Management contends that this grievance is filed in bad faith, as this grievance is repetitive. The union has already filed two grievances on this issue (see 04053770 and 04070115) with the same requested remedy. Management further contends that this grievance is untimely. The incident in question had its inception on 12/24/03 and the first day of AWOL was 12/30/03. The union contends in their Step 2 appeal that "the union became aware on 2/21/04". I also note that no Step 1 was filed until 2/27. The union contends that Ms. Wilson did not know she was in a non-pay status until she returned to work and was given 3971s to sign on 2/13, therefore the Step 1 filed on 2/27 is timely. Management contends that Ms. Wilson knew she would be AWOL when on 12/24 she was told to make a leave choice for her absence and declined to select leave beyond 12/24. Analysis of TACS reports shows that Ms. Wilson was charged Annual Leave on 12/27 and only began to be charged AWOL on 12/30. This non-paid AWOL time would have been on Ms. Wilson's paystub on 1/15 at the latest. Certainly Ms. Wilson knew at that time that she was not in a pay status. Ms. Wilson also got pay stubs on or before 1/29 and 2/12 which all would have shown non-pay status. The 14 day period to file a grievance at Step 1 begins when the employee or the union knew or reasonably should have known about the alleged violation. It is obvious that Ms. Wilson knew well before 2/13 that she was in a non-pay status from 12/30 to 2/2. Further, management contends that the Step 2 appeal is procedurally defective in that it is dated 2/21/04 and was obviously completed on that date. The Step 1 hearing was 2/27/04. The Step 2 appeal contains no information whatsoever about a Step 1 hearing. The only types of grievances that may be directly appealed to Step 2 are under Articles 2 or 14, neither of which apply in this case. The union's failure to hold a Step 1 hearing prior to filing a Step 2 appeal renders this grievance defective and waived.

MW/0933

FAX:



DEPOSITION
EXHIBIT
Keen 4
10-6-05

A-0115

- 2 -

Management contends there is no contractual violation as described by the union. Ms. Wilson was absent without pre-approved leave for the reasons covered in the previous two Step 2 responses. There is no need to repetitively address the union's contentions. The responses in the previous two grievances adequately addressed the circumstances surrounding Ms. Wilson's absence from 12/27 to 2/2.

The union contended a violation of Article 10 in that Ms. Wilson was charged AWOL from 12/27 to 2/2/04. For the reasons explained in the two prior grievances (see 04053770 and 04070115), this was the proper leave code. The ELM Section 513.64 covers AWOL. Ms. Wilson was advised on 12/24 to select a leave type for the term of her absence, but did not select a leave type or complete a leave slip beyond 12/24. Therefore, the designation of AWOL is appropriate and this portion of the grievance is denied.

The union contends a violation of Article 19 and the LMOU. When questioned, the union was unable to identify a specific handbook or manual or a specific provision of any handbook or manual or the LMOU. The CBA requires that the union will at Step 2 make a full and detailed statement of facts and the contractual provisions relied on. The union's failure to identify any specific provision of any handbook or manual renders management unable to investigate or address this allegation. Therefore, this portion of the grievance must be waived.

I also note that Ms. Wilson had medical documentation dated 1/8 and 1/20 but did not provide this to anyone until 1/22 and then only to her union steward. This information was received by Ms. Wilson's manager on 1/25 and on 1/26 Ms. Wilson was sent a notice to return to duty via express mail. Notice of this mail piece was delivered to her address of record on 1/27. Ms. Wilson however, did not pick up and sign for this mail piece until 2/4. On 1/30 two express mail pieces were sent, one requiring signature, and one with signature waiver. The signature waiver piece was delivered on 1/31 as was the notice for the mail requiring signature. The mail requiring signature was picked up and signed for on 2/4. I also note that on 1/30 SDO Linda Drummer contacted Ms. Wilson by phone and instructed to her report to work, but Ms. Wilson claimed that she was sick and unable to report for duty.

The parties shared all relevant information at Step 2 and it was agreed that all information requested by the union was provided. In view of the foregoing I can find no contractual violation. This grievance is denied.

Andrew Keen
Labor Relations Specialist

Cc:     grievance file
        MDO Van Istendal
        SDO Drummer

MW/0934

A-0116

# COLLINS DEPOSITION

13

1    Q.    And you heard Ms. Wilson testify about

2    attempting to contact you by phone prior to meeting

3    with you on April 6.  Do you recall that testimony?

