# COLLECTIVE BARGAINING AGREEMENT

# COLLECTIVE BARGAINING AGREEMENT

Between
**American
Postal Workers
Union, AFL-CIO**

And
**U.S. Postal Service**

**November 21, 2000
November 20, 2003**



EXHIBIT

A-0141

# Table of Contents

Preamble ................................................. 1

Article 1  Union Recognition .............................. 1

Article 2  Non-Discrimination and Civil Rights ........... 5

Article 3  Management Rights .............................. 6

Article 4  Technological and Mechanization Changes ....... 7

Article 5  Prohibition of Unilateral Action .............. 9

Article 6  No Layoffs or Reduction In Force .............. 9

Article 7  Employee Classification ....................... 18

Article 8  Hours of Work ................................. 23

Article 9  Salaries and Wages ............................ 29

Article 10 Leave ......................................... 43

Article 11 Holidays ...................................... 47

Article 12 Principles of Seniority, Posting and
           Reassignment .................................. 50

Article 13 Assignment of Ill or Injured Regular Workforce
           Employees ..................................... 72

Article 14 Safety and Health ............................. 80

Article 15 Grievance-Arbitration Procedure ............... 90

Article 16 Discipline Procedure .......................... 109

Article 17 Representation ................................ 115

Article 18 No Strike ..................................... 123

Article 19 Handbooks and Manuals ......................... 124

Article 20 Parking ....................................... 126

Article 21 Benefit Plans ................................. 127

Article 22 Bullentin Boards .............................. 129

Article 23 Rights of Union Officials to Enter Postal
           Installations ................................. 129

Article 24 Employees on Leave with Regard to Union
           Business ...................................... 130

iii

## Article 15.1

### Section 9. Field Federal Safety and Health Councils

In those cities where Field Federal Safety and Health Councils exist, one representative of the Union who is on the Local Safety and Health Committee in an independent postal installation in that city and who serves as a member of such Councils, will be permitted to attend the meetings. Such employee will be excused from regularly assigned duties without loss of pay. Employer authorized payment as outlined above will be granted at the applicable straight time rate, provided the time spent in such meetings is a part of the employee's regular work day.

(The preceding Article, Article 14, shall apply to Transitional Employees)

### ARTICLE 15
### GRIEVANCE-ARBITRATION PROCEDURE

### Section 1. Definition

A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

### Section 2. Grievance Procedure Steps

**Step 1:**

(a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within

## Article 15.2 (Step 1)

fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause. The employee, if he or she so desires, may be accompanied and represented by the employee's steward or a Union representative. The Union also may initiate a grievance at Step 1 within 14 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required. A Step 1 Union grievance may involve a complaint affecting more than one employee in the office. When the Union files a class action grievance, Management will designate the appropriate employer representative responsible for handling such complaint.

(b) In any such discussion the supervisor shall have authority to settle the grievance. The steward or other Union representative likewise shall have authority to settle or withdraw the grievance in whole or in part. No resolution reached as a result of such discussion shall be a precedent for any purpose.

(c) If no resolution is reached as a result of such discussion, the supervisor shall render a decision orally stating the reasons for the decision. The supervisor's decision should be stated during the discussion, if possible, but in no event shall it be given to the Union representative (or the grievant, if no Union representative was requested) later than five (5) days thereafter unless the parties agree to extend the five (5) day period. Within five (5) days after the supervisor's decision, the supervisor shall, at the request of the Union representative, initial the standard grievance form that is used at Step 2 confirming the date upon which the decision was rendered.

(d) The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after receipt of the supervisor's decision. Such appeal

## Article 15.5.C.3.f

   f.  the arbitrator may issue a bench decision at the hearing but in any event shall render a decision within forty-eight (48) hours after conclusion of the hearing. Such decision shall be based on the record before the arbitrator and may include a brief written explanation of the basis for such conclusion. These decisions will not be cited as a precedent. The arbitrator's decision shall be final and binding. An arbitrator who issues a bench decision shall furnish a written copy of the award to the parties within forty-eight (48) hours of the close of the hearing.

4. No decision by a member of the Expedited Panel in such a case shall be regarded as a precedent or be cited in any future proceeding, but otherwise will be a final and binding decision.

5. The Expedited Arbitration Panel shall be developed by the National parties, on a District level.

### D. National Level Arbitration

1. Only cases involving interpretive issues under this Agreement or supplements thereto or of general application will be arbitrated at the National level.

2. A docket of cases appealed to arbitration at the National level shall be maintained for the Union. The arbitrators on the National Panel shall be scheduled to hear cases on a rotating system basis, unless otherwise agreed by the parties. Cases on the docket will be scheduled for arbitration in the order in which appealed, unless the Union and Employer otherwise agree.

## Article 16.1

### Section 6. Administration

The parties recognize their continuing joint responsibility for efficient functioning of the grievance procedure and effective use of arbitration. Commencing April 1, 1979, and quarterly thereafter, the Employer will furnish to the President of the Union a copy of a quarterly report containing the following information covering operation of the arbitration procedure at the National level, and for each Grievance/Arbitration Processing Center separately:

(a) number of cases appealed to arbitration;

(b) number of cases scheduled for hearing;

(c) number of cases heard;

(d) number of scheduled hearing dates, if any, which were not used;

(e) the total number of cases pending but not scheduled at the end of the quarter.

(The preceding Article, Article 15, shall apply to Transitional Employees)

[see Memo, page 317]

### ARTICLE 16
### DISCIPLINE PROCEDURE

### Section 1. Principles

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to,

A-0144

### Article 16.1

insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

### Section 2. Discussion

For minor offenses by an employee, management has a responsibility to discuss such matters with the employee. Discussions of this type shall be held in private between the employee and the supervisor. Such discussions are not considered discipline and are not grievable. Following such discussions, there is no prohibition against the supervisor and/or the employee making a personal notation of the date and subject matter for their own personal record(s). However, no notation or other information pertaining to such discussion shall be included in the employee's personnel folder. While such discussions may not be cited as an element of prior adverse record in any subsequent disciplinary action against an employee, they may be, where relevant and timely, relied upon to establish that employees have been made aware of their obligations and responsibilities.

### Section 3. Letter of Warning

A letter of warning is a disciplinary notice in writing, identified as an official disciplinary letter of warning, which shall include an explanation of a deficiency or misconduct to be corrected.

### Section 4. Suspensions of 14 Days or Less

In the case of discipline involving suspensions of fourteen (14) days or less, the employee against whom disciplinary

110

### Article 16.5

action is sought to be initiated shall be served with a written notice of the charges against the employee and shall be further informed that he/she will be suspended after ten (10) calendar days during which ten-day period the employee shall remain on the job or on the clock (in pay status) at the option of the Employer. However, if a timely grievance is initiated, the effective date of the suspension will be delayed until disposition of the grievance, either by settlement or an arbitrator's final and binding decision. The employee shall remain on the job or on the clock (in pay status) at the option of the Employer.

### Section 5. Suspensions of More Than 14 Days or Discharge

In the case of suspensions of more than fourteen (14) days, or of discharge, any employee shall, unless otherwise provided herein, be entitled to an advance written notice of the charges against him/her and shall remain either on the job or on the clock at the option of the Employer for a period of thirty (30) days. Thereafter, the employee shall remain on the rolls (non-pay status) until disposition of the case has been had either by settlement with the Union or through exhaustion of the grievance-arbitration procedure. A preference eligible who chooses to appeal a suspension of more than fourteen (14) days or his/her discharge to the Merit Systems Protection Board (MSPB) rather than through the grievance-arbitration procedure shall remain on the rolls (non-pay status) until disposition of the case has been had either by settlement or through exhaustion of his/her MSPB appeal. When there is reasonable cause to believe an employee is guilty of a crime for which a sentence of imprisonment can be imposed, the Employer is not required to give the employee the full thirty (30) days advance written notice in a discharge action, but shall give such lesser number of days advance written notice as under the circumstances is reasonable and can be justified. The employee is

111

# HANDBOOK
# EL-921

## (SUPERVISOR'S GUIDE TO HANDLING GRIEVANCES)

A-0146



Supervisor's Guide to Handling Grievances

Handbook EL-921
August 1990

A-0147

What are employee obligations? Some are spelled out fully, and some are at least touched on, in the collective bargaining agreements. Others relate to behavior expected in an industrial or work environment. These include, but are not limited to:

◆ Working safely.

◆ Reporting for work regularly and as scheduled.

◆ Cooperating with fellow employees and superiors.

◆ Performing quality work.

◆ Maintaining the general ability to perform the job as required.

◆ Following reasonable rules, orders, and directions.

## B. Disciplinary Procedures

The main purpose of any disciplinary action is to correct undesirable behavior on the part of an employee. All actions must be for *just cause* and, in the majority of cases, the action taken must be progressive and corrective.

12

The following is a review of the measures management should take in dealing with employee problems:

As a supervisor, you should know daily what each employee is doing. If an employee usually does an acceptable or above-average job, but does poorly on a particular day, you are responsible for talking with the employee in a friendly and constructive manner. Determine what the problem is and try to help.

This is where your concern for the employee can be used to prevent additional and perhaps more serious problems. Personal concern does not mean being soft on employees; it is a trait of a good manager.

If minor offenses occur, discussion with the employee may be effective in correcting deficiencies. In such a case, let the employee know what the problem is. Be specific. Cite examples and let the employee know what is expected. You have a responsibility to encourage employees to correct their shortcomings. Let the employee talk—an interchange may be all that is needed. Follow up to make sure the discussion was effective. If the employee corrects the shortcomings after this discussion, let it be known that you appreciate the improvement.

13

What happens if the employee's behavior does not improve? A second discussion is sometimes advisable, or formal disciplinary action may be initiated through issuance of a letter of warning or suspension. Remember, your job is to handle disciplinary actions so they are corrective and not punitive.

In suspending an employee, use extreme caution in convincing yourself that the penalty is appropriate for the offense. Progressively longer suspensions may be in order to correct a situation. When these fail, discharge should be considered. Before you take such action, review thoroughly:

◆ Is it for just cause?

◆ Have we made attempts to correct the employee's behavior?

◆ Have we taken prior progressive disciplinary action?

◆ Is the decision based upon objectivity and not emotionalism?

Remember, however, certain offenses may warrant discharge without prior progressive discipline.

14

## C. Just Cause

What is *just cause?* The definition of just cause varies from case to case, but arbitrators frequently divide the question of just cause into six sub-questions and often apply the following criteria to determine whether the action was for just cause. These criteria are the *basic* considerations that the supervisor must use before initiating disciplinary action.

◆ Is there a rule?

If so, was the employee aware of the rule? Was the employee forewarned of the disciplinary consequences for failure to follow the rule?

◆ *Important:* It is not enough to say, "Well, everybody knows that rule," or, "We posted that rule 10 years ago." You may have to prove that the employee should have known of the rule.

Certain standards of conduct are normally expected in the industrial environment and it is assumed by arbitrators that employees should be aware of these standards. For example, an employee charged with intoxication on duty, fighting on duty, pilferage, sabotage, insubordination, etc., may be gen-

15

A-0149

erally assumed to have understood that these offenses are neither condoned nor acceptable, even though management may not have issued specific regulations to that effect.

◆ Is the rule a reasonable rule?

Management must maintain work rules by continually updating and reviewing them, and making sure that they are reasonable, based on the overall objective of safe and efficient work performance. Management's rules are reasonably related to business efficiency, safe operation of our business, and the performance we might expect of the employee, and this is known to the employee.

◆ Is the rule consistently and equitably enforced?

If a rule is worthwhile, it is worth enforcing, but be sure that it is applied fairly and without discrimination.

Consistent and equitable enforcement is a critical factor, and claiming failure in this regard is one of the union's most successful defenses. The Postal Service has been overturned or reversed in some cases because of not consistently and equitably enforcing the rules.

Consistently overlooking employee infractions and then disciplining without warning is one issue. If employees are consistently allowed to smoke in areas designated as *No Smoking* areas, it is not appropriate suddenly to start disciplining them for this violation. In such cases, management loses its right to discipline for that infraction, in effect, unless it first puts employees (and the unions) on notice of its intent to enforce that regulation again.

Singling out employees for discipline is another issue. If several employees commit an offense, it is not equitable to discipline only one.

