grievance. To do otherwise, according to the Service, would be to ignore that clearly provided for under the parties' Agreement and tantamount to my amending the Agreement.

As for the Union's argument concerning possible pending matters of grievant before the Office of Workers' Compensation Programs (OWCP), the Service questions whether grievant truly has any pending appeals at this time. In any event, it argues that the existence of an OCWP appeal does not excuse the failure of grievant or the Union to file/process a grievance contesting her removal in a contractually timely manner. This is so, according to the Service, even if some or most of the relevant facts surrounding the grievance and OWCP matters are rooted in same events.

Should grievant eventually prevail before the OWCP, she will be obliged to seek appropriate remedy under governing statute having waived any right to challenge the propriety of her removal under the parties' grievance and arbitration procedure. That fact is, according to the Service, grievant failed to file the subject grievance within the time limits provided under the parties' Agreement.

Accordingly, the Service requests this grievance be dismissed.


## UNION POSITION

The Union argues this record establishes grievant has long maintained that her absences over the years have been rooted in work-related injuries, injuries that obliged Management under Article 19 and, more specifically, Part 546 of the Employee Labor Relations Manual, to find her work. It emphasizes further this record establishes grievant is seeking a declaration from the OWCP that she had sustained work-related injuries over the years, injuries that entitle her to compensation, medical benefits and other protections. In any event, the Union contends that until the OWCP matters are fully litigated under its' procedures, I am precluded from dealing with the merits of the case before me. Put simply, it contends I must either sustain the Union's grievance, including voiding the aggrieved-of Notice of Removal or, at the very least, hold this matter in abeyance pending the disposition of grievant's claim(s) before OWCP.

The Union contends if I were to dismiss or deny this grievance, it could result in a gross injustice for grievant upon the final disposition of her claim before OWCP. It emphasizes the propriety of Management's actions would be clearly eroded if grievant's claim before OWCP were to be sustained.

4

Turning to the alleged untimely filing of this grievance, the Union contends local shop stewards proceeded to file a grievance promptly after becoming aware of same.    It contends Management has not attempted to rebut Union claims as to when local stewards first became aware of grievant's removal.  In any event, it contends that grievance filing time lines only come into play when it can be shown the Union knew or reasonably should have know of a grievable event.

Accordingly, the Union requests this grievance either be sustained or the matter held in abeyance pending the disposition of grievant's OWCP claim(s).

## RELEVANT CONTRACTUAL PROVISIONS
### Article 15.4.B

> The failure of the employee or the Union in Step 1, were the Union thereafter to meet the prescribed time limits of the steps of this procedure, including arbitration, shall be considered a waiver of the grievance.  However, if the Employer fails to raise the issue of timeliness at Step 2, or at the step at which the employee or Union fail to meet the prescribed time limits, whichever is later, such objection to the processing of the grievance is waived.

## ISSUES

1.  Is this matter properly before me for adjudication given the 17 September 2003 filing date of the subject grievance?  If so, how should the parties and this arbitrator precede?

2.  Is this matter ripe for adjudication, grievant having pending a collateral/related matter before the Office of Workers' Compensation Programs?  If not, what should be done with this grievance?

3.  If timely and ripe for decision, did Management have just cause to meted out to grievant a Notice of Removal dated 9 June 2003?  If not, what shall be the remedy?

## OPINION

Now, it has been long recognized by the parties that issues of entitlement to benefits, etc., for employees who have been injured on-the-job falls within the exclusive jurisdiction of the OWCP.  Specifically, under Article 21.4 it states: "[e]mployees covered by this Agreement shall be covered by subchapter I of Chapter 81 of Title 5, and any amendments thereto relating to

A-0220

compensation for work injuries." And, while this record is less than clear as to whether grievant truly has a current appeal before the OWCP, the last official document of record reflecting a denial of her claim, there are other communiques suggesting that there is pending an unanswered appeal of nearly two years in duration. This ambiguity can be only rightly resolved in grievant's favor.

Even if it were clear that the OWCP had yet to rule on a properly taken injury claim appeal by grievant, there is nothing of record demonstrating that Management was/is estopped from taking disciplinary action against her. Nor, is there anything precluding me, as arbitrator, from dealing with the various issues presented by a grievance challenging the propriety of specific discipline. This is especially so when a "waiver" issue is initially raised that calls into question my authority/jurisdiction over the merits of a grievance. In any event, there are no contractual bases for summarily sustaining this grievance or holding it pending the disposition of the referenced OWCP appeal. If the parties had intended to provide for the stay of any disciplinary action where a collateral OWCP injury claim is pending they would have so stated in their Agreement. I have been directed to no such provision. Likewise, I have been directed to no provision providing for automatic extension of the grievance time lines for filing/processing of a grievance challenging removal when the employee has pending a collateral claim with the OWCP.

Turning to that found under Article 15.2, Step 1 (a), these disjunctive provisions make clear that the 14-day time line for filing a grievance starts from: "the date the employee or the Union first learned or may reasonably have been expected to have learned of it cause." [emphasis added]. There is nothing under these provisions basing this trigger on the date the Union, and only the Union, learns of the referenced cause. In this case, the record clearly shows grievant received her Notice of Removal on 10 June 2003, more than two months prior to the filing of the subject grievance. As for the Union, it, too, exceeded the 14-day time line in not filing the subject grievance until 35 days after local stewards claimed to have first learned of grievant's removal. In any event, such a belated filing clearly brought into play the grievance waiver provisions of Article 15.4.B.

Under Article 15.4.B, it states: "[t]he failure of the employee or the Union in Step 1 or the Union thereafter to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance." These provisions not only spell out

6

the consequences of the stated failure, i.e., "a waiver of the grievance," it likewise reaffirms that provided under Article 15.2, Step 1 (a) relative to either the employee or Union's responsibility for filing a timely grievance.

Accordingly, this grievance is dismissed, having been waived as a result of not being filed within 14 days of the triggering event; here, grievant's receipt of her Notice of Removal on 10 June 2003.

7

15. 2

REGULAR ARBITRATION PANEL

| | |
|---|---|
| In the Matter of the Arbitration * | |
| * | |
| between: * | Grievant:  B. Harcum |
| * | |
| United States Postal Service * | Post Office: Philadelphia, PA |
| * | |
| and * | USPS Case No: C00C-1C-D 03187805 |
| * | |
| American Postal * | APWU Case No: 032533 |
| Workers Union, AFL,CIO * | |

DEN

BEFORE:                                        Lawrence Roberts, Arbitrator

APPEARANCES:

    For the U.S. Postal Service:        Janice Smith         **ENTERED**

    For the Union:                              Bill Manley

Place of Hearing:                          Philadelphia, PA

Date of Hearing:                           February 19, 2004

Date of Award:                             March 18, 2004

Relevant Contract Provision:      Article 16

Contract Year:                             2000

Type of Grievance:                       Discipline

RECEIVED
MAR 2 2 2004
By

### Award Summary:

    The Grievant in this case was removed for failure to maintain a regular work attendance.  The hearing was procedurally bifurcated based on an issue of timeliness.  The Union failed to prove that detrimental reliance or presumptive arbitrability should be controlling in this matter.  The evidence, clearly and convincingly proved the instant grievance was untimely filed in accordance with the mandate of Article 15.  And based on procedural irregularity, the only choice was to dismiss the grievance.  The Grievance is denied.

Lawrence Roberts, Panel Arbitrator

**SUBMISSION:**

This matter came to be Arbitrated pursuant to the terms of the Wage Agreement between United States Postal Service and the American Postal Workers Union, AFL-CIO, the Parties having failed to resolve this matter prior to the arbitral proceedings. The hearing in this cause was conducted on 19 February 2004 in Philadelphia, PA, beginning at 9 AM. Testimony and evidence were received from both parties. A transcriber was not used. The Arbitrator made a record of the hearing by use of a tape recorder and personal notes. The Arbitrator is assigned to the Regular Regional Arbitration Panel in accordance with the Wage Agreement.

## OPINION

**BACKGROUND AND FACTS:**

The Grievant in this matter was a Full Time Automation Clerk working at Philadelphia Postal facility. The record indicates the Grievant last worked on 11 February 2003. Since that time the Grievant was absent from work.

On or about 3 May 2003, a Supervisor sent the Grievant a letter of inquiry regarding his extended absence. The record indicates the Grievant failed to respond.

Then, on 10 June 2003, the Grievant was issued a Notice of Removal letter via certified mail. The charge was "FAILURE TO MEET THE ATTENDANCE REQUIREMENTS/FAILURE TO REPORT AS SCHEDULED, FAILURE TO FOLLOW INSTRUCTIONS-AWOL." More specifically, Management pointed out the Grievant had failed to perform any service since 11 February 2003.

Page 2 of 12

A-0224

In protest, the instant grievance was filed on or about
4 August 2003.  And with that, the Employer immediately claimed
the grievance was untimely according to the window provided in
Article 15.

With that, the Parties, via the prior steps of their
Grievance-Arbitration procedure of Article 15, were unable to
self-resolve the dispute.

The Employer insisted the grievance was not filed in a
timely manner and the hearing was bifurcated to this issue of
procedure.

The Parties were afforded a fair and full opportunity to
present evidence, examine and cross examine witnesses.
Afterward, the record was closed upon the receipt of oral closing
arguments presented by each Advocate.

The Employer requested a bench decision which was granted.
Following the closing of the record, the undersigned provided an
oral decision to both Parties, for which, a more in-depth written
opinion is provided below.


JOINT EXHIBITS:

    1. Agreement between the American Postal Workers
       Union, AFL-CIO and the US Postal Service.


Page 3 of 12

Case # C00C-1C-D 03187805

2. Grievance Package

3. JCAM

4. Notice of Removal

5. Affidavit

## EMPLOYER'S POSITION:

It is the position of the Service that the Grievant was not an employee of the Postal Service when the instant grievance was filed. According to the Service, the Union's position cannot be supported by the language of the Parties Agreement.

The Employer asserts the JCAM is specific. To that end, it is the claim of the Service that any grievance cannot be processed by the Union when it is filed after an Employee's separation.

Management also points out that an arbitrator's authority is limited only to the terms and provisions of the Agreement. The Employer contends that arbitrators are not permitted to alter, amend or modify the language of the negotiated Agreement.

The Service argues that despite the fact the evidence will show the Grievant was knowledgeable of the Notice of Removal letter, he failed to communicate with his Employer.

According to the Employer's argument, this Notice of Removal places the responsibility on the Employee to ensure that a grievance is filed. The Agency insists the instant grievance was not filed within that fourteen day window of opportunity set forth in Article 15.

And with that, Management requests the instant grievance be found procedurally defective and dismissed on that basis.

## UNION'S POSITION:

It is the claim of the Union that the Service is going to great lengths in arguing the issue of arbitrability.

The Union suggests that if there is any doubt to timeliness, the case must be decided on it's merits. It was mentioned by the Union, that to do otherwise, would go against the principle of presumptive arbitrability.

The Union points out the Grievant sought assistance from the Employee Assistance Program. As noted by the Union, the Parties have negotiated affirmative obligations on the Postal Service, via the language of Article 35.

A-0226

But, according to the Union, instead of assisting the Grievant, the Service is attempting to remove him, based on their procedural argument of untimeliness.

The Union contends that instead of helping the Grievant, the Agency has taken advantage of the Grievant's illness and diminished capacity in their attempt to remove him on procedural ground without the benefit of a hearing on the merits.

The Union insists the Employer's procedural argument be set aside and the instant grievance be decided on it's merits.

**THE ISSUE:**

Whether or not the instant grievance was properly filed in accordance with the Parties Agreement? If not, what is the proper remedy?

**PERTINENT CONTRACT PROVISIONS:**

## ARTICLE 16
## DISCIPLINE PROCEDURE

**SECTION 1. Principles**

"In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulation. Any such discipline or discharge shall be subject to the grievance-arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay."

**DISCUSSION AND FINDINGS:**

As previously announced to the Parties via a bench decision,

the instant grievance was found to be procedurally defective and,

on that basis alone, set aside. The following discussion

provides a more in-depth analysis of my verbal decision rendered at the conclusion of the live hearing.