4    A.    Yes.

5    Q.    First, do you recall meeting with Ms. Wilson in

6    person on April 6?

7    A.    Yes.

8    Q.    Do you know how that meeting came about or how

9    it was arranged?

10    A.    Myself -- she called me on my cell phone.

11    Ms. Wilson was out of work, placed on administrative

12    leave.  And we met down our union office which is

13    separate from the building, around the corner from the

14    post office, because she wasn't allowed on postal

15    premises.

16    Q.    Now, did you know she was on administrative

17    leave prior to April 6?

18    A.    Yes.

19    Q.    How did you know that?

20    A.    I don't recall.

21    Q.    Do you know why she was on administrative

22    leave?

23    A.    I knew there was many times she was on

24    administrative leave, but they were -- my assumption



16

1    A.    Yes.

2    Q.    Now, at that meeting did she show you the

3    notice of removal?

4    A.    Yes.

5    Q.    Or did she have it with her?

6    A.    Yes.

7    Q.    And do you recall looking at that?

8    A.    Yes.

9    Q.    Do you recall noticing the date of the notice

10   of removal letter?

11   A.    The date as far as --

12   Q.    What the date was on the letter.

13   A.    On what -- there's a lot of dates on there.

14   Which date are you talking about?

15   Q.    Let me get that.

16   A.    There's one right there.

17   Q.    All right.  I'll show you this one.  It's

18   Deposition Exhibit Wilson Number 1.  You want to look

19   at that there's a date at the very top?

20   A.    Mm-hmm.

21   Q.    March 24th?

22   A.    Yes.

23   Q.    Do you recall noticing that on April 6?

24   A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

17

1   Q.   Let me ask you this, in dealing with grievances

2   is timing important?  In other words, deadlines for

3   doing certain things?

4   A.   Yes.

5   Q.   And what was your understanding of the deadline

6   for filing grievances --

7   A.   14 --

8   Q.   -- under the contract?

9   A.   14 days from the date of receipt of notice.

10   Q.   Is 14 days from the date of receipt, or is that

11   your understanding?

12   A.   The contract lays out clearly.

13   Q.   Isn't there also language in the contract to

14   the effect of in so many words -- let me get it for

15   you so I don't misstate anything.

16          I'm going to show you Wilson 4 and

17   page 90, subparagraph A at the bottom of 91.

18   A.   Are you talking C or D?

19   Q.   Pardon me?

20   A.   Are you talking about C or D.

21   Q.   I'm talking about A.

22   A.   You said on the bottom.  That's 91 -- 90-A.

23   Q.   Okay.

24   A.   Okay.  It says, "Any employee who feels



18

1    aggrieved must discuss the grievance with the

2    employee's immediate supervisor within 14 days.."

3       Q.   Does it say anything about when the 14-day

4    period begins to run?

5       A.   Of which the employee or the Union first

6    learned or may reasonably have expected to have

7    learned of its cause.

8       Q.   And what is your understanding of that

9    provision?

10      A.   That once an individual receives a notice of

11   removal, on that date the time clock starts clocking.

12      Q.   Okay.   When Ms. Wilson showed you the notice of

13   removal -- that's Wilson Number 1 -- did you pay any

14   particular attention to the fact that the letter

15   states that it was sent by certified mail?

16      A.   I knew it was sent certified mail.

17      Q.   Is that the normal practice?

18      A.   No.

19      Q.   How did you --

20      A.   Melinda told me she was out of work.

21      Q.   Did you ask her when she signed for the

22   certified mail notice?

23      A.   Yes.

24      Q.   What did she tell you?



19

1   A.    April 6.

2   Q.    Did you also notice that this notice of removal

3   was sent by first class mail?

4   A.    No.

5   Q.    You did not notice that.  Okay.

6         Did you do anything after April 6 to

7   determine when the Postal Service may have sent this

8   notice to Ms. Wilson?

9   A.    I went by what the grievant wrote and told me.

10  Q.    So when you say you went by what the grievant

11  wrote, you're talking about the handwritten statement,

12  Wilson Exhibit Number 2?

13  A.    Yes.

14  Q.    Did you hear Ms. Wilson testify that she put

15  down the date of April 6, 2004, because you told her

16  that's when she received it?

17  A.    No.

18         MR. LEFF:  Objection to the form of the

19  question.