When the Postal Service maintains that certain conduct is serious enough to be grounds for discharge, it is unwise—as well as unfair—to make exceptions. If the Postal Service is to maintain consistency in its position that theft or destruction of deliverable mail is grounds for discharge even on a first offense, for example, then the otherwise good employee guilty of this offense, like the borderline or marginal employee, must be discharged.

16

17

A-0150

◆ **Was a thorough investigation completed?**

Before administering the discipline, management must make an investigation to determine whether the employee committed the offense. Management must ensure that its investigation is thorough and objective.

This is the employee's *day in court* privilege. Employees have the right to know with reasonable detail what the charges are and to be given a reasonable opportunity to defend themselves *before* the discipline is initiated.

◆ **Was the severity of the discipline reasonably related to the infraction itself and in line with that usually administered, as well as to the seriousness of the employee's past record?**

The following is an example of what arbitrators may consider an inequitable discipline: If an installation consistently issues 5-day suspensions for a particular offense, it would be extremely difficult to justify why an employee with a past record similar to that of other disciplined employees was issued a 30-day suspension for the same offense.

There is no precise definition of what establishes a good, fair, or bad record. Reasonable judgment must be used. An employee's record of previous offenses may never be

18

used to establish guilt in a case you presently have under consideration, but it may be used to determine the appropriate disciplinary penalty.

The Postal Service feels that unless a penalty is so far out of line with other penalties for similar offenses as to be *discriminatory*, the arbitrator should make no effort to equalize penalties. As a practical matter, however, arbitrators do not always share this view. Therefore, the Postal Service should be prepared to justify why a particular employee may have been issued a more severe discipline than others.

◆ **Was the disciplinary action taken in a timely manner?**

Disciplinary actions should be taken as promptly as possible after the offense has been committed.

19

A-0151

Failure to investigate before taking a disciplinary action can result in some awkward situations for the Postal Service. Examples:

◆ One employee who worked for many different supervisors on a relief assignment was involved in discussions at separate times within one year by different supervisors for similar infractions. When discussion did not correct the employee's irregularity, progressive discipline should have been imposed at an early stage.

◆ In another instance, an employee bid into a new section and immediately became a tardiness problem. During the first 10 days under the new supervisor, the employee was tardy six times. The supervisor held a discussion with the employee without investigating the past record, which would have revealed that the employee had been a continuing problem and had recently returned from a 30-day suspension for tardiness. Obviously, a discussion was not the correct action in this instance.

When in doubt as to the appropriate discipline to be issued, supervisors are encouraged to consult with their managers or with designated labor relations personnel. They will assist you in determining the appropriate corrective action based upon individual circumstances.

22

## F. How Much Discipline

One of the most difficult areas of discipline is the determination of the amount or type of discipline to be issued for a particular offense. The Postal Service generally does not subscribe to any *discipline formula,* where a table of penalties is maintained for particular offenses. The discipline data base, which is part of the National Labor Relations Information System (NLRIS) and accessible to labor relations professionals, provides guidance concerning corrective actions. Generally, however, certain factors should be considered in assessing discipline, and disciplinary action should be tailored to the particular circumstances.

Items for consideration in assessing discipline include but are not limited to:

◆ The nature and seriousness of the offense.

◆ The past record of the employee; and/or other efforts to correct the employee's misconduct.

◆ The circumstances surrounding the particular incident.

23

A-0152

- The amount of discipline normally issued for similar offenses under similar circumstances in the same installation.

- The length of service.

- The effect of the offense upon the employee's ability to perform at a satisfactory level.

- The effect the offense had on the operation of the employee's work unit; for example, whether the offense made coverage at the overtime rate necessary, whether mail was delayed, etc.

The collective bargaining agreements also provide that discipline be corrective in nature rather than punitive.

24

# IV. Review

## A. Get the Facts

- Review the record.
- Find out what rules apply.
- Talk with individuals concerned.
- Get opinions and feelings.
- *Be sure you have the whole story.*

## B. Weigh and Decide

- Fit the facts together.
- Consider their bearing on each other.
- Decide what possible actions there are.
- Check practices and policies.
- Consider objective and effect on individual, group, and production.

## C. Take Action

- Are you going to handle this yourself?
- Do you need help in handling it?
- Should you refer this to your supervisor?
- Watch the timing of your action.
- *Don't pass the buck.*

## D. Check Results

- How soon will you follow up?
- How often will you need to check?
- Watch for changes in productivity, attitudes, and relationships.

25

A-0153

# ARBITRATION CASES

SOUTH JERSEY DISTRICT


**UNITED STATES**
**POSTAL SERVICE**

Arbitrator George Shea
19 Deerfield Rd
Sherborn MA 01770-1481


October 9, 2004


RE: Arbitration Case C00C-1C-D 04114132 (CL40704)


Arbitrator Shea:


In accord with the agreement of the advocates at the arbitration hearing in the Delaware
P&DC on 10/7/04, I am submitting ten (10) arbitration awards in support of
management's position.

Sincerely,



Andrew Keen
Manager Labor Relations
South Jersey District
PO Box 9001
Bellmawr NJ 08099-9401


Cc:    grievance file

MW/0975

## REGULAR REGIONAL ARBITRATION PANEL

|  |  |
|---|---|
| In the Matter of the Arbitration ) | **Grievant:**   Donna M. Ariola |
| between ) | |
| ) | **Post Office:**  Chicago BMC Illinois |
| United States Postal Service ) | |
| ) | **Case No:** |
| and ) | USPS  J98T-1J-D 00152336 |
| ) | APWU 00M42 |
| American Postal Workers Union ) | |

**Before:**          **John C. FLETCHER, Arbitrator**

**Appearances:**

| | |
|---|---|
| **For the Postal Service:** | Juanita Smallwood, Labor Relations Specialist |
| | USPS Central Illinois District |
| | Bedford Park, Illinois  60499-9402 |
| **For the Union:** | Benjamin A. Barnes, Sr., Arbitration Advocate |
| | APWU Maintenance Division |
| | Gary, Indiana  46401 |
| **Place of Hearing:** | Chicago BMC, Forest Park, Illinois |
| **Date of Hearing:** | October 19, 2000 |
| **Date of Award:** | November 6, 2000 |
| **Relevant Contract Provisions:** | Article 16, National Agreement |
| **Contract Year:** | 1998 - 2000 |
| **Type of Grievance:** | Discipline - Removal |

### Award Summary

Management had just cause to effect the removal of Ms. Donna M. Ariola when she worked a second job while she was on medical restrictions on her Postal Service job, and she worked at that job while on sick leave.

_____
John C. FLETCHER, Arbitrator

MW/0976

A-0156

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

## OPINION AND AWARD

### J98T-1J-D 00152336 [00M42]
### Chicago BMC, Forest Park, Illinois
### Donna M. Ariola - Removal

**Background:**

On August, 22, 1977, while working as a Mailhandler in the Chicago Bulk Mail Center, the herein Grievant, Ms. Donna M. Ariola, injured her back while lifting a mail sack. In January 1979, Grievant was separated from Postal Service employment to OWCP rolls, where she remained until early 1981. In February of that year, the Service's Injury Compensation Officer referred Grievant to an Orthopedic Surgeon for examination. On February 23, 1981, that Surgeon provided the Postal Service with the results of his findings, which indicated that she "has apparently sustained a lumbosacral strain, but may return to work as she is improved." The doctor further opined that he "would not allow her to lift more than fifty pounds at work."

After receipt of this determination a meeting was held on March 20, 1981 with Ms. Ariola and several Postal Service Managers "for the purpose of finding suitable work" within Grievant's medical limitations. When asked about the doctor's evaluation Ms. Ariola indicated that her orthopedic doctor had restricted her to lifting 20 to 30 pounds. (The meeting minutes indicate that having Grievant examined by a "third doctor" was discussed. However the record is silent if this ever occurred.) Nonetheless, Ms. Ariola was told that she was being offered a modified custodian job on Tour 1, at the same salary level she had when she had

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

been employed as a Mailhandler. She was also assured that she would not be expected to perform tasks that exceeded her medical restrictions. Grievant indicated that she would prefer to go on light duty in the Re-wrap Section, but was told that for various reasons (including fluctuations in volume) this was not available. At the conclusion of the meeting, Grievant signed the job offer, which was effective at 11:00 p.m., April 4, 1981. Thereafter Grievant was reinstated to Postal Service employment as a rehabilitated employee in the Maintenance Craft on Tour 1, with an 11:00 p.m. starting time.

While working her modified custodian assignment, Grievant re-injured her back on December 9, 1993, while "bending and sweeping." This resulted in another OWCP claim that was accepted for payment by DOL. Following "recovery" from that injury the restrictions placed on Grievant's modified custodian job were expanded to exclude "mopping or cleaning activities," with limited bending, and no lifting over 35 pounds. Also, Grievant was to avoid prolonged standing or sitting without the opportunity to move about. Thereafter, Grievant's only assigned work functions were to clean water fountains and wipe down tables in several cafeteria areas in the BMC.

Sometime in January 2000, a co-worker of Grievant's approached their Supervisor and complained that "it was not fair that Ariola gets all the easy work when she is able to work a second job." The Supervisor contacted the Inspection Service to have them find out if Grievant was indeed working a second job. The Inspection Service determined that Grievant did have a second job, becoming

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

employed on January 26, 1999, at a Dominick's Finer Food store near her residence, that she worked there between 20 and 30 hours each week as a cashier, usually scheduled between 3:00 p.m. and 9:30 p.m., Monday through Thursday. The Inspection Service also learned that at times in the last quarter of 1999, Grievant had worked at her second job on days that she had not worked her schedule at the Bulk Mail Center because she was on sick leave.

Following a pre-discipline interview, Grievant, on April 25, 2000, was issued a notice of removal. The removal was based on two charges, reading:

### Charge 1 - UNACCEPTABLE CONDUCT

Specifically, since January 26, 1999, you have been employed at a Dominick's Food Store in a position as a *Cashier/Clerk* where your normal working hours are from 23 to 30 hours per week and one of the job requirements is standing 100% of the time. This is in direct violation of your Postal work restrictions, which states that you may only stand a maximum of 3 hours per day and also states that you can only work 8 hours per day.

When questioned during your pre-disciplinary hearing about your restrictions you were very vague and you further stated that someone at Dominick's is there to help with any lifting. You were then asked about standing for 6 to 8 hours as required by the job at the Dominick's store and you responded, you didn't see anything wrong with working two jobs, in that you needed the money.

### Charge 2 - UNACCEPTABLE CONDUCT

Specifically, your are in violation of the ELM 513.312 (Engaging in gainful employment while in a sick leave status), and ELM 661.42, conflict of interests which states no employee will engage in outside employment which impairs mental or physical ability to perform Postal Service duties and responsibilities. The records show that on several occasions you had work hours at Dominick's store on a day previous to your use of Sick Leave at the CBMC and that on one occasion you presented Medical substantiation stating you were incapacitated (ill) and unable to work at the CBMC, but worked during this same period at Dominick's.

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

When questioned on these charges during your pre-disciplinary hearing, you stated that you didn't see anything wrong with this because the time you worked at Dominick's did not correspond with your regular Postal hours.

APWU filed a grievance challenging the removal on both procedural and substantive grounds. Following a denial at Step 2, the removal was appealed directly to arbitration.

### THE ISSUE

The parties' Advocates are in agreement that the issue should be stated as:

Did the Postal Service have just cause to effect the removal of Ms. Donna M. Ariola?

If not what shall the remedy be?

There are no procedural or jurisdictional impediments to a final and binding award in this matter.

### THE POSITION OF THE PARTIES

**The Position of the Postal Service:**

The Postal Service first notes that the issue involved in Ms. Ariola's removal is not working a second job, but rather it is working a second job that is beyond her restrictions at the Post Office, and working a second job on days that she was absent from her Postal Service job because she claimed to be sick. It points out that Grievant was under severe medical restrictions. Nonetheless, she was unable to work within these restrictions without having "numerous accidents" over the years. Because of her accidents and her medical restrictions Grievant was

A-0160

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

accommodated by the Postal Service with a job that required little more than that she show up for work - wiping off tables and cleaning water fountains - an effort on the part of Management to provide her with some type of work within her restrictions.