First of all, the prescribed time limits of Article 15, were constructed without ambiguity. Grievances and disputes must be raised and processed accordingly, within that prescribed window of opportunity.

Granted, there have been many exceptions to that rule. In fact, on many occasions, this Arbitrator has not hesitated in setting aside a procedural argument of timeliness and deciding a dispute on it's merits. For there have been many times whereby circumstances clearly prohibit the timely filing and processing of grievances.

The initial burden is on the Employer to show a grievance was filed outside the time window mandated by Article 15. To that end in the instant case, the record shows that a Notice of Removal letter was issued by the Service on 10 June 1993 and received at the Grievant's mailing address shortly thereafter. The Union conceded the fact that the Grievant received the Notice, on or about that date. The Step 1 Meeting and Decision occurred on 6 August 2003.

So, at first blush, it was clear the instant grievance was filed well outside of the fourteen day requirement.

At that point, the burden shifted to the Union to account for such a delay. In that regard, the Union argued presumptive arbitrability and detrimental reliance. Unfortunately, both of the Union's arguments failed to convince me that the prescribed time limits of Article 15 should be set aside in this matter.

The Union insisted the Grievant was somehow lulled into a false sense of security by the EAP counselor. The Union also implied that the Grievant must have knowledge of the action in order to trigger a contractual requirement of timely filing.

But based on the evidence, I was convinced that both arguments lacked foundation.

There is no doubt the Grievant was dependent on the word of his EAP counselor. And there is evidence to show the counselor assured the Grievant, that the successful completion of a treatment program could result in his continued employment with the Postal Service. However, the counselor was not aware the Grievant had not responded to the removal notice.

The basis for the Grievant's defense was evidenced by the following affidavit, authored by the Grievant on 4 August 2003, which reads:

> "Writing a grievance letter to APWU on behalf of a
> Notice of Removal, I didn't know to call or let my
> supervisor know that I was going away. (rehab) The

> only person I let know was Ron Lamb the EAP person.
> They sent me away before I could response to the
> Letter, or do anything about it.
>
> Not knowing that Ron Lamb EAP person couldn't do
> anything about it."

But the above statement is in direct conflict with the Union's own additions and corrections at Step 2, wherein "Grievant states that he had no knowledge of the five day letter because he was away at rehab" and "He was sent to rehab before he could respond to the five-day letter and figured that since EAP specialist Ronald Lamb knew where he was, everything was okay."

There is no doubt the Grievant received the Notice of Removal letter prior to entering the rehabilitation program. Equally convincing was the testimony of the Counselor, wherein he stated the Grievant was advised to immediately contact his supervisor and the Union concerning the Notice of Removal.

Even assuming the Grievant's mindset was diminished during that period of time, I'm certain he recognized the Notice of Removal as real. The last paragraph of the Notice of Removal clearly advises that "You have the right to an appeal under the Grievance Arbitration Procedure set forth in Article 15 of the National Agreement within 14 days of receipt of this notice."

For I could find no circumstance to mitigate the fact the Grievant failed to contact anyone within fourteen (14) days of his receipt of the Notice of Removal letter. For some reason, it

appeared as though the Grievant thought that silence on his part would make it all go away.

Furthermore, I believe the relationship between the dates of the Notice of Removal and the Grievant's admission into a rehabilitation program were more than coincidental.

The Grievant had not worked since 11 February 2003. On or about 3 May 2003, the Grievant received a letter from the Service requesting some form of evidence to support his continued absence. There was no documented evidence to indicate there was any response from the Grievant.

And then, on 12 June 2003, the evidence indicates the Grievant received the Notice of Removal letter, a date prior to his admission into rehabilitation on 25 June 2003. Those dates muted the Union's argument that the Grievant entry into a rehabilitation program inhibited his ability to timely respond to the Notice of Removal letter. In fact, fourteen day window had already expired when the Grievant was admitted for rehab.

Even with all of that, I considered the possibility that, immediately prior to the Grievant's admission for rehabilitation, he may have still been under some form of influence. One's inability to fully understand the significance of a Notice of Removal letter would certainly inhibit their ability to properly respond.

The Union produced a medical report (U2) from the rehabilitation center and signed by the Clinical Director and a Counselor. Arguing this was new evidence, the Employer Advocate objected to it's admission to the record. The document was accepted at face value.

The pre-entrance interview of that report indicates the Grievant's claim of being substance free for two months prior to entering the rehabilitation program.

All this conflicting evidence proved fatal to the Grievant.

In addition, I was not convinced the Grievant was totally honest and forthright, with the Union, his Employer, the EAP counselor as well as the rehabilitation counselors, through this entire process.

And with all of that said, the end result of this case rests on the shoulders of the Grievant.

There was no convincing evidence to even suggest the Employer violated the mandate of Article 35. The basic premise of any Employer-Employee relationship is premised on regular work attendance. In this case, it's quite clear the Grievant was

given the benefit of any doubt by his Employer.

For the Grievant was absent work for almost three (3) months before the Employer first requested some form of documented explanation from the Grievant. And then, after the Notice of Removal was not confronted with a timely filing of a grievance, the only reasonable conclusion of the Employer was that of abandonment.

But controlling in this matter is the Grievant's failure to respond until it was too late. The testimony of the EAP counselor was believable, in that, he advised the Grievant to seek assistance from the Union immediately upon receipt of the Notice of Removal letter. There was absolutely no reason to consider the counselor's testimony as flavored or tainted in that regard.

Significant is the lack of evidence to establish that Management was somehow involved in a ploy against the Grievant.

The fact remains, that it was the Grievant's responsibility to file a grievance in a timely manner. Despite the professionalism of the Union Representative in his formidable defense, the fact remains the Grievant himself, failed to bring the issue of removal to the attention of either Management or a Union Steward in a timely manner.

Page 11 of 12

At the very least, the Grievant should have made immediate contact with the Union, advising them of the Notice of Removal letter. For I'm convinced that had the Grievant made that contact, this issue of procedure would have never been raised by the Employer.

But with the reasoning set forth above, I have no other alternative than to uphold the Employer's procedural argument and deny the instant grievance.

### AWARD

The instant grievance is set aside due to untimeliness.

DATED: **March 18, 2004**
Fayette County, PA

Regular Arbitration Panel

| | | |
|---|---|---|
| In the Matter of Arbitration | ) | |
| between | ) | Grievant: Rosezena Brown |
| United States Postal Service | ) | Post Office: Linthicum, MD IMF |
| and | ) | USPS Case No: K00C-1K-D 03174566 |
| American Postal Workers Union, | ) | APWU Case No: (None) |
| AFL-CIO | ) | |

| | |
|---|---|
| **Before:** | Laurence M. Evans, Arbitrator |
| **Appearances:** | |
|    For the Postal Service: | Kelly Spence |
|    For the Union: | Richard C. Shelley |
| **Place of Hearing:** | 900 East Fayette Street, Baltimore, MD |
| **Date of Hearing:** | February 4, 2004 |
| **Date of Award:** | February 16, 2004[1] |
| **Relevant Contract Provisions:** | Article 15, Section 2 |
| **Contract Year:** | 2000-2003 |
| **Type of Grievance:** | Discipline—Removal (Timeliness) |

### Award Summary

Neither the Grievant nor the Union timely filed a grievance challenging the Grievant's removal. The Union's contention, in effect, that local management had agreed to waive the timeliness issue and process the grievance on its merits failed to meet the "clear and unmistakable" standard for establishing a waiver. The grievance was therefore dismissed on procedural grounds.

### I.    Statement of the Case

At the outset of the hearing, the Postal Service raised a preliminary issue; it asserted

---

[1] The parties filed post-hearing briefs on the timeliness issue on February 11, 2004. The record was closed on February 12, 2004.

1

that the Union's July 1, 2003, grievance was not timely filed. The Union responded by noting that the parties at the local level had agreed to extend the time for the filing of the grievance until July 9, 2003. Given the significance of the timeliness issue, the parties agreed to bifurcate the proceeding. Each side presented testimony in support of its position on the timeliness issue and each side thereafter submitted a post-hearing brief.

What happened here is as follows. On May 30, 2003, the Grievant was issued a Notice of Removal for "[1] Failure to Meet the Requirements of [her] Position in the area of attendance due to being...AWOL" and "[2] Failure to Follow Instructions." According to local Postal Service delivery/confirmation records, the Notice of Removal was delivered to the Grievant's listed address on May 31, 2003, at 12:49 p.m.[2] There is no evidence that the Grievant ever contacted the Union at any relevant time or filed her own Step 1 grievance at any time. Union Chief Shop Steward Stanley Mason testified that he first learned on or about, but no later than, June 14, 2003, that the Grievant had been removed when he received certain documentation at work regarding the matter.

On July 1, 2003, at approximately 7:15 a.m., Chief Steward Mason attended a Step 1 meeting with Attendance Control Supervisor/SDO Samuel Parker. At that time, Parker advised Mason that the grievance was untimely. Nonetheless, Parker listened to Mason's position on the Grievant's absences. Parker agreed to review certain medical documentation pertaining to those absences that he had apparently independently received from the Medical Unit. Parker claims that he told Mason that since it would take some time for him to review the documentation, he was not certain that he could timely file his response to the grievance within the contractual mandate of five (5) days under Article 15, Section 2, Step 1(c). According to Parker, Mason agreed to give Parker an extension of time until July 9, 2003, to provide his Step 1 response. To memorialize their prior understanding, Mason and Parker (on July 8th) executed an "Extension of Step One (1) Time Limits" form (form) which, in part, provided that "the parties named below agree to extend the time limits of the Step One Procedure, on this case...to 7-9-03." On July 9, 2003, Parker

---

[2] The Union does not dispute the date of delivery.

2

denied the grievance, pointing out, among other things, that the grievance was not timely filed at Step 1.

The Union appealed to Step 2. In her Step 2 Decision, Step 2 Designee Yvonne Turner, among other reasons, denied the grievance because it was not timely filed. There is no record evidence that the Union ever filed its (or another) grievance on July 9, 2003. Instead, when it received Parker's Step 1 denial on July 9, 2003, at approximately 3:55 a.m., it went forward and filed a Step 2 grievance appeal which noted, among other things, that the Step 1 grievance had been filed on July 1st.

A. The Position of the Union

The position of the Union is that SDO Parker clearly agreed, in writing, to extend the Union's time to file the grievance in dispute here until July 9, 2003, and that the Postal Service cannot now claim that the grievance was not timely filed. Support for its position is found, the Union argues, in the credible testimony of Chief Steward Mason and in the terms of the July 8th form itself.

Additionally, the Union cites an arbitration case it maintains is almost identical to the instant case. In Case No. 98C-4K-D 00160036 (Linthicum, MD, December 23, 2000), Arbitrator Lawrence Roberts found that "it is contractually acceptable for either Party to request an extension of the prescribed time limits, so long as the request is understood and accepted by the opposing Party." In the case before Arbitrator Roberts, it appears that the very same form at issue here was involved there. Arbitrator Roberts noted that "that [form] illustrates a mutual agreement for an extension of the time limits. The language is self explanatory indicating the Parties both agreed to extend the time limits of Step 1. Arbitrator Roberts thus found an otherwise untimely grievance timely because "the record shows that the Parties mutually agreed to extend the time limits."

The Union also relies on the "credible" testimony of Chief Steward Mason to buttress its claim that SDO Parker agreed to extend (waive) the time limits at issue here. The Union argues that, as between the differing version of events advanced by Parker and Ma-

3

son, Mason is the one who testified accurately and credibly. In addition, the Union argues that the July 8th form that both Parker and Mason executed is, on its face, clear evidence that each participant agreed to extend all of the time limits set forth in Article 15, Step 1, that is, Step 1(a)-(d).

Finally, in the given circumstances, the Union urges the Arbitrator to give the Grievant an opportunity to defend her removal on the merits in the interest of "justice and fundamental fairness."

B. The Position of the Postal Service

The position of the Postal Service is that the grievance was not timely filed at Step 1 on July 1, 2003, and that SDO Parker never agreed to extend the Union's time for filing this grievance until July 9, 2003. It maintains that Parker credibly testified that he sought the Union's permission to extend his time to file a response to its July 1st grievance. The Postal Service further notes that the form in question ("Extension of Step One (1) Time Limits") may include extensions of time involving any time frame under the negotiated "Step One Procedure" and is not, on its face, merely limited to the Union's request for an extension of time to file a grievance.