20  BY MR. BERNSTEIN:

21  Q.    That's the day you put down?

22         MR. LEFF:  Objection.

23  Q.    Do you recall that testimony?

24  A.    I recall it.



20

1    Q.    Do you agree or disagree with that testimony?

2    A.    Disagree.

3          MR. LEFF:  Object to the form of question.

4    Q.    What is the basis for your disagreement?

5    A.    She told me that she got it on the 6th.

6    Q.    Did you tell her to put that in the

7  handwritten?

8    A.    Of course, you needed a whole scenario of when

9  you get everything, what the whole scenario of the

10  case.

11    Q.    Were you concerned about getting the step 1

12  grievance on the table?

13          MR. LEFF:  Object to the form of the

14  question.

15    Q.    That there was any urgency to do that after

16  April 6?

17    A.    Urgency?

18    Q.    Yeah.

19    A.    Explain yourself.

20    Q.    Looking at this letter, you see it's dated

21  March 24?

22    A.    That's the date that management prepared that

23  letter.  I've done hundreds of grievances through the

24  years.  That's the date that labor prepares it.  It



Steven Collins - Bernstein

22

1    A.    No.

2    Q.    Let me ask you this.  Were you satisfied in

3    your own mind that you had 14 days from April 6 to

4    file the step 1?

5    A.    Absolutely.

6    Q.    Okay.  No question?

7    A.    Absolutely.

8    Q.    No doubt?

9    A.    Third time.  Absolutely.

10   Q.    Now, as I understand it, when this case went to

11   arbitration, the arbitration hearing itself was

12   divided in two, is that correct?

13   A.    No.

14   Q.    That's not bifurcated?

15   A.    They have heard -- we heard -- it wasn't an

16   actual bifurcation where we heard it just on the

17   14-day -- heard the 14-day argument first.  Then we

18   went on with the merits.  And that was the ruling that

19   the arbitrator ruled.

20   Q.    So there was evidence taken on the timeliness

21   of the grievance issue, correct?

22   A.    Yes.

23   Q.    And there was also evidence taken on the

24   merits?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Steven Collins - Bernstein

23

1    A.    Yes.

2    Q.    But the arbitrator decided, I'm going to rule

3    separately on these issues, is that correct, or was

4    that by agreement?

5    A.    He came out and had a conference between Andy

6    Keen and myself.  He mentioned that he did not want

7    the labor rep's name brought in unless it had direct

8    evidence or matter of the case, and that he would hear

9    it on the timeliness and hear it on the merits also at

10   the same time.

11   Q.    Okay.  Did he indicate at some point that he

12   was going to make a separate decision on the

13   timeliness issue before making a decision on the

14   merits issue?

15   A.    I don't recall.

16   Q.    On the merits issue, can you describe for me

17   just in summary fashion what the defense was to the

18   charge that Ms. Wilson was working at Boscov's while

19   she was on sick-leave status?

20   A.    We made the argument that the discipline was

21   untimely, for unjust cause, harsh, punitive, not

22   corrective in nature, in direct violation of the

23   EL 921.

24   Q.    What's EL 921?



A-0125

31

1  you vaguely disagree or agree with it?

2     A.    I agree with what part of it.

3     Q.    What she said.  What part do you agree with?

4     A.    FMLA.

5     Q.    Yeah.

6     A.    Discipline employee for a governed absence.

7     Q.    You would agree that you can't do that?

8     A.    Correct.

9     Q.    What part do you disagree with?

10    A.    If it's approved FMLA absence, under Family

11  Medical Leave Act, you cannot discipline for it.

12    Q.    Did you argue that at the arbitration hearing?

13    A.    We argued everything at the arbitration

14  hearing.

15    Q.    Do you recall arguing that?

16    A.    We argued for ten hours.

17    Q.    I understand that.  My question is, do you

18  recall arguing the FMLA point.

19    A.    I argued everything.

20          MS. HANNIGAN:  I'm sorry.  What was that

21  final answer?

22          THE WITNESS:  I argued everything.

23  BY MR. BERNSTEIN:

24    Q.    In cases where you learn that the Postal



**WILCOX & FETZER LTD.**
Registered Professional Reporters

34

1          And you filed a step 1?

2     A.    Yes.

3               MR. BERNSTEIN:   Excuse me a moment.

4               (Discussion off the record.)