Her second job at Dominick's Finer Foods, though, encompassed work that was beyond her Postal Service restrictions. It invovled standing 100% of the time, as well as lifting, bending, and stooping. And, Grievant would go to work at Dominick's, perform all of these duties, and then call the Post Office and ask to be excused because she was now too sick to come to work, the Service notes. Referencing Section 513.312 of the ELM, the Service says that when an employee claims sick leave, she is sick for all purposes of employment at whatever time the employee may have worked. Thus, it makes no difference that the hours of her Dominick's job do not parallel the hours of her Postal Service job for which she received sick leave. If you are too sick to come to work for the Postal Service your are too sick to work elsewhere, Management asserts.

In response to the assertion that Grievant now has a current medical release indicating that she is able to do more things, the Service states that it was her responsibility to provide information pertaining to changes in her limitations to OWCP and Management, but she failed to do so until after the discipline was issued, and this is too little too late.

On the claim that the discipline assessed was excessive and punitive in the case of a 20 year-plus employee, the Service responds that Grievant's conduct was

A-0161

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

egregious, she claimed sick leave she was not entitled to, worked another job when she was on sick leave, concealed facts about her physical limitations, and generally misrepresented her medical condition. Accordingly, it was proper to proceed directly to removal without following any progressive discipline steps.

**The Position of the Union:**

The Union first argues that Grievant's Supervisor did not make a proper investigation before he proceeded to discipline of removal. It asserts that all the Supervisor did was rely on the IM, which he is not privileged to do. Any Supervisor issuing discipline must conduct his own independent investigation, it is stressed. The Union also argues that procedural defect obtained when it was not furnished all of the material it requested. For example, it was never provided with a definitive explanation as to precisely what Grievant's medical restrictions were. Instead, it was only given a copy of an undated 0-13 that had a couple of notes scribbled on it pertaining to Grievant. In this regard Grievant cannot be accused of work activity beyond her restrictions if the restrictions are not known, the Union says.

The Union stresses that Article 16 contemplates that discipline be progressive. In this matter removal of an employee with over twenty years of service, an employee with a discipline free record, is punitive. And, because this is a removal case, in effect the imposition of the industrial capital punishment, Management must be held to the highest standard of proof to support its action, proof that is clear and convincing, it is argued.

On the merits, the Union says that Grievant was never aware of the rule she is said to have violated. One of the seven tests for the administration of discipline requires that the rule breached be adequately published and that the employee be aware of its proscriptions. This is missing in this matter, the Union insists.

With regard to the charge of using sick leave and working at her second job, the Union points out that at no time was Grievant working at the second job when she should have been working at the Post Office - the hours of the two simply did not conflict with each other, it is noted.

APWU also argued that Grievant should have been sent for a fitness for duty examination, rather that be removed, in order to determine just what her physical limitations were.

Concern is also raised with regard to the motive of the individual that brought this matter to the attention of Management. The Union has asked that this person be identified, as some discriminatory motive - race or sex - may be involved, but Management has refused. Failure of Management to make a full disclosure in this regard hinders the Union's defense, and provides another basis for throwing the discipline out, it is asserted.

Finally, the Union suggests that Grievant was provided misleading direction by the Inspection Service and her Supervisor. When she was interviewed by the Inspection Service she asked is she should quit her second job but was never given an answer. In her pre-disciplinary interview, she asked her

Supervisor the same question, and he responded "I don't care what you do," which could be interpreted as not being concerned if she continued to work at Dominick's as well as at the BMC.

## DISCUSSION

Two basic elements are involved in Management's decision to effect Grievant's removal. The first, that Grievant worked a second job that required that she work beyond her Postal Service work restrictions. The second, that Grievant worked this second job at times that she was on paid sick leave from the Postal Service. Proof establishing that either charge is correct is sufficient to warrant discipline, and when the conduct is egregious, Management need not follow the precepts of progressive discipline. In this matter Management has offered sufficient proof to establish that both charges are well founded.

For many years Grievant has been assigned to a modified custodian position because of her claimed physical impairment. The duties of this position, it is obvious, were of a "make-work" nature, designed so that Management could secure minimal productivity from an employee that claimed to have been disabled as a result of an on-the-job event – an employee that was required to be continued in employment because of this event. Medical restrictions are physical limitations that are in place twenty-four hours a day. These limitations are not in place only when an employee is "clocked-in" at the Post Office. Any activity, work or play, that occurs away from the Postal Service work site which demonstrates that an employee is exceeding one's medical restrictions is sufficient to establish that

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

material misrepresentation of physical condition is present.  In this matter, Grievant's work at her second job at Dominick's for over a year "before she was caught" demonstrates that she repeatedly participated in physical activity that greatly exceeded the medical restrictions she had in place governing her Postal Service employment.  Accordingly, it must be concluded that the proof offered by Management is sufficient to establish that this charge is correct.

With regard to the matter of Grievant working at her second job on days that she was on sick leave from the Postal Service, this charge, too, has been established.  There are several elements involved in this charge, only one need be mentioned in this decision – her sick leave absence between May 11-17, 1999.  To cover that absence Grievant submitted a doctor's note indicating that she was incapacitated for that entire period.  During that period she was paid 8 hours sick leave on Tuesday the 11th, Wednesday the 12th, Thursday 13th, and Monday the 17th.  However on the 11th Grievant worked at Dominick's.

Grievant's explanation, that she left work feeling sick, took medication that made her feel some better, so she tried to work her Dominick's job, but had to leave early as she was feeling ill again, makes no difference, because applicable regulations of the Postal Service proscribe any outside employment while on sick leave, without prior Management approval.

Also, her contention that the absence between May 11, 1999 and May 17, 1999 was not a continuous absence, but instead occurred day-to-day is not credited.  While Grievant did call-in several times, the initial call occurred a 10:20

Page No. 10

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

p.m. on May 10, 1999. In that call, Grievant requested 16 hours sick leave, covering her Tour 1 assignment beginning at 11:00 p.m. for Service Days, Tuesday May 11th and Wednesday May 12th. Yet she was able to report for work at Dominick's on May 11th at 3:30 p.m., even though she represented the night before that she was too sick to work at the Post Office the tour before and the tour after she was able to work at Dominick's. Accordingly, it must be concluded that the proof offered by Management is sufficient to establish that this charge is correct.

Management, having established that it had just cause to impose discipline as a result of Grievant's outside work activity exceeding her medical restrictions and working a second job while on sick leave, our next task is to determine if the discipline assessed is appropriate and then if procedural flaw is present so as to require modification. In this matter, the Arbitrator agrees that Grievant's conduct was sufficiently egregious so as to warrant severe discipline. Grievant represented to the Postal Service that her medical condition was such that she was only able to do minimal work. These representations occurred over an extended period of time. Nonetheless, for over a year Grievant was able to work a second job that required that she vastly exceed these limitations. This conduct boarders on fraud, if it is indeed not actual fraud. Many arbitrations have concluded that fraudulent activity in personal injury situations is grounds for immediate removal without following the tenets of progressive discipline.

A-0166

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

The second charge is just as serious. While only one instance of working at the other job while on sick leave has been discussed in this decision, it should be noted that several others are contained in this record. Any Postal Service employee, to say nothing of one with more than twenty years of service, should be aware that an employee claiming sick leave is sick for all activity – not just the time that the employee would be scheduled at the Postal facility. It is a serious offense when an employee claims that they are too sick to work for the Postal Seville, but is able to work at their second job. In such circumstances progressive discipline need not be followed and Management, when the circumstances warrant, may proceed directly to removal.

The Union has stressed from the very first steps of the grievance procedure that Grievant's Supervisor failed to make an adequate investigation into the matter before he imposed discipline. In this regard the Union asserts that the Supervisor merely relied upon the IM as his investigation. This contention overlooks the fact that it was the Supervisor himself that asked the Inspection Service to investigate Grievant's second job with Dominick's. In the circumstances present here it would be the Inspection Service that had the resources to go to Dominick's and interview the Store Manager, it was the Inspection Service that had the ability to secure the job description of a food store cashier, it was the Inspection Service that had subpoena power to secure Grievant's employment records from Dominick's. These are functions of the Inspection Service, and Grievant's Supervisor, who has a mission vastly different, should be privileged to utilize this resource as a part of the required investigation he is obligated to make. Moreover, upon receipt of the

USPS & APWU
J98T-1J-D 00152336 [00M42]
Chicago BMC, Illinois
Donna M. Ariola - Removal

IM, Grievant's Supervisor conducted a pre-disciplinary interview with her, where the facts developed were fully discussed. The totality of these facts do not even hint that the Supervisor failed in his responsibility to conduct his own investigation into this matter.

The Union has asserted that Grievant should have been sent for an FFD. This notion is also misplaced. If Grievant, when she went to work at Dominick's – or at any other time for that matter – believed that her medical condition had sufficiently improved so that she was able to relax her restrictions and work a second job, it was incumbent upon her to notify her Supervisor of this. Anything less is material misrepresentation of one's physical condition to continue on light or limited duty when not eligible to do so. That Grievant was not sent for an FFD does not warrant modification of the discipline assessed.

Finally, we will look at the charge that the Supervisor never disclosed the name of the individual that brought Grievant's second job to his attention. The Union requested this information so as to explore the motive of this individual. The motive of an individual reporting employee or supervisory misconduct has nothing to do with the merits of the charge of misconduct itself. It is facts that determine if misconduct occurred – not the motive of the tipster. This case is not flawed because Management refused to share the name of the tipster with the Union.

The grievance is without merit. It will be denied.

# A W A R D

Management had just cause to effect the removal of Ms. Donna M. Ariola when she worked a second job while she was on medical restrictions on her Postal Service job, and she worked at that job while on sick leave.

_____
**John C. FLETCHER, Arbitrator**

**Page No. 14**

A-0169

# SOUTHEAST REGION REGULAR ARBITRATION PANEL

RECEIVE

OCT 21 2002

COLLECTIVE BARGAINING AND ARBITR/
LABOR RELATIONS

-----------------------------------------------------------

IN THE MATTER OF THE ARBITRATION.GRIEVANT:  Massie

**UNITED STATES POSTAL SERVICE**      .POST OFFICE: Sarasota, FL

        and

.CASE NO.: H00C-1H-D 02141148

**AMERICAN POSTAL WORKERS UNION**    .

-----------------------------------------------------------

BEFORE:  Linda S. Byars, Arbitrator

APPEARANCES:

    For the U. S. Postal Service:  Cindy S. Beierlein
                                Labor Relations Specialist

    For the Union:  Bud Hissam
                  Arbitration Advocate

Place of Hearing:  Manasota PDC, Florida

Date of Hearing:   August 27, 2002

Briefs:  Postmarked September 27, 2002

Contract Provisions:  Article 16, Article 19 (ELM 513.312)

Date of Award:  October 17, 2002


## Award Summary

The Postal Service had just cause to issue a Notice of
Removal to the Grievant when she misused FMLA leave.  The
Grievance is denied.

1

BACKGROUND

By memorandum dated April 22, 2002, the Grievant, who
is a level four Mail Processor working 2250-0700 hours and
has a seniority date of January 31, 1987, was charged with
improper conduct and issued a Notice of Removal signed by
Supervisor Distribution Operations Mary Fleury.
Specifically, the Grievant was charged as follows:

"1. On February 26, 2002 at approximately 1:45
p.m. your BMW was observed parked in the church
parking lot next to the Ethic Hair Salon. You had
not worked the night before, February 25, 2001 nor
did you report for duty on the evening of February
26, 2002.

2. On March 1, 2002, you left your residence at
approximately 11: 25 a.m. You proceeded to the
Ethnic Hair Salon and arrived at approximately
1:00 p.m. During the observations, you came out
of the salon and talked on your cell phone.
Although observations ended at 5:00 p.m. you
remained at the Ethnic Hair Salon.

3. On March 8, 2002, your vehicle was again
observed at the Ethnic Hair Salon. On this
occasion observations by the Postal Inspection
Service began at 1:24 p. m. and ended at 4;30 p.m.
During this time you remained at the Ethnic Hair
Salon.

4. On March 14, 2002 you left your residence at
approximately 1:20 p.m. and drove to Firkins Pre-
owned Car Dealership in Bradenton, FL. From there
you continued to the Ethnic Hair Salon and arrived
at approximately 2:00 p.m. You remained at the
hair salon until approximately 7:00 p.m. You then
returned to the dealership and test-drove several
vehicles before returning to your residence.

As previously noted during the time you were

2

working at the Ethnic Hair Salon you absented
yourself from work based on the fact that you were
incapacitated.  Documentation from your health
care practitioners certify that you have illnesses
relating to migraine headaches and bells palsy.
As indicated above while you claimed you were
incapacitated for work you were in fact working at
the Ethnic Hair Salon.  An investigative interview
relative to the above circumstances was conducted
on April 8, 2002.