II.     The Issues

Did local management "waive" its right to challenge the timeliness of the Union's July 1, 2003, Step 1 grievance, which was otherwise untimely filed?[3] If so, what is the next appropriate step in the processing of the Union's grievance?

III.     Analysis & Opinion

Turning first to the question whether the Union's July 1, 2003, grievance was timely filed, before addressing the waiver issue. I find, for the following reasons, that neither the Grievant nor the Union timely filed a grievance challenging the Grievant's removal.

---

[3] This is not a "waiver" dispute under Article 15, Section 4(B) since local management at Steps 1 and 2 of the grievance procedure raised the issue of the untimeliness of the grievance.

4

There is no dispute that the Grievant received (actually or constructively) the May 30, 2003, Notice of Removal on May 31, 2003. The Grievant had until either June 13, 2003 or June 14, 2003, to file a Step 1 grievance under the language of Article 15, Section 2, Step 1(a): "Any employee who feels aggrieved must discuss the grievance…within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause."[4] (Underscoring added.) There is no evidence that the Grievant herself filed any grievance at any time over her removal. Nor is there any claim of extenuating circumstances raised by her or on her behalf.

The evidence establishes that no later than on June 14, 2003, Chief Shop Steward Stanley Mason learned that the Grievant had been removed. Although Mason has been a steward for some seven (7) years, he did not at that time immediately file a grievance or request an immediate extension of time in order to preserve the Grievant's contract rights.[5] Instead, for reasons that are not at all clear, he did not come forward to file the Union's Step 1 grievance until July 1, 2003,[6] at which time he asserts that he asked for and was granted an extension of time to file from Parker. Even assuming for the sake of argument that the "clock" did not begin to run on May 31st (or even on June 1st) when the Grievant actually or constructively received the Notice of Removal but instead began to run as late as on June 14th when Mason first learned that the Grievant had been removed, the July 1st grievance would have nonetheless been untimely by several days under the provisions of Article 15.[7]

In view of the foregoing, I cannot conclude that the Union's July 1st grievance was timely filed under the National Agreement. The evidence establishes that the Union, in

---

[4] The Union takes the position that the "clock" begins to run on the day following the day of actual receipt; that is, here, June 1st.

[5] If he had seen the May 30, 2003, removal letter, or related documentation, then he should have known that the time for filing a timely grievance had just about expired.

[6] The Union concedes this point in its Brief. There, it states: "The union does not dispute that a step 1 grievance meeting was not held until July 1, 2003."

[7] This is not the kind of case where the "clock" begins to run solely upon the Union's first learning of the matter. Here, in the instant circumstances, the "clock" began to run on May 31st when the Grievant received actual or constructive notice of her removal. The Article 15, Section 2, Step 1(a) language resolves this by providing that the "14 days" commences when either the "employee or the Union first [learn]" of

5

fact, filed its Step 1 grievance untimely on July 1st. A Step 1 meeting took place at that time during which the Union was advised that the grievance was not timely. There is no contention being made here that the Union sought its "extension" at any time while the grievance was still timely.

The next question for resolution is whether local management converted an untimely grievance into a timely one by agreeing in word or deed to waive the negotiated time limits and process the grievance on the merits. As noted above, on July 1st, when Mason approached Parker about the Grievant's removal, any as yet un-filed grievance over the matter was already untimely. Once a potential grievance becomes untimely, the time for filing that grievance cannot be extended unless management clearly agrees to treat that grievance as timely by knowingly "extending" the time to file, in effect, consciously agreeing to waive its right to contest timeliness and permitting the grievance to be processed on its merits.[8] The law of waiver in labor relations is well-established; waiver of a right, to be found, must be "clear and unmistakable" in the particular circumstances.[9]

Thus, in the instant circumstances, given Mason's testimony, it must determined whether Parker "clearly and unmistakably" gave up or waived management's claim that the Union's July 1st grievance was not timely filed and that it, by "mutual consent," agreed to extend the time limits for filing the grievance.[10]

The Union takes the position that when Parker executed the "Extension of Step One (1) Time Limits" form he, in fact, "waived" management's right to claim that the grievance was not timely filed. Mason testified that he and Parker agreed orally, in effect, to make this grievance timely and that the executed form documents their understanding.

---

the potential grievance. (Underscoring added.) I reached this same conclusion in Case No. K00C-1K-D 03085169 (May 6, 2003).

[8] Article 15, Section 4.(B) ("Grievance Procedure – General") begins by stating: "The failure of the employee or the Union in Step 1…to meet the prescribed time limits of the Steps of this procedure…shall be considered as a waiver of the grievance."

[9] See, for example, Elkouri & Elkouri, How Arbitration Works (Fifth Ed., 1997), Chapter 11, page 616, footnote 62.

[10] The notion of "mutual consent" is advanced by Arbitrator Alan Walt in Case No. C7C-4B-D 7375 (December 8, 1988), a case cited by the Union.

6

Mason further claims that it was he and not Parker who requested the disputed "extension" and that any testimony to the contrary would not be accurate. Parker testified that it was he who requested an "extension" solely for the purpose of being able to timely fulfill his supervisory obligations under Article 15, Section 2, Step 1(c).

Having carefully reviewed the entire record in this matter, including the parties' post-hearing briefs, I am unable to conclude that local management "clearly and unmistakably" waived its right to claim that the instant grievance was not timely filed; stated otherwise, the evidence is not sufficient to establish that local management agreed to treat this grievance as being timely filed and to process it on its merits. The heart of the Union's case rests on Parker's execution of the "Extension of Step One (1) Time Limits" form, buttressed by Mason's supporting testimony.

This form, however, even though signed by Parker, does not "clearly and unmistakably" establish that he granted or intended to grant the Union a waiver of an untimely filed grievance. Generally speaking, the form is used by the Union when it needs to obtain an extension of time to file a grievance. The form allows for the parties "to extend the time limits of the Step One Procedure...." Under Article 15 of the National Agreement, that procedure includes Step 1, subsections (a)-(d). The Union here is contending that the form, when executed, automatically extends all of the time limits set forth in Step 1(a)-(d). The Postal Service contends that Parker executed the form only to acknowledge that he had been given a Step 1(c) extension by Mason, to preserve his right to respond to the July 1st grievance. There is nothing on the "boilerplate" form which shows or establishes whether, in the instant case, the "extension" was meant to address Step 1(a) or Step 1(c). Mason testified that it was intended to mean Step 1(a) while Parker testified that it was meant to apply to Step 1(c). Given the conflicting testimony, I cannot conclude, as the Union contends, that the executed form itself, standing alone, automatically establishes that local management "clearly and unmistakably" agreed to waive the time limits for an untimely filed grievance.[11]

---

[11] This result is not inconsistent with the opinion of Arbitrator Roberts, above, since he found that the parties in his case "mutually" agreed to extend the time limits.

7

However, even though, in the circumstances of this case, the form is ambiguous on its face, in resolving this dispute, I cannot ignore the testimony given by Chief Steward Mason and SDO Parker. Mason's version of events, if reliable/credible/plausible, could establish that Parker orally agreed to waive the otherwise untimely filing of the grievance. In my view, however, Mason's version of events does not "add-up" and is not particularly plausible. I base this finding on the following. Mason intended to file, and did file, the grievance on July 1st. When advised that it was not timely filed by Parker, Mason nonetheless urged Parker to look at the Grievant's medical documentation, which he agreed to do. Parker was concerned that he could not accomplish this work within five (5) days under Article 15, Section 2, Step 1(c) and raised the extension issue. Perhaps Mason, in good faith, believed that Parker was agreeing to waive the timeliness issue but Parker clearly evidenced no such intention.[12] However, had this been Mason's understanding, it stands to reason that he would have had Parker execute an appropriate written agreement then and there to protect the Grievant's interests. No written agreement was executed until July 8th when Parker sought one to protect his role in the processing of the July 1st grievance. The execution of the generic form by Parker opened the door for Mason to contend that Parker had agreed to "waive" the timeliness issue.

Significantly, if Mason truly believed that he had been, in fact, given an "extension" until July 9th to file a timely grievance, no such grievance was ever forthcoming or ever filed. Instead, when Parker issued his Step 1 decision on July 9th, which is consistent with his version of the facts, the Union never asserted that Parker's decision was made without a grievance having been filed. If Parker had understood that he had waived the timeliness issue, he would not have, on July 9th, continued to insist that the grievance was not timely filed, when he denied it.

In the final analysis, this dispute is not about an "extension" of time to file a grievance; rather, it is about whether or not Parker agreed to waive the timeliness issue and process the grievance on its merits. And, I am unable to conclude that he did.

---

[12]Clearly, there was no "meeting of the minds" as between Parker and Mason.

8

With respect to the Union's "fundamental fairness" argument, no arbitrator, I am sure, "likes" being in the position of denying a removal grievance on timeliness grounds for obvious reasons. Nonetheless, the arbitrator's job is to interpret and apply the terms and provisions of the collective bargaining agreement entered into by the parties. The arbitrator is not authorized to find timely those grievances that are not timely filed, except perhaps in certain extraordinary circumstances, not present here.

In view of the foregoing, I find that the Union filed its Step 1 grievance on July 1, 2003. That filing was untimely under Article 15 of the National Agreement. The Union has failed to establish that local management nonetheless agreed to waive untimeliness and process the grievance on its merits. The grievance is therefore denied on procedural grounds.

## IV.    The Award

The Union's July 1, 2003, grievance was not timely filed under the National Agreement. The grievance is therefore dismissed on procedural grounds.


Laurence M. Evans
Laurence M. Evans
Arbitrator

9

*Timeliness*
*outside Employment*

NOV ~ ~ ~~~~

COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

REGULAR REGIONAL ARBITRATION PANEL

|  |  |  |
|---|---|---|
| In the Matter of the Arbitration | ) | GRIEVANT: Patricia Taylor |
|  | ) |  |
| Between | ) | POST OFFICE: CINCINNATI, OH |
|  | ) |  |
| UNITED STATES POSTAL SERVICE | ) | USPS NO: C98M-1C-D 02226293 |
| Cincinnati, Ohio | ) | C98M-1C-D 02214216 |
|  | ) |  |
| And | ) | NPMHU NO: PH082302B |
|  | ) | PH080802A |
| NATIONAL POSTAL MAIL HANDLERS | ) |  |
| UNION, AFL-CIO | ) |  |
|  | ) |  |

BEFORE: PHILIP W. PARKINSON, ARBITRATOR

APPEARANCES:

|  |  |
|---|---|
| For the U.S. Postal Service: | Jim Robb |
|  | Labor Relations Specialist |
|  |  |
| For the Union: | Clyde Patterson |
|  | Advocate |

| | |
|---|---|
| Place of Hearing: | Cincinnati, Ohio |
| Date of Hearing: | September 9 & 23, 2003 |
| Date of Award: | October 22, 2003 |
| Relevant Contract Provisions: | Articles 15, 16 and 19 |
| Contract Year: | 2000-2004 |
| Type of Grievance: | Discipline |

## AWARD

The grievance is denied. The Notice or Removal issued to the grievant Ms.
Patrisha Taylor was for just cause.