5               MR. BERNSTEIN:   That's all I have.

6               MR. LEFF:   Any questions?

7               MS. HANNIGAN:   No.

8                    EXAMINATION

9     BY MR. LEFF:

10    Q.    Steve, I want to clarify a few things.   I want

11    to go back to questions about covered FMLA absence.

12    If an employee takes covered FMLA absence tomorrow for

13    a serious health condition, instead of going to the

14    doctor or staying home and recuperates, that employee

15    goes, works for Sears, do you think the Postal Service

16    would have grounds to terminate that person if they

17    used their approved FMLA absence time to go work

18    another job during their Postal Service hours.

19    A.    They would go after them, yes.

20    Q.    And the Union might fight that, correct

21    A.    We've had it before.

22    Q.    Basically the Union fights every removal that's

23    out there?

24    A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    This is a person's job, right?

2    A.    Right.

3    Q.    And no matter what the merits are, if it's a

4    removal, the Union is pretty much going to fight it?

5    A.    Absolutely.

6    Q.    But the mere fact that the Union is fighting it

7    doesn't mean that the Postal Service didn't have cause

8    under the collective bargaining agreement; it's just

9    the Union's position that that should be for an

10   arbitrator to decide, right?

11   A.    Absolutely.

12   Q.    You said you made a number of arguments in

13   trying to prevail on the grievance challenging

14   Ms. Wilson's removal.  One of them was that the Postal

15   Service was untimely in delivering the discipline in

16   the first place, correct?

17   A.    Correct.

18   Q.    Another one was that the Postal Service did not

19   have just cause to remove her, is that correct?

20   A.    Correct.

21   Q.    Is it correct that there were several arguments

22   under the just cause prong.  One of them I think you

23   testified to was that, for the most part, the hours

24   she worked at Boscov's did not overlap the hours she



Steven Collins - Leff

36

1    worked at the Postal Service, is that correct?

2    A.    Correct.

3    Q.    Is it correct that an another argument you made

4    was that, look, she may have taken sick leave from the

5    Postal Service, but when she took sick leave from the

6    Postal Service she was actually sick.  She went home,

7    took the medication to get better, and therefore

8    couldn't work.  So she was not working, taking sick

9    leave, and then working another job which would be a

10   violation?

11   A.    Correct.

12   Q.    You also argued that, even if the Postal

13   Service had cause, a termination was too severe of a

14   penalty, is that correct?

15   A.    Absolutely.

16   Q.    What was that EL handbook violation argument

17   that you mentioned?

18   A.    EL 921 speaks of the way that a supervisor

19   should handle grievances and discipline, and we felt

20   that also was violated being as that the procedural

21   arguments that during the day in court was not a true

22   day in court, that it was more of a fact-finding

23   investigation, which is a violation of EL 921.

24                 And we also made the argument that the



A-0129

37

1   concurring higher official, Carla Van Istendal, sat in

2   the day in court, and she was the concurring official.

3   We said that that was not an independent

4   investigation, which Postal Service is mandated by its

5   own handbook and manuals to do so.  We also made that

6   argument at arbitration.

7      Q.   Am I missing any major arguments that you made?

8   Corrective, you said the discipline wasn't corrective.

9   Was that an argument you made?

10     A.   It wasn't corrective.  It wasn't progressive as

11  per the contract.

12     Q.   And that was all attempts to mitigate the

13  harshness of the discipline.  If you couldn't prevail

14  on the merits, at least get her back to work?

15     A.   Yes.

16     Q.   At any time, either before, during, or after

17  the arbitration hearing, did Ms. Wilson express to you

18  that you should have made different arguments on the

19  merits or additional arguments?

20     A.   No.

21     Q.   Looking at the notice of removal, why is that

22  March 24th, 2004, date not important in your opinion?

23     A.   Because that's the date that labor prepares it.

24  They sit on it at times before it gets back to the



39

1    Q.    Or the date the employee received it?

2    A.    The date that it was dropped off at his house.

3    Q.    So it wasn't the date on the discipline, but it

4    was the date that the express mail was delivered?

5    A.    Yes.

6    Q.    So my question is, do you know of any case in

7    which the arbitrator held that a grievance was

8    untimely because it was 14 days after the date that

9    the discipline had on it?

10    A.    Oh, absolutely not.

11    Q.    In your experience, the tolling date begins

12    when the employee receives the discipline, whether

13    it's by hand or by mail?