As a Postal employee you are well aware of your
responsibility to refrain from engaging in
dishonest conduct or other conduct prejudicial to
the Postal Service.  You are well aware that
employees are expected to be honest, reliable, and
trustworthy. As the facts relate during the time
in which you called in sick you were engaged in
gainful employment at the Ethnic Hair Salon.  Your
actions as described above are a very serious
matter of such gravity that the Postal Service has
lost all confidence in  your creditability as a
Postal employee.  Your actions are  inconsistent
with the Code of Ethical Conduct 661.2, Standards
of Conduct 661.3, 661.53, and 513.312 of the
Employee and Labor Relations Manual and will not
be tolerated."  [Joint Exhibit No. 2, p. 2.]

Cited in the removal notice is a Letter of Warning dated

January 24, 2002 for Continued Unsatisfactory Attendance –

Tardiness.  The removal action was requested by Supervisor

Fleury on April 10, 2002 and was concurred in by Tour 1 MDO

Norris Hamm on April 11, 2002.

The Union protested the removal action by filing a Step

1 Grievance on May 4, 2002 that was denied the same day by

SDO Kevin Badgley.  The Union appealed the Grievance to Step

2 on May 7, 2002, and MDO Hamm denied the Grievance in a

memorandum dated May 29, 2002.  The Union filed Corrections

3

and Additions dated June 1, 2002 and the same day appealed
the Grievance to arbitration.  The Parties agree that the
Grievance is properly before the Arbitrator and jointly
submit the following as the statement of issue.

STATEMENT OF ISSUE

Did the Postal Service have just cause to issue the
Notice of Removal, and, if so, what should be the remedy?

POSITIONS OF THE PARTIES

Position of the Postal Service

The Postal Service maintains that while the Grievant
requested and received  SWOP or LWOP under the guise of
FMLA, she continued to work at the Ethnic Hair Salon on the
very same day.  In so doing, the Grievant violated Section
513.312 of the Employee and Labor Relations Manual, which
states,

> "An employee who is in a sick leave status may not
> engage in any gainful employment unless prior
> approval has been granted by the appropriate
> authority."

The Postal Service submits that if the Grievant were
incapacitated for work with migraines and/or Bells Palsy, as
she claims, she would certainly stay home and rest with
minimal activity and only as necessary.  The Postal Service
further submits that the Grievant's action show a total

4

disregard for her coworkers, who did the work she should
have been doing, and that her actions abused the trust of
her managers and supervisors.

The Postal Service maintains that the Grievant's
refusal to respond to questions during the investigation by
the Inspection Service, during the investigative interview
by her supervisor and even at the arbitration hearing calls
for an adverse inference.[1]  The Postal Service had only FMLA
documentation for migraine headaches during the period in
question, and the Grievant did not explain or even try to
inform Management that she had FMLA for another condition.
However, regardless of whether she was claiming FMLA for
migraines or Bells Palsy, the Grievant failed in her duties
as a Clerk and as an employee of the United States Postal
Service.  She chose to go to her own place of business and
to drive her personal vehicle as well as test drive several
other vehicles when she claimed to be unable to work her
Clerk job for the Postal Service.[2]

Contrary to the Union's argument, the Postal Service
maintains that having the concurring official act as the
Step 2 designee is not a harmful error.  The EL 921 Handbook
is a "Supervisor's Guide To Handling Grievances." The
guidelines are not necessarily requirements that must be

[1] In support of this position, the Postal Service cites a decision by
the Supreme Court in <u>Erickson vs. LaChance</u>.

5

strictly complied with, and no employee right is created when the guidelines are not followed.[3]

The Postal Service maintains that it had just cause to issue the Notice of Removal. The Postal Service urges the Arbitrator to uphold the action by denying the Grievance.

Position of the Union

The Union maintains that Management has failed to meet its burden of proving that the Grievant was actually working while at her hair salon or showing that the Grievant's actions were in any way fraudulent. The Union further maintains that Management relied solely on the report of the Inspection Service. Neither the Grievant's supervisor nor any other official in Manasota Management conducted an independent investigation, as outlined in the Memo of Understanding, which states,

> "The parties further acknowledge the necessity of an independent review of the facts by management prior to the issuance of disciplinary action. . . ." [Union Exhibit No. 1.]

The Union further maintains that because the concurring official was also the management official who heard the

---

[2] The Postal Service cites Case No. H98C-1H-D 99232594 decided by Arbitrator M. K. Durham as supportive of its position.
[3] In support of its position that no harmful error occurs when the concurring official also services as the Step 2 designee, the Postal Service cites the following:
  Case No. K98C-1K-C 00229363 decided by Arbitrator Jacquelin F. Drucker
  Case No. W7C-5S-D 17193 decided by Arbitrator Ernest E. Marlatt

6

Grievance at Step 2, the Grievant was unable to obtain an impartial hearing at the second step of the grievance procedure.

The only restrictions placed on the Grievant by her physician was that she was not permitted to work during the period of February 8, 2002 through March 10, 2002. The Grievant's doctor did not place the Grievant under any restrictions that precluded her from driving a car, walking, using a cell phone or performing any other necessary functions of life. The Union submits that there was nothing on the video tape showing the Grievant doing anything outside the parameter of the doctor's restrictions. During the period of the surveillance, the Grievant was not forewarned that her actions would result in discipline, nor did Management invoke its right to ask the Grievant for recertification of her medical condition or send her for a second medical opinion.

The Union asserts that the Grievant's testimony was credible as to the condition of Bell's Palsy and her migraine headaches as well as her restrictions. The Grievant explained that other beauticians handled her clients at the Hair Salon while she was out of work and that she may have taken care of problems that did not require performing work outside of her restrictions. The Union

Case No. J90M-1J-D 94008783 decided by Arbitrator Bernard Dobranski

further asserts that the testimony of the Grievant's physician should be credited over that of the Postal Inspector. The Postal Inspector testified that the doctor responded "no" when asked if he had seen the Grievant recently but that he made no mention of any such question or response in the Investigative Memorandum. However, the doctor testified from his notes at the arbitration hearing that he had seen the Grievant on February 8, 15 and 25, 2002 and that he had recommended therapy sessions during the same time period.

The Grievant's supervisor admitted that she did not go to the hair salon to observe the Grievant's actions during the time period of the surveillance, and she further testified that she did not personally witness the Grievant perform work at the hair salon. It is clear, the Union asserts, that the supervisor's reliance on the Investigative Memorandum is the sole reason she used for the discipline. Contrary to the supervisor's assertion that the Grievant was uncooperative in her interview, a review of the interview as contained in the record demonstrates that the Grievant responded to the questions as completely as could be expected given her right to privacy and that the answers had already been provided in the FMLA documentation given to Management by the Grievant.

8

The evidence fails to demonstrate action by the Grievant that is tantamount to removal.[4]  Moreover, the Grievant has no discipline in her record pertaining to improper conduct.  Accordingly, the Union urges the Arbitrator to sustain the Grievance by expunging the Notice of Removal from any and all of the Grievant's records and by making her whole in any and all respects.

OPINION

As the Union maintains, the case turns primarily on a credibility determination, and, as the Union also maintains, there were no physical restrictions on the Grievant as demonstrated by her physician's statement in the record and his testimony by telephone at arbitration.  However, the Union's conclusion that the Grievant can engage in activity of her choice while taking leave as long as her physician restricts her from work is not a reasonable one.

The Grievant's physician testified that he completed his statement with the understanding that she would not be able to function at work when she was suffering with a migraine.  The Grievant's ability to attend to other

---

[4] In support of its position, the Union cites the following cases:

    Case No. G90C-1G-D 94012024 decided by Arbitrator Linda S. Byars
    Case No. H90C-1H-D 01124930 decided by Arbitrator Christopher E. Miles
    Case No. E7C-2A-D 34888 decided by Arbitrator Walter H. Powell

9

employment duties at the hair salon she owns during the time she was taking leave does not support a conclusion that she was suffering with a migraine headache. As the Postal Service also contends, her failure to obtain prior approval to engage in gainful employment while in leave status is a violation of Section 513.312 of the Employee and Labor Relations Manual.[5]

The credible evidence clearly demonstrates that the Grievant was engaged in gainful employment while she was in leave status. Even she admits that during the periods she was observed at the Ethnic Hair Salon, she was "checking on" a business enterprise she owned and operated. She admits that during the time she was claiming FMLA leave she was attending to business at her salon and "making sure everything was running smoothly," dealing with "problems with customers," and checking on "deliveries" of supplies.

If the Grievant believed she was free to engage in such activity, she refused to admit such activity during the investigation by both the postal inspectors and during the investigative interview with her supervisor. Moreover, there was no sign of an "eye patch" in the surveillance video, as the physician testified he prescribed in response to the question on direct examination, "What were the Grievant's

10

physical limitations?"  The Grievant offered no explanation at the arbitration hearing for the absence of the eye patch in the videotape or for her ability to continue a normal routine of "checking on business," driving, etc. while incapacitated for work with either migraines or "Bells. Palsy."

As the Union contends, the Arbitrator does not find in the Investigative Memorandum where the Postal Inspector asked the physician about visits with the Grievant during the period in question.  However, the testimony elicited from the Postal Inspector on cross-examination does not, as the Union asserts, call for a credibility determination in favor of the Grievant.  At issue is whether or not her activities were improper during the period she was claiming leave and not whether or not she visited her physician during the period in question.

The Postal Service has an obligation and a right to investigate when Management believes an employee may be abusing leave.  As the Postal Service contends, the record demonstrates that the Grievant was very uncooperative during the investigation, and her refusal to provide a reasonable explanation for the observations made by the Inspection Service is persuasive proof that she had none.

---

[5] The conclusion here, as well as many other significant facts, distinguishes the instant case from those cited by the Union.

11

Contrary to the Union's assertion, the Grievant's refusal to provide an explanation for her activities while under surveillance cannot be explained adequately by a desire for privacy or by her assertion that Management had FMLA documentation. The Grievant's refusal to even spell her last name for the Postal Inspector or to respond to the most basic questions that would have been also contained in her FMLA documentation demonstrates, as the Postal Service maintains, an unwillingness to cooperate and an attempt to conceal the facts. A review of the investigative interview (Joint Exhibit No. 2, pp. 5-7) demonstrates that not only did the Grievant refuse to inform Management of the FMLA condition for which she was claiming leave, but she responded "None of you (sic) business on all of the above dates," when asked "Explain why you were unable to report to work but were seen at the above locations at these dates and times." [Joint Exhibit No. 2, p. 6.]

The Arbitrator agrees with the Postal Service that professing an inability to report for duty under such circumstances is serious misconduct warranting discharge. Moreover, the Grievant's conduct during the two interviews convinces the Arbitrator that she knew her behavior was improper. The Grievant does not have to explain why she is able to spend hours everyday at her hair salon and she does

12

not have to answer questions about her medical conditions, but if she chooses not to provide a reasonable explanation for her conduct, it is not unreasonable for Management to conclude that she is misusing leave as charged.

Relying on Article 16.2, the Union submits that the Grievant should have been warned at the beginning of the investigation by the Postal Inspectors that her conduct was improper. However, as the Postal Service pointed out to the Union Steward, discussion is used for "minor offenses" and not for serious misconduct as the evidence demonstrates was occurring in this case. The Union's argument that the Postal Service should have used progressive discipline in this case is likewise unreasonable. Progressive discipline is used for offenses that are more serious than those requiring discussion, but it is not usually considered appropriate for offenses that undermine the trust an employer has in an employee. In this case, it is understandable that the Grievant's supervisor found her behavior inconsistent with the Code of Ethical Conduct and of such gravity as to cause Management to lose confidence in her reliability and trustworthiness.

Contrary to the Union's assertion, the Arbitrator finds no contractual procedural violations during the investigation, and the record demonstrates that the Postal

13

Service conducted a fair and thorough investigation before taking disciplinary action.  Neither the Memorandum of Understanding (Union Exhibit No. 1) nor Article 16, Section 8 of the National Agreement requires an "independent investigation," as asserted by the Union.   The Memorandum of Understanding requires an "independent review of the facts by management prior to the issuance of disciplinary action (emphasis supplied)," and the evidence demonstrates that Management conducted such a review in this case.