*Philip W Parkinson*
Philip W. Parkinson

MW/01064

|  |  |
|---|---|
| In the Matter of the Arbitration | ) |
| between | ) |
| United States Postal Service<br>Cincinnati, Ohio | ) |
| and | ) |
| NATIONAL POSTAL MAIL HANDLERS<br>UNION, AFL-CIO | ) |

HEARING DATE:  09-09 & 23-03

DATE OF AWARD:  09-22-03

USPS NO:  C98M-1C-D 02226293
                 C98M-1C-D 02214216

UNION NO:  PH082302B
                PH080802A

**BEFORE**

**PHILIP W. PARKINSON, ESQ.**

**ARBITRATOR**

Representing the Postal Service -      Jim Robb
                                                Labor Relations Specialist

Representing the Union -             Clyde Patterson
                                                  Advocate

## I. THE GRIEVANCE

By letter dated July 15, 2002, Ms. Patrisha Taylor, a Mail Handler employed at the Cincinnati, Ohio P & DC of the United States Postal Service (hereafter referred to as the "Postal Service" or "Management") was issued a Notice of Removal to be effective August 24, 2002. The charges were "Absent Without Official Leave (AWOL)/Failure to Follow Instructions" and "Improper Conduct." This charge basically resulted after Ms. Taylor failed to notify Management of her absences and failed, as requested, to provide a medical basis for the absence.     Thereafter, a grievance was filed on her behalf by Local Union Branch No. 304 of the National Postal Mail Handlers Union (hereafter referred to as the "Union"). It was denied at Step 1 and appealed to Step 2 on August 26, 2002. The Grievance Form alleges a violation of Articles 15, 16 and 19 of the parties' collective bargaining agreement.[1] The grievance states as follows:

> On said date, (7-27-02, 4:00 P.M., Amelio P.O.) the grievant received a Notice of Removal dated 7-15-02. Said removal is punitive not corrective in nature and without just cause. In addition, the discipline is procedurally defective and violates the FMLA.

> The following was requested as the "Corrective Action".

> Management will comply with the National Agreement. Said notice will be rescinded and expunged from all official postal records and the grievant made whole. In addition, change all AWOL to appropriate leave/FMLA protected.

It was appealed to Step 2 and a meeting was held on September 17, 2002 to discuss the appeal and by letter dated October 10, 2002, the Postal Service denied the appeal stating, in part, as follows:

> The grievance is procedurally defective in that a timely grievance was not filed at Step 1 in accordance with Article 15 of the National Agreement. ... As a

---

[1] AGREEMENT between National Postal Mail Handlers Union, AFL-CIO and the United States Postal Service, November 21, 2000 – November 20, 2004 (hereafter referred to as the "Agreement").

Step one was not held until 08/09/02, far beyond the 14-day requirement, this grievance is untimely.

The grievant was issued a Notice of Removal dated 07/15/02 for the charges of Absent Without Official Leave (AWOL)/Failure to Follow Instructions and Improper Conduct. ,,, The grievant had missed work for an extended period of time and had ultimately failed to return to work or provide acceptable medical documentation of her incapacity despite receiving instructions in the form of 5-Day letters, to do such. ...Ironically, during this period of claimed incapacity to work by the grievant, she was found to be working another job. Such actions are deceptive and fraudulent. ... The facts of this grievance are compelling and egregious enough to warrant the action taken.

On October 18, 2002, the Union filed detailed "Corrections and Additions" and stated:

Your adverse decision is incomplete and inaccurate. You have failed to list and consider points and facts presented to you by the union. Your decision is absent a full statement of all relevant facts. ...

The grievance was next appealed to Step 3 of the Grievance Procedure on

October 22, 2002 alleging that the Postal Service violated Articles 15,16 and 19 of the

Agreement whereby Management issued the grievant a removal "for no just cause."

Thereafter, a Step 3 discussion was held and by letter dated May 20, 2003, the

Postal Service denied the Step 3 Appeal stating in pertinent part as follows:

Employees must obey the instructions of their supervisors, are required to be regular in attendance, and employees failing to report for duty on scheduled days, including Saturdays, Sundays, and holidays, will be considered absent without leave except in actual emergencies which prevent obtaining permission in advance in addition, an employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority in accordance with Postal regulations. ... The action of management was with just cause and in accordance with the principles Article 16 of the National Agreement. There is no breach of the National Agreement regarding management's actions. This grievance was untimely filed it is therefore procedurally defective and waived. Accordingly this grievance is denied. (sic)

The grievance was then appealed to arbitration and the undersigned was

appointed to hear and decide the matter. Accordingly, a hearing was held on September

9 and 23, 2003, in Cincinnati, Ohio, at which time the parties were afforded full

MW/01067

2

opportunity to present evidence, both oral and written, to cross examine witnesses who were sworn, and to argue their respective positions. The record was closed at the conclusion of the hearing.

## II. STIPULATIONS

1. The parties stipulated that although there are two grievances involved in this matter that grievance local union No. PH082302B will be determined by the instant grievance, which carries local union No. PH080802A.

2. The grievant, Ms. Michele Taylor, was employed at the Dairy Mart from 4-29-02 thru 7-31-02.

3. Ms. Taylor's affiliation with the Dairy Mart started on 4-27-02,when she was offered employment at the Dairy Mart. She accepted employment on 4-29-02, and it lasted until 7-31-02.

## III. BACKGROUND

Mr. Michael Ferguson, is employed as the Family Medical Leave (FMLA) Coordinator for the Cincinnati District and has held such job for some six and one half years. Mr. Ferguson, explained that when an employee calls in to be absent from work the Attendance Control Officer (ACO) will ask them if the absence is FMLA related. If it is, he reviews health certifications to determine if they are eligible for FMLA. As the FMLA coordinator, Mr. Ferguson trained supervisors and employees regarding rules and regulations of the act. Mr. Ferguson testified that on April 24, 2002, Ms. Taylor requested FMLA leave through the ACO. The required forms were sent to her and subsequently in May or June, Ms. Taylor submitted a certification and was approved for FMLA. He recollected the grievant had previous FMLA certification but he wasn't

certain of the circumstances. He explained that if a person's condition is chronic, certification could be requested every thirty (30) days when the facts of the conditions change. He confirmed that the grievant has had an approved condition prior to the April 24, 2002 request. She was due for a re-certification of the previous condition. The grievant's condition causing her to be off beginning April 27, 2002 through June 10, 2002 was for chronic sinusitis and occasional severe headaches. Her doctor placed restrictions of up to ten (10) days absence for every six months, including bed rest. After the dates of the certification, the grievant never returned to work. When he became aware that her certification may have changed he sent a Request for Additional Facts and a Request to Re-certify in the event the facts significantly changed. He indicated that he had sent her a letter indicating that the request for re-certification was not timely and the certification was two (2) months overdue. He felt that the grievant who had been a supervisor at one time, knew the process, because she had come to him to get information when an employee whom she supervised went on FMLA. He pointed out that he could require periodic re-certification where the facts of certification had changed significantly. The original certification provided that the grievant would be out for ten (10) days every six months but she was out considerably more time. This would indicate a significant change. He further explained that if the circumstances of the grievant significantly changed when she was out of work for an extended absence then this is one of the criteria for re-certification. An extended absence letter such as he sent her requires the employee to contact his (her) supervisor with appropriate documentation. To contact anyone other than the supervisor would not satisfy the requirement of submitting the required documentation.

MW/01069

4

Mr. Robert King, a clerk who has been detailed, on occasion, for the past two (2) years as a 204B Supervisor, stated that he has been employed by the Postal Service for a total of six (6) years in August. He had submitted a written statement on June 25, 2002 in which he stated that he saw Ms. Taylor working at the Dairy Mart. In talking to her she had mentioned to him that her documentation was legitimate and she was going to be released by her doctor to return to work. She also asked him not to tell anyone that he had seen her but he said he would not lie for her. According to Mr. King, Ms. Kelly James, a Supervisor, told him to go to the Dairy Mart and determine that the grievant was working there "and it would be nice if he would do it." He denied that he obtained any favors from Ms. James. Mr. King said that he had only seen Ms. Taylor there on June 18, 2003, although he had stopped at that Dairy Mart a number of times prior to that since it was close to his home.

Mr. Noah Huff, an MDO has been employed with Postal Service almost thirty (30) years. He had been asked to investigate certain telephone calls to the grievant inasmuch as she had indicated that she had been receiving harassing phone calls. He could not find such calls. He also said that he had been at the Dairy Mart in question and that he talked to a person there who confirmed that Ms. Taylor worked there. Mr. Huff said that when Ms. Taylor was an acting Supervisor that she had worked for him and that she was familiar with the discipline procedure because of being an Acting Supervisor.

Mr. Jeff Knauer has been employed by the Postal Service for about three and one half years. His bid job is a Mail Handler, but he has filled in as Supervisor for the grievant during the summer of 2002. When he filled in during the summer of 2002, it was on a permanent basis and he noticed that the grievant had been absent. He sent her a five (5)

MW/01070

5

day letter and identified the Extended Absence Letter that was sent to her by Carrier Affidavit and certified mail. He had sent the letter both ways because he was concerned that she would not sign for it, but would get it in her post office box. The grievant did not respond but telephoned the ACO. As a result, he sent her another Extended Absence Letter by Carrier Affidavit and Certified Mail, and on June 22, 2002 he got a response from the Carrier Affidavit that a notice had been left but the letter was unclaimed. He sent the second letter because she had not provided acceptable documentation and it was rumored that she had a second job. According to Mr. Knauer he tried to talk with the grievant to confirm that she was working at the Dairy Mart and asked why she had not provided acceptable documentation but she would not talk to him without a Steward. He then called Mr. Paul Hines, a Steward, in order for him to participate in the telephone call, but Ms. Taylor never called back. Mr. Knauer had a filled out Work Assessment for June 24, 2002 when the grievant had advised the ACO that she was going to return to work even though she had not returned his telephone call. She never returned to work based on this Work Assessment, but returned to work on June 27, 2002 where she had been cleared to return but he did not know this for certain. She never contacted him directly, therefore the next step was to proceed with her removal and he prepared a request for discipline. Although he understood the grievant was planning to return to work he went forward with the removal. He stated that the letter was put in the grievant's PO Box on July 16, 2002 as verified by the Carrier Affidavit. There were other date stamps on the letter dated August 26, 2002 but he did not know what they meant. Mr. Knauer admitted that there was no prohibition to having a second job if it did not interfere with the employee's primary job.

A-0251

Mr. Jason Adams has held various jobs in the Postal Service and for the last two (2) years has been acting MDO from time to time. His signature is on the request for discipline and he concurred in the request. In concurring he had reviewed a packet containing the request for discipline along with interview sheets from Mr. Knauer and was aware that the grievant had not provided documentation in that she had a second job.

Ms. Kelly James has been employed with the Postal Service since 1994 and currently is a regular Supervisor. The grievant was part of her regular unit. Ms. James has supervised the grievant and also had worked with her as a Supervisor. Ms. James conducted the Step 1 of the grievance and stated that no information was provided as to why Ms. Taylor was off because she was not present at Step 1 but later participated by speakerphone. At that time the grievant stated that she was working at the Dairy Mart because she needed the money. She also said that she did not tell her doctor, again because she needed the money. She claimed that she did not return to work because her husband did not want her to work at the Postal Service. The day that the grievant began her work at the Dairy Mart was the same day that she was scheduled to return to the Postal Service according to Ms. James. It was Ms. James' testimony that the grievant has said that her boss at the Dairy Mart was giving her trouble and that if she was going to take abuse she may as well get the higher hourly rate and work for the Postal Service. When questioned later by Ms. James the grievant explained that what she meant was that she was taking abuse from her husband. Ms. James stated that for FMLA the grievant could not be disciplined but confirmed that she had made a Last Chance offer to the grievant. She said that the grievant told her that her husband was receiving harassing calls saying that his wife was sleeping with other men in the Post Office.

A-0252

Mr. Lonnie Gates the Step 2 designee stated that the grievant was not present at the Step 1 meeting and that the grievance was not timely filed. His counterpart with the Union was Mr. Hines who suggested that the grievant was denied the right to Union representation. He indicated that the grievant did not submit acceptable medical documentation.

Mr. Paul Hines, the Steward of Record in this case, first became aware of the situation when Mr. Knauer told him that the grievant was requesting a steward. It was the next day that he learned that the grievant was given a Notice of Removal and he then came in and filed a grievance for her on August 9, 2002. He said that at the Step 1 no mention of timeliness was raised or mentioned at that meeting. He claimed that there were three (3) or four (4) meetings with the Step 2 designee Mr. Gates who had offered a Last Chance Agreement. This was in addition to the one offered by Ms. James. Mr. Gates had written it so that any violation in regulations would result in firing. He identified a note from the grievant's doctor received by Management as well as a second note from the grievant's doctor which he personally delivered to Management. Mr. Hines also stated that the note written by the nurse and also by the doctor confirmed that the grievant could return to work on June 23, 2002. He felt that the Postal Service did not meet the required elements of just cause in this case. He affirmed that the Union was aware of the case just a few days prior to when the grievance was filed.