14    A.    Correct.

15    Q.    Did you have any indication that Ms. Wilson

16    received the notice of removal prior to April 6, 2004?

17    A.    No.

18    Q.    Did Ms. Wilson ever tell you that she received

19    notice of removal by first class mail?

20    A.    No.

21    Q.    Your understanding, at what step did the Postal

22    Service raise the timeliness issue?

23    A.    Step 2.

24    Q.    Did you handle the step 2 of this grievance?



A-0131

Steven Collins - Leff

41

1    Q.    What did working on the grievance entail?

2    A.    I did a search on LexisNexis.

3    Q.    What did you search on LexisNexis?

4    A.    Removals that fit the criteria of Ms. Wilson.

5    I even did a -- it took me a while to dig it up.   MSPB

6    case that was similar to Melinda's in Wilmington.

7    Q.    But let's take this one at a time.   Is it

8    correct that the APWU catalogs Postal Service employee

9    arbitration cases in a LexisNexis computer database?

10   A.    Yes.

11   Q.    So you searched that database?

12   A.    Yes, I did.

13   Q.    MSPB, does that stand for Merit Systems

14   Protection Board?

15   A.    Yes, it does.

16   Q.    Certain Postal Service employees have cases

17   before the Merit System Protection Board, correct?

18   A.    Correct.

19   Q.    So you searched for those cases also.

20              What else did you do?

21   A.    I went through case files.   I went to the CBRs,

22   which is collective bargaining reports which APWU puts

23   out to arbitration advocates.   It's in paper form

24   where you go through and find similar cases to the



42

1   ones that you're looking for.

2      Q.   What else did you do?

3      A.   Went to the ELM, went to the FMLA act.

4      Q.   Did you prepare a request for information?

5      A.   Yes, I did.

6      Q.   Tell me about that.

7      A.   At step 1 I requested information from the

8   supervisor Joylyn Pascual that I did the step 1 with,

9   asking for the records, and presented it to her.

10     Q.   And did you do all this before you filed the

11  step 1?

12     A.   This was all -- the investigation?

13     Q.   Yes.

14     A.   Yes.

15     Q.   Why?

16     A.   You want to make sure it's right.

17     Q.   If, in your opinion, you've had time to file

18  the grievance, have you ever filed a grievance before

19  doing an investigation on a removal.

20     A.   Not a removal, no.

21     Q.   And why not?

22     A.   Because they're so complicated, and there's so

23  much at stake.

24     Q.   And it's possible if you don't include things



Steven Collins - Leff

44

1    and she was telling me that her and her husband were

2    having family problems and that she always didn't go

3    check her cluster box.

4        Q.    That's her mailbox?

5        A.    Yes.  And that she went back and forth, and

6    that was when she found out that it was all in there,

7    the 5th, and she was going down to get it all.

8        Q.    This was during your prearbitration

9    preparation?

10       A.    Yes.

11       Q.    Did Ms. Wilson at that point tell you that she

12   had received the first class mailing of the notice of

13   removal on March 30th or 31st?

14       A.    I don't know if she told me that date.  I found

15   out for sure that I know was when Mr. Keen presented

16   the EEO investigation paperwork there that's --

17       Q.    I'll get to that in a second before the

18   arbitration here, did you know that Ms. Wilson had

19   received notice of removal prior to that certified

20   letter on April 6?

21       A.    No.

22       Q.    I want to show you Wilson Exhibit Number 3

23   which is the information for pre-complaint counseling.

24   During Ms. Wilson's testimony she stated that she had



WILCOX & FETZER LTD.
Registered Professional Reporters

A-0134

45

1  wrote that on March 31st that she received a notice of

2  removal.  Did you see this document, exhibit 3 to

3  Ms. Wilson's deposition, prior to the arbitration

4  hearing?

5  A.    No.

6  Q.    Did you try to keep this document out?

7  A.    Absolutely.  I objected that Mr. Keen obtained

8  this with unclean hands, and the arbitrator ruled that

9  he would let it in for what it was worth as a

10 credibility issue.

11 Q.    Do you recall, during the hearing, did

12 Ms. Wilson testify that the first time she received

13 the notice of removal was on April 6 when she signed

14 for the certified letter, if you recall.