The Union's reliance on the EL 921 Handbook, "Supervisor's Guide to Handling Grievances," and the assertion that the concurring official must be someone other than the Step 2 designee in order to guarantee an employee a fair hearing at Step 2 is without merit.[6]  The roles of the reviewing authority and the Step 2 designee, as described in the Guide, can be performed by the same person and there is nothing in the Guide that prohibits the concurring official acting in both roles.  It is to be hoped that when the reviewing authority looks at the facts supplied by the supervisor, he is reviewing "both sides."  However, he is doing so individually, but when the Step 2 official looks "at both sides of the coin in an effort to resolve the grievance" locally, he is doing so collectively with the

14

Union's Step 2 official.

For the reasons stated above, the Arbitrator finds for the Postal Service and makes the following Award.

AWARD

The Postal Service had just cause to issue the Notice of Removal.  Accordingly, the Grievance is denied.

DATE:   October 17, 2002

_____
Arbitrator

---

[6] As the Postal Service also contends ". . . no employee rights are created when these guidelines are not followed."  [EL 921 Handbook, p. i.]

15



14,101 (C8T-4B-D)
Cohen  1/26/81
Removal case  WON

## IN ARBITRATION

UNITED STATES POSTAL SERVICE, )    Case No. C8T-4B-D 14101;
                               )    Arbitrator's File 80-30-453;
                and            )
                               )    Date of Hearing:
AMERICAN POSTAL WORKERS UNION, )    5/6/80 and 10/24/80,
T. S. TAYLOR, JR., Grievant.   )    Allen Park, Michigan.

### APPEARANCES

For the Postal Service:

    DONALD T. COATS
      SC Director, E & LR
      United States Postal Service
      MSC Kalamazoo, MI    49001

For the Union:

    DOUGLAS C. HOLBROOK
      American Postal Workers Union
      20530 Southfield Road
      Detroit, MI    48235



RECEIVED
JAN 28 1981
Arbitration Division
Labor Relations Department

### O P I N I O N

#### Issue

Was Grievant discharged for just cause?

#### Facts

On January 24, 1980, Grievant received a Notice of Charges

Removal, which stated:

> "This is notice that it is proposed to remove you from the
> Postal Service no earlier than thirty (30) days from the
> date you receive this notice.  The reason(s) for this
> removal action are:
>
> "CHARGE I
>
> "Wrongful claim for and receipt of sick leave benefits
> from the Postal Service in violation of Parts 513.312
> and 661.42 K of the Employee and Labor Relations
> Manual.

would not have worked for the Postal Service in any event.  In other words, the work for the T.V. station was being done during hours that were Grievant's own free time, and hence he had a right to do what he wished with his own free time.

This argument can be stated another way with much more of an obvious implication:  Grievant was actually sick during the hours that he would have normally been working for the Postal Service, and hence was entitled to sick leave, but he was not sick during his own hours, and hence was entitled to work.  Stated in this fashion, it can be seen that the argument cannot be sustained. Sick leave implies that the party claiming it is too sick to work in any job.  It is not possible to divide the time for purposes of sick leave and claim that one is not sick during part of the day, but sick during the rest of the day, and to alternate in this fashion for several days.

Section 513.312 of the Employee and Labor Relations manual anticipates this type of situation.  It states:

> "An employee in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority."

This section recognizes that when an employee claims sick leave, he is sick for all purposes of employment at whatever time the employment may be worked.  This is not an unreasonable restriction, and, in fact, any other method or procedure

-13-

would lead to obvious abuses of sick leave.

Simply stated, Grievant claimed sick leave when he was not entitled to it, and this is evidenced by the fact that he was working at another job. If he was able to work at another job, he could have worked at the Post Office. This is not a situation where the employee was too sick to work but could still engage in other, less strenuous activities. Generally speaking, a charge of fraudulent sick leave can be defended on the ground that, while one may be too sick to work, he is still not totally disabled.

In this case, Grievant, by his own actions, showed that he was able to work, evidenced by the fact that he was actually working at another job. He cannot, on the one hand, claim inability to work due to illness, and then work at another job anyway.

The Postal Service cited Case No. NC-C-1898-D, where another employee had claimed sick leave from the Postal Service while working at another job with a private employer. His discharge was likewise sustained.

The grievance is denied.

The costs are assessed equally.

Dated this _26th_ day of January, 1981.

GERALD COHEN
Arbitrator
722 Chestnut Street
St. Louis, MO   63101
(314) 231-2020.

MW/01007

RECEIVED
JAN 2 8 1981
Arbitration Division
Labor Relations Department.

-14-

A-0187

IN ARBITRATION

| | |
|---|---|
| UNITED STATES POSTAL SERVICE, | ) Case No. E4C-2L-D 31119; |
| | ) Arbitrator's File 86-54-1160; |
| and | ) |
| | ) Date of Hearing: |
| AMERICAN POSTAL WORKERS UNION, | ) October 22, 1986, |
| THERESE M. BRUNTON, Grievant. | ) Columbus, Ohio. |

### OPINION

### Issue

Was Grievant discharged for just cause?

### Facts

On February 25, 1986, Grievant was issued a Notice of Pro-
posed Removal which stated as follows:

> "This is advance written notice that it is proposed to
> remove you from the Postal Service no sooner than 30
> days from the date of your receipt this (sic) letter.
>
> This action is based on the following reasons:
>
> #### CONDUCT UNBECOMING A POSTAL EMPLOYEE
> #### VIOLATION OF CODE OF ETHICAL CONDUCT
>
> You requested fourteen (14) hours sick leave for the
> period October 26, 1985 through November 2, 1985.
> During this period you were allegedly totally incapa-
> citated for work according to medical documentation
> that you submitted to the Postal Service to support
> your absence.  Investigation has revealed that during
> this same period you worked for S & S Aggregate in
> Zanesville, Ohio on the following dates:
>
> October 28, 1985 - 7 hours
> October 29, 1985 - 7 hours
> October 30, 1985 - 6 hours
> October 31, 1985 - 3 hours
> November 1, 1985 - 5 hours
>
> These actions violate section 513.312 of the Employee
> and Labor Relations Manual which states; 'An employee
> in sick leave status may not engage in any gainful

MW/01008

-1-

Submitted

employment unless prior approval has been granted by
appropriate authority.  These actions also violate
sections 661.42c and 661.42k of the Code of Ethical
Conduct for Postal Employees (ELM)).

The Postal Service has a fiduciary responsibility to
the public to expedite processing and delivery of the
mail.  Our public image is, to a large degree, a
reflection of our employees conduct.  Therefore,
Postal employees are expected and required to avoid
any action which might harm or destroy public trust
and confidence.

Postal employees are expected to conduct themselves
in a manner which reflects favorably upon the Postal
Service.  Further, our employees are required to be
honest, reliable, trutworthy (sic) and of good
character."

The testimony of the Postal Service was that the
Postmistress at Grievant's station had granted Grievant sick
leave for the period of October 26, 1985, through November 2,
1985.  The original application for this sick leave had been made
by Grievant on December 13, 1985, when she filed a Form 3971.
The granting of the sick leave had been delayed to allow Griev-
ant to produce acceptable documentation for the need for this
sick leave.  She had done so.  While the Postal Service was
waiting for the documentation for the sick leave, Grievant was
carried for the time that she was absent in a leave-without-pay
status.

Thereafter, the leave without pay was converted to sick
leave, and Grievant was paid her sick leave.  This occurred some
time in January, 1986.

The Postmistress heard rumors that Grievant might have been
working at another job during the period that she was claiming
sick leave.  She advised her superiors, who, in turn, contacted

MW/01009

-2-

the Postal Inspection Service. The Postal Inspection Service investigated, and discovered that during the period of October 26 through November 2, 1985, Grievant had been employed as a clerk in the S & S Aggregate Company in Zanesville, Ohio.

The Union's evidence was that Grievant had been a part-time flexible employee. Her hours during the period in question were 6:30 A.M. to 8:30 A.M.. Grievant worked for S & S Aggregate, as the Notice of Removal stated, but never during the period from 6:30 A.M. through 8:30 A.M.. Generally she started work at S & S Aggregate at 9:30 A.M. or even later, depending on the needs of that company. She was a part-time worker at that company, and did not work an eight-hour day.

In addition, her work at the Postal Service had been very stressful as a result of a personality conflict with her Post-mistress. She also was experiencing physical problems as a result of a service-connected injury. Her physical problems pre-vented her from lifting more than five pounds or being on her feet for more than an hour.

The job at S & S Aggregate involved checking weights on a truck scale. The work required no lifting, and Grievant could sit while performing her duties. All she did was make out weight tickets for trucks. This required no physical effort. The job had no stress.

The Postal Service was aware of Grievant's second job. Grievant had advised her Postmistress on October 9 that she did have the other job. Grievant's Postal Service work hours had been cut to the point where it was necessary that she have a

-3-

A-0190

second job.  Even with the second job she had to give up her
apartment and live with her sister because of lack of income.

The Union questioned a Form 3971 which the Postal Service
had introduced.  The hours claimed on that form were changed.
There was a "2" in the hours claimed, and it looked like a "14"
had been written over the "2".  All of the Postal Service manage-
ment employees denied changing the figure, and Grievant had no
recollection of the change.  However, she did state that one 3971
that she had filed had been for two hours for a Veterans Admini-
stration examination, and she also filed a 3971 for seven days of
sick leave for two hours per day.

### Discussion and Award

### Position of the Postal Service

The position of the Postal Service was that Grievant had
violated three sections of the Employee and Labor Relations
Manual.  Section 513.312 provides:

> "An employee in sick leave status may not engage
> in any gainful employment unless prior approval has
> been granted by appropriate authority".

Section 661.42-c states:

> "No employee will engage in outside employment
> which impairs ability to perform Postal Service
> duties and responsibilities acceptably."

Lastly, Section 661.42-k provides:

> "No employee will take sick leave to engage in
> outside work."

Grievant had violated all of these sections of the E&LM.
She had been on sick leave and had engaged in gainful employment.

-4-

In addition, her gainful employment would impair her ability to perform her Postal Service duties because sick leave is to be used for recuperation, and not using sick-leave time for recuperation could impair her ability to return to work.

Lastly, she took sick leave so that she might engage in outside work.

When Grievant claimed sick leave, it was not acceptable to say that she was sick for the two hours which she was to work at the Post Office each day but not sick the rest of the time. On its face, such a position is unacceptable. There are cases that so hold. See Case MC-C-1898-D, where an employee claimed sick leave for his tour of duty but worked a period different than his Postal tour of duty in a manufacturing plant. His termination was upheld.

A similar result was reached in Case C8T-4B-D 14101. There, an employee claimed sick leave, and, later the same day, worked another job. His termination was likewise upheld.

This grievance should be denied because Grievant has clearly violated Postal Service regulations.

### Position of the Union

The Union argues that on the dates in question Grievant was actually on leave without pay. She therefore was not in a sick-leave status. In addition, the Postal Service knew that Grievant had a second job, as was attested to by a statement of her Postmistress in the Inspection Service investigative memorandum. No one had advised Grievant that she could not have the job, hence

-5-

no one at this point should be permitted to discipline Grievant for what was never objected to.

The Postal Service's statement that Grievant's outside employment would impair her ability to perform her duties is refuted by the fact that Grievant's Postmistress evaluated Grievant for a transfer to another station after this incident, and that evaluation was entirely favorable. For instance, one question asked was, "Do you consider this person a satisfactory employee in the performance of her duties?", and the answer given was, "Yes".

Additionally, the charge that Grievant violated Section 661.42-k is not supported by the evidence. Grievant did not take sick leave so as to engage in outside work. Firstly, she had had the job prior to sick leave, and, secondly, she did not need sick leave to engage in the work because she worked the second job outside of her Postal Service hours. There was never any conflict between the two jobs. She had no need to take sick leave to be able to work the other job.

Grievant did not violate Section 513.312 because the Postal Service knew she had a second job, and she was never told prior to her sick leave or during her sick leave not to work at it.

The Union introduced a number of cases in support of its position that Grievant's conduct did not justify discipline. For instance, American Bakeries Co., 43 LA 1106, found that an employee on leave of absence to recuperate from a heart attack who was doing light employment did not misconduct himself to

-6-

justify discharge.  At the very most, according to the arbitra-
tor, he showed bad judgment.