Ms. Michele Patrisha Taylor, the grievant herein, started with the Postal Service in March 1997, and was hired as a Casual Carrier/Clerk. At the time of this action she was a Mail Handler and has also worked as an Acting Supervisor. She held the Acting Supervisor's position for about one (1) year and seven (7) months. She claimed that

being an Acting Supervisor affected her personal life because of harassing phone calls to her husband that caused him to lose three (3) jobs. The calls started because she had to take action against a Truck Driver in the terminal. The callers alleged that she was sleeping around the terminal and "that was too much." She had notified Mr. Hines and they went to see Mr. Huff, who said that they could only check on outgoing phone calls. She asserted that the harassing calls did not stop. She ceased being an Acting Supervisor in November 2001 because there were too many pressures, especially from her home.

According to Ms. Taylor she took the job at Dairy Mart because she had no income inasmuch as her husband had been fired from his jobs. She had seen Mr. King at the Dairy Mart and had an exchange with him and told him to mind his own business because she did not want any more harassment. It was not until she received the removal letter that she became aware that the Postal Service felt the Dairy Mart job was improper. She then quit her job at the Dairy Mart. She claimed that she did not tell her doctor about the Dairy Mart job because she had no income.

Ms. Taylor explained her medical condition, which has been ongoing for six (6) years and started with an ear and sinus infection and got worse over time. She had been seeing a doctor for about six (6) years, two or three times a month. The doctor could not help and sent her to a specialist. She has been seeing a specialist since June 2002. Prior to returning to work in August 2002, she had been off since April and although she had been scheduled to return earlier, her doctor did not release her. She first became aware of the Postal Service's concern of her absences when she received the five (5) day letter via Certified Mail. She responded by having her doctor provide the Postal Service with the information they needed. She verified that her Physician sent the FMLA papers via

A-0254

facsimile and a second FMLA paper with a different date was sent. The first set was dated April 27, 2002 through June 10, 2002 and the second page said June 10, 2002 through June 21, 2002. She also identified a Return to Work Without Restriction. Ms. Taylor claimed that she had talked to Mr. Knauer on June 21, 2002 and he never mentioned a five (5) day letter of that date. Her next correspondence was a Letter of Removal. She then contacted the Union. She claimed she received the Letter of Removal on July 27. According to Ms. Taylor when she spoke to Mr. Hines, he said the Postal Service was objecting to a part-time job and as a result, sent a letter of removal.

As a Supervisor Ms. Taylor confirmed that she was familiar with Failure to Maintain a Work Schedule and had requested discipline for other employees on numerous occasions. Ms. Taylor stated that she had called the ACO on April 27, 2002, stating she was sick but told them that she did not know that it was FMLA related but would have her doctor fill out the paperwork. It was also in February that she filled out the job application for the Dairy Mart. It was Ms. Taylor's testimony that when she spoke with Mr. Knauer that she had asked him three (3) times if he was calling for discipline and she also said that she called back on two (2) or three (3) occasions but he could not be reached by his radio. Ms. Taylor said that she received her Letter of Removal on July 27, 2002 and for the most part she got her mail on Wednesdays and Saturdays. She claimed that when she checked the PO Box before July 27, 2002 the letter was not there. She had returned to work on August 8, 2002 and filed the grievance on the same date. The Return to Work date changed because the medical unit could not read the doctor's statement and it took about four (4) days to correct it. She only learned of this by calling the medical

A-0255

unit. Finally, she stated that her doctor would not have released her to work if she knew she

was working a second job, but she never told the doctor. Ms. Taylor also confirmed that the doctor's statement covered her from April 27, 2002 until June 10, 2002 but the doctor's statement that covered her from April 27, 2002 until June 10, 2002 required that she should have bed rest.

## IV.    POSITION OF THE PARTIES

### A. UNION

The Union contends that the Postal Service disregarded the basic principle that disciplinary action should be corrective rather than punitive. They state that the grievant was not AWOL, as charged by the Postal Service. They state that documents and testimony demonstrate that the grievant's absence was covered by FMLA and the absence was authorized by her physician. The Union contends that the grievant followed the instructions of the Postal Service and provided documentation, making several attempts to contact her supervisor during the time involved. They state that the grievant's physician was involved in the process, as well. The Union argues that there were justifiable reasons for the grievant to accept part-time employment and that the grievant believed that she was doing nothing wrong or contrary to Postal Regulations. The Union alleges that the Postal Service was less than forthright about the events surrounding this disciplinary action. For these reasons, they contend that the Postal Service lacked just cause to remove the grievant from Postal employment and therefore, the grievant should be returned to work and made whole for all losses.

11

## B. POSTAL SERVICE

The Postal Service contends that the grievant waited too long to file the grievance, that it is untimely, and for this reason, the grievance is not subject to arbitration. They point out that initially the grievant was eligible for protection under FMLA, but ultimately was ineligible because of failure to provide requested documentation to support her absence. Additionally, the Postal Service states that the grievant did not contact the Postal Service to explain her need for continued absence. The Postal Service states that eye witnesses reported the grievant was working at a convenience store. Because of the grievant's refusal to be forthcoming about any aspect of her continuing absence, the grievant's supervisor had no alternative but to seek discipline to address the situation. The Postal Service has the right to expect the grievant to report to work as scheduled. They refer to rules and regulations concerning working another job when the employee makes a claim that they are unable to work due to illness. Likewise, they note that the Postal Service has rules and regulations that govern documentation for absences and that the grievant knew these rules. They point out that the grievant was given an opportunity to keep her job, and chose not to take advantage of it. Both the grievant and the Union were given opportunities to provide documentation that was necessary to explain the grievant's continued absence from work. No acceptable proof was ever submitted by either the grievant or the Union. Therefore, the Postal Service contends that it had just cause to remove the grievant from her career position because of her failure to follow instructions, her long-term absence without official leave and improper conduct.

MW/01077

12

A-0257

## V. PERTINENT PROVISIONS OF THE AGREEMENT

### ARTICLE 15
### GRIEVANCE-ARBITRATION PROCEDURE

**Section 15.2 Grievance Procedure – Steps**

Step 1. (a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employees or the Union first learned or may reasonably have been expected to have learned of the cause. ...

### ARTICLE 16
### DISCIPLINE PROCEDURE

**Section 16.1**

In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause such as, but not limited to, insubordination, pilferage, intoxication (drugs or alcohol), incompetence, failure to perform work as requested, violation of the terms of this Agreement, or failure to observe safety rules and regulations. Any such discipline or discharge shall be subject to the grievance arbitration procedure provided for in this Agreement, which could result in reinstatement and restitution, including back pay.

### ARTICLE 19
### HANDBOOKS AND MANUALS

**Section 19.1**

Those parts of all handbooks, manuals and published regulations of the Postal Service, that directly relate to wages, hours or working conditions, as they apply to employees covered by this Agreement, shall contain nothing that conflicts with this Agreement, and shall be continued in effect except that the employer shall have the right to make changes that are not inconsistent with this Agreement and that are fair, reasonable and equitable. This includes, but is not limited to, the Postal Service Manual and the F-21 Timekeeper's Instructions.

### EMPLOYEE AND LABOR RELATIONS MANUAL

**513.312    Restriction**

An employee who is in a sick leave status may not engage in any gainful

MW/01078                           13

employment unless prior approval has been granted by appropriate authority.

**513.36.1    Documentation Requirements**

**513.364    Medical Documentation or Other Acceptable Evidence**

When employees are required to submit medical documentation pursuant to these regulations, such documentation should be furnished by the employee's attending physician or other attending practitioner. The documentation should provide an explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee's illness or injury sufficient to indicate to management that the employee was (or will be) unable to perform his or her normal duties for the period of absence. Normally, medical statements such as "under my care" or "received treatment" are not acceptable evidence of incapacitation to perform duties. Supervisors may accept proof other than medical documentation if they believe it supports approval of the sick leave application.

**513.365    Failure to Furnish Required Documentation**

If acceptable proof of incapacitation is not furnished, the absence may be charged to annual leave, LWOP or AWOL.

## VI.  OPINION

The issue in this case involves the question of the propriety of the issuance of a

Notice of Removal to Ms. Patrisha Taylor, a Mail Handler, employed at the Cincinnati,

Ohio P & DC. The Notice of Removal was dated July 15, 2002 and charges Ms. Taylor

with having been absent without official leave (AWOL), Failure to Follow Instructions

and Improper Conduct. Ms. Taylor had been absent from duty since April 27, 2002 due

to illness and had provided documentation in support of said absence up through June 10,

2002. Subsequent to June 10 however, the Postal Service charges that she failed to notify

Management of her absence or report for duty. A letter was sent to her via Certified Mail

and Carrier Affidavit on June 21, 2002 instructing her to contact Management concerning

her continued absence. The evidence revealed that she received the letter on June 22, but failed to follow the instructions as set forth in the letter and hence the charge of AWOL and Failure to Follow Instructions. The second charge involving Improper Conduct stems from the fact that during the absence for illness she was employed at the Dairy Mart in the town of Newtown. To this extent the parties have stipulated, as noted in the stipulations set forth herein, that Ms. Taylor was employed at Dairy Mart from April 29, 2002 through July 31, 2002 and that she had applied for employment with the Dairy Mart on April 27, 2002.

The Union charges that the action taken in removing Ms. Taylor from employment with the Postal Service were punitive in nature and that her absences stemmed from a valid FMLA covered medical condition and were authorized and documented by her treating physicians. They furthermore allege that Ms. Taylor made several attempts to contact her immediate Supervisor throughout the time period involved and that there were valid reasons as to why she had been working part-time employment.

On the other hand, Management's position is that the grievance is untimely and that it has consistently contested the timeliness of the grievance. Therefore, it questions whether the grievances are arbitrable. Additionally, they point out that although Ms. Taylor was initially eligible for protection under the FMLA she was later categorized as having been ineligible because of her failure to provide certain requested documentation to support her absence. They also point out that she was scheduled to return to work for an assessment by the Medical Unit on a number of occasions and did not keep those appointments nor did she contact Postal Management to explain her need for a continued absence.

As to the question of arbitrability, the record reveals that when the Notice of Removal was drawn up on July 15th, it was delivered on July 16, 2002 by the Carrier who signed the Carrier Affidavit, indicating that he had delivered the official letter to her address of record on July 16, 2002. Furthermore, the letter was also sent via Certified Mail and the delivery was attempted to be made in this regard on July 16, 24 and 31, to no avail. The grievant claims that she did not pick up her mail until July 27, and subsequently when the grievance was filed on or about August 9, 2002, it was within the fourteen (14) day period from the time she first became aware of the action being taken. It is significant that the grievant stated she would pick up her mail on Wednesdays and Saturdays; therefore, the period from July 16 to the 27th, which is an eleven (11) consecutive day period, would seem to be an inordinate period of time to not have retrieved mail from one's mail receptacle. Thus it is understandable why the Postal Service is concerned and feels that the grievance was written and processed at a time that is not within the intent of the time limitations as set forth in Article 15 of the Agreement. When the Union became aware of the Notice or Removal, it cannot be said that they did not act within their contractually mandated time frame, but it is questionable as to whether the employee did. The Postal Service appears to have a legitimate claim in this regard.

Initially it should be pointed out that Postal employees, above all, are aware of the importance of having a proper address of record so that their employer is aware of where they can be reached, for any number of employment related reasons. The address of record for Ms. Taylor was not incorrect. Nevertheless unless there is a valid basis for not picking up one's mail it stands to reason that an employee could let mail sit in his or her

mailbox that perhaps he or she does not want to receive and then later claim that they did not retrieve it from the box. This of course is unacceptable in the absence of a valid reason such as hospitalization, while having no other persons during such time able to get her mail, or, for example vacation, with the same circumstances. There was no evidence that her husband or another person could not have picked up her mail, nor was there any evidence that there was any reason why she could not pick up her mail. Indeed the evidence indicated that she worked during this period at the Dairy Mart and obviously was able to travel and to move and to manipulate and function as a normal person. Be that as it may, this is a portrayal of what I consider to be an unfortunate and perhaps a circuitous maneuver on the part of the grievant. It is significant that she has been an Acting Supervisor and was aware of Postal rules and regulations.    This nonfeasance and circuitous behavior although impacting on the timeliness aspect of the filing of her grievance, also impacts on the charges that go to the merits of Ms. Taylor's unfortunate effort to perhaps unwittingly terminate her own employment.