15 A.    Yeah.  Right now I don't recall that.

16 Q.    Do you think that the arbitrator in your

17 opinion that the arbitrator relied on this information

18 for pre-complaint counseling document in determining

19 that Ms. Wilson had noticed the removal on March 31st?

20 A.    Oh, yes.

21        MR. LEFF:  If you'll allow me, I'd like to

22 authenticate a few of the grievance documents through

23 Mr. Collins, just to save on doing that declaration.

24        MR. BERNSTEIN:  Sure.



A-0135

46

1              MR. LEFF:  Hopefully I can get through

2    these quickly.

3              Can you mark this.

4              (Collins Deposition Exhibit 1 was marked

5    for identification.)

6    BY MR. LEFF:

7      Q.   Mr. Collins, take a look at that document.

8    It's been marked exhibit 1.  Can you tell me what that

9    is?

10     A.   That was my bullet points that I was going

11   through of my arguments that I was going to make in

12   defense of Ms. Wilson.

13     Q.   Okay.  And 4/6/04, it says, sign for certified

14   letter.  Can you tell me about that, right-hand

15   corner?

16     A.   Right.  I wrote that that's the date.  Tell me

17   when the 14 days would start.

18     Q.   Mr. Collins, if you had known that Ms. Wilson

19   had received the first class mail letter seven days,

20   six or seven days earlier than April 6, 2004, would

21   that have changed your belief of when the time limits

22   for filing a grievance had begun?

23     A.   If I had known?

24     Q.   Yes.



Steven Collins - Leff

47

1    A.    Yes.

2    Q.    So if Ms. Wilson had told you that she received

3    notice of removal by first class mail on March 31st,

4    you would have believed that the 14 days' time limit

5    had begun on March 31st?

6    A.    Yes.

7    Q.    And from your discussions with Ms. Wilson, you

8    believe that the first time she received the notice of

9    removal was April 6, is that correct?

10    A.    Correct.

11              MR. LEFF:   Can you make this exhibit 2?

12              (Collins Deposition Exhibit 2 was marked

13    for identification.)

14    BY MR. LEFF:

15    Q.    Can you tell me what exhibit 2 is, please?

16    A.    This is a request of information that I've

17    presented to Joylyn Pascual during the step 1 hearing.

18    Q.    Is that something you prepared prior to the

19    filing the step 1 grievance?

20    A.    Yes.

21    Q.    Why did you do that?

22    A.    This is information I need to go through to

23    make more arguments and prove my case.

24    Q.    I want to show you from Ms. Wilson's exhibits.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Steven Collins - Leff

49

1    Q.    Now, typically, to do the step 1, you would

2    meet with the removed employee's supervisor, correct?

3    A.    Correct.

4    Q.    That's that supervisor, Ms. Drummer, was on

5    leave at the time?

6    A.    Yes.

7    Q.    So you made extra sure that they had another

8    supervisor who you could meet with within the 14 days?

9    A.    Correct.

10   Q.    And you went to the MDO to get a Postal Service

11   supervisor appointed?

12   A.    Yes.

13   Q.    And you met with that person on April 16?

14   A.    Yes.

15   Q.    And that was, in your opinion or your view,

16   four days before the time limits for the grievance

17   ran?

18   A.    Correct.

19   Q.    And you did that to make extra careful sure

20   that the grievance was timely filed?

21   A.    Absolutely.

22   Q.    Approximately how many employees were in the

23   Union's bargaining unit at this time?

24   A.    About 660.



Steven Collins - Leff

51

1    A.    This is what we consider additions,

2    corrections, or deletions.  This is, after we receive

3    the denial, from the post service, we have five days

4    to rebut or make any other arguments than what they've

5    contended or to add anything that needs to be added.

6    Q.    And is that something that Mr. Stinson

7    prepared?

8    A.    Yes.

9    Q.    And so that is rebutting the Postal Service

10   step 2 denial and any final arguments that the Union

11   wants to make?

12   A.    Yes.

13   Q.    And to your knowledge, Mr. Stinson challenged

14   the Postal Service timeliness --

15   A.    Yes.

16   Q.    -- assertions?

17   A.    Yes.

18   Q.    Did you prepare and read an opening statement

19   during the hearing?

20   A.    Yes, I did.

21   Q.    Did you submit arbitration awards to the

22   arbitrator in support of both the timeliness issue and

23   the merits issue?

24   A.    Yes, I did.



WILCOX & FETZER LTD.
Registered Professional Reporters