In the case of United Engineering & Foundry Co., 37 LA
1095, the arbitrator held that an employee who refused to give up
a second full-time job could not be discharged because there was
no rule against "moonlighting", and the second job did not affect
his work in his first job.

The Postal Service did not have just cause for Grievant's
discharge, and Grievant should be reinstated and made whole.

### Arbitrator's Discussion

Several of the arguments advanced by the Union are not per-
suasive.  For instance, the Union has argued that the Postal Ser-
vice knew of Grievant's second job, and therefore could not
complain that she had it.  It is true that the Postal Service did
know of Grievant's second job.  This, however, is not the same as
saying they had approved her working that job when she was claim-
ing to be ill.  They made no objection to her working that second
job when there was no relation between that job and her Postal
Service job.

The circumstances, however, changed when Grievant claimed
that she was too ill to work with the Postal Service, but not too
ill to work her second job.

Likewise, it is no defense for Grievant to say that she did
not work the second job during the same hours that she was
working for the Postal Service.  Grievant could hardly claim to
be too ill to work from 6:30 A.M. to 8:30 A.M. for the Postal

-7-

Service, yet at 9:00 have recovered sufficiently to work else-
where.  Logically, if she is too ill to work for the Postal
Service, she is too ill to work elsewhere.

Grievant attempted to avoid this obvious conclusion by
stating that it was the Postal Service's work which contributed
to her illness, i.e., it was job stress causing her illness, but
the same stress was not present at the other job.  If Grievant
found the Postal Service job so stressful that it made her ill,
then one would think that she should use her off-time to rest
from the Postal Service work so that she might be able to perform
her Postal Service duties.

The Union cited a case in which an arbitrator held that an
employee could not be discharged for moonlighting because there
was no rule against moonlighting.  The simple answer to that case
is that Grievant was not discharged for holding a second job, and
was never disciplined for moonlighting.

The question to be resolved is, Can Grievant be too sick to
work part of the day but not too sick to work another job for
other portions of the day?  The answer to that is, No.  If
Grievant is too sick to work one job, she should be too sick to
work the second.

The Employee & Labor Relations Manual, Section 513.312 is
very explicit in this situation.  It says:

> "An employee in sick leave status may not engage in
> any gainful employment unless prior approval has been
> granted by appropriate authority."

The Union seems to believe that the knowledge of the Postal

-8-

A-0195

Service that Grievant had a second job is permission under this section to work in a sick-leave status. However, that section indicates that the individual must obtain the permission of the Postal Service to work while on sick leave. The knowledge of the Postal Service of Grievant's second employment does not constitute blanket approval for her to work it under any and all circumstances.

Paragraph c contained in section 661.42 of the Employee & Labor Relations Manual provides that "No employee will engage in outside employment which impairs ability to perform Postal Service duties ...". It might very well be argued here that Grievant's working in another job while on sick leave impaired her ability to perform at the Postal Service because sick leave is to be used to recuperate so as to be able to perform Postal Service work. By working elsewhere during recuperation time Grievant may have impaired her recuperation and ability to work.

The Postal Service has cited paragraph k of Section 661.42 as also having been violated. This provides that "No employee will take sick leave to engage in outside work". That section is not applicable to the situation here. Grievant did not take sick leave so as to engage in outside work. She did not need sick to be able to engage in that work since she worked hours there other than her Postal Service hours.

However, considering the foregoing, the Postal Service did have just cause in terminating Grievant. Her working at a second job while on sick leave from the Postal Service clearly indicates that she misused her the sick leave.

-9-

<u>Award</u>

The grievance is denied.

The costs are assessed equally.

Dated this _____3rd_____ day of December, 1986.


GERALD COHEN
Arbitrator
1221 Locust Street – Suite 600
St. Louis, MO    63103
(314) 231-2020


**RECEIVED**

DEC 0 9 1986

Grievance and Arbitration Division
Labor Relations Department

-10-

A-0197

COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

**REGULAR ARBITRATION PANEL**

------------------------------------

In the Matter of the Arbitration   (          Grievant:        Allison Batson
                                    )
              between               (          Post Office:     Southern, CT
                                    )
UNITED STATES POSTAL SERVICE        (          USPS Case No:    B00C-1B-D 02181225
                                    )
               and                  (          APWU Case No:    02352
                                    )
      AMERICAN POSTAL WORKERS        (
         UNION, AFL-CIO              )

------------------------------------

BEFORE:                    Philip Harris, Arbitrator

APPEARANCES:

        For the U.S. Postal Service:  James W. Carr, Labor Relations Specialist
        For the Union:                Jo-Anne Colburn, Industrial Relations
                                      Director

Place of Hearing:          Wallingford, CT
Dates of Hearing:          March 23 and May 1, 2003
Date of Award:             June 23, 2003
Relevant Provisions:       Article 16, ELM
Contract Year:             2002
Type of Grievance:         Discipline

### Award Summary:

**Issue**: Was the Notice of Removal dated June 14, 2002 issued for just cause? If not, what shall the appropriate remedy be?

**Charge:** Violation of USPS Code of Ethical Conduct.

**Postal Service Position**: Ms. Batson had a pattern of requesting sick leave while working for another employer.

**Union Position**: The discipline was punitive, not progressive, represented double jeopardy, and lacking proof of wrongdoing.

**Opinion and Award**: The Grievant knew the work environment and did abuse sick leave. The grievance is denied.

Philip Harris

2

### Issue

Was the Notice of Removal dated June 14, 2002 issued for just cause?  If not, what shall the appropriate remedy be?

### Facts

Allison Batson was employed by the Postal Service for eleven years.  For almost a year she had a series of sick day payments while she worked at Stop & Shop on the same days, though not during her Postal Service tour of duty hours.  She refused to provide all requested documentation for her illness absences.

### Relevant Provisions

ARTICLE 16 - DISCIPLINE PROCEDURE
Section 1.  Principles

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive.  No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations.  Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

ELM
Section 511.43 Employee Responsibilities
"Employees are expected to maintain their assigned schedule and must make every effort to avoid unscheduled absences.  In addition, employees must provide acceptable evidence for absences when required."

Section 513.312, Restriction
"An employee who is sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority (see 660 Code of Ethics.)"

Section 661, Code of Ethical Conduct

Section 661.42, Conflicts of Interest - Employment
"...An employee may not engage in outside employment or other outside activity that is not compatible with the full and proper discharge of the duties and

A-0199

3

responsibilities of Postal Service employment. Detailed rules cannot practically be prescribed that will cover every situation of incompatible employment or activity. The following rules, however, provide guidance for specific situations and illustrate the manner in which the general principles should be applied":

c.  "No employee will engage in outside employment which impairs mental or physical ability to perform Postal Service duties and responsibilities acceptably.

k.  "No employee will take sick leave to engage in outside work."

## Postal Service Position

1.  "Ms. Batson's actions went to the heart of the relationship...There just isn't any reasonable excuse for the grievant's dishonest behavior." The Union intentionally delayed submitting Stop & Shop work records because they were damning information (Postal Service Closing Statement page 1, hereafter PSS 1).

2.  The Step 2 grievance papers make no reference to Management withholding requested information, nor any reference in the appeal to Step 3. Also, "Dishonesty and fraudulent behavior are not character traits that are correctable." Arbitrator Roberts said, "There are certain infractions that are so industrially hideous and simply not deserving of any progressive discipline consideration" (see below) (PSS 2).

3.  He also asserted that fraud is "a terminal disease that cannot be corrected through progression." Furthermore, Management thoroughly investigated the matter and gave Ms. Batson two PDIs.  And the burden of proof is the "preponderance of evidence," not "beyond a reasonable doubt."  Ms. Batson's sister also worked both jobs, and not a coincidence.  "This was dishonesty via the family plan to obtain undeserved financial gain."  The Grievant's sham got her pay from two employers "without having to work double shifts."  There is no evidence that she was able to work the other job.  And the Code of Ethics requires approval to work elsewhere while on sick leave (PSS 3).

4.  Ms. Batson did not use her sick leave to recuperate, but to work at Stop & Shop.  She was burning the candle at both ends, not getting proper rest or sleep, and denying responsibility for her actions.  Arbitrator Holden heard sister Jennifer Batson's case on the same issue (PSS 4).

5.  The sisters' similarities are there: the removal was too harsh; the

4

other job was not physically demanding; no request for light duty; awareness of employment conditions; and no permission sought. The Arbitrator upheld the termination and mentioned there was no prior discipline.

Arbitrator Parkinson heard a grievant whose other job was student teaching. He said the Postal duties caused him mental and physical stress, but he never filed a claim for this, suggesting "his allegations of disability were unsupported" (PSS 5).

6.    So too Ms. Batson should be regarded. When asked for documentation about Stop & Shop, she said, "my obligation to the Postal Service is from 11 p.m. to 7:30 a.m." Parkinson said, "trust and honesty are the cornerstone of any effective employer-employee relationship," and that Grievant gave cause to question his integrity and commitment to it. He undermined Postal efficiency and caused potential morale problems. The nature of his action is not offset by the absence of prior discipline. The grievance was denied (PSS 6).

7.    The above is on point. Ms. Batson's "type of behavior cannot be corrected by lessor [sic] discipline."

Arbitrator Cohen heard another similar case. The grievant said her Postal job was stressful and caused sick leave, but she recovered enough to attend the second job. The Arbitrator said, "Logically, if she is too ill to work for the Postal Service, she is too ill to work elsewhere (PSS 7).

8.    Cohen upheld the removal saying she misused sick leave by working a second job while on it.

He heard another such case wherein the grievant on three occasions claimed incapacitation yet reported "on his own time" to another job (PSS 8).

9.    The Arbitrator said, "It is not possible to divide the time for purposes of sick leave and claim that one is not sick during part of the day, but sick during the rest of the day, and to alternate in this fashion for several days."

"Ms. Batson unbelievably alternated in this fashion in at least 18 instances."

In a third case by Arbitrator Cohen, the grievant worked another job where he started prior to the end of the Postal shift for which he was on sick leave! Cohen denied the grievance saying, "Grievant has been shown to have deliberately supplied false information to obtain benefits to which he had no right" (PSS 9).

10.    Arbitrator Roberts' case cited previously had a Grievant who provided medical documentation and had no prior discipline. Yet he sustained the removal because the other job constituted a fraud. "When first hired into any position, regardless of employer, profession or industry, all employees understand that

5

fraud or deception will not be tolerated."

Ms. Batson has no credibility (PSS 10).

11. One of her sick leave requests covering 01/26/02 through 01/29/02 was for her contracting the flu. Yet she worked at Stop & Shop 01/28/02 and 01/29/02. "This is simply not credible." She sought two pay checks while working one job.

Referee Sizensky's case was whether Ms. Batson was discharged for willful misconduct. Ms. Sizensky noted that the Grievant agreed to the employment requirement regarding a second job while on sick leave (PSS 11).

12. The Referee also said the Grievant was not cooperative in providing information and answering questions. Hence Ms. Batson was discharged for willful misconduct (PSS 12).

13. Ms. Batson's sister was removed for similar behavior. And the claim of double jeopardy is bogus. It is defined in Black's Law Dictionary as being for the same offense. The Grievant's prior disciplines were for irregular attendance. The present violation relates to the Code of Ethical Conduct (PSS 13).

14. "She was duplicitous when she applied for payment from USPS while reporting for work at Stop & Shop." The Postal Service cannot trust Ms. Batson. The grievance should be denied (PSS 14).


**Union Position**

1. "The highest level of proof must be shown," which the Service did not meet. The Grievant has always said she has nothing to hide (Union Closing Statement page 1, hereafter US 1).

2. Ms. Batson never denied having a part-time job, which many Postal employees do. She would not have taken so visible a position if it were against the rules. The Postal Service did not prove that the second job impaired her mentally or physically. There was no proof of a conflict of interest (US 2).

3. "She took sick leave because she was sick," not to engage in the other job. The document she signed eleven years ago said a second job may lead to an investigation, not a firing (US 3).

4. The Grievant was not given the specific dates and hours involved in the charge. The investigation was incomplete (US 4).

5. Ms. Batson was unaware of the ELMs that were cited, and not forewarned of possible discipline for violations. The evidence against her is

6

circumstantial at best (US 5).

    6.    Her sister, "whose case must stand alone and isolated," was the only employee removed "for the same alleged offense." The Grievant had an LOW and 7-day suspension as prior discipline (US 6).