The evidence reveals that there is little question that her doctor had sent in an FMLA form stating that her chronic sinusitis and occasional sinus headaches commenced on April 27 and the duration of that condition would conclude on June 10, 2002. The FMLA form has a specific diagnosis or prognosis from the doctor indicating that because of the chronic sinusitis and occasional sinus headaches "she can not work." It also states that the probable time and duration of this condition would be six weeks and that she may have a recurrence every six months. Finally and significantly it indicates that she should take antibiotics, decongestants and rest approximately ten days for this problem. The form furthermore states that she is unable to perform the functions of her position

because the patient should be at bed rest. This form was signed by the doctor on June 3, 2002, but during the entire period of the diagnosed sinusitis condition, she worked and was employed at another position with the Dairy Mart despite the representation to the Postal Service that she should be at bed rest. So while claiming FMLA to her employer and given the conditions that the doctor advised, she nevertheless worked another job. On the very date that her condition was allegedly supposed to have commenced, the grievant applied for the Dairy Mart job on April 27 and began working there on April 29, 2002. To this arbitrator this is an unfortunate scenario and bespeaks of being deceptive and perhaps even fraudulent on the employee's part. The Union argues, and they are correct, that a second job or employment by a Postal Employee is not prohibited as long as it does not interfere in some manner and/or conflict with their activities commensurate with their responsibilities and duties of employment with the Postal Service. Here, however, a more serious concern is raised inasmuch as the employee through her doctor indicated that she was sick and needed bed rest, has a sinus infection, had severe headaches, and yet on the same date that the absence resulting from this condition was to commence she was applying for and then working at another job. Furthermore, Postal Regulations require approval of a Supervisor for an employee who is on sick leave to engage in gainful employment. There is no evidence that such permission was given nor sought.

Ms. Taylor, who is a relatively short term employee and who had worked for a period of a year or so as a Supervisor, was well aware of her responsibility as an employee with respect to absences as well as the need for the necessary information to be

A-0263

provided to the Postal Service regarding absences and particularly with an extended absence.

Furthermore, after June 10th Management sent her a Certified Mail letter date June 21, 2002 and one via Carrier Affidavit, for her to contact her Supervisor concerning her continued absence. She was warned at this time that Failure to Comply would result in her being placed in an AWOL status and she could possibly be removed from the Postal Service. She received it on June 22, and as of the time of the Notice of Removal there is no indication that she followed the instructions. The grievant claimed that in her testimony that she didn't tell the doctor she was working at the Dairy Mart because she needed the money because she did not have other income. However, the grievant, at that point, obviously would have had employment with the Postal Service, had she complied with the instructions that were sent to her. If she felt well enough to work at the Dairy Mart she could and should have been working at the Postal Service. Her absences created an untenable situation. The almost unbelievable period of time in which she alleges that she did not pick up any of her mail, the deceptiveness on her part of not working and/or reporting for work at the Postal Service when her doctor said her sickness would last through June 10, and yet at the same period of time working another job, all indicate to this arbitrator that Ms. Taylor was not interested in working as a Mail Handler for the Postal Service. She seemed to do everything to skirt her responsibilities as an employee and now seeks, through a grievance, an additional opportunity to return to this employment. Considering the circumstances of this case, this arbitrator cannot justify placing her back in employment with the Postal Service. The overwhelming evidence is that Ms. Taylor, herself, was not interested in Postal employment and clearly exhibited

MW/01084

19

this when she opted for employment with the Dairy Mart. The Union has done everything in its power to help her retain employment status with the Postal Service. Be that as it may, Ms. Taylor was the cause of her removal from the Postal Service and her complete abandonment of her responsibilities and duties as a Postal Employee justified the Postal Service's action herein in dismissing her from employment. There was sufficient cause for the Postal Service to have issued the Notice of Removal and therefore the grievance is denied. Should the Postal Service feel that there would be a future opportunity for her to function as an acceptable employee then they must make such determination; however based on the record of evidence this arbitrator is of the opinion that there was a justifiable basis to have relieved her of employment as a Postal employee.

## AWARD

The grievance is denied. The Notice or Removal issued to the grievant Ms. Patrisha Taylor was for just cause.

_Philip W Parkinson_
PHILIP W. PARKINSON

October 22, 2003
Washington, PA

RECEIVED

JUL 17 2002

COLLECTIVE BARGAINING AND ARBITRATION
LABOR RELATIONS

## REGULAR ARBITRATION PANEL

| | |
|---|---|
| In the Matter of Arbitration ) | |
| ) | Grievant: R. Johnson |
| between ) | |
| ) | Post Office: Bellmawr, NJ |
| United States Postal Service ) | |
| ) | Case No: C00C-1C-D 0210447 |
| and ) | |
| ) | |
| American Postal Workers Union ) | |

| | |
|---|---|
| Before: | GEORGE R. SHEA, Jr. |
| Appearances: | |
| For United States Postal Service: | A. Keen |
| For American Postal Workers Union: | J. Smith |
| Place of Hearing: | Bellmawr, NJ |
| Date of Hearing: | June 5, 2002 |
| Date of Award: | July 1, 2002 |
| Relevant Contract Provisions: | Articles 15, 16, 19 |
| Contract Year: | 2000-2002 |
| Type of Grievance: | Discipline (Removal) |

### AWARD SUMMARY

For the reasons more fully set forth in the attached
Opinion, the Arbitrator determines that the grievance is
not arbitrable. The grievance, therefore, is denied

George R. Shea, Jr.

George R. Shea, Jr.

MW/01086

A-0266

OPINION

STATEMENT OF PROCEEDINGS:

The Union, in accordance with the parties' National Agreement [Agreement], appealed the above captioned matter to arbitration. The undersigned was designated as the Arbitrator to hear and decide the matter. The Arbitrator held a hearing on and at the previously captioned date and location. The parties' representatives appeared and the Arbitrator provided them with a full and fair opportunity to be heard, to present evidence and argument and to examine and cross examine witnesses. The Service called no witnesses. The Union called A. Marioni as its witness.

The parties agreed to bifurcate the issues of the arbitrability of the grievance and the merits of the grievance and allow the Arbitrator to address the issue of arbitrability separately.

BACKGROUND:

1.  The Service, in the person of V. Rago, Supervisor of Distribution Operations, [Disciplining Supervisor] and with the concurrence of T. Oswald, Manager of Distribution Operations, [Concurring Official] issued R. Johnson [Grievant] a Notice of Removal dated January 24, 2002. The Notice of Removal was based on the charge Violation of Last Chance Agreement. The Notice set forth the factual allegations upon which the Service relied to establish the charge and indicated the Service took into consideration the Grievant's past disciplinary record when it issued the Notice of Removal. The disciplinary record cited in the Notice of Removal included (a) Notice of Removal, June 23, 2001 (modified to Last Chance Agreement, August 18, 2001), (b) Fourteen-Day Suspension, April 3, 2001, (c) Seven-Day Suspension, June 7, 2000, (d) Seven-Day Suspension, November 15, 1999, (e) Letter of Warning, May 13, 1999. All the listed disciplines were attendance related.

C00C-1C-D 0210447                                    2

CONTRACT PROVISIONS:

Article 15, Section 1:

"A grievance shall include, but is not limited to, the complaint of an employee of the Union which involves the interpretation, application of, or compliance with the provisions of this Agreement..."

Article 15, Section 2, Step 1 (a):

"Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause."

Article 15 Section 4.B:

"The failure of the employee or the Union in Step 1, or the Union thereafter to meet the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered a waiver of the grievance. However, if the Employer fails to raise the issue of timeliness at Step 2, or at the step at which the employee or Union failed to meet the prescribed time limits, whichever is later, such objection to the processing of the grievance is waived."

Article 16, Section 5:

"In the case of suspension of more than fourteen (14) days or of discharge, any employee shall, unless otherwise provided herein, be entitled to an advance written notice of the charges against him/her and shal remain either on the job or on the clock at the option of the Employer for a period of thirty (30) days. Thereafter, the employee shall remain on the rolls (non-pay status until disposition of the case has been either by settlement with the Union or through exhaustion of the grievance-arbitration procedure."

ISSUE:

The parties could not agree to a statement of the issue before the Arbitrator. Based upon the parties' arguments and evidence and their suggested statement of the issue, the Arbitrator determines that the following is a fair and neutral statement of the issues presented by the parties for resolution and disposition.

Is the underlying grievance in this matter arbitrable?

If so, did the Service have just cause to issue the Grievant, R. Johnson, the Notice of Removal dated January 24, 2002? If not, what shall be the appropriate remedy?

C00C-1C-D 0210447                          3

**FACTS:**

The parties' representatives agreed to the following statements of stipulated facts:

1. The Union's appeal of the underlying grievance directly to arbitration and bypassing Step 3 of the grievance procedure was authorized by the Agreement.

2. The Service does not normally send the Union any notification that it has disciplined an employee.

3. The Service sent the Notice of Removal, at issue in this matter, to the Grievant's official mailing address.

4. The Notice of Removal was delivered and accepted on January 26, 2002.

5. The Union's filing of the underlying grievance in this matter was no earlier than March 2, 2002.

6. The Service raised the issue of the timeliness of the grievance at Steps One and Two.

The events regarding this matter were described in the testimony of the Union's witness and in the documentary evidence offered by the parties. Based upon his review of that evidence, including his personal observation of the witness during his testimony, the Arbitrator determines that the preponderance of that evidence supports the following findings of fact.

1. R. Johnson [Grievant] was, at times relevant to this matter, employed by the Service as a full-time regular level 5 Clerk and assigned to the So. Jersey P&DC located at Bellmawr, NJ.

2. August 18, 2001: The Service, Union and the Grievant entered into a Last Chance Agreement on or about this date. (J-#2, pages 16-18)

3. January 9, 2002: The Service notified the Grievant by certified and regular mail of his opportunity for a "day in court" hearing scheduled for January 15, 2002. The regular mail letter was delivered to the Grievant's official mailing address on January 9, 2002. The Certified Mail was delivered

4

and accepted at the same address on January 9, 2002. (J-#2, pages 13-15)

4.  **January 24, 2002:** The Service issued the Grievant a Notice of Removal dated January 24, 2002 [Notice/Removal]. The Removal was effective February 25, 2002. The Service mailed the Notice by ordinary and certified mail to the Grievant's official address.

5.  **January 26, 2002:** The Notice, both the ordinary and certified mail, were delivered and accepted at that address on this date. (J-#2, pages 8-11)

6.  The Grievant did not contact the Union regarding the Notice of Removal prior to the Union's filing of the underlying grievance in this matter.

7.  **March 3-6, 2002:** During this period, the Union met with the Service's Step One representative regarding the underlying grievance. The Service denied the grievance as untimely. (J-#2, page 6) During the Step One meeting, the parties discussed the Grievant's involvement in a motor vehicle accident, his resulting absence and his medical condition. (J-#2, page 6)

8.  **March 13, 2002:** The Union appealed the Step One denial on a standard grievance form dated March 13, 2002. The form was stamped as received by the Service on March 19, 2002. (J-#2, page 5)

9.  **April 11, 2002:** The Service denied the grievance on its merits and also on the basis that the Union failed to initiate or process the grievance in accordance with the time limits of Article 15 of the Agreement. The Service indicated that the Union argued that the grievance was timely filed; in that, the Grievant was "not in his right mind and was not aware of the consequences or cognizant of the Removal action when he received the Notice." (J-#2, page 3-4)

C00C-1C-D 0210447

5.