    7.    She had been charged with failing to be regular in attendance. The same dates involved then are again being cited in the instant matter. This is double jeopardy: the earlier dates should be disallowed, reducing the number to half the original (US 7).

    8.    Only three sick days overlapped with the other job in almost two years. Ms. Batson was unaware of the rule requiring approval to work while on sick leave, or she would have complied with it (US 8).

    9.    The Grievant made every effort to maintain her schedule. In her sister's case the Arbitrator said "The Union did not argue that the records submitted into evidence by the Postal Service were inaccurate" (US 9).

    10.  Her sister did not testify or explain the absence pattern, different from the case at bar.

    In support of its position, the Union submitted three arbitration awards. The first was heard by Rose Jacobs, Case No. B98C-4B-D 01101475. A Postal Clerk was on sick leave due to an on-the-job injury, but continued to work at his part-time job as a card dealer not inconsistent with his medical restrictions. However, the Arbitrator was concerned primarily with the question of whether the employee was aware of the rule to get approval to work while on sick leave. She concluded he was not because everyone at the Post Office knew for eight years of his dealer job and "He would never have chosen a second job with thousands of people walking around that might have spotted him had he known it was against the rule." But there was misconduct by the employee, leading to no back pay associated with his reinstatement (US 10).

    11.  The second case was also heard by Arbitrator Rose Jacobs, No. B98C-1B-D 00089750. An employee was on FMLA leave and returned after it expired. The documentation he produced did not cover the period of absence, which was then entered as AWOL leading to his removal. He later got another FMLA certification for the remainder of his absence. Ms. Jacobs said Management was aware of his illness because of past FMLA leaves. Also, "The Arbitrator is further persuaded that the Grievant had no reason to disbelieve he was on FMLA leave for the period of his absence especially since his documentation supplied to the medical unit for the same malady was found just as acceptable as it was in the past." The Grievant was restored to his position and made whole.

    The third case was heard by Arbitrator George Sulzer, No. B98C-1B-D

00016932. The Grievant was absent from her job for 104 hours claiming a child-care emergency, and failed to produce the requested documentation. It was then discovered she was working as a cook in a newly opened, family owned restaurant. She was terminated based on an allegation of fraud. Mr. Sulzer determined that the facts justified the emergency characterization, there being four children involved. Also, the Service did not disprove the Grievant's contention that she prepared the restaurant food during off hours from her tour. Though she was AWOL, it was not ground for the removal. She was restored to her job and made whole.

The Union in the case at bar asserted that reasonable doubt should be resolved in favor of Ms. Batson. The burden of proof should be "beyond a reasonable doubt (US 11).

12. The Grievant should be made whole and the Arbitrator retain jurisdiction (US 12).

## Opinion

A major reason to deny the grievance is the serious, self-inflicted harm Ms. Batson brought to her credibility. One of her numerous sick days was for "flu like symptoms," (from which she seemingly made a rather rapid recovery!) Yet during the illness she worked her second job! This point was picked up by the Department of Labor of the State of Connecticut. In its review of her claim for employment benefits, the Referee said concerning the second job, " I n  o n e instance, the claimant claimed to have the flu, which would clearly debilitate the claimant from working at all jobs and not simply the claimant's post office position." It does debilitate with fever, headaches, sore throat, body aches, etc., as many an adult and/or parent can testify. For Ms. Batson to be fit for duty at Stop & Shop is unlikely, a reasonable person would conclude. Furthermore, her value as an employee in the second job was recognized early-on; she was promoted from cashier to job recruiter, processing some 400 job applications monthly, selecting the people to interview and checking references. The Arbitrator thinks it unlikely that she would reward the Stop & Shop executive suite by reporting to work with a disease, a contagious virus! It is more rather than less likely that the Grievant was not so afflicted.

This conclusion on Ms. Batson's credibility readily justifies taking a close look at her other statements and actions. She has a long string of sick days, to the point where her sick day bank is depleted even though she has 104

8

hours of such benefit per year for the past eleven years. This stands out as excessive use, particularly because she refused to submit as requested documentation for the absences. This is uncooperative and violative of Section 511.43 above. In addition, "On another occasion, the claimant failed to notify the employer of her absence, which constitutes willful misconduct even if the claimant had good cause for the absence," said the State of Connecticut Referee.

As to her knowledge of the work environment, the Grievant admitted to signing a Statement of Understanding by Employee, including the points below:

> 4.  I understand that if I am absent due to illness or injury for more than two days, I must call in advance to advise that I intend to report for duty, and when.
> 5.  I understand that, when a supervisor deems it necessary under appropriate regulations, I may be required to furnish a doctor's certification or other acceptable evidence to substantiate any absence which I claim is due to illness or injury.
> 6.  I also recognize that I am subject to investigation if I work for another employer on a day when I report sick at the post office, even though the hours of the two jobs are different.

I HAVE READ AND I AGREE TO THE ABOVE

She claimed that it was eleven years ago, and hence she did not recall signing it. This is not a reason to ignore one's responsibilities. How about marriage vows (although some people are in denial)? What about the Declaration of Independence, the Constitution, apartment rental agreement, etc.? The beneficiaries of such meetings of the mind are entitled to enforcement.

Ms. Batson's claimed unawareness of the work environment expectations is contradicted by the impression she creates. The Grievant is intelligent, quick-minded, verbal and personable. Her competence has been recognized at both jobs, a recruiter at Stop & Shop and actual Post Office service as an Acting Supervisor! She has been around the world of work for sometime, and also has demonstrated her skills at child-rearing while working: her daughter is entering college! But even without these impressive credentials, employees using common sense about attendance and work conflicts would come up with appropriate behaviors to be well regarded by Management.

It is most regrettable that Ms. Batson saw fit to work the system as she did. The Union arguments do not offset this. The double jeopardy issue is not precisely that, she having been previously charged with attendance irregularities. It was subsequently learned about the second job and its relation to Postal sick leave. The arbitration cases submitted by the Union do

9

not come close to matching the credibility question in the case at bar.


**<u>Award</u>**

The Notice of Removal dated June 14, 2002 was issued to Ms. Allison Batson for just cause.  The grievance is denied.

MAY - 7 2004

COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

**REGULAR ARBITRATION PANEL**

| | |
|---|---|
| In the matter of Arbitration ) | |
| ) | |
| UNITED STATES POSTAL SERVICE ) | Grievant:   Darren Calhoun |
| ) | |
| ) | Post Office: Lawndale |
| ) | |
| ) | USPS Case : F98C-4F-D 02035212 |
| AMERICAN POSTAL WORKERS ) | |
| UNION, AFL-CIO ) | APWU Case No: LD201TS |
| ) | |

BEFORE:                          Fred D. Butler, Arbitrator

APPEARANCES:
     For the U.S. Postal Service:   Kevin Gray
                                    Labor Relations Specialist
                                    United States Postal Service
                                    7001 S. Central Ave
                                    Los Angeles, CA 90052-9401

     For the American Postal        John P. Driver
     Workers Union: AFL-CIO         APWU Advocate
                                    5555 Inglewood Blvd
                                    Culver City, CA 90230

     Place of Hearing:             Hawthorne Post Office

     Date of Hearing:              August 19, 2003

     Date Record Closed:           April 8, 2004

     Date of Decision:             April 27,  2004

     Relevant Contract Provision:  Article 15.1, 16

     Contract Year:                2000-2003

     Type of Grievance:            Discipline

### Award Summary:

It is always preferable to decide disputes on the merits rather than technicalities. However in this matter, Management was within its rights to deny this grievance on the timeliness issue and that decision is being upheld.

FRED D. BUTLER, Arbitrator

1

I.
## INTRODUCTION

This matter involves the USPS (Management) decision to issue a Notice of Removal on September 15, 2001 to Darren Calhoun, Window Clerk (Grievant) for unacceptable conduct-Obstruction of the mail.

The Union filed a grievance on his behalf, contending that Management did not follow correct procedures and did not have just cause to remove the grievant from his position.

The matter was heard through a Step 1 Grievance on October 15, 2001 with Management contending that the grievance was not timely filed.  The Union appealed the matter to Step 2, however because Management continued to maintain that the grievance was not timely, the matter was denied on or about November 6, 2001. The matter was then appealed to Arbitration on November 17, 2001.

On August 19, 2003 at Hawthorne, California, the following parties appeared before me in an arbitration hearing, pursuant to the agreement between the United States Postal Service ("Management") and the American Postal Workers Union ("Union").

Representing Management was Kevin Gray Harris, Labor Relations Specialist.  Appearing as witnesses on behalf of Management were Billy Hector, Postmaster, Lawndale Post Office, Christopher Estrada, Former Postal Inspector, Evangeline Odeyemi, Postal Inspector and Janice Wilkins, Supervisor, Lawndale Post Office.

Representing the Union was John P. Driver, APWU Advocate. Appearing on behalf of the Union as a witness was Darren Calhoun, Grievant.

The parties were afforded full opportunity for examination and cross examination of witnesses, introduction of relevant exhibits.

The parties introduced two joint exhibits, J-1, the USPS/APWU Contract for 2000/2003 and J-2, the moving papers of this action, which consist of 102 pages, numbered consecutively. Management introduced one additional exhibit.  Namely, M-1-United Stated District Court Judgement and Probation/Commitment Order dated August 1, 2002 pertaining to Darren Calhoun.  The Union introduced two additional exhibits, namely U-1, Step 1 Grievance Appeal Form and U-2, Infinity Insurance Co. Identification Card of Darren Keith Calhoun.

The proceedings were tape recorded as an extension of the

2

Arbitrator's personal notes.

Management raised an issue of jurisdiction, as they contend that the matter is not properly before the arbitrator because it is not timely. However it was agreed by the parties to present this issue along with the merits and that the Arbitrator would render a decision on the timeliness issue prior to ruling on the merits.

The Grievant requested a stay of either decision pending a criminal appeal based on his guilt or innocence of the underlying criminal charges. Management agreed and the decision in this matter was stayed for 210 days. (Arbitrator Exhibit 1) The matter was then rescheduled to be heard on June 8, 2004. (Arbitrator Exhibit 2) On or about April 8, 2004, this Arbitrator was requested to render a decision in accordance with the original request (Arbitrator Exhibit 3)

II.

### ISSUE PRESENTED

The issues before the Arbitrator are as follows:

1.  Did the Grievant or the Union file the grievance in accordance with the procedure's outline in the National Agreement?

2.  Was there just cause to issue a Notice of Removal to the Grievant, Darren Calhoun? If not, what is the appropriate remedy?

III.

### RELEVANT CONTRACT PROVISIONS AND REGULATIONS

The relevant contract provisions, in pertinent parts, are outlined below.

### ARTICLE 15. GRIEVANCE PROCEDURE

Section 2. Grievance Procedure Steps

Step 1.
    (a)  Any employee who feels aggrieved must discuss the grievance with the employees' immediate supervisor within fourteen days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause.   .   .

3

ARTICLE 16.
DISCIPLINE PROCEDURE

Section 1. Principles

In the administration of this Article, a basic principle shall be
that discipline should be corrective in nature, rather than
punitive.  No employee may be disciplined or discharged except
for just cause such as, but not limited to, insubordination,
pilferage, intoxication (drugs or alcohol) incompetence, failure
to perform work as request, violation of the terms of this
agreement, or failure to observe safety rules and regulations.
Any such discipline or discharge shall be subject to the
grievance-arbitration procedure provided for in this Agreement,
which could result in reinstatement and restitution, including
back pay.

IV.
STATEMENT OF FACTS

The parties presented the following stipulated facts to the
arbitrator.

1. The matter is properly before the arbitrator for
adjudication.

2. At the time the Letter of Removal was issued, the
Grievant was a nixie clerk at the Lawndale Post office, since
October 1, 1983.

3. On August 28, 2001, Los Angeles County Sheriff's stopped
the Grievant for running a stop sign at Normandie and 122nd
Street, Los Angeles, CA 90046.

4. The Los Angeles Sheriff searched the Grievant's vehicle
and found marijuana, two open pieces of mail, both containing
credit cards, four unopened pieces of mail, three DirecTV acces
cards, two Sprint phone cards, an ATM card, a Texaco gas card,
and a 24-hour Fitness Center Membership card.  None of the cards
bore the Grievant's name or address.

5. The Grievant was arrested

6. Postal Inspectors went to the sheriff's station to
interview the Grievant and he refused to talk with them.

7. On August 28, 2001, Postal Inspector D. Zemke called the
Lawndale Post Office and apprised Supervisor Janice Wilkins of
the known facts of the case.