POSITIONS OF THE PARTIES:

American Postal Workers Union, AFL-CIO [Union]

The Union argued that the grievance was initiated in accordance with the time limits of Article 15; in that, the Grievant, due to his medical condition, including his incapacity resulting from his medication, could not have been reasonably expected to have learned of his Removal from postal employment at the time the Notice was delivered to his residence. The Union further argued that the findings of Arbitrator Bernstein, in the matter designated as H1N-4E-C 9678 and Item 13 of the USPS/APWU Joint Contract Application Manual are inapplicable to this matter; in that, the matters addressed in those documents were the filing and processing of contract grievances by former employees and that the instant matter involves a grievance challenging the Service's separation of the Grievant from his postal employment. Based upon these factual assertions and contractual contentions, the Union requested the Arbitrator find the matter arbitrable and order a hearing on the merits of the underlying grievance.

United States Postal Service [Service]

The Service argued that the subject matter of the instant matter was outside the jurisdiction of the Arbitrator; in that, Johnson was not a postal employee at the time the grievance was filed by the Union. The Service relied upon the finding of National Arbitrator Bernstein in the matter designated as H1N-4E-C 9678 and Item 13 of the USPS/APWU Joint Contract Application Manual to support its contention on this issue. The Service further argued that the grievance was not procedurally arbitrable; in that, the grievance was not initiated or processed in accordance with the time limits set forth in Article 15 of the Agreement; therefore, it must be considered waived by the Grievant/Union. (See Section 15.4.B of the Agreement) Based upon these factual assertions and contractual contentions, the Service requested the Arbitrator deny the grievance.

DISCUSSION:

The Service challenged the arbitrability of the instant matter on both substantive and procedural grounds. The Arbitrator will address these challenges separately.

Substantive Arbitrability:

The Service may initially raise the issue of the substantive arbitrability of a grievance at anytime during the grievance procedure and at the arbitration hearing itself. (Mittenthal, H7T-3W-C 12454 (1992) page 4 & Snow, H0C-3N-C 418 (1993) page 12)

In the instant matter, the Service relied upon the award of National Arbitrator Bernstein and argued that "the grievance machinery is strictly a creation of the collective bargaining Agreements and applies only where the parties agree it will apply." Article XV, Section 2 of the applicable labor Agreement provides for grievances to be initiated only by "the employee" or the "Union". (Sr-#2, page 4) Extrapolating from these premises, the Service argued that Johnson was not an employee of the postal Service at the time the underlying grievance was filed; therefore, the instant matter cannot be a grievance, as that word is defined in Article 15 of the Agreement. The Service argued, therefore, the instant matter was outside the scope of the arbitration process.

Section 15.2 must be applied in its entirety and each segment of the Section must be given meaning. In circumstances where an Agreement contains two or more seemingly inconsistent provisions, the Arbitrator must seek an application of those sections which provides meaning to all those provisions. (Elkouri, Frank & Elkouri Edna, How Arbitration Works 4th ed (1984) page 353)

In the instant matter, Section 15.2 provides that a grievance must be filed within fourteen days of the date when the Employee or the Union may reasonably be expected to have learned of its cause. The parties differ on the date on which the Grievant may reasonably have been expected to know of his Removal from his postal employment. This difference is a controversy subject to resolution as a grievance. (See Section 15.1) In the instant matter, the Union

asserted the timeliness of the grievance at all steps of the grievance procedure based on the asserted incapacity of the Grievant during the period between January 26 and March 3, 2002.

The Service's broad application of the Bernstein award to the instant matter would deprive the Grievant of his right to use the grievance procedure to resolve that dispute because he had been automatically dropped from the postal employment roles at the end of the Notice period.(Section 16.5 of the Agreement) This application of Section 15.2 would negate the Grievant's right to timely file a grievance based upon a date calculated from the time when it would be reasonable for him to know of the Service's termination of his employment. Such a forfeiture of rights must be clearly established by the Agreement and by the evidence. (United Steelworkers of America v. Warrior & Gulf Nav. Company, 363 U.S. 574 (1960) The Arbitrator determines that, in the circumstances of this matter, the Service did not clearly establish such a waiver either on the basis of the Agreement or by the evidence.

The Arbitrator determines that the controversy between the parties regarding the timeliness of the Union's initiation of the underlying grievance is substantively arbitrable, notwithstanding, the Service's automatic purging of the Grievant from its employment roles on February 25, 2002.(See Section 16.5 of the Agreement)

**Procedural Arbitrability:**

The Service is correct in its contention that the Agreement requires the Grievant or the Union to initiate a grievance within fourteen days of the employee's or the Union's first knowledge of the precipitating event or, the date upon which the Union or employee could reasonably be expected to know of that event.

The evidentiary record establishes that the Service provided the Grievant, by mail delivered to his official address on January 26, 2002, with notice of its intent to remove him from his postal employment. The underlying grievance challenging the Removal was presented no earlier than March 3, 2002. The expiration of the fourteen-day period for filing the grievance would normally expire

A-0273

no later than February 9, 2002. Based upon this evidence, the
Service argued that the grievance was procedurally not arbitrable
by application of Section 15.4.B. of the Agreement. The Service
maintained this position in its denial of the grievance at Steps
One and Two. In consideration of this evidence, the Arbitrator
determines that the Service established a prima facie case that the
underlying grievance was not procedurally arbitrable.

The Union, in rebuttal to this prima facie case, argued that
the Grievant was medically incapacitated at the time the Service
provided the Notice to him. The Union further argued that the
filing of the grievance was timely; in that, it would have been
unreasonable to expect that, in his state of incapacity, the
Grievant would have known of the cause of the grievance prior to
March 3, 2002. The Union must bear the burden of proof regarding
its contentions on this issue.

The Arbitrator observes that the evidentiary record contained
no evidence regarding the Grievant's medical condition during the
period between January 26, 2002 and March 3, 2002. The record did
not contain any testimony from the Grievant regarding his medical
condition during that period of time. Finally, the record does not
contain any evidence of the nature of the medication allegedly
being taken by the Grievant during that period of time or any
incapacity resulting from his medication. Based upon this record,
the Arbitrator must determine that the Union failed to establish a
factual basis of its claim that the Grievant could not be
reasonably held to have had knowledge of the Service's intent to
remove him from his postal employment on January 26, 2002 because
of physical, psychological or emotional incapacity. Accordingly,
the Arbitrator must agree with the Service that the underlying
grievance in this matter was untimely initiated, therefore,
procedurally not arbitrable.

Based upon the findings and reasoning set forth in this
Opinion, the Arbitrator makes the attached Award.

C00C-1C-D 0210447                              9

A-0274

1    something like that on the floor, you actually have to

2    sign for it.  And looking at the collective bargaining

3    agreement, it says, your receipt of the letter.  So me

4    seeing receipt, in my mind, you actually have to have

5    a piece of paper saying, hey, got it on that day.  So

6    that's why.

7       Q.   So I just want to make sure I understand your

8    answer.  Your belief is that, upon receipt of the

9    first class, there's no proof as to what date you

10   receive it.  So your belief was that, only when there

11   was proof that you received it, either by signing for

12   it upon hand delivered, signing an express mail,

13   signing a certified, signing a registered mail, that

14   would be the date that could be proven that you

15   actually have received it, is that fair?

16      A.   That is fair.

17      Q.   Is there any reason that you did not inform the

18   Union that you had received a notice of removal by

19   regular mail before you received the certified letter

20   on April 6?

21      A.   I believe that I did note -- well, attempt to

22   notify by leaving a message at the union office, but

23   if I'm not mistaken, during the time -- the end of

24   that month -- that was the weekend, I believe, if I'm



1       grieving the fact that I was issued a letter of

2       removal dated March 24th, 2004, that I received on

3       April 6, 2004.  The removal is for the charge of

4       improper conduct."

5               Do you recall, is that what you wrote in

6       this statement?

7       A.      Everything here I wrote, yes.

8       Q.      Can you tell me, is there anywhere in this

9       statement where you wrote that you had received the

10      notice of removal on March 30th or 31st?

11      A.      I don't believe it says that in here any where.

12      Q.      Do you recall telling Steve Collins when you

13      met with him that you received the notice of removal

14      on March 30 or 31?

15      A.      I don't recall telling him one way or the

16      other.

17      Q.      Tell me about that meeting, that first meeting

18      with Steve Collins.  What do you recall occurring?

19      A.      The first thing I recall was him pulling out

20      the step 1 forms, getting my, you know, address and

21      pay location and things of that nature and asking me

22      to write the statement as he was filling out the

23      preliminary step 1 forms.

24      Q.      Did you review the forms that Steve filled out?



WILCOX & FETZER LTD.
Registered Professional Reporters

1      A.    Yes, I did.

2      Q.    Were you satisfied with that?

3      A.    Yes.

4      Q.    Did you file an EEO complaint against the

5   Postal Service over your removal?

6      A.    Yes.

7      Q.    Did the Union help secure an attorney for you

8   to do that?

9      A.    Yes.

10           MR. LEFF:   Would you mark this the next

11   exhibit, please.

12           (Wilson Deposition Exhibit 3 was marked

13   for identification.)

14   BY MR. LEFF:

15     Q.    Ms. Wilson, can you tell me what your

16   understanding of the document that's been handed to

17   you that is marked exhibit number 3, what that is?

18     A.    Yes.   This is the pre-complaint counseling form

19   sent out to me from the EEO office.

20     Q.    And is this something that you filled out, at

21   least the first few pages?

22     A.    Yes.

23     Q.    Turning your attention to section C of page 1,

24   am I correct in stating that you wrote that "on March



1    31st, 2004, I received a letter of removal issued by

2    Linda Drummer and concurred with by Carla

3    Van Istendal"?

4        A.    Yes.

5        Q.    And am I correct in saying that that's the date

6    you received the first class mail letter and not the

7    certified letter?

8        A.    Yes.

9        Q.    Turning your attention to exhibit 2 in

10   comparison to exhibit 3, is there any particular

11   reason you informed the Union of the date you received

12   the certified letter but the EEO of the date you

13   received the regular mail letter?

14       A.    The only reason being at the time that I called

15   to get this pre-complaint counseling form sent out to

16   me, I had a thousand things running and going on in my

17   mind that I wanted to file EEO complaints about, and I

18   had filed three or four on this date, March 31st.  I

19   believe I had gotten the letter regular mail and

20   jumped right on the phone to EEO and started, you

21   know, to get that complaint process going.  And like I

22   said, I believe it was the -- those dates for some

23   reason in my mind, I'm believing, are near the

24   weekend, and if I called the Union, I didn't get an



1    answer or I left a message.  And when I got to Steve

2    or when I finally got in touch with Steve on the 6th

3    and he informed me to come right away, in my mind it

4    went back to I received it when I signed for it.

5        Q.    Now, you filled this out on April 10, 2004, is

6    that correct?

7        A.    Yes.

8        Q.    Turning to exhibit number 2, if you wrote a

9    statement to the Union that you received the notice of

10   removal on April 6, 2004, in your opinion, was the

11   Union wrong to believe that they had until April 20th,

12   2004, to file the grievance?

13       A.    I believe that the Union was wrong, yes,

14   because of being as though I was speaking with the

15   president, and this instance, he should have known the

16   rule book or the rules governing a grievance and its

17   timely filing, no matter what the situation or

18   circumstance.  So in going there on the 6th, Steve

19   Collins told me himself that, no, your receipt of the

20   letter is the date you signed for it.  Therefore, your

21   statement is -- you know, that is what you can say.

22              So, in writing in the statement, pretty

23   much I was following what he told me was the proper

24   thing to do.  You received it when you signed for it.



1    And I'm sitting right there in the office after

2    leaving the Postal Service, and that's what he said,

3    and that's what I wrote.

4        Q.   So I want to make sure I understand you.

5    You're saying that Steve Collins told you that the

6    date that the time limits for filing a grievance begin

7    the day that you receive the notice of removal,

8    correct?

9        A.   That I signed for it.  Receiving meaning a

10   certified receipt of some sort or the fact that I got

11   it by signing something.

12       Q.   So Steve Collins told you that the date that

13   you signed for a notice of removal is the day that

14   starts the running of the 14-day time limit?

15       A.   Yes.

16       Q.   He told you that before or after you wrote the

17   statement to your recollection?

18       A.   Before.

19       Q.   So based on what he stated to you, you wrote

20   that you received the notice of removal on April 6,

21   2004, and you were relying on his statement the day

22   that you signed for it is the day that starts the time

23   limits, is that correct?