4

8. On August 28, 2001, Supervisor Wilkins mailed the Grievant a notice advising him that he was being placed on emergency suspension.

9. On September 6, 2001, the Postal Inspectors issued a Memorandum detailing the LASD's report and itemizing the mail and stolen items found in the Grievant's possession

10. On September 7, 2001, Supervisor Wilkins conducted an investigative (day in court interview) with the Grievant and the Grievant's Union Representative, Terry Stoller. The Grievant denied stealing the credit and access cards and also denied the obstruction of mail.

11. On July 29, 2002, in United States District Court while represented by an attorney, the Grievant pled guilty to 18 U.S.C. 1708, Possession of Stolen Mail, Class D Felony and placed on probation for a term of five (5) years.

12. On October 10, 2002, an arbitration hearing was held and it was determined that the Postal Service had sufficient information and evidence to form a reasonable belief that the Grievant was in possession of mail and credit cards without authorization and based on this information there was sufficient cause to place the Grievant on Emergency Placement.

The following additional facts were established at the hearing;

On September 15, 2001, the Postal Service through Janice Wilkins, Supervisor issued a Letter of Removal to the Grievant for unacceptable conduct-obstruction of mail. The effective date of the removal was October 16, 2001. (JE 2-, pgs 4-6) The letter was received by the Grievant on September 20, 2001. (JE 2, pg. 58)

On or about October 5, 2001 Management received a telephone call from the Union advising them that the Grievant would be filing a grievance on this matter and requested that the matter be filed by fax and also asked for an extension. (Testimony of Janice Wilkins) Both of these request were denied and more specifically the Union was notified by Management that the time limit had expired for filing the grievance. However, on October 9, 2001 Management received the grievance by mail. (Testimony of Janice Wilkins)

On October 11, 2001, Management agreed to meet with the Union to discuss the grievance. (JE 2, pg. 71) The meeting was held on October 15, 2001. The purpose of the meeting was to discuss the untimely filing as well as the merits. The grievance

5

A-0211

was again denied at that time based on lack of timeliness, as well as on the merits. (Testimony of Janice Wilkins)

On or about October 22, 2001 Management received a Step 2 Grievance appeal from the Union. (JE 2, pg. 70) This appeal lists the date of the Step 1 meeting as October 5, 2001. The October 5th date is incorrect based on the fact that the parties acknowledged meeting after that date. (Testimony of Janice Wilkins, also see JE 2, pg. 71)

Management scheduled a Step 2 grievance meeting for October 26, 2001, however the Union did not appear. This meeting was rescheduled to November 1, 2001 @ 1:00PM, however the Union representative did not show up until 4:PM. Therefore the Step 2 Grievance decision was given by telephone, followed by a letter. (Testimony of Billy Hector & Janice Wilkins) The grievance was denied in part based on a lack of timeliness. ( JE 2, pg 69)

The Union appealed the matter to arbitration from Step 2.

V.

POSITION OF THE PARTIES

Management's Position

It is Management's position that the grievance filed in this matter is not timely because it was filed after the 14-day period required by Article 15 of the National Agreement and therefore violated the Grievance procedure negotiated by Management and the Union.

It is also Management's position that it possessed sufficient just cause to remove the Grievant from his position based on the verified information that he illegally confiscated mail from the postal facility. The Grievant offered no acceptable explanation of why he had the mail in his automobile nor why the mail was opened.

Management maintains that its action was substantiated by the admission of guilt by the Grievant in United States District Court.

Therefore Management requests that the grievance be denied.

In support of their position Management the following decisions. Namely USPS & APWU, Case No: F98C-4F-D 01262592 (2002) Fred D. Butler, Arbitrator;Virginia Figueroa v. US Postal Service, Merit Systems Protection Board, Docket Number SF-0752-

6

98-0407-1-1 (1998) Phillip Reed, Administrative Judge;USPS & NALC, Case No W4N-5E-D 38133 (1987) Edwin R. Render, Arbitrator;USPS & APWU, Case No. W7C-5G-D 16132 (1989) Joseph F. Gentile, Arbitrator; USPS & NRLCA, Case No. E95R-4E-D 01027978 (2002) Dana Edward Eischen, Arbitrator.

Unions Position:

It is the Union's position that the action of Management does not meet the standards set by Arbitrators in matters where criminal allegations are made.  They believe that this standard rises above just cause and must be guilt "beyond a reasonable doubt."

They contend that these were not sufficient facts and information to form a reasonable belief that Grievant had stolen the mail especially since from time to time he routinely delivered the mail and had mail in his possession.

The Union also contends that the removal letter is flawed in that the effective date of the removal does not allow the Grievant to remain on the job or the clock for the 30-day period following the notice.  They also maintain that the action is based solely on the report of the Postal Investigator and not on an independent investigation.

Finally the Union maintains that there is no concurrence to the removal action by a higher level official.  This higher level concurrence is required by the National Agreement.

Therefore the Union is requesting that the Letter of Removal be rescinded, expunged and removed from the Grievant's records and that he be made whole in all respects.

The Union presents the following decision in support of its position.  Namely, USPS & NRLCA, Case No. E95R-4E-D 01027978(2002) Dana Edward Eiscehn Arbitrator.

## VI.
## DECISION

After a review of the testimony and evidence in this matter, this Arbitrator finds that the grievance in this matter was not timely filed.

Article 15, Section 2(a) of the National Agreement between the USPS and the APWU requires that "Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days) of the date on which the employee or  the Union first learned or may reasonably

7

have been expected to have learned of its cause."

As this Arbitrator held in <u>USPS & APWU Case No. F98C-4F-D 01262592</u>. " Interpreted this means that when either the Union or the employee first learns of the matter, there must be some action taken by either or both to meet or discuss the grievance with the supervisor within fourteen days of this notification."

The Grievant was notified by letter from Management dated September 15, 2002 that he was being removed from the Postal Service. This letter was received by him on September 20, 2001. The letter advises him that he could appeal that decision within fourteen days of its receipt. The Grievant had, from that date until October 4, 2001 to contact his Supervisor for a meeting to discuss this matter. However it was not until October 5, 2001 that the Union contacted the supervisor to request an extension to file a grievance. This was already after the deadline. Even then the request was not to file the grievance but to request an extension.

Article 15.2 is quite clear and this Arbitrator has held in other matters, where there has not been a timely filing of a grievance, the principal reason for strict adherence to contractual time limitations for processing of grievances is so that grievances will be quickly and efficiency processed. Any relaxation of the time requirements, rather than benefitting any of the parties, actually leads to the ultimate destruction of the utility of the grievance procedure.

The National Agreement sets forth the agreed upon time limits and procedures for processing grievances and arbitrators have no authority to add to, subtract from, or change that agreement.

This Arbitrator, in quoting Arbitrator Howard Gamser in <u>USPS & APWU Case No. SB 55</u> has also held ". . . only convincing evidence to the contrary should allow a party to escape the consequences when an examination of the chronology of the grievance processing indicates a possible failure to abide by the time limits prescribed." There was no evidence or testimony offered at the hearing that would suggest that the Grievant or the Union was not in a position to have timely filed.

It is always preferable to decide disputes on the merits rather than technicalities. However in this matter, Management was within its rights to deny this grievance on the timeliness issue and that decision is being upheld.

Therefore, the grievance is denied on that basis.

8

Dated:    *April 27, 2004*

FRED D. BUTLER
Arbitrator

9

REGULAR ARBITRATION PANEL
...............................................

| | | |
|---|---|---|
| IN THE MATTER OF ARBITRATION | ( | Grievant: C. Davenport |
| Between | ) | Post Office: Baltimore, MD P&DC |
| UNITED STATES POSTAL SERVICE | ( | USPS Case No.  K00C-1K-D 03220087 |
| and | ) | APWU Case No.  D03220087 |
| AMERICAN POSTAL WORKERS<br>UNION, AFL-CIO | ( | File No. 04-01-123 |

...............................................)

BEFORE:  James E. Rimmel, Arbitrator

APPEARANCES:

| | |
|---|---|
| For the U. S. Postal Service:<br>For the Union: | Kelly Spence<br>Pamela Richardson |
| Place of Hearing: | Baltimore, MD P&DC |
| Date of Hearing: | 13 April 2004 |
| Date of Award: | 6 May 2004 |
| Relevant Contractual Provision: | Article 16 |
| Contract Year: | 2000/2005 |
| Type of Grievance: | Removal |

**Award Summary:**
**The grievance is dismissed having been filed beyond the 14-day period provided for under the provisions of Article 15.2, Step 1 (a) of the Agreement.**

JAMES E. RIMMEL, Arbitrator

1

## BACKGROUND

This matter comes on as a protest from a full-time Craft Clerk at the Baltimore, Maryland Processing and Distribution Center (P&DC) of the United States Postal Service who claims the Notice of Removal meted out to her under letter dated 6 June 2003 for alleged "failure to meet the requirements of your position in the area of attendance due to being absent without official leave/permission..." was for other than just cause. A violation is alleged of Articles 15, 16 and 19 of the 2000/2005 National Agreement (Agreement) between the United States Postal Service (Service) and American Postal Workers Union, AFL-CIO (Union). As appealed to Step 2 on 3 October 2003, the grievance reads as follows:

> On June 9, 2003, the grievant was issued a 'Notice of Removal' by Absence Control Supervisor V. Moore for (1) failure to meet the requirements of your position in the area of attendance due to being absent without official leave/permission (AWOL) and (2) failure to follow instructions. The Union contends that this action by Management is unjust, punitive and in violation of the National Agreement for the following reasons:
>
> On July 18, 2002, Dr. Raymond J. Altieri of the United States Postal Service contacted the grievance's [sic] primary care doctor in reference to her workplace injury.... J.C. Barry, MD on August 18, 2002, gave a response.
>
> On February 3, 2003 a correspondence was sent from US Senator Barbara A. Mikulski's office to Mr. Anthony W. Conway, Manager Legislative Affairs, US Postal Service for an extension of time to gather and submit medical documentation for her absence from work.... In response, on February 27, 2003, Mitch King, Manager of Government Relation, US Postal Service indicated that he would forward this information to the Baltimore Process and Distribution Center Absence Control Office....
>
> On March 25, 2003, Absence Control Supervisor V. Moore sent an Absence Inquiry/Pre-Disciplinary Interview letter to the grievant... The grievant responded with a written [sic] on April 14, 2003, explaining why she was unable to be present in person at the requested meeting... however, she did provide information from her primary care doctor stating the amount of time the grievant would be absent following her surgery....

2

The grievant is currently awaiting a final disposition of her disability case (pending surgery) and has been in contact with Ms. Helene Brower (OWCP) about her medical status and her efforts to get information from her physician concerning her pending surgery. Until the grievant's workman compensation case has been finalized, the Union contends that the Notice of Removal is unjust, unwarranted and without 'just cause.' The grievant has kept the US Postal Service (at various levels) inform of her situation and medical status and to remove the grievant from the service at this time would be premature.

Request the Notice of Removal be rescinded in its entirety and removed from all records. Compensate the grievant for all lost time and benefits. Make grievant whole.

At hearing a considerable amount of documentation was proffered by the parties with most concerning two jurisdictional motions relative to my authority at this time to deal with the merits of this grievance. In other words, both the Service and Union proffered arguments contending I lack jurisdiction to deal with the issue of just cause or otherwise pass upon the merits of the action taken against grievant. The fact of the matter is, this record is devoid, save for the grievance record below, of any evidence concerning the propriety of the action taken. And, while neither party expressly sought to bifurcate these proceedings their limited proffer was tantamount to such a motion.

## SERVICE POSITION

The Service argues this matter is not properly before me having been filed beyond the prescribed time limits set out under the provisions of Article 15.2, Step 1 (a). It emphasizes the aggrieved-of Notice was posted to the grievant under letter dated 9 June 2003, a letter received by her the following day. Likewise, it notes the Union acknowledgment that Local Stewards became aware of this matter on or about 13 August 2003, yet the grievance before me was not filed at Step 1 until 17 September 2003.

The Service emphasizes under Article 15.4.B, the parties have specifically provided that a grievance not properly filed/appealed within prescribed time limits is to be deemed "waived." It thus contends I am obliged to dismiss this matter, lacking jurisdiction to hear the merits of the

3

A-0218