24       A.   Correct.



1    Q.   I may have asked you this, but just to make

2    sure, at any time do you recall telling Steve Collins

3    that you received the notice of removal also by first

4    class mail?

5    A.   I don't recall telling him that offhand, but I

6    do believe that I left a message during the time of --

7    that time before the 6th, and in letting him know

8    that.   But he may have been out of town.   It was

9    something going on to where he wasn't in the office

10   until that Monday or whatever day the 6th was.   He

11   wasn't there.   So I believe that I left a message on

12   his cell phone and/or the office phone.

13   Q.   At any time did you follow up with Steve

14   Collins or the Union with respect to whether they had

15   filed the grievance?

16   A.   No.   I was just waiting for something from him.

17               MR. LEFF:   Mark this exhibit 4, please.

18               (Wilson Deposition Exhibit 4 was marked

19   for identification.)

20   BY MR. LEFF:

21   Q.   Ms. Wilson, are you aware that an employee who

22   has been wronged can file a step 1 grievance on his or

23   her own without the help of the Union?

24   A.   No.   I'm not aware of that.



Melinda G. Wilson - Leff                    37

1     A.    I believe it was collectively done between

2    Steve, the labor relations, and the arbitrator.

3     Q.    So the only issue addressed was whether or not

4    the grievance was timely, is that correct?

5     A.    That's what I believe.

6     Q.    In your opinion, was Steve Collins trying to

7    prevail on your behalf on that issue?

8     A.    Yes.

9             (Wilson Deposition Exhibit 6 was marked

10   for identification.)

11            THE WITNESS:  Okay.

12   BY MR. LEFF:

13    Q.    Ms. Wilson, what is your understanding of what

14   exhibit 6 is?

15    A.    This is the award that was sent back by the

16   arbitrator from the -- or his decision from our

17   arbitration of the grievance filed for my removal.

18    Q.    So this is the arbitrator's decision denying

19   the grievance on the basis that it was untimely filed?

20    A.    Correct.

21    Q.    Turning your attention to page 7 of that first

22   part where it says procedural arbitrability, it says,

23   "Specifically the Union argued that the tolling of the

24   time period for initiating the grievance commenced on

1    April 6, 2004, the date on which the grievant

2    reasonably would have been expected to learn of the

3    issuance of the contested removal."

4            Do you recall that that was the argument

5    that the Union put forth?

6    A.    Yes.

7    Q.    I want to turn your attention back to exhibit

8    number 3, the EEO pre-complaint.  Prior to the

9    arbitration hearing, did you provide the Union with a

10   copy of what has been marked exhibit 3, the EEO

11   pre-complaint?

12   A.    I don't know.

13   Q.    Turning your attention back to exhibit

14   number 6, in, I guess, the last full paragraph that

15   begins "conversely" --

16   A.    Still on page 7?

17   Q.    I'm sorry.  Page 9.  Last full paragraph that

18   begins "conversely."

19   A.    Mm-hmm.

20   Q.    It says, "Conversely, the documentary evidence

21   established that the first class mailing was delivered

22   to the grievant's residence address of record on March

23   30, 2004.  The arbitrator further determines that the

24   preponderance of documentary evidence and credible

**W&F**

1    testimony established that the grievant actually

2    received the notice of removal contained in the first

3    class mailing on or before March 31st, 2004."

4           During the arbitration hearing did you

5    testify that you had received the notice of removal by

6    first class mail on March 30th or 31st?

7    A.    I don't think I did.

8    Q.    Do you recall if you were asked that question?

9    A.    Yes.  I recall that I was asked that question.

10    Q.    Is there any particular reason that you did not

11    testify that you received the notice of removal on

12    March 30th or 31st by first class mail?

13    A.    No.

14    Q.    Did you testify during the arbitration hearing

15    that the first time you had received the notice of

16    removal is when you signed for the certified letter on

17    April 6?

18    A.    I believe that is what I said at the

19    arbitration.

20    Q.    Was that honest?

21    A.    No.

22    Q.    Is there any particular reason why you weren't

23    being honest in that testimony?

24    A.    Well, I was under the impression that



1      April 6 -- every time I would ask Steve, or just

2      knowing in my mind from reading in the collective

3      bargaining agreement, received, to me, just went back

4      to when I actually signed for it because there was no

5      real way to know that I actually picked it up out of

6      the mailbox on any given day. In my mind, April 6,

7      the day I signed for it was the date I received the

8      letter. That's why I testified to that fact.

9         Q.   Is it correct that, during the arbitration

10     hearing, you did not, or that the Union did not, argue

11     that, yes, you picked it up on March 30 or 31st, but

12     because you didn't sign for it until the 6th, that's

13     when the time limit started? That was not the

14     argument that the Union put forth, is that correct?

15        A.   I don't believe that's the argument they put

16     forth, no.

17        Q.   And in fact, is it correct you're not exactly

18     sure whether or not you ever notified the Union that

19     you picked up the first class mail letter on March 30

20     or 31?

21        A.   I'm almost certain that I spoke with Steve

22     and/or left a message because I recalled Steve saying,

23     Well, we have 14 days. Just being careful, you have

24     14 days. So you need to go ahead and sign for the



1    letter.  You need to go and get it and sign for it

2    because you have 14 days.  And you don't want to mess

3    up because I've had a case where somebody didn't pick

4    up their stuff and they still went through.  So pick

5    the letter up.

6              So, yes, I did tell him that I got the

7    letter -- but on the -- by phone.

8    Q.    So you actually had a telephone conversation

9    with Steve Collins before April 6?

10   A.    Yes.  Now it's coming back do me, yes.

11   Q.    And do you recall the date that you had this

12   conversation?

13   A.    Cannot recall the date.

14   Q.    So during this telephone conversation, you told

15   Steve Collins that you received a letter by first

16   class on March 30th or 31st?

17   A.    Yes.  Mm-hmm.

18   Q.    But you told him you not received the certified

19   letter yet?

20   A.    I hadn't -- yeah.  Had a pink slip in my box.

21   I let him know I had a pink slip.

22   Q.    Do you recall whether you called Steve Collins

23   at the union office or on his cell phone?

24   A.    Probably both.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A-0286

1    2003, I, Melinda G. Wilson, was called into the MDO

2    office to see Carla Van Istendal."

3              Do you recall that on December 23rd, 2003,

4    you were called in to the MDO's office?

5    A.    It should be been December 24th.

6    Q.    Do you recall why you wrote December 23rd?

7    A.    Just got mixed up on the date.

8    Q.    With respect to your understanding that Steve

9    Collins had a belief that the time limits started

10   running on the date that you signed for the certified

11   letter, it's your understanding that Mr. Collins's

12   belief was incorrect, is that right?

13   A.    Yes.

14   Q.    That actually the time limit should have begun

15   to run on the date that you received that first class

16   letter on March 30th or 31st, is that correct?

17   A.    That's what I was told afterwards.

18   Q.    Do you have any knowledge that Mr. Collins's

19   belief or telling you that it begins on the date on

20   April 6, instead of March 30th or 31st, was something

21   that Mr. Collins did purposefully or with bad intent

22   or wanted the grievance not to be timely filed?

23   A.    I have no idea.

24   Q.    It's possible that he just made a mistake?



Melinda G. Wilson - Leff                    50

1     A.   Of course, it is.

2             MR. LEFF:  Make this 9, please.

3             (Wilson Deposition Exhibit 9 was marked

4     for identification.)

5             THE WITNESS:  Okay.

6     BY MR. LEFF:

7     Q.   Do you know what exhibit 9 is?

8     A.   This looks like a decision without a hearing

9     for a sexual harassment case that I filed.

10    Q.   And have you seen this document before today?

11    A.   I believe I have, yes.

12    Q.   Do you understand that your EEO case was denied

13    by the administrative judge?

14    A.   Yes.

15    Q.   I want to turn to the damages you're claiming.

16    When you were terminated from the Postal Service, do

17    you recall what level and grade you were at?

18    A.   Yes.  Level 5, step O.

19    Q.   Do you recall what your salary was at that

20    time?

21    A.   I think it was approximately 46, 47,000.

22    Q.   And do you recall approximately how many

23    overtime hours you worked in a year?

24    A.   No.  I can't approximate.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    for identification.)

2              THE WITNESS:  Okay.

3    BY MR. LEFF:

4        Q.    Before I continue on with damages, do you have

5    any reason to believe, or knowledge, that Steve

6    Collins of the Union would have not wanted you to

7    prevail on the grievance or anything of that nature?

8        A.    I don't know.

9        Q.    You don't have any?

10       A.    I don't have any -- no knowledge.

11       Q.    Turning your attention to exhibit 10, which

12   purports to be your answers to the Union's

13   interrogatories, do you know what this document is?

14       A.    Yes.

15       Q.    Is this something that you helped prepare?

16       A.    Yes.

17       Q.    And on the last page, is that a copy of your

18   signature swearing that these are true and correct to

19   the best of your knowledge?

20       A.    Yes.

21       Q.    I see in response to question number 13, you

22   received unemployment compensation from April 2004

23   through September 2004 at the rate of 290 per week, is

24   that correct?



1    restrictions?

2      A.    Correct.

3      Q.    Correct.  And you need to either come back to

4    us with more medical information, and until you do,

5    you're off the clock, so to speak?

6      A.    Or you may take leave.

7      Q.    You can take leave, but we don't want you

8    working?

9      A.    That's correct.

10     Q.    Is that correct?

11     A.    We are not going to permit you to work until we

12   get this cleared up.  You need to take leave.

13     Q.    Okay.

14            (Discussion off the record.)

15            (Pause.)

16   BY MR. BERNSTEIN:

17     Q.    Do you know whether or not that action sending

18   Ms. Wilson home resulted in any sort of grievance that

19   was filed on the part of the Union?

20     A.    I know it did.

21     Q.    It did?

22     A.    Yes, it did.

23     Q.    And do you know what that grievance was or what

24   the Union was trying to do?



1    A.    I do.

2    Q.    What was that?

3    A.    The grievance said that we had violated the

4    contract, the collective bargaining agreement by

5    not -- by not allowing Ms. Wilson to work subsequent

6    to 12/24 until she had cleared up the medical issues,

7    medical conflicts.

8            MR. BERNSTEIN:  Have this marked as

9    Keen 2.

10            (Keen Deposition Exhibit 2 was marked for

11    identification.)

12    BY MR. BERNSTEIN:

13    Q.    Mr. Keen, I'm showing you what's been marked as

14    Keen 2.  It's also identified as Bates stamp MW 0938

15    through 0941 for the record.  That's at the bottom.

16    A.    I see.

17    Q.    And this appears to be a document from you to a

18    Courtland Stinson, is that correct?

19    A.    Yes.

20    Q.    Now, who is Mr. Stinson?

21    A.    Mr. Stinson is the vice-president of the

22    American Postal Workers Union, Wilmington, Delaware,

23    Local.

24    Q.    Is he kind of your counterpart in the Union



## CERTIFICATE OF SERVICE

I hereby certify that on **February 24, 2006**, I electronically filed an **APPENDIX TO OPENING BRIEF OF THE UNITED STATES POSTAL SERVICE** with the Clerk of Court using CM/ECF. Notification of such filing will be electronically mailed to the following:

**Joseph M. Bernstein, Esquire**
Delaware Bar I.D. No. 780
800 North King Street, Suite 302
Wilmington, DE 19801-3544
(302) 656-9850
jmbern001@comcast.net

ATTORNEY FOR PLAINTIFF

**A. Dale Bowers, Esquire**
The Law Offices of Joseph J. Rhoades
Delaware Bar I.D. No. 3932
1225 King Street, 12th Floor
Wilmington, DE 19801
(302) 427-9500
dale.bowers@rhoadeslegal.com

ATTORNEY FOR AMERICAN
POSTAL WORKERS UNION

COLM F. CONNOLLY
United States Attorney

By:   /s/Patricia C. Hannigan
      Patricia C. Hannigan
      Assistant United States Attorney
      Delaware Bar I.D. No. 2145
      The Nemours Building
      1007 Orange Street, Suite 700
      P. O. Box 2046
      Wilmington, DE 19899-2046
      (302) 573-6277
      Patricia.Hannigan@usdoj.